Douglas T. Tabachnik (DT 6337)
LAW OFFICES OF
DOUGLAS T. TABACHNIK, P.C.
Suite C
Woodhull House
63 West Main Street
Freehold, New Jersey 07728
(732) 792-2760


and

Sander L. Esserman (SE 0356)*
Jo E. Hartwick (JH 4109)*
STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas  75201
(214) 969-4900

Attorneys for Ad Hoc Committee of Asbestos Personal Injury Claimants

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------- x
In re                                             :
                                                  :     Chapter 11
                                                  :
Dana Corporation, et al.,                         :
                                                  :     Case No. 06-10354 (BRL)
                                                  :     (Jointly Administered)
                                                  :
                                    Debtors.      :
------------------------------------------------- x
```

<u>NOTICE OF APPEAL</u>

Pursuant to 28 U.S.C. § 158(a), the Ad Hoc Committee of Asbestos

Personal Injury Claimants[1] (the "Ad Hoc Committee"), by and through its

---

[1] The Ad Hoc Committee of Asbestos Personal Injury Claimants consists of James J.
Demahy, Individually and as the Independent Executrix of the Estate of Lydia Demahy,
deceased, represented by Bryan O. Blevins, Jr., Provost Umphrey Law Firm L.L.P.,

* Admitted pro hac vice.

undersigned counsel, hereby gives notice of appeal to the United States

District Court for the Southern District of New York from the Bankruptcy

Court's Order Confirming Third Amended Joint Plan of Reorganization of

Debtors and Debtors in Possession entered on December 26, 2007 [Doc. No.

7509], a copy of which is appended hereto as Exhibit "A."

The parties to the order appealed from and the names, addresses and

telephone numbers of their respective attorneys are as follows:

| | |
|---|---|
| Sander L. Esserman<br>Jo E. Hartwick<br>Stutzman, Bromberg, Esserman &<br>Plifka, A Professional Corporation<br>2323 Bryan Street, Suite 2200<br>Dallas Texas 75201<br>(214) 969-4900 | Douglas T. Tabachnik<br>Law Offices of<br>Douglas T. Tabachnik, P.C.<br>Suite C<br>Woodhull House<br>63 West Main Street<br>Freehold, New Jersey 07728<br>(732) 792-2760 |
| **Counsel for the Ad Hoc Committee of<br>Asbestos Personal Injury Claimants** | **Counsel for the Ad Hoc Committee of<br>Asbestos Personal Injury Claimants** |
| Corinne Ball<br>Richard H. Engman<br>Jones Day<br>222 East 41st Street<br>New York, New York 10017<br>(212) 326-3939 | Heather Lennox<br>Carl E. Black<br>Jones Day<br>North Point<br>901 Lakeside Avenue<br>Cleveland, Ohio 44114-1190<br>(216) 586-3939 |
| **Counsel for the Debtors** | **Counsel for the Debtors** |

Beaumont, Texas; Estelle Moore, Personal Representative of the Estate of Royce Wilfred
Moore, represented by Russell Budd and Natalie Duncan, Baron & Budd, P.C., Dallas,
Texas; John Hellen, Personal Representative of the Estate of Harwood Hellen, deceased,
represented by Brent Coon and Lou Thompson Black, Brent Coon & Associates, Beaumont
and Houston, Texas and Cleveland, Ohio; Robert Haun, represented by Steven Kazan,
Kazan, McClain, Abrams, Lyons & Greenwood, A Professional Law Corporation, Oakland,
California; George Winter represented by Al Brayton, Brayton Purcell, Novato and Los
Angeles, California, Portland, Oregon, and Salt Lake City, Utah; and Charles Kloock
represented by Thomas M. Wilson, Kelley & Ferraro, LLP, Cleveland, Ohio.

Jeff B. Ellman
Jones Day
1420 Peachtree Street, NE
Suite 800
Atlanta, Georgia 30309-3053
(404) 521-3939

**Counsel for the Debtors**


Dated:  January 3, 2008
        New York, New York

Respectfully submitted,


/s/ Douglas T. Tabachnik
Douglas T. Tabachnik (DT 6337)
LAW OFFICES OF
DOUGLAS T. TABACHNIK, P.C.
Suite C
Woodhull House
63 West Main Street
Freehold, New Jersey 07728
(732) 792-2760

and

Sander L. Esserman (SE 0356)
Jo E. Hartwick (JH 4109)
STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas  75201
(214) 969-4900

**ATTORNEYS FOR THE
AD HOC COMMITTEE OF ASBESTOS
PERSONAL INJURY CLAIMANTS**

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                          :

In re                          :    Chapter 11
                          :

Dana Corporation, *et al.*,     :    Case No. 06-10354 (BRL)
                          :

             Debtors.    :    (Jointly Administered)
                          :

------------------------------------------------------------x

## ORDER CONFIRMING THIRD AMENDED JOINT PLAN OF
## REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION

The above-captioned debtors and debtors in possession (collectively,

the "Debtors") having proposed the Third Amended Joint Plan of Reorganization of Debtors and

Debtors in Possession (in the form dated as of October 23, 2007 and included in the contents of

the solicitation packages distributed to the creditors that were entitled to vote thereon,

the "October 23 Plan," a true and correct copy of which (without exhibits) is attached hereto as

Appendix I), as modified by (i) the First Modifications to Third Amended Joint Plan of

Reorganization of Debtors and Debtors in Possession (the "First Modifications") filed with the

Court on December 6, 2007 as Exhibit D to the Confirmation Memorandum (as such term is

defined below) and (ii) the Stipulation and Agreed Order Between the Debtors and the Official

Committee of Non-Union Retirees, entered on December 11, 2007 (Docket No. 7423)

(the "Boilermakers Stipulation" and, collectively with the First Modifications,

the "Modifications," true and correct copies of which are annexed hereto as Appendix II, and

collectively with the October 23 Plan, as modified and including the exhibits thereto,

the "Plan");[1] the Court having conducted a three-day evidentiary hearing to consider

---

[1]      All capitalized terms used but not defined herein have the meanings given to them in the Plan.

confirmation of the Plan on December 10, 11 and 12, 2007 (the "Hearing"); the Court having

considered:  (i) the testimony of the 12 witnesses called at the Hearing, as well as the affidavits

and declarations included among the 60 exhibits admitted into evidence at the Hearing;

(ii) the arguments of counsel presented at the Hearing; (iii) the objections Filed with respect to

Confirmation of the Plan; (iv) the resolution and settlement of nine of the 11 timely objections to

Confirmation of the Plan and one late-filed joinder to an objection; and (v) the pleadings Filed by

the Debtors in support of the Plan, including:  (A) the Debtors' Consolidated Reply to Objections

to Confirmation of Third Amended Joint Plan of Reorganization of Debtors and Debtors in

Possession and Request for Judicial Notice (Docket No. 7375) (the "Consolidated Reply"),

including (1) the Declaration of William R. Hanlon (Docket No. 7378), (2) the Declaration of

R. Thomas Radcliffe, Jr. (Docket No. 7379), (3) the Declaration of John E. Heintz in Support of

Confirmation of Joint Plan of Reorganization of Dana Corporation and Certain of its Debtor

Affiliates Under Chapter 11 of the Bankruptcy Code (Docket No. 7380) and (4) the Declaration

of Jonathan R. Terrell (Docket No. 7381), attached to the Consolidated Reply as Exhibits E

through H, respectively; (B) the Debtors' (I) Memorandum of Law in Support of Confirmation of

Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession and

(II) Consolidated Reply to Certain Objections to Confirmation of Third Amended Joint Plan of

Reorganization of Debtors and Debtors in Possession (Docket No. 7376) (the "Confirmation

Memorandum"), including the summary of the Debtors' compliance with the standards of

sections 1129(a) and 1129(b) of the Bankruptcy Code (inclusive of the standards of

sections 1122, 1123 and 1124 of the Bankruptcy Code) attached as Exhibit B thereto (and

marked as an unnumbered exhibit by the Court at the Confirmation Hearing) (the "Confirmation

Standards Exhibit"); and (C) the Supplemental Brief in Support of Confirmation of Third

Amended Joint Plan of Reorganization of Debtors and Debtors in Possession (Docket No. 7377);

and the Court being familiar with the Plan and other relevant factors affecting these Chapter 11

Cases pending under the Bankruptcy Code; the Court having taken judicial notice of the entire

docket of the Debtors' Chapter 11 Cases maintained by the Clerk of the Court and/or its duly

appointed agent, and all pleadings and other documents filed, all orders entered, and evidence

and arguments made, proffered or adduced at, the hearings held before the Court during the

pendency of the Chapter 11 Cases, including, but not limited to, those orders, pleadings and

other documents set forth in Exhibit A to the Consolidated Reply; the Court having found that

due and proper notice has been given with respect to the Hearing and the deadlines and

procedures for Filing objections to the Plan; the appearance of all interested parties having been

duly noted in the record of the Hearing; and upon the record of the Hearing, and after due

deliberation thereon, and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND CONCLUDED, that:

**JURISDICTION AND VENUE**

A.    The Court has jurisdiction over this matter and these chapter 11 cases

pursuant to 28 U.S.C. § 1334.

B.    Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2)(L), and this Court has jurisdiction to enter a final order with respect thereto.

C.    The Debtors are proper debtors under section 109 of the Bankruptcy Code,

and the Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

D.    Each of the conditions precedent to the entry of this Order has been

satisfied in accordance with Section IV.A of the Plan or properly waived in accordance with

Section IV.C of the Plan.  *See* Transcript of Confirmation Hearing, December 10, 2007

(the "12/10 Transcript"), at 87:5 – 88:23.

- 3 -

## MODIFICATIONS OF THE PLAN

E.      The Modifications do not materially and adversely affect or change the treatment of any Claim against or Interest in any Debtor.  Pursuant to section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019, the Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of acceptances or rejections of the Plan under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims against the Debtors be afforded an opportunity to change previously cast acceptances or rejections of the Plan as Filed with the Court.  The Filing of the Modifications and the disclosure of the Modifications on the record at the Confirmation Hearing, constitute due and sufficient notice thereof under the circumstances of the Chapter 11 Cases.  Accordingly, the Plan (which consists of the October 23 Plan as modified by the Modifications) is properly before the Court, and all votes cast with respect to the October 23 Plan prior to the Modifications shall be binding and shall apply with respect to the Plan.  *See* 12/10 Transcript, at 16:13 – 22:1; Transcript of Confirmation Hearing, December 11, 2007 (the "12/11 Transcript"), at 105:25 – 106:25; Transcript of Confirmation Hearing, December 12, 2007 (the "12/12 Transcript"), at 10:8 – 10:9.

## STANDARDS FOR CONFIRMATION
## UNDER SECTION 1129 OF THE BANKRUPTCY CODE

F.      The evidentiary record of the Confirmation Hearing and the Confirmation Standards Exhibit support the findings of fact and conclusions of law set forth in the following paragraphs.

- 4 -

G.    Section 1129(a)(1).  The Plan complies with each applicable provision of the Bankruptcy Code.  In particular, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code as follows:[2]

1.    In accordance with section 1122(a) of the Bankruptcy Code, Section II.B of the Plan classifies each Claim against and Interest in the Debtors into a Class containing only substantially similar Claims or Interests (*see* Confirmation Standards Exhibit, at 2-6);

2.    In accordance with section 1123(a)(1) of the Bankruptcy Code, Section II.B of the Plan properly classifies all Claims and Interests that require classification.  With respect to Asbestos Personal Injury Claims classified in Class 3, the Debtors have provided proof of a legitimate reason for the separate classification of such Claims, and such classification is justified (*see id.*, at 5-6; 12/11 Transcript, at 145:14-146:13);

3.    In accordance with section 1123(a)(2) of the Bankruptcy Code, Section II.B of the Plan properly identifies and describes each Class of Claims and Interests that is not impaired under the Plan (*see* Confirmation Standards Exhibit, at 6-7);

4.    In accordance with section 1123(a)(3) of the Bankruptcy Code, Section II.B of the Plan properly identifies and describes the treatment of each Class of Claims or Interests that is impaired under the Plan (*see id.*, at 7);

5.    In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Interest of a particular Class unless the holder of such a Claim or Interest has agreed to less favorable treatment (*see id.*);

6.    In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate means for its implementation, including, without limitation, the implementation of the Global Settlement in Article III of the Plan and the provisions regarding Effective Date transactions and transfers and post-Effective Date corporate management, governance and actions in Article V of the Plan (*see id.*, at 7-10);

---

[2]    *See* S. Rep. No. 989, 95th Cong., 2d Sess. 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess. 412, *reprinted in* 1978 U.S.C.C.A.N. 5962, 6368 (1977); *see In re Johns Manville Corp.*, 68 B.R. 618, 629-30 (Bankr. S.D.N.Y. 1986), *as modified*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) ("Objections to confirmation raised under § 1129(a)(1) generally involve the failure of a plan to conform to the requirements of § 1122(a) or § 1123.").

7.     In accordance with section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtors' charters, bylaws or comparable constituent documents contain provisions prohibiting the issuance of non-voting equity securities and providing for the appropriate distribution of voting power among all classes of equity securities authorized for issuance (*see id.*, at 10-11);

8.     In accordance with section 1123(a)(7) of the Bankruptcy Code, the provisions of the Plan and the Reorganized Debtors' charters, bylaws or comparable constituent documents regarding the manner of selection of officers and directors of the Reorganized Debtors, including, without limitation, the provisions of Section V.C.2 of the Plan, are consistent with the interests of creditors and equity security holders and with public policy (*see id.*, at 11-12; 12/10 Transcript, at 85:11 – 86:15);

9.     In accordance with section 1123(b)(1) of the Bankruptcy Code, Section II.B of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests (*see* Confirmation Standards Chart, at 12);

10.    In accordance with section 1123(b)(2) of the Bankruptcy Code, Section II.E and other provisions of the Plan provide for the assumption, assumption and assignment or rejection of the Executory Contracts or Unexpired Leases of the Debtors that have not been previously assumed, assumed and assigned or rejected pursuant to section 365 of the Bankruptcy Code and orders of the Court (*see id.*, at 12-13);

11.    In accordance with section 1123(b)(3) of the Bankruptcy Code, Section IV.E.2 of the Plan provides that, except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and causes of action that any Debtor or Estate may hold against any entity, including any Recovery Actions, to the extent not expressly released under the Plan or by any Final Order of the Court (*see id.*, at 13);

12.    In accordance with section 1123(b)(5) of the Bankruptcy Code, Section II.B of the Plan modifies or leaves unaffected, as the case may be, the rights of holders of Claims in each Class (*see id.*, at 13-14);

13.    In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including, without limitation, the provisions of Article III, Article IV, Article V, Article VI, Article VII, Article VIII, Article IX and Article X of the Plan (*see id.*, at 14-15); and

14.     In accordance with section 1123(d) of the Bankruptcy Code, Section II.E.3 of the Plan provides for the satisfaction of Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. All Cure Amount Claims will be determined in accordance with the underlying agreements and applicable law.

H.      <u>Section 1129(a)(2)</u>.  The Debtors have complied with all applicable provisions of the Bankruptcy Code with respect to the Plan and the solicitation of acceptances or rejections thereof.  In particular, the Plan complies with the requirements of sections 1125 and 1126 of the Bankruptcy Code as follows:

1.      In compliance with the Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Joint Plan of Reorganization, (III) Scheduling Hearing on Confirmation of Joint Plan of Reorganization and (IV) Approving Related Notice Procedures, entered October 23, 2007 (Docket No. 6673) (the "<u>Disclosure Statement Order</u>"), on or before November 2, 2007, the Debtors, through their Claims and Noticing Agent, BMC Group, Inc. ("<u>BMC Group</u>"), caused copies of the following materials to be transmitted to all holders of Claims in Classes that were entitled to vote to accept or reject the Plan (<u>i.e.</u>, Allowed Claims in Classes 2C, 5B, 5C and 6C):

•       notice of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>");

•       the Disclosure Statement (together with the exhibits thereto, including the October 23 Plan);

•       the Debtors' and the Creditors' Committee's letters recommending acceptance of the Plan; and

•       an appropriate form of Ballot (collectively with the materials described in the preceding bullets, the "<u>Solicitation Package</u>").

*See* Certificate of Mailing by BMC Group, Inc. in Connection with Solicitation Package and Notice of (A) Deadline for Casting Votes to Accept or Reject Third Amended Joint Plan of Reorganization, (B) Hearing to Consider Confirmation of Third Amended Joint Plan of Reorganization and (C) Related Matters (Docket No. 6831), dated November 6, 2007 (the "<u>Initial BMC Service Affidavit</u>"), at ¶ 2 and Certificate of Mailing in Connection with Solicitation Book (Docket

- 7 -

No. 7058) (the "<u>Final BMC Service Affidavit</u>"), dated
November 21, 2007, at ¶ 2.

2.    In compliance with the Disclosure Statement Order, on or before
November 2, 2007, the Debtors, through BMC Group, caused copies of
the Solicitation Package (not including Ballots) to be transmitted to:
(a) holders of Administrative Claims; (b) holders of Priority Tax Claims;
(c) non-Debtor parties to Executory Contracts or Unexpired Leases; and
(d) parties listed on the Special Service List and General Service List (as
such terms are defined in the Case Management Order). *See* Final BMC
Service Affidavit at ¶ 2.

3.    In compliance with the Disclosure Statement Order, on or before
November 2, 2007, the Debtors, through BMC Group, transmitted (a) the
Confirmation Hearing Notice and (b) a Notice of Non-Voting Status (as
such term is defined in the Disclosure Statement Order) to all holders of
Claims and Interests in the Non-Voting Classes (as such term is defined in
the Disclosure Statement Order) that were not entitled to vote on the Plan
(other than Classes 6A, 6B and 8). *See* Final BMC Service Affidavit
at ¶ 2.

4.    In compliance with the Disclosure Statement Order, on or before
November 2, 2007, the Debtors, through BMC Group, transmitted the
Confirmation Hearing Notice to:  (a) all other creditors and equity security
holders of the Debtors; and (b) all parties in interest that had Filed requests
for notice in accordance with Bankruptcy Rule 2002 in the Chapter 11
Cases on or before the record date established by the Court pursuant to
Bankruptcy Rule 3017(d) in the Disclosure Statement Order. *See* Final
BMC Service Affidavit at ¶ 2.

5.    In compliance with the Disclosure Statement Order, on
November 5, 2007, the Debtors caused a copy of the Confirmation
Hearing Notice to be published in the national editions of *The Wall Street
Journal* and *USA Today* and the daily edition of *The Toledo Blade*.
*See* Notice of Filing of Sworn Statements of Publication in *The Toledo
Blade*, *USA Today* and *The Wall Street Journal*, dated November 13, 2007
(Docket No. 6899) at page 2.

6.    On November 20, 2007, the Debtors Filed (and made available on BMC
Group's website at http://www.dana.bmcgroup.com) the following
Confirmation Exhibits:  (a) Exhibit II.E.1.a (Executory Contracts and
Unexpired Leases to be Assumed); (b) Exhibit II.E.1.c (Joint Venture
Agreements to be Assumed and Assigned); (c) Exhibit II.E.4 (Previously
Assumed Executory Contracts and Unexpired Leases to be Assigned); and
(d) Exhibit II.E.5 (Executory Contracts and Unexpired Leases to be
Rejected) (collectively, the "<u>Executory Contract Exhibits</u>"). *See* Notice of
Filing Certain Exhibits to Third Amended Joint Plan of  Reorganization

Relating to Executory Contract and Unexpired Leases and Joint Venture Agreements (Docket No. 7030) at page 2.

7.    On December 4, 2007, the Debtors Filed (and made available on BMC Group's website at http://www.dana.bmcgroup.com) supplements to the Executory Contract Exhibits, as necessary.  *See* Notice of Filing Supplements to Certain Exhibits to Third Amended Joint Plan of Reorganization Relating to Executory Contract and Unexpired Leases and Joint Venture Agreements (Docket No. 7342).

8.    On December 5, 2007, the Debtors Filed (and made available on BMC Group's website at http://www.dana.bmcgroup.com) the following Confirmation Exhibits:  (a) Exhibit I.A.88 (Principal Terms of the Exit Facility); (b) Exhibit V.C.1.a (Certificate of Incorporation (or Comparable Constituent Documents) of New Dana Holdco, including New Dana Holdco's Certificate of Designations and Form Certificates of Incorporation (or Comparable Constituent Documents) for the Other Reorganized Debtors); (c) Exhibit V.C.1.b (Bylaws (or Comparable Constituent Documents) of New Dana Holdco and Form Bylaws (or Comparable Constituent Documents) for the Other Reorganized Debtors); and (d) Exhibit V.C.2 (Initial Directors and Officers of New Dana Holdco and Each Other Reorganized Debtor).  *See* Notice of Filing of Certain Exhibits to Third Amended Joint Plan of Reorganization (Docket No. 7362) at page 2.

9.    The Confirmation Hearing Notice provided due and proper notice of the Hearing and all relevant dates, deadlines, procedures and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the Voting Deadline, the Objection Deadline (as such term is defined in the Confirmation Hearing Notice), the time, date and place of the Hearing and the release provisions in the Plan. *See* Disclosure Statement Order at ¶ 12, Annex 2.

10.    All persons entitled to receive notice of the Disclosure Statement, the Plan and the Hearing have received proper, timely and adequate notice in accordance with the Disclosure Statement Order, applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto.  *See* Confirmation Standards Exhibit, at 16.

11.    The Debtors solicited votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order, including, without limitation, the inclusion of letters from the Debtors and the Creditors' Committee recommending acceptance of the Plan in the Solicitation Packages. Accordingly, the Debtors are entitled to the protections afforded by

- 9 -

section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in section IV.E.7 of the Plan. *See id.*, at 15-18.

12. Claims and Interests in Classes 1A, 1B, 2A, 2B, 3, 4, 5A, 6B and 8 under the Plan are unimpaired, and such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. *See id.*, at 17. With respect to Asbestos Personal Injury Claims classified in Class 3, even after giving effect to the Restructuring Transactions, holders of Asbestos Personal Injury Claims will retain the same legal, equitable and contractual rights as they possessed prior to the Petition Date, and such rights are unaltered by the Plan and the Restructuring Transactions. *See id.*, at 5.

13. Claims in Class 6A under the Plan are impaired within the meaning of section 1124 of the Bankruptcy Code. To the extent that Class 6A Claims are not eliminated by operation of law in the Restructuring Transactions, such Claims are deemed settled and compromised in exchange for the consideration and other benefits provided to the holders of such Claims and are not entitled to any distribution under the Plan. Notwithstanding this treatment, however, each holder of a Claim in Class 6A is deemed to have accepted the Plan. *See id.*, at 18.

14. The Plan was voted on by two of the classes of impaired Claims that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order (<u>i.e.</u>, Classes 5B and 5C). *See id.*, at 27.

15. Two of the impaired Classes that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order (<u>i.e.</u>, Classes 2C and 6C) are deemed to accept the Plan, consistent with section 1126(c) of the Bankruptcy Code. *See id.*, at 27-28.

16. BMC Group has made a final determination of the validity of, and tabulation with respect to, all acceptances and rejections of the Plan by holders of Claims entitled to vote on the Plan, including the amount and number of accepting and rejecting Claims in Classes 2C, 5B, 5C and 6C under the Plan. *See* Declaration of Jeffrey B. Ellman Certifying the Tabulation of Votes on, and the Results of Voting with Respect to, the Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession, dated December 6, 2007 (Docket No. 7374) (the "<u>Voting Declaration</u>") at ¶¶ 7-8.

17. Each of Classes 5B and 5C have accepted the Plan by at least two-thirds in amount and a majority in number of the Claims in such Classes actually voting. *See* Voting Declaration at ¶¶7-8.

- 10 -

18.    The affidavit of BMC Group (attached as an exhibit to the Voting Declaration) with respect to the voting on the Plan sets forth the tabulation of votes, as required by the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.  *See* Voting Declaration, Exhibit A.

I.    Section 1129(a)(3).  The Plan has been proposed in good faith and not by any means forbidden by law.  The Chapter 11 Cases were filed with an honest belief that the Debtors were in need of reorganization and the Plan was negotiated and proposed with the intention of accomplishing a successful reorganization, and for no ulterior purpose.  The Plan fairly achieves a result consistent with the objectives and purposes of the Bankruptcy Code.  In so finding, the Court has considered the totality of the circumstances in these Chapter 11 Cases.  The Plan is the result of extensive good faith, arms'-length negotiations between the Debtors and certain of their principal constituencies (including the Creditors' Committee, the Ad Hoc Bondholders' Committee, Centerbridge, the Unions and their respective Representatives) and reflects substantial input from the principal constituencies having an interest in the Chapter 11 Cases and, as evidenced by the overwhelming acceptance of the Plan, achieves the goal of consensual reorganization embodied by the Bankruptcy Code.  Further, as described in greater detail below, the Plan's indemnification, exculpation, release and injunction provisions have been negotiated in good faith, are consensual and voluntary and are consistent with sections 105, 1123(b)(6), 1129 and 1142 of the Bankruptcy Code and applicable law in this Circuit.  *See* 12/10 Transcript, at 83:21 – 83:23; Confirmation Standards Exhibit, at 18-20.

J.    Section 1129(a)(4).  No payment for services or costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be made by a Debtor other than payments that have been authorized by order of the Court.  Pursuant to Sections III.A.1.h.ii.A and IX.B of the Plan, and except as otherwise provided under the Plan or herein, all such payments to be made to

- 11 -

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date will be subject to review and approval by this Court.  *See* Confirmation Standards Exhibit, at 20-21.

          K.      <u>Section 1129(a)(5)</u>.  The Debtors have disclosed (1) the identities of the officers and directors of New Dana Holdco and each other Reorganized Debtor and (2) the identity of any insiders that will be employed or retained by the Reorganized Debtors on Exhibit V.C.2 to the Plan.  The compensation of the Reorganized Debtors' directors will be consistent with each Reorganized Debtor's applicable constituent documents, as disclosed on Exhibits V.C.1 and V.C.2 to the Plan.  The Debtors disclosed (1) the affiliations of their proposed respective directors and officers and (2) the compensation of any insiders to be employed or retained by the Reorganized Debtors (to the extent not previously disclosed) at or prior to the Confirmation Hearing.  The prior compensation of the Debtors' management, as well as that of the Debtors' current directors, has been disclosed by the Debtors in their previous filings with the SEC (including Dana's most recent Form 10-K, filed March 2007) as well as within the various pleadings and at the various hearings preceding the Court's entry of the Order, Pursuant to Sections 105, 363, 365, 502 and 503 of the Bankruptcy Code (A) Authorizing Assumption of Employment Agreements, as Modified, (B) Approving Long-Term Incentive Plan and (C) Granting Related Relief (Docket No. 4386), entered on December 18, 2006.  The proposed directors and officers for the Reorganized Debtors as set forth on Exhibit V.C.2 to the Plan are qualified, and the appointments to, or continuance in, such offices by the proposed directors and officers is consistent with the interests of holders of Claims and Interests and with public policy.  *See* 12/10 Transcript, at 85:6 – 85:10; 105:18 – 105:23; Debtors' Exhibit 3; Confirmation Standards Exhibit, at 21-23.

- 12 -

L.    <u>Section 1129(a)(6)</u>.  The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency.  *See* Confirmation Standards Exhibit, at 23-24.

M.    <u>Section 1129(a)(7)</u>.  Each holder of an impaired Claim or Interest in each impaired Class of Claims or Interests that has not accepted the Plan will, on account of such Claim or Interest, receive or retain property under the Plan having a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  The Debtors have demonstrated that the Plan is in the best interests of their creditors.  Section 1129(a)(7) of the Bankruptcy Code is inapplicable to Asbestos Personal Injury Claims classified in Class 3 because such Claims are not impaired by the Plan.  Even were the holders of Class 3 Asbestos Personal Injury Claims entitled to the protections of section 1129(a)(7) of the Bankruptcy Code, that section would be satisfied with respect to such holders.  *See* 12/10 Transcript, at 162:22 – 165:25; 183:18 – 185:22; Debtors' Exhibits 9, 10; Confirmation Standards Exhibit, at 24-27.

N.    <u>Section 1129(a)(8)</u>.  The Plan has not been accepted by all impaired classes of Claims and Interests because, pursuant to the Disclosure Statement Order, the holders of Claims in Classes 6D (Section 510(b) Securities Claims Against the Consolidated Debtors) and 7B (Section 510(b) Old Common Stock Claims Against the Consolidated Debtors) and holders of Interests in Class 7A (Old Common Stock of Dana) are deemed to have rejected the Plan, even though they will receive contingent, residual interests in the Disputed Unsecured Claims Reserve Assets under the Plan.  *See* Disclosure Statement Order at ¶ 11.  Nevertheless, as more fully explained below, the Plan is confirmable because it satisfies section 1129(b)(1) of the

- 13 -

Bankruptcy Code with respect to such non-accepting Classes of Claims and Interests. *See* Confirmation Standards Exhibit, at 27-29.

O.    Section 1129(a)(9). The Plan provides treatment for Administrative Claims, Priority Tax Claims and Priority Claims that is consistent with the requirements of section 1129(a)(9) of the Bankruptcy Code. *See* Confirmation Standards Exhibit, at 29-33.

P.    Section 1129(a)(10). The Plan has been accepted by two classes of impaired Claims that are entitled to vote on the Plan (i.e., Classes 5B and 5C), determined without including any acceptance of the Plan by any insider. *See* Voting Declaration at ¶ 8; Confirmation Standards Exhibit, at 33-34.

Q.    Section 1129(a)(11). The Plan is feasible, within the meaning of section 1129(a)(11) of the Bankruptcy Code. The Debtors' projections of the capitalization and financial information of the Reorganized Debtors as of the Effective Date are reasonable and made in good faith, each Reorganized Debtor is deemed to be solvent as of the Effective Date after giving effect to the Restructuring Transactions, and Confirmation of the Plan is not likely to be followed by the liquidation (other than the potential liquidation of inactive Debtor entities that no longer serve an ongoing business purpose, as described in Exhibit V.B.1 to the Plan) or the need for the further financial reorganization of the Debtors. The Debtors have demonstrated a reasonable assurance of the Plan's prospects for success.[3]

---

[3]    See 12/10 Transcript, at 91:2 – 91:8; 103:3 – 103:20; 167:25 – 169:17; 173:25 – 174:24; 175:1 – 183:17; 209:1 – 209:25; 211:1 – 211:25; 215:7 – 217:13; 220:1 – 221:2; 221:25 – 223:2; 225:25 – 226:21; 232:16 – 235:11; 235:18 – 236:7; 237:15 – 237:23; 238:1 – 241:1; 241:8 – 242:21; 242:25 – 243:2; 244:21 – 245:15; 245:17 – 245:20; 246:4 – 253:13; 261:8 – 261:16; 262:4 – 262:8; 263:12 – 264:3; 12/11 Transcript, at 10:17 – 10:24; 14:1 – 20:21; 21:4 – 23:7; 99:7 – 99:12; 100:5 – 101:2; 102:16 – 103:02; 145:17 – 146:13; 148:14; 149:6 – 150:4; 150:12 – 151:19; 152:17 – 153:7; 155:3 – 156:18; 157:4 – 158:24; 201:12 – 202:4; 204:17 – 205:7; 229:3 – 230:17; Debtors' Exhibits 7, 9, 10, 13, 19, 21 (at ¶¶ 7-8), 22-26, 27 (at ¶¶ 9-11, 14-16, 19-24, 28, 33-38), 28 (at ¶¶ 4-9), 29- 32, 33B-33N, 34 (at ¶ 1, 3-4, 9, 16-17), 35 (at 3-4, 9), 36 (at ¶¶ 5, 10-33), 38; Confirmation Standards Exhibit, at 34-37.

- 14 -

i.      *Dana's Asbestos Litigation*.  Testimony concerning Dana's asbestos litigation and claims database was presented in open court, subject to cross-examination, by R. Thomas Radcliffe, Jr. and William R. Hanlon.  Mr. Radcliffe and Mr. Hanlon are attorneys who are members of Dana's national defense team and who have extensive experience and expertise in asbestos personal injury litigation.  I find from their demeanor, knowledge, and experience that their testimony was credible, truthful and reliable.

ii.      The filing of Dana's chapter 11 petition was not caused by or related to Dana's pending asbestos related cases or asbestos litigation in general.  Debtors' Exhibit 27, at ¶ 10.  As of the Petition Date, Dana's pending asbestos related cases were being managed in accordance with its long term strategy and were under control.  *See* 12/10 Transcript, at 239:19 –241:1; 249:15 – 251:18; Debtors' Exhibit 27, at ¶¶ 9-10.

iii.      Dana believes that it faces a lower level of liability risk in the asbestos litigation than many traditional asbestos defendants (*see* 12/10 Transcript, at 232:24 – 235:11; Debtors' Exhibits 27, at ¶¶ 11, 38; 29), and the Court finds that belief to be reasonable based on a number of factors.  *See* 12/10 Transcript, at 233:20 – 235:11; 241:2 – 242:14; Debtors' Exhibit 27, at ¶¶ 11, 14, 38.

iv.      Dana's successful implementation of its defense and settlement strategy in the period from 2001-2006 has been accompanied and reinforced, at least since 2004, by substantial tort system changes that have limited and continue to limit the overall extent of costs and potential liabilities in the asbestos litigation.  *See* 12/10 Transcript, at 245:17 – 245:20; Debtors' Exhibits 27, at ¶ 28; 31.  Those changes have included (1) limits on the pursuit of claims by unimpaired claimants, under deferral dockets in New York City and elsewhere and new laws in Ohio, Texas, Florida and elsewhere (*see* 12/10 Transcript, at 246:4 –

246:12); (2) increased scrutiny of mass screening and the physicians involved in them, which have also greatly reduced the filing and pursuit of claims for alleged nonmalignant conditions (*see* Debtors' Exhibit 27, at ¶ 28); (3) the essential elimination of mass consolidations, including through statutory or rule changes in Texas, Ohio and Michigan (*see* 12/10 Transcript, at 246:12 – 246:20; Debtors' Exhibit 27, at ¶ 28); (4) greater enforcement of *forum non conveniens* and joinder rules, including in Mississippi, Ohio and Illinois (*see* 12/10 Transcript, at 246:21 – 246:22; Debtors' Exhibit 27, at ¶ 28); and (5) limits on the extent of each defendant's liability for a plaintiff's claimed damages, including in Florida, Mississippi, Texas and Ohio (*see* 12/10 Transcript, at 246:22 – 246:24; Debtors' Exhibit 27, at ¶ 28).  Many of the states in which these reforms have been adopted are the ones in which the greatest numbers of asbestos cases against Dana were pending, including Mississippi, Texas, Florida, Ohio and New York. *See* 12/10 Transcript, at 247:2 – 247:7; Debtors' Exhibits 24, 32.  These changes have, among other things, resulted in dramatic reductions in new asbestos claims filings against other defendants as well.  *See* 12/11 Transcript, at 82:11 – 82:14.

v.    The data in Dana's asbestos claims database reflects that, as a result of Dana's implementation of its strategy and the tort system changes effectuated in various states across the country, Dana's new filings and pending active claims had all been declining by 2005.  *See* 12/10 Transcript, at 248:21 – 251:18; Debtors' Exhibit 30.  Dana's defense costs have been dropping since 2004, with no alterations in the pace of Dana's defense work or change in Dana's billing practices occurring prior to the Petition Date.  Dana's incurrence of defense and indemnity expenses relating to asbestos litigation through December 31, 2005 was not affected by any possibility that Dana might file for bankruptcy protection.  In this regard, the counsel directing Dana's asbestos defense work were not aware

- 16 -

until some time in 2006 of the possibility that Dana might soon file for bankruptcy protection. *See* 12/10 Transcript, at 239:13 – 239:24; 12/11 Transcript, at 22:21 – 23:10; 215:3 – 215:6; Debtors' Exhibit 27, at ¶ 10.

       vi. In anticipation of the proposed Reinstatement of Class 3 Asbestos Personal Injury Claims, Mr. Hanlon worked with personnel at PACE (a part of Navigant Consulting) and with Dana's network of defense counsel across the country to update Dana's asbestos claims database to reflect accurately the current status of the Asbestos Personal Injury Claims that had been filed against Dana. *See* 12/11 Transcript, at 10:17 – 10:24; Debtors' Exhibit 21, at ¶¶ 7-8. This work was conducted in accordance with reasonable procedures and standards designed to ascertain the true current status of the claims in question. *See* 12/11 Transcript, at 14:1 – 20:21.

       vii. Based on that work, Dana updated its database to reflect the dismissal of 17,655 claims in Mississippi and the rendering inactive of some 80,000 claims pending in Florida, Georgia, Illinois, Maryland, Ohio, Texas, Washington and federal court (as part of MDL-875 pending in the Eastern District of Pennsylvania). *See* 12/11 Transcript, at 19:22 – 20:3; Debtors' Exhibits 21, 22, 24, 38. In this regard, the claims classified by Dana as inactive are unlikely to be the subject of litigation or payment unless and until the claimant develops an asbestos-related malignancy. *See* 12/11 Transcript, at 17:7 – 19:3.

       viii. The number of new Asbestos Personal Injury Claims filed against Dana rose from 39,716 in 2001 to 63,081 in 2002, but then declined to 40,971 in 2003, to 20,699 in 2004 and to 11,582 in 2005. *See* 12/10 Transcript, at 249:4 – 249:23; Debtors' Exhibits 23, 30.

ix. The number of claims that Dana resolved without payment (either through dismissal or through the claim being rendered inactive) rose from 7,922 in 2001 and 7,726 in 2002 to 18,699 in 2003, to 47,697 in 2004 and to 66,622 in 2005. Debtors' Exhibit 30. Including paid settlements, the number of Asbestos Personal Injury Claims resolved against Dana rose from 23,842 in 2003, to 47,863 in 2004 and to 67,334 in 2005. *See* 12/10 Transcript, at 249:24 – 251:18; Debtors' Exhibits 23.

x. As a result, the number of active pending claims against Dana, which had risen from 64,399 in 2001 to 127,300 by 2003, declined to 100,136 by the end of 2004, to 44,384 by the end of 2005 and to 35,392 by the end of 2006. Debtors' Exhibits 23, 25, 30; *See* 12/11 Transcript, at 20:4 – 20:6.

xi. *Dana Corporation's Asbestos Liabilities*. Dana reasonably believes that, upon its emergence from bankruptcy protection, the number of claims that it will be required to defend, the percentage of those claims it ultimately pays and the sums that it will be required to spend to defend and resolve cases should generally continue to decline or at worst remain at their relatively low 2005 levels for the foreseeable future. *See* 12/10 Transcript, at 251:21 – 252:15; Debtors' Exhibit 27, at ¶¶ 33-35.

xii. With respect to defense costs, Dana reasonably believes that its defense costs for 2008 will not exceed $20,000,000 and should generally continue to decline thereafter, in light of the decrease in the number of claims and in trial activity. *See* 12/10 Transcript, at 252:16 – 253:13; Debtors' Exhibit 27, at ¶¶ 35-36.

xiii. With respect to settlement costs, Dana reasonably believes that such amounts should continue to remain at the relatively low levels experienced in the

2001-2005 time period into the foreseeable future, in light of the lower number of filings and trial activity and Dana's substantial tort system defenses. *See* Debtors' Exhibit 27, at ¶ 37.

xiv.    Certain objectors argue that Dana's expectations are belied by *Estate of Louis A. Hicks v. Dana Corp., et al.*, Civil Action, Law Trial Division, December Term No. 3509 (Ct. C.P., Philadelphia Cty., Pennsylvania), where a judgment in an asbestos personal injury case was entered against Dana in the amount of $464,605.65 (including interest). The Court finds that the *Hicks* case does not suggest that Dana's strategy has been unsuccessful or will not continue to be successful in the future. First, the *Hicks* case is on appeal, and Dana believes that it has substantial appellate issues. *See* 12/10 Transcript, at 242:25 – 243:2. Second, the law firm that represents the plaintiff in *Hicks* has had at least 50 other cases against Dana dismissed, has not tried any other case or obtained any other verdict against Dana and has never actually obtained any money from Dana through settlement or otherwise. *See* 12/11 Transcript, at 229:3 – 230:17. Finally, the *Hicks* verdict has had no effect on the asbestos litigation against Dana: it did not produce an increase in filings, trials or settlement demands, either in Philadelphia or elsewhere. *See* 12/10 Transcript, at 244:21 – 245:15.

xv.    Testimony concerning efforts to estimate the dollar amount of Dana's pending and future asbestos liabilities, including both defense and indemnity costs, was presented in open court, subject to cross-examination, by Dr. Robin Cantor (called by the Debtors) and by Dr. Thomas Vasquez (called by certain objectors).

xvi.    Dr. Cantor is a Managing Director in the Insurance and Claims Services practice of Navigant Consulting, Inc., which was retained by the Debtors. She has a Ph.D. in economics from Duke University with a specialization in econometrics. She has a faculty appointment in the Graduate Part-Time Program in Environmental Engineering, Science

and Management of the Johns Hopkins University.  She has more than 20 years of research,
teaching and consulting experience, has served on numerous committees and boards and has
published scholarly articles, all in relevant subject matters.  She has extensive experience and
expertise with the estimation of asbestos-related liabilities and has been qualified as an expert on
asbestos claims analysis in other cases as well.  *See* 12/11 Transcript, at 55:8 – 60:14; Debtors'
Exhibit 35.

xvii.    Dr. Vasquez is a partner in Analysis, Research & Planning
Corporation ("ARPC"), which was retained by the Creditors' Committee.  He has a Ph.D. in
economics from Clark University.  He worked for KPMG Peat Marwick from 1987 to 1997 and
then for Yankelovich Partners Inc. from 1997 to 1999.  He also has extensive experience and
expertise with the estimation of asbestos-related liabilities.  *See* 12/11 Transcript, at 170:3 –
172:12; Valdez Exhibit 6, at 9-10.

xviii.    The Court finds that both Dr. Cantor and Dr. Vasquez were
very knowledgeable about the estimation of future asbestos-related liabilities and were reliable in
terms of making calculations based on the assumptions that they made and the methodologies
they employed.  The Court's conclusions in choosing among the numerous estimates that they
presented in their reports and in their testimony are based on the substance of those assumptions
and methodologies.  Indeed, as another court has observed, in estimating asbestos liabilities, "we
are dealing with uncertainties, and are attempting to make predictions which are themselves
based upon predictions and assumptions."  *Owens Corning v. Credit Suisse First Boston*,
322 B.R. 719, 721 (D. Del. 2005).

xix.    Certain objectors argued that Dr. Cantor's findings should
be discounted because Navigant Consulting performs other work for Dana.  The Court finds that

the other work was done by separate personnel in other parts of the Navigant corporate structure and did not affect Dr. Cantor's testimony.  *See* 12/11 Transcript, at 75:25 – 76:4.

xx.    Both Dr. Cantor and Dr. Vasquez agreed that there has been a "sea change" in terms of fewer filings and lower defense and indemnity costs for asbestos defendants from 2005 and continuing through the present time.  *See* 12/11 Transcript, at 91:12 – 92:16; 177:24 – 178:14.

xxi.    Dr. Cantor forecasts that Dana's combined defense and indemnity costs for asbestos personal injury claims for the 15-year period after emergence from bankruptcy will most likely total between $133.0 and $200 million.  *See* Debtors' Exhibits 34, at 1; 35, at 3.  She also forecasts that combined costs for the period extending through 2049 will most likely total between $182.4 and $291.5 million (not reduced to present value).  *See* Debtors' Exhibit 35, at 3.  These are nominal amounts that have not been reduced to present value.  Reorganized Dana will be initially capitalized with $195 million in Cash and other assets as of the Effective Date.  *See* 12/10 Transcript, 180:16 – 181:17; Debtors' Exhibit 7.

xxii.    Employing a somewhat different methodology, Dr. Vasquez forecasts that the combined costs for the period extending through 2049 will most likely total between $0.7 billion and $1.1 billion, excluding what he termed the "low probability scenarios" that could be more or less than those amounts.  Valdez Exhibit 6, at 3.  Once again, these are nominal amounts that have not been reduced to present value.

xxiii.    Dr. Cantor testified that, by adopting Dr. Vasquez's methodology, and then applying appropriate assumptions (*e.g.*, the use of "incurred" rather than "paid" defense costs; recognizing a "regime break" leading to increased dismissals; and a 2004/2005 calibration window), Dr. Vasquez' forecast for Reorganized Dana's asbestos liabilities

- 21 -

decreases to $244 million.  Both Dr. Vasquez and Dr. Cantor testified that the 2004/2005

calibration window is the most appropriate assumption for forecasting Reorganized Dana's

asbestos liabilities.  Dr. Cantor further testified that by adopting Dr. Vasquez' approach and her

assumptions set forth in the first sentence of this paragraph, but limiting the calibration window

strictly to 2005 to account for substantial downward trends in the number of filings and defense

and indemnity costs, the forecast for Reorganized Dana's asbestos liabilities decreases further to

$153 million.  *See* 12/11 Transcript, at 99:7 – 103:2; 177:15 – 177:20; Debtors' Exhibit 35, at 4.

                               xxiv.    *Insurance Coverage for Asbestos Liabilities*.  Testimony

concerning Dana's insurance coverage for asbestos-related liabilities and Dana's estimated

recoveries thereunder was presented by John E. Heintz and by Jonathan R. Terrell.  Mr. Heintz is

an attorney with extensive experience in the negotiation and litigation of insurance coverage for

Asbestos Personal Injury Claims on behalf of Dana and numerous other asbestos defendants.

*See* 12/11 Transcript, at 142:4 – 145:13.  He testified in open court subject to cross-examination,

and I find from his demeanor, knowledge and experience that his testimony was credible and

reliable.  Mr. Terrell has extensive experience in valuing insurance assets and potential

recoveries.  *See* Debtors' Exhibit 28, at ¶ 3.   His direct testimony was presented through his

sworn declaration (without objection), he was cross-examined in open court and his testimony

was credible and reliable.

                               xxv.    Between 1954 and 1986, Dana purchased over $2.6 billion

in aggregate products liability limits under commercial general liability insurance coverage.

*See* 12/11 Transcript, at 145:17 – 146:13; Debtors' Exhibit 36, at ¶ 5.  After subtracting amounts

that are no longer potentially available due to exhaustion, commutation, insurer insolvency or

exclusion, Dana has about $1.5 billion in products liability limits available to pay Asbestos

Personal Injury Claims. *See* 12/11 Transcript, at 146:14 – 149:5; Debtors' Exhibit 36, at ¶¶ 5-10. This significant amount of available coverage distinguishes Dana from companies that filed for bankruptcy protection after having exhausted or nearly exhausted their available insurance assets. *See* 12/11 Transcript, at 149:6 – 149:18; Debtors' Exhibit 36, at ¶ 11.

xxvi.   In addition, Dana has previously entered into a number of "coverage-in-place" agreements with certain of its insurers.  These agreements provide a substantial level of assurance that the available insurance coverage will in fact translate into future payments of defense and indemnity costs for Asbestos Personal Injury Claims. *See* 12/11 Transcript, at 149:16 – 150:4; Debtors' Exhibit 36, at ¶ 12.  Specifically, some $1.24 billion of Dana's approximately $1.5 billion in remaining available products liability limits is subject to coverage-in-place agreements, including the Wellington Agreement (approximately $620 million in remaining product liability limits) and four so-called "Bilateral Agreements" (totaling about $618 million in remaining product liability limits).  *See* 12/11 Transcript, at 150:12 – 151:14; Debtors' Exhibit 36, at ¶¶ 13-17.  As a result of the so-called "coverage block" system employed under these agreements, Dana has substantial control over the disposition of its insurance assets.  *See* 12/11 Transcript, at 155:3 –156:18; Debtors' Exhibit 36, at ¶¶ 18-21.  Moreover, roughly 75% of Dana's insurance is subject to an A or A- rating. *See* 12/11 Transcript, at 152:17 – 153:7.

xxvii.   Despite its available insurance assets, there are instances when Dana is required to pay, out of its own resources, amounts arising from its asbestos-related tort liability.  These arise where amounts are allocated to insolvent London-based insurers or to certain policies that Dana has commuted for lump-sum payments; where the claimant's first

- 23 -

exposure to asbestos postdates the end of Dana's coverage block; or where Dana is obligated to pay retrospective premiums.  *See* Debtors' Exhibit 36, at ¶¶ 22-24.

xxviii.  The percentage that Dana will have to pay out of its own resources will decline sharply over time, as a greater percentage of future payments are allocated to available coverage and coverage subject to gaps are exhausted by Dana payments.  Dana can reduce the impact of the insolvencies and commutations by expanding its so-called "coverage block" beyond June 1, 1976, which will allocate defense costs and liability amounts among more policies, thereby increasing the percentage of solvent and available coverage triggered by substantially all claims (although not increasing the total amount of available coverage). *See* 12/11 Transcript, at 157:16 – 158:24; Debtors' Exhibit 36, at ¶¶ 24-26.

xxix.  Dana's expansion of its coverage block will, for a period of time, require Dana to pay retrospective premiums on amounts paid under certain policies.  These payments, however, are a short-term issue and will not be overly burdensome.  *See* Debtors' Exhibit 36, at ¶¶ 27-29.  These retrospective premiums are estimated to be approximately $10 million, and are already accounted for in the insurance recoveries calculated by Mr. Terrell. *See* Debtors' Exhibit 28, at ¶ 7.

xxx.  In addition, Dana has some $259 million of available products liability limits that was issued by insurers with which Dana has not negotiated a "coverage-in-place" agreement.  *See* Debtors' Exhibit 36, at ¶ 30.  To date, Dana's asbestos-related liabilities have not triggered any of this $259 million in unsettled coverage, which therefore remains entirely unexhausted.  *See* Debtors' Exhibit 36, at ¶ 31.  Although these policies are not subject to coverage-in-place agreements, Dana reasonably believes that the insurers that issued this coverage are likely obligated, under applicable law, to pay claims in a

- 24 -

manner consistent with the framework established by those agreements. *See* Debtors' Exhibit 36, at ¶¶ 32-33.

>    xxxi.    Over the range of reasonable forecasts of Dana's future asbestos liabilities, Dana can expect to recover fifty percent or more of its liabilities from insurance. *See* 12/10 Transcript, at 185:13 – 185:15; 12/11 Transcript, at 157:9 – 159:2; Debtors' Exhibit 28, at ¶¶ 7-9.

>    xxxii.    It is not necessary for this Court to forecast the exact amount of Reorganized Dana's future costs for asbestos liabilities for the purposes of confirming this Plan and determining that the Plan is feasible. This is so because, in addition to Dana's substantial available insurance resources of approximately $1.5 billion, Reorganized Dana's initial capitalization of $195 million (representing nominal amounts for the next five years and present-valued amounts for years six through 45 at a 6% discount rate) is more than sufficient to cover the range of reasonable forecasts described above. *See* 12/10 Transcript, at 174:13 – 183:17. Based on all the foregoing, the Court finds that the Plan presents a workable scheme of reorganization and operation from which there is a reasonable assurance of success and is, thus, feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.[4]

>    R.    Section 1129(a)(12). The Plan provides that Administrative Claims for fees payable pursuant to section 1930 of title 28 of the United States Code will be paid by the Debtors in Cash equal to the amount of such Administrative Claims on or before the Effective Date. After the Effective Date, all fees payable pursuant to section 1930 of title 28 of the United States Code will be paid by the applicable Reorganized Debtor until the earlier of the conversion

---

[4]    See Kane v. Johns Manville Corp. (In re Johns Manville Corp.), 843 F.2d 636, 649 (2d Cir. 1988) ("As the Bankruptcy Court correctly stated, the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code. *See* Confirmation Standards Exhibit, at 37-38.

        S.     Section 1129(a)(13).  Prior to the Effective Date, the Debtors will cease providing and paying all retiree benefits (as defined in section 1114(a) of the Bankruptcy Code) to:  (1) non-union retirees and their dependents in accordance with the Non-Union Retiree Settlement Order; and (2) retirees who had been members of the International Association of Machinists and Aerospace Workers and their dependents in accordance with the Agreed Order Approving Settlement Agreement Between Dana Corporation and the International Association of Machinists and Aerospace Workers (Docket No. 5180), dated April 27, 2007.  Moreover, the Plan implements the Global Settlement and the transactions contemplated thereby, as approved by the Global Settlement Order.  Retiree benefits (as defined in section 1114(a) of the Bankruptcy Code) to all UAW and USW-represented retirees will be terminated in accordance with the Union Settlement Agreements, as approved by the Global Settlement Order, and Section III.B of the Plan.  Non-pension retiree health and welfare benefits for retirees who were members, surviving spouses or dependents of members of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers, AFL-CIO will be terminated, pursuant to the Boilermakers Stipulation.  Accordingly, the Plan provides for the payment of all retiree benefits at the levels established pursuant to sections 1114(e)(1)(B) and 1114(g) of the Bankruptcy Code prior to the Confirmation of the Plan.  *See* Confirmation Standards Exhibit, at 38-39; Boilermakers Stipulation.

        T.     Section 1129(b).  The Plan does not "discriminate unfairly" because each dissenting Class is treated substantially equally to similarly situated classes, and, except with

- 26 -

respect to holders of Claims and Interests in the dissenting Classes (which Classes are entitled to distributions under the Plan only to the extent that Classes that are senior in priority are paid in full plus Postpetition Interest and Post-Effective Date Interest), no holder of a Claim or Interest will receive more than it is legally entitled to receive on account of its Claim or Interest. Interests in Class 7A and Claims in Class 7B are *pari passu* and subordinated, pursuant to section 510(b) of the Bankruptcy Code, to Claims Class 6D which, in turn, are subordinated to Claims in Class 5B in accordance with 510(b) of the Bankruptcy Code. All Classes of Claims or Interests senior to the Claims in Classes 6D and 7B and Interests in Class 7A either are unimpaired under the Plan or have accepted the Plan. The Plan is "fair and equitable" under section 1129(b) of the Bankruptcy Code because it does not provide a recovery on account of any Claim or Interest that is junior to the impaired, non-accepting Classes of Claims and Interests (i.e., Classes 6D, 7A and 7B). *See* 12/10 Transcript, at 137:2 – 137:7; Debtors' Exhibit 11; Confirmation Standards Exhibit, at 41-44.

       U.    <u>Section 1129(c)</u>. The Plan is the only plan that has been Filed in the Chapter 11 Cases that has been found to satisfy the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

       V.    <u>Section 1129(d)</u>. No party in interest, including but not limited to any governmental unit, has requested that the Court deny Confirmation of the Plan on grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act, and the principal purpose of the Plan is not such avoidance. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## RESTRUCTURING TRANSACTIONS

W.      The Restructuring Transactions described in Article V of the Plan are the result of extensive negotiations between the Debtors, their primary stakeholder constituencies and proposed investors and have been proposed in good faith.  The Restructuring Transactions promote, among other things:  (1) the creation of a rational corporate structure; and (2) appropriate financial reporting according to business lines.  Dana's primary purpose in effecting the Restructuring Transactions is the rationalization of the Reorganized Debtors' corporate structure.  Over time, a number of corporate acquisitions and divestitures by various Dana-related entities have resulted in a relatively labyrinthine corporate structure.  The Restructuring Transactions work to streamline this corporate structure to (1) better reflect and serve the Reorganized Debtors' operational functions and (2) enhance the Reorganized Debtors' ability to analyze and address their operational performance along their various business lines.  *See* 12/10 Transcript, at 81:22 – 83:23.  The Restructuring Transactions have not been entered into fraudulently, nor with the intent to hinder, delay or defraud any entity to which the Debtors or Reorganized Debtors are, or may become, indebted on or after the Effective Date.   Article V of the Plan and Exhibit V.B.1 to the Plan provide, among other things, for the incorporation and existence of New Dana Holdco as a separate corporate holding company entity and the formation thereunder of various business-unit and product-line limited liability company subsidiaries (collectively, the "Operating Subsidiaries").  *See* 12/10 Transcript, at 79:9 – 80:24; 101:21 – 101:25; 102:14 – 102:19.  New Dana Holdco and the Operating Subsidiaries will acquire and assume those assets and Liabilities of the Debtors as are described in Article V of the Plan, Exhibit V.B.1 thereto or in any contract, instrument or other agreement or document effecting a revesting in, or transfer or assignment of assets and Liabilities to, an Operating Subsidiary or any other Reorganized Debtor.  Pursuant to Article V of the Plan and Exhibit V.B.1 to the Plan, the

- 28 -

transfer of assets to the Operating Subsidiaries and the assumption of certain Liabilities of

Debtor Dana Corporation by the Operating Subsidiaries in exchange for the shares of New Dana

Holdco Common Stock to be distributed to the creditors of Dana Corporation is a transfer for fair

value and fair consideration inasmuch as Dana Corporation will be transferring more liabilities

than assets to New Dana Holdco.  *See* 12/10 Transcript, at 163:15 – 165:10; Debtors' Exhibit 2

(at 3).  After such transfers, New Dana Holdco, the Operating Subsidiaries, Reorganized Dana

Corporation and each of the other Reorganized Debtors will be solvent and left with sufficient

assets, liquidity and capital to satisfy their obligations as they come due for the foreseeable

future.  *See* 12/10 Transcript, at 175:1 – 183:17; 215:7 – 217:13; 220:1 – 221:2; 221:25 – 223:2;

225:25 – 226:21; 232:16 – 235:11; Debtors' Exhibits 7, 8.

<u>**EXECUTORY CONTRACTS**</u>

    X.  Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the

occurrence of the Effective Date, Section II.E of the Plan provides for the assumption,

assumption and assignment or rejection of certain Executory Contracts and Unexpired Leases.

The Debtors' determinations regarding the assumption, assumption and assignment or rejection

of Executory Contracts and Unexpired Leases are based on and within the sound business

judgment of the Debtors, are necessary to the implementation of the Plan and are in the best

interests of the Debtors, their estates, holders of Claims and other parties in interest in the

Chapter 11 Cases.  *See* 12/10 Transcript, at 198:23 – 205:10.  The Debtors have Filed

Exhibits II.E.1.a, II.E.1.c, II.E.4 and II.E.5 to the Plan (as they may have been amended or

supplemented) and either have provided or will provide notice of the Debtors' determinations

regarding the assumption, assumption and assignment or rejection of Executory Contracts or

Unexpired Leases and any related Cure Amount Claims in accordance with the procedures

(collectively the "<u>Contract Procedures</u>") set forth in paragraph 3 of the Order, Pursuant to

- 29 -

Sections 105, 363 and 1123 of the Bankruptcy Code:  (A) Establishing Procedures with Respect to the Proposed Assumption, Assumption and Assignment and Rejection of Executory Contracts and Unexpired Leases and the Treatment of Other Agreements Pursuant to the Debtors' Third Amended Joint Plan of Reorganization and Applicable Law; and (B) Approving the Form and Manner of Notice Thereof (Docket No. 6783), entered on October 31, 2007.

## SETTLEMENTS AND RELEASES

Y.      Pursuant to Bankruptcy Rule 9019(a), and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan (collectively, the "Settlements"), including but not limited to the settlement (the "Ineligible Issue Settlement") between the Debtors, the Creditors' Committee, the Ad Hoc Steering Committee and Centerbridge (1) resolving the dispute between the parties related to certain unsecured creditors that do not qualify to purchase the New Series B Preferred Stock under the terms of the New Investment Agreement and (2) resulting in the creation of the Settlement Pool.

Z.      Based upon the representations and arguments of counsel to the Debtors, the Creditors' Committee and the Ad Hoc Bondholders' Committee and all other testimony either actually given or proffered and other evidence introduced at the Hearing and the full record of these Chapter 11 Cases, the findings and conclusions of which are hereby incorporated by reference as if fully set forth herein, this Order constitutes the Court's approval of all Settlements, including the Ineligible Issue Settlement (*see* 12/12 Transcript, at 38:25 – 39:3; 120:16 – 137:7; 191:3 – 194:2), and the effectuation of the transactions previously approved by the Court in, among others, the Global Settlement Order, provided for herein or in the Plan because, among other things, such Settlements:

- reflect a reasonable balance between certainty and the risks and expenses of both future litigation and the continuation or conversion of these Chapter 11 Cases;

- fall well within the range of reasonableness for the resolution of complex litigation;

- are fair, equitable and reasonable and in the best interests of the Debtors, Reorganized Debtors, their respective Estates and property, creditors, equity security holders and other parties in interest;

- will maximize the value of the Estates by preserving and protecting the ability of the Reorganized Debtors to continue operating outside of bankruptcy protection and in the ordinary course of business; and

- are essential to the successful implementation of the Plan.

*See* 12/10 Transcript, at 72:15 – 72:20; 120:16 – 137:7; 191:3 – 194:2; 12/12 Transcript, at 38:25 – 39:3.

AA.    Further, each non-Debtor party that will benefit from the releases, exculpations and related injunctions set forth in, among others, Sections IV.E.5, IV.E.6 and IV.E.7 of the Plan (collectively, the "Plan Releases") either shares an identity of interest with the Debtors, was instrumental to the successful prosecution of the Chapter 11 Cases and/or provided substantial consideration to the Debtors, which value will allow for distributions that would not otherwise be available but for the contributions made by such non-Debtor parties. The Plan Releases are, individually and collectively, integral to, and necessary for the successful implementation of, the Plan, essential to the Debtors' reorganization and supported by reasonable consideration. Releases of non-Debtor parties pursuant to Section IV.E.6.b of the Plan (1) are binding upon only those creditors (a) that have accepted the Plan and/or (b) to the extent enforceable by applicable law and (2) were appropriately disclosed by the Debtors both in the Disclosure Statement and on each Ballot mailed to creditors. The Debtors and all creditors that voted to accept the Plan have expressly consented to the Plan Releases and the Creditors'

Committee and the Ad Hoc Bondholders' Committee have not objected to the Plan Releases. Accordingly, in light of all of the circumstances, the Plan Releases are consonant with the prevailing law in this District and are fair to the releasing parties.

**MISCELLANEOUS**

BB.    All findings and conclusions contained in the Global Settlement Order are included herein by this reference, the same as if such findings and conclusions were set forth herein in full.  Except as may be set forth explicitly herein or in an amendment to any of the documents executed in connection with the Global Settlement, this Order does not modify or amend any of the provisions of the Global Settlement or the Global Settlement Order or modify the rights of the parties under the Global Settlement.

CC.    The total amount of Allowed General Unsecured Claims against the Debtors (excluding any General Unsecured Claims held by the Unions (including the Union Claim), any General Unsecured Claims held by the Retiree Committee, Convenience Claims, General Unsecured Claims against EFMG, Prepetition Unsecured Claims and the DCC Claim) will not exceed $3.25 billion and, accordingly, the condition to the Effective Date in Section IV.B.5 of the Plan is satisfied.  *See* 12/10 Transcript, at 189:3 – 190:17; Debtors' Exhibit 15.

DD.    As of the Effective Date and after giving effect to the Restructuring Transactions, the Debtors, the Creditors' Committee, Centerbridge, the Ad Hoc Steering Committee and the Unions agree that the Debtors will not have Cash in excess of (1) the minimum Cash required by the Reorganized Debtors to operate their businesses on the Effective Date and thereafter, *plus* (2) the amount of Cash needed, pursuant to the terms of the Plan, to satisfy all (a) Allowed Secured Claims, Allowed DIP Lender Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims and Allowed Claims in Classes 4, 5A, 6B and 6C and (b) Secured Claims, DIP Lender Claims, Administrative Claims, Priority

- 32 -

ing, December 5, 2007, at 34:11 – 36:4.

CORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, AS FOLLOWS:

**A.    Confirmation of Plan**

1.    The Plan and each of its provisions (whether or not specifically approved herein) are CONFIRMED in each and every respect, pursuant to section 1129 of the Bankruptcy Code; *provided*, *however*, that if there is any direct conflict between the terms of the Plan and the terms of this Order, the terms of this Order shall control.

2.    The Effective Date of the Plan shall occur on the date determined by the Debtors when the conditions set forth in Section IV.B of the Plan have been satisfied or, if applicable, have been waived in accordance with Section IV.C of the Plan.

3.    Any objections or responses to Confirmation of the Plan and the reservation of rights contained therein that (a) have not been withdrawn, waived or settled prior to the entry of this Order or (b) are not cured by the relief granted herein are hereby OVERRULED in their entirety and on their merits, and all withdrawn objections or responses are hereby deemed withdrawn with prejudice.

**B.    Approval of Settlements**

4.    Pursuant to Bankruptcy Rule 9019, the Settlements as set forth in the Plan (including the Ineligible Issue Settlement) are approved in all respects.

CLI-1556545v22

5.      The Settlement Pool.  The Settlement Pool shall be established in accordance with the Ineligible Issue Settlement and shall provide for settlement payments to be made to holders of Ineligible Unsecured Claims (as such definition has been modified by the Modifications) in accordance with the terms of Section V.J of the Plan.  Any funds remaining in the Settlement Pool after all payments have been made to holders of Ineligible Unsecured Claims shall be deemed Excess Minimum Cash.

6.      In accordance with section V.J.4 of the Plan, to receive a payment from the Settlement Pool established as part of the Ineligible Issue Settlement, a holder of an Ineligible Unsecured Claim shall be required to provide the Debtors or Reorganized Debtors, as applicable, no later than 15 days after the Effective Date, reasonable evidence that its Claims are Ineligible Unsecured Claims.  The proper completion and execution, and timely submission of a certification (the "Certification") by a holder of an Ineligible Unsecured Claim may be considered such reasonable evidence and the Debtors may rely on such Certification.  Any creditor that fails to provide reasonable evidence that its Claims are Ineligible Unsecured Claims, including the failure to timely submit a properly completed and executed Certification, shall not be eligible to participate in the Settlement Pool in any respect and shall not receive any distributions therefrom.  On the Effective Date, the Debtors shall distribute such Certifications to holders of Class 5B Claims that are Ineligible Unsecured Claims.  Holders of Claims that are first Allowed or estimated after the Effective Date shall not be entitled to participate in the Settlement Pool in connection with such Claims.

## C.      Approval of Releases

7.      The Plan Releases as set forth in, among others, Section IV.E.6 of the Plan, as such releases may have been modified by the Modifications, are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the

- 34 -

Effective Date of the Plan without further order or action on the part of the Court, any of the parties to such releases or any other party.

8.       Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan, the Global Settlement and the B-2 Backstop Commitment Letter; *provided*, *however*, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

9.       Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan (solely with respect to the Claim(s) that such holder voted in favor of the Plan) to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided in the Plan and under this Order and the Bankruptcy Code).  Notwithstanding the foregoing and except with respect to

Derivative Claims and holders of Claims that vote in favor of the Plan (solely with respect to the Claim(s) that such holder voted in favor of the Plan), nothing in the Plan or this Order shall release the claims asserted, or to be asserted, solely on account of alleged conduct occurring prior to the Petition Date, against any non-Debtor defendant in the Securities Litigation. In addition, nothing in the Plan shall be deemed to release any applicable Debtor or Reorganized Debtor from any Liability arising from or related to Asbestos Personal Injury Claims.

10.     From and after the Effective Date, except with respect to obligations arising under the Plan, the Global Settlement, the Union Fee Order and the B-2 Backstop Commitment Letter, to the fullest extent permitted by applicable law, the Released Parties shall release each other from any and all Liabilities that any Released Party is entitled to assert against any other Released Party in any way relating to any Debtor, the Chapter 11 Cases, the Estates, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, the Disclosure Statement, any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy; *provided*, *however*, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

**D.     Order Binding on All Parties**

11.     Subject to the provisions of Section IV.B of the Plan and Bankruptcy Rule 3020(e), in accordance with section 1141(a) of the Bankruptcy Code and notwithstanding

- 36 -

any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of: (a) the Debtors; (b) the Reorganized Debtors; (c) any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted, rejected or are deemed to have accepted or rejected the Plan); (d) any other person giving, acquiring or receiving property under the Plan; (e) any and all non-Debtor parties to Executory Contracts or Unexpired Leases with any of the Debtors; and (f) the respective heirs, executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing. All settlements (including, without limitation, the Settlements), compromises, releases (including, without limitation, the Plan Releases), waivers, discharges, exculpations and injunctions set forth in the Plan shall be, and hereby are, effective and binding on all Persons who may have had standing to assert any settled, released, discharged, exculpated or enjoined causes of action, and no other Person or entity shall possess such standing to assert such causes of action after the Effective Date.

E.    **Consolidation of the Debtors**

12.    As no objections to such consolidation have been Filed or served by any party pursuant to Section VIII.B of the Plan, the consolidation of the Consolidated Debtors solely for the purpose of implementing the Plan, including for purposes of voting, Confirmation and distributions to be made under the Plan is hereby approved. Solely for purposes of implementing the Plan, and for no other purposes: (a) all assets and Liabilities of the Consolidated Debtors will be deemed merged; (b) all guarantees by one Consolidated Debtor of the obligations of any other Consolidated Debtor will be deemed eliminated so that any Claim against any Consolidated Debtor and any guarantee thereof executed by any other Consolidated Debtor and any joint or

- 37 -

several liability of any of the Consolidated Debtors will be deemed to be one obligation of the

Consolidated Debtors; and (c) each and every Claim Filed or to be Filed in the Chapter 11 Case

of any of the Consolidated Debtors will be deemed Filed against the Consolidated Debtors and

will be deemed one Claim against and a single obligation of the Consolidated Debtors.

13.    Such consolidation (other than for the purpose of implementing the Plan)

shall not affect:  (a) the legal and corporate structures of the Consolidated Debtors, subject to the

right of the Consolidated Debtors to effect restructurings as provided in Section V.B; (b) pre- and

post-Effective Date guarantees, liens and security interests that are required to be maintained

(i) in connection with contracts or leases that were entered into during the Chapter 11 Cases or

Executory Contracts and Unexpired Leases that have been or will be assumed or (ii) pursuant to

the Plan; (c) Interests between and among the Consolidated Debtors; (d) distributions from any

insurance policies or proceeds of such policies; or (e) the revesting of assets in the separate

Reorganized Debtors pursuant to Section V.A of the Plan.  In addition, such consolidation shall

not (a) constitute a waiver of the mutuality requirement for setoff under section 553 of the

Bankruptcy Code or (b) otherwise provide the basis for the assertion of any setoff or rights of

subrogation or recoupment of any kind, directly or indirectly, against any obligation due a

Debtor, its Estate or its Assets, or any direct or indirect successor in interest to a Debtor, or any

assets or property of such successor.

## F.    Vesting and Transfer of Assets

14.    On the Effective Date, except as otherwise provided in the Plan (including

with respect to the Restructuring Transactions), all property of the Estate of a Debtor and any

property acquired by a Debtor or Reorganized Debtor under the Plan (including, but not limited

to, owned and leased real property) shall vest (subject to, and taking into account, the

Restructuring Transactions) in, and be transferred to, such Reorganized Debtor in accordance

with the terms of the Plan, free and clear of all liens, charges, Claims, other encumbrances, Interests and other interests in accordance with section 1141 of the Bankruptcy Code, with any prohibitions upon such transfer being null and void.

**G.    Approval of Discharge of Claims and Termination of Interests**

15.    The Plan discharge provision as set forth in Section IV.E.4 of the Plan and the termination of interest provisions of Section V.I of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court or any other party.

16.    Except as specifically set forth in the Plan, as of the Effective Date, pursuant to sections 524 and 1141 of the Bankruptcy Code, the Reorganized Debtors shall be discharged of all Claims and other debts and Liabilities, in accordance with Section IV.E.4 of the Plan, and no creditor shall have recourse against any Reorganized Debtor or any of their assets or property on account of such Claims and other debts and Liabilities.

**H.    Release of Liens**

17.    The release and discharge of all mortgages, deeds of trust, liens or other security interests against the property of any Estate as set forth in Section V.K of the Plan are approved in all respects, are incorporated herein in their entirety, are so ordered and shall be immediately effective on the Effective Date of the Plan without further order or action on the part of the Court.  As of the Effective Date, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement this Order and Section V.K of the Plan.

18.    All entities holding Claims against or Interests in the Debtors that are treated under the Plan are hereby directed to execute, deliver, file or record any document, and to

- 39 -

take any action necessary to implement, consummate and otherwise effect the Plan in accordance with its terms, and all such entities shall be bound by the terms and provisions of all documents executed and delivered by them in connection with the Plan. Upon the entry of this Order, all entities holding Claims against or Interests in the Debtors that are treated under the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

## I.    Injunction

19.    As of the Effective Date, except as provided in the Plan or this Order, all entities and Persons that have been, are or may be holders of Claims against or Interests in a Debtor are enjoined from taking any of the following actions against or affecting a Debtor, its Estate, its Assets, any direct or indirect successor in interest to a Debtor or any assets or property of such successor with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan): (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien (other than as contemplated by the Plan); (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due to any Debtor, its Estate, its Assets, any direct or indirect successor in interest to a Debtor or any assets or property of such successor; and (e) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth therein (including, without limitation, the Settlements).

20.     All Persons that have held, currently hold or may hold any Liabilities released or exculpated pursuant to Sections IV.E.6 and IV.E.7 of the Plan, respectively, are permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (d) except as provided in the Plan, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

21.     Except with respect to Derivative Claims and holders of Claims that vote in favor of the Plan (solely with respect to the Claim(s) that such holder voted in favor of the Plan), nothing in this Order or in the Plan shall enjoin the prosecution of the claims asserted, or to be asserted, solely on account of alleged conduct occurring prior to the Petition Date, against any non-Debtor defendant in the Securities Litigation.  In addition, nothing in this Order or in the Plan shall prevent the holders of Asbestos Personal Injury Claims from exercising their rights against any applicable Debtor or Reorganized Debtor or its Estate or Assets with respect to their Asbestos Personal Injury Claims.

22.     With respect to Asbestos Personal Injury Claims, the automatic stay imposed by section 362 of the Bankruptcy Code is hereby terminated as of the Effective Date rather than as provided in Section IV.E.5.c of the Plan, and, pursuant to section 108(c) of the

Bankruptcy Code, the applicable statute of limitations with respect to any such Claim that did not expire prior to the Petition Date will cease to be tolled as of the Effective Date.

**J.      Survival of Corporate Indemnities**

        23.      Prior to the Effective Date, Dana shall make arrangements to continue liability and fiduciary (including ERISA) insurance for the benefit of its directors, officers and employees for the period from and after the Effective Date, and, prior to the Effective Date, shall fully pay the annual premium for such insurance.  With respect to its pre-Effective Date officers and directors' liability insurance, Dana shall obtain and pay for a run-off policy continuing existing policy limits on substantially the same terms and conditions as existing officers and directors' liability policies, for a term of six years, and providing coverage to all parties covered by policies in effect during the pendency of the cases.

        24.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees on or after February 28, 2006 by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Reorganized Debtor, shall be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations will survive and be unaffected by entry of this Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.

        25.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees prior to February 28, 2006

- 42 -

by reason of such person's prior service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; *provided, however*, that to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be deemed and treated as Executory Contracts that are rejected by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) will be subject to the bar date provisions of Section II.E.6 of the Plan, <u>provided that</u> the Debtors shall not have to reserve for such Claims in the Disputed Claims Reserve, as such claims (if any) are already adequately reserved for in the Contingency Reserve.

## K.    Exemption From Securities Laws

26.    Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering, issuance and distribution of the New Dana Holdco Common Stock pursuant to the Plan are, and shall be, exempt from section 5 of the Securities Act and any state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer or underwriter of, or broker or dealer in, a security.  Resales and subsequent transactions in the New Dana Holdco Common Stock shall generally be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act unless the holder thereof is deemed to be (a) an "underwriter" with respect to the New Dana Holdco Common Stock within the meaning of section 1145(b) of the Bankruptcy Code, (b) an "affiliate" of New Dana Holdco within the

meaning of the Securities Act or (c) a "dealer" within the meaning of section 2(12) of the Securities Act.

27.    Stockbrokers effecting transactions in the New Dana Holdco Common Stock prior to the expiration of 40 days after the first date on which such securities are bona fide offered to the public by New Dana Holdco or by or through an underwriter shall be required to deliver to the purchaser of such New Dana Holdco Common Stock a copy of the Disclosure Statement at or before the time of delivery of such New Dana Holdco Common Stock to such purchaser, in accordance with section 1145(a)(4) of the Bankruptcy Code.

28.    Each Qualified Investor that subscribes for shares of the New Preferred Stock shall be bound by the restrictions contained in the certificate of designation of New Dana Holdco attached as Exhibit V.C.1.a to the Plan.  In addition, the New Preferred Stock will not have been registered under the Securities Act and will not be issued and distributed pursuant to the exemption from the registration requirements under the Securities Act provided by section 1145 of the Bankruptcy Code and, as such, will be subject to certain restrictions on resale contained in the Securities Act.

## L.    Exemption From Taxation

29.    Pursuant to section 1146(a) of the Bankruptcy Code, the following transactions will not be subject to any sales or use Tax, stamp Tax, transfer Tax, intangible Tax, mortgage recording Tax or similar Tax, charge, expense or conveyance fee:  (a) the issuance, transfer or exchange of any securities (including the New Dana Holdco Common Stock and New Preferred Stock), instruments or documents; (b) the making of the New Equity Investment; (c) the creation of any mortgage, deed of trust, lien or other security interest; (d) the making or assignment of any lease or sublease; (e) the execution and delivery of the Exit Facility; (f) any Restructuring Transaction, including, but not limited to, any transfers of owned or leased real

property between the Debtors or from a Debtor to a Reorganized Debtor created as part of the Restructuring Transactions; (g) the establishment of the Settlement Pool; or (h) the making, delivery or recording of any instrument, lease, deed, pledge, deed of trust, bill of sale or other instrument of transfer, financing statement or assignment (including any merger agreements and agreements of consolidation, restructuring, disposition, liquidation or dissolution) or the revesting, transfer or sale of any real or personal property of a Debtor under, in furtherance of or in connection with the Plan or this Order.

30.     All filing and recording officers are hereby directed to accept for filing or recording all instruments of transfer to be filed and recorded in accordance with the Plan or the Confirmation Exhibits without payment of any such Taxes.  Notice of entry of this Order in the form approved by the Court (a) shall have the effect of an order of the Court, (b) shall constitute sufficient notice of the entry of this Order to such filing and recording officers and (c) shall be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law. This Court retains jurisdiction to enforce the foregoing direction by contempt proceedings or otherwise.

31.     Any transfers of owned or leased real property undertaken pursuant to the Plan or the Restructuring Transactions are specifically for the purpose of reorganizing and restructuring the Debtors under the Bankruptcy Code and shall not trigger (a) any increase in applicable real property taxes or (b) a reappraisal of any real property so transferred.

**M.     Executory Contracts and Unexpired Leases**

32.     The Executory Contract and Unexpired Lease provisions of Section II.E of the Plan are specifically approved in all respects, are incorporated herein in their entirety and are so ordered.  The Debtors are authorized to assume, assign and/or reject Executory Contracts or Unexpired Leases in accordance with Section II.E of the Plan and the Contract Procedures.

- 45 -

33.    This Order shall constitute an order of the Court approving the assumptions, assumptions and assignments or rejections described in Section II.E. of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the later of: (a) the Effective Date; (b) the resolution of any motion to reject an Executory Contract or Unexpired Lease filed on or prior to the Effective Date; or (c) the resolution of any objection to the proposed assumption, assumption and assignment or rejection of an Executory Contract or Unexpired Lease or the amount of any proposed Cure Amount Claim. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the Debtors or the Reorganized Debtors, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors or the Reorganized Debtors for rejection within five Business Days of the entry of the order of the Court resolving the matter against the Debtors. Such rejection shall be deemed effective as of the Effective Date.

34.    Except as otherwise provided in the Plan, the Contract Procedures or as requested in any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the Debtors shall be deemed to reject each Executory Contract and Unexpired Lease that (a) was not previously assumed, assumed and assigned or rejected by an order of the Court, (b) was not assumed pursuant to Section II.E of the Plan (including any related agreements assumed pursuant to Section II.E.1.b of the Plan) or (c) did not terminate or expire pursuant to its own terms.

35.    Contracts, leases and other agreements entered into after the Petition Date by a Debtor, including, without limitation, the Union Settlement Agreements and any Executory Contracts or Unexpired Leases assumed by a Debtor, shall be performed by such Debtor or Reorganized Debtor in the ordinary course of its business, as applicable. Such contracts and

- 46 -

leases (including any assumed Executory Contracts or Unexpired Leases) shall survive and remain unaffected by entry of this Order; *provided, however*, that, except as provided under Section III.A of the Plan, any Executory Contracts or Unexpired Leases assumed by a Debtor and not previously assigned will be assigned to the Reorganized Debtor identified on Exhibit II.E.4 to the Plan. The Debtors and Reorganized Debtors may, at any time until the date that is 30 days after the Effective Date, amend Exhibit II.E.4 to the Plan to identify or change the identity of the Reorganized Debtor party that will be the assignee of an Executory Contract or Unexpired Lease.

36.    As provided in the Contract Procedures, the Reorganized Debtors may provide counterparties to various prepetition agreements that are not executory in nature (collectively, the "Nonexecutory Agreements") and postpetition agreements that generally are not subject to the provisions of section 365 of the Bankruptcy Code (collectively, the "Postpetition Agreements") with notice of the applicable surviving or resulting corporate entity in which such Nonexecutory Agreements and Postpetition Agreements shall vest following the completion of the Restructuring Transactions. The Debtors may exercise their rights under state law and applicable nonbankruptcy law — including section 2-210 of the Uniform Commercial Code — to provide parties to Nonexecutory Agreements and Postpetition Agreements with notice of any assignments as practicable following the Effective Date.

37.    Notwithstanding any language to the contrary in any such Executory Contract or Unexpired Lease, and in accordance with section 365(f) of the Bankruptcy Code, any assignment of an Executory Contract or Unexpired Lease under which a Debtor is the lessee of real property may be effected without (a) the consent of the lessor party thereto and (b) the payment of any fees or similar charges (including attorneys' fees) to the lessor. In addition,

- 47 -

section 365(c)(1) is inapplicable to the Executory Contracts being assumed or assumed and assigned by the Debtors pursuant to Section II.E of the Plan.

**N.    Plan Distributions**

38.    On and after the Effective Date, distributions on account of Allowed Claims and the resolution and treatment of Disputed Claims shall be effectuated pursuant to Section II.B and Article VI of the Plan.  Notwithstanding anything to the contrary in the Plan, the Distribution Record Date shall be the later of (a) the Confirmation Date and (b) December 28, 2007.

**O.    Recovery Actions**

39.    Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and causes of action that the Debtors or the Estates may hold against any entity, including any Recovery Actions, to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court.

40.    If the Reorganized Debtors determine to pursue any Specified Recovery Action and, as a result, receive Cash proceeds through a settlement or other compromise of, or a judgment in connection with, such Specified Recovery Action, then promptly following the receipt of such Cash proceeds, the Reorganized Debtors will deposit the Net Preference Recovery Proceeds, if any, with respect to such Specified Recovery Action in the Disputed Unsecured Claims Reserve for the benefit of creditors and, to the extent applicable, the benefit of Interest holders as provided in the Plan.

41.    All decisions and determinations by the Reorganized Debtors in connection with the Specified Recovery Actions, including without limitation decisions and

CLI-1556545v22

determinations regarding whether to pursue or at any time to abandon any Specified Recovery Action and decisions and determinations regarding the terms for any settlement or other compromise of any Specified Recovery Action that is pursued, will be made in the sole and absolute discretion of the Reorganized Debtors and none of the Reorganized Debtors, Affiliates of the Reorganized Debtors or Representatives of the Reorganized Debtors or their Affiliates will have liability for any act or omission in connection with the Specified Recovery Actions, including without limitation the pursuit, abandonment or resolution or other compromise thereof.

**P.    Claims Bar Dates and Other Claims Matters**

42.    General Administrative Claim Bar Date Provisions.  Except as otherwise provided in Section II.A.1.i.ii of the Plan or in a Bar Date Order or other order of the Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties, pursuant to the procedures specified in this Order and the notice of entry of this Order, no later than 30 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the later of (a) 150 days after the Effective Date, (b) 60 days after the Filing of the applicable request for payment of Administrative Claims or (c) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

43.    Professional Compensation.  Except as otherwise provided in Sections II.A.1.e, II.A.1.f, II.A.1.h and II.A.1.i.ii.A of the Plan, Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the

- 49 -

Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Fee

Order, this Order or other order of the Court an application for final allowance of such Fee Claim

no later than 60 days after the Effective Date; *provided*, *however*, that any professional who may

receive compensation or reimbursement of expenses pursuant to the Ordinary Course

Professionals Order may continue to receive such compensation and reimbursement of expenses

for services rendered before the Effective Date pursuant to the Ordinary Course Professionals

Order without further Court review or approval (except as provided in the Ordinary Course

Professionals Order).  Objections to any Fee Claim must be Filed and served on the Notice

Parties and the requesting party by the later of (a) 90 days after the Effective Date, (b) 30 days

after the Filing of the applicable request for payment of the Fee Claim or (c) such other period of

limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims.  To the

extent necessary, this Order shall amend and supersede any previously entered order of this

Court regarding the payment of Fee Claims; *provided*, *however*, that Fee Claims Filed by Union

Professionals will continue to be governed by, and paid in accordance with, the Union Fee Order.

Other than as set forth herein or in the Plan, the procedures set forth in the Fee Order regarding

interim compensation of Professionals shall remain in effect through the Effective Date.

Notwithstanding anything to the contrary in the Plan or this Order, each Reorganized Debtor is

authorized to pay the charges that it incurs on or after the Effective Date for retained Estate

Professionals' fees, disbursements, expenses or related support services (including fees relating

to the preparation of Professional fee applications) without application to the Court.

        44.    Bar Date for Rejection Claims.  Except as otherwise provided in a Final

Order of the Court approving the rejection of an Executory Contract or Unexpired Lease, Claims

arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan

must be Filed with the Court on or before the later of: (a) 30 days after the Effective Date or

(b) for Executory Contracts or Unexpired Leases identified on Exhibit II.E.5 to the Plan, 30 days

after (i) the service of a notice of such rejection is served pursuant to the Contract Procedures, if

the contract counterparty does not timely File an objection to the rejection in accordance with the

Contract Procedures, or (ii) if such an objection to rejection is timely Filed with the Court in

accordance with the Contract Procedures, the date that an order is entered approving the rejection

of the applicable contract or lease or the date that the objection to rejection is withdrawn. Any

Claims not Filed within such applicable time periods are forever barred from receiving a

distribution from the Debtors, the Reorganized Debtors or the Estates.

45.    28 U.S.C. § 1930 Fees.  Pursuant to Section II.A.1.b of the Plan, on or

before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930

shall be paid in Cash equal to the amount of such Administrative Claims by the applicable

Reorganized Debtor in accordance therewith until the earlier of the (a) conversion or dismissal of

the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code or (b) closing of the

applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

**Q.    Plan Implementation**

46.    In accordance with section 1142 of the Bankruptcy Code, section 13.1-

604.1 of the Virginia Stock Corporation Act, section 303 of the Delaware General Corporation

Law, section 1701.75 of the Ohio Revised Code, section 808 of the New York Business

Corporation Law and any comparable provisions of the business corporation law of any other

state (collectively, the "Reorganization Effectuation Statutes"), without further action by the

Court or the stockholders, members, managers or directors of any Debtor or Reorganized Debtor,

the Debtors, the Reorganized Debtors, as well as the Chairman of the Board, Chief Executive

Officer, President, Vice President, Chief Financial Officer, Treasurer, Assistant Treasurer or

- 51 -

Secretary (collectively, the "Responsible Officers") of the appropriate Debtor or Reorganized

Debtor, are authorized to:  (a) take any and all actions necessary or appropriate to implement,

effectuate and consummate the Plan, this Order or the transactions contemplated thereby or

hereby, including, without limitation, those transactions identified in Article V of the Plan and

the payment of any employment taxes owing in respect of distributions under the Plan; and

(b) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, releases,

agreements and documents necessary to implement, effectuate and consummate the Plan,

including without limitation, those contracts, instruments, releases, agreements and documents

identified in Article V of the Plan.

> 47.     To the extent that, under applicable non-bankruptcy law, any of the

foregoing actions would otherwise require the consent or approval of the stockholders or

directors of any of the Debtors or Reorganized Debtors, this Order shall, pursuant to

section 1142 of the Bankruptcy Code and the Reorganization Effectuation Statutes, constitute

such consent or approval, and such actions are deemed to have been taken by unanimous action

of the directors and stockholders of the appropriate Debtor or Reorganized Debtor.

> 48.     Each federal, state, commonwealth, local, foreign or other governmental

agency is hereby directed and authorized to accept any and all documents, mortgages and

instruments necessary or appropriate to effectuate, implement or consummate the transactions

contemplated by the Plan and this Order.

> 49.     All transactions effected by the Debtors during the pendency of the

Chapter 11 Cases from the Petition Date through the Confirmation Date are approved and

ratified.

50.     The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to another Reorganized Debtor shall not constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

**R.      Implementation of the Global Settlement**

51.     <u>Assumption and Assignment of Collective Bargaining Agreements</u>.  On the Effective Date, Reorganized Dana will assume and assign to the applicable Reorganized Debtor, in consultation with and subject to the consent of the applicable Unions, the collective bargaining agreements identified on Exhibit III.A to the Plan, which include the Union Settlement Agreements, and such other agreements as are described in Section III.A of the Plan. Upon assumption, all proofs of Claim filed by the Unions or any individual relating to such collective bargaining agreements will be deemed withdrawn to the extent that such proofs of Claim relate to such collective bargaining agreements.  Ordinary course obligations arising under the assumed agreements shall be unaltered by the Plan and shall be satisfied in the ordinary course of the Reorganized Debtors' business.  The Debtors shall take any and all actions necessary to implement the terms of the Global Settlement.

52.     <u>Cessation of Union Retiree and Long Term Disability Benefits</u>.  On the Union Retiree Benefit Termination Date, the Reorganized Debtors, in accordance with the Union Settlement Agreements, shall cease providing and paying (a) all retiree benefits (as defined in section 1114(a) of the Bankruptcy Code) to all UAW and USW-represented retirees and (b) all long-term disability income and medical benefits to individuals who are Union Disableds (as defined in the Union Settlement Agreements).

- 53 -

53.   <u>Contributions to UAW Union Retiree VEBA and USW Union Retiree VEBA</u>.  After the Effective Date, in accordance with the terms of the Union Settlement Agreements, the Reorganized Debtors will make (a) the UAW Union Retiree VEBA Contribution and (b) the USW Union Retiree VEBA Contribution, as such contributions may be adjusted pursuant to Appendix K of the Union Settlement Agreements.

54.   <u>Assumption and Assignment of Pension Benefits</u>.  On the Effective Date, Reorganized Dana shall assume and assign the Pension Plans to Dana Limited, which shall become the sponsor and continue to administer the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the Pension Plans in accordance with their terms and the provisions of ERISA and the Internal Revenue Code. Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or the Debtors' successors from any liability imposed under any law or regulatory provision with respect to the Pension Plans.  Neither the PBGC, the Pension Plans nor any participant or beneficiary of the Pension Plans shall be enjoined or precluded from enforcing such liability with respect to the Pension Plans.

55.   <u>Emergence Bonus for Union Employees</u>.  In accordance with the terms of the Union Settlement Agreements, New Dana Holdco shall reserve New Dana Holdco Common Stock having a maximum aggregate Per Share Value of $22.53 million to be distributed to certain current and former union employees as a post-emergence bonus in accordance with Appendix J to the Union Settlement Agreements.

56.   <u>The New Equity Investment</u>.  On the Effective Date, New Dana Holdco, shall (a) issue the New Preferred Stock and (b) receive the New Equity Investment in accordance with the terms and conditions of the New Investment Agreement, the New Series B Subscription

Agreements and the B-2 Backstop Commitment Letter.  The New Investment Agreement, as

amended by the executed First Amendment to the Investment Agreement, dated December 7,

2007 (Docket No. 7407), is approved in all respects and the issuance of New Preferred Stock

pursuant thereto is approved in all respects with no further stockholder or directors action

required.

       57.   New Employment Agreements.  Prior to the Effective Date, the

individuals who will serve as directors of New Dana Holdco, shall appoint a three-person

committee of such directors to commence negotiating, in consultation with Centerbridge, post-

Effective Date employment agreements with New Dana Holdco's anticipated senior management

team.  Such employment agreements shall (a) be at market terms, (b) be reasonably acceptable in

form and substance to Centerbridge, in consultation with the Ad Hoc Steering Committee as set

forth in the Plan Term Sheet, and (c) be approved by New Dana Holdco's board of directors on

or after the Effective Date.

**S.    Claims Monitor**

       58.   The appointment of a Claims Monitor as described at Section V.G of the

Plan (as modified by the Modifications) is hereby approved and the Debtors are authorized to

enter into an engagement letter (the "Engagement Letter") with the Claims Monitor consistent

with Section V.G of the Plan (as modified by the Modifications), which may also provide for

customary indemnities.  The identity of the Claims Monitor, as filed with the Court on

December 6, 2007, is hereby approved and shall be effective as of the Effective Date.

       59.   The powers, rights and responsibilities of the Claims Monitor shall be as

specified in the Plan.  In connection with its responsibilities, the Claims Monitor may employ,

without further order of the Court, professionals to assist in carrying out its duties under the Plan.

60.     Except as otherwise ordered by the Court, the reasonable and necessary fees and expenses of the Claims Monitor (including the reasonable and necessary fees and expenses of any professionals assisting the Claims Monitor in carrying out its duties under the Plan) shall be paid by the Reorganized Debtors in accordance with the Plan and the Engagement Letter without further order from the Bankruptcy Court.

### T.     Cancellation of Securities

61.     On the Effective Date, the Indentures, the Bonds and the Old Common Stock of Dana (including, without limitation, the Series A Participating Preferred Stock Purchase Rights issued pursuant to the Rights Agreement, dated as of April 25, 1996, as amended, between Dana and The Bank of New York, as Rights Agent) shall be deemed canceled and of no further force and effect, without any further action by the Debtors, the Reorganized Debtors or the Court.  The holders of and parties to such canceled securities and other documentation shall have no rights arising from or relating to such securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan, *provided*, *however*, that the applicable provisions of the Indentures shall continue in effect solely for the purposes of (a) allowing the Indenture Trustee or other Disbursing Agent to make distributions on account of Bondholder Claims under the Plan as provided in Section VI.F of the Plan and for the Indenture Trustee to perform such other functions with respect thereto under the Indentures and to have the benefit of all the protections and other provisions of the applicable Indentures with respect to the Bondholders in doing so and (b) permitting the Indenture Trustee to maintain or assert any rights or Charging Liens it may have on distributions to Bondholders for the Indenture Trustee Fee Claim pursuant to the terms of the Plan and the applicable Indenture.  The Reorganized Debtors shall have not have any obligations to the Indenture Trustee for any fees, costs or expenses except as expressly provided in the Plan.

62.     Nothing in the Plan shall be deemed to impair, waive or extinguish the Charging Lien with respect to fees and expenses of the Indenture Trustee incurred after the Effective Date.  Reasonable fees and expenses incurred by the Indenture Trustee after the Effective Date (a) in its capacity as a Disbursing Agent, (b) for matters relating to distributions to Bondholders, (c) for matters relating to any dispute concerning the Indenture Trustee Fee Claims, (d) for matters relating to any dispute concerning the Claims of the Indenture Trustee and (e) matters relating to enforcement of the Plan will be paid in accordance with Section VI.D of the Plan and any dispute between the Reorganized Debtors and the Indenture Trustee regarding the reasonableness of such fees and expenses will be submitted to this Court for resolution.

63.     Nothing in the Plan shall be deemed to impair, waive or extinguish any rights of the Indenture Trustee with respect to a Charging Lien, *provided*, *however*, that any such Charging Lien will be released to the extent provided in the Plan upon payment of the Indenture Trustee's reasonable fees and expenses in accordance with the terms of the applicable Indentures and the Plan.

**U.     Approval of Equity Incentive Plan**

64.     Entry of this Order constitutes the approval of the equity incentive plan described at Section V.E.5 of the Plan (the "Equity Incentive Plan"), substantially in the form as Filed with the Court on December 7, 2007 (Docket No. 7401).  The Debtors and Reorganized Debtors, as applicable, are authorized to (a) take any and all actions necessary or appropriate to implement, effectuate and consummate the Equity Incentive Plan and (b) execute and deliver, adopt or amend, as the case may be, any contracts, instruments, agreements and documents necessary to implement, effectuate and consummate the Equity Incentive Plan.

**V.    Approval of Non-Union Emergence Bonus**

65.    New Dana Holdco shall  reserve New Dana Holdco Common Stock having a maximum aggregate Per Share Value of $22.0 million to be distributed to certain non-union hourly and salaried non-management employees, excluding in all events employees that will be eligible for management bonus programs after the Effective Date, on terms and conditions established by the Debtors or the Reorganized Debtors consistent with the description of such terms and conditions previously provided to the Unions and the Creditors' Committee.

**W.    Binding Effect of Prior Orders**

66.    Pursuant to section 1141 of the Bankruptcy Code, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as authorized and directed thereunder and all motions or requests for relief by the Debtors pending before the Court as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Reorganized Debtors and their respective successors and assigns.

**X.    Final Order**

67.    This Order is a final order, and the period in which an appeal must be Filed shall commence immediately upon the entry hereof.

**Y.    Reversal**

68.    If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of such order.  Notwithstanding any such reversal, modification or vacatur of this Order, any such

- 58 -

act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.

### Z.    Notice of Confirmation of the Plan

69.    Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), the Debtors or the Reorganized Debtors are directed to serve a notice of the entry of this Order and the establishment of bar dates for certain Claims hereunder, substantially in the form of Appendix III attached hereto and incorporated herein by reference (the "Confirmation Notice"), on all parties that received the Confirmation Hearing Notice and parties to Executory Contracts or Unexpired Leases in accordance with the Contract Procedures, no later than 20 Business Days after the Confirmation Date; *provided*, *however*, that the Debtors or the Reorganized Debtors shall be obligated to serve the Confirmation Notice only on the record holders of Claims or Interests as of the Confirmation Date.  The Debtors are directed to publish the Confirmation Notice once in the national editions of *The Wall Street Journal* and *USA Today* and the daily edition of the *Toledo Blade* no later than 20 Business Days after the Confirmation Date.  As soon as practicable after the entry of this Order, the Debtors shall make copies of this Order and the Confirmation Notice available on BMC Group's website at www.dana.bmcgroup.com.

### AA.    Miscellaneous Provisions

70.    The Debtors are hereby authorized to amend or modify the Plan at any time prior to the substantial consummation of the Plan, but only in accordance with section 1127 of the Bankruptcy Code and Section X.A of the Plan, without further order of the Court.  In addition, without the need for a further order or authorization of this Court, but subject to the express provisions of this Order, the Debtors shall be authorized and empowered to make non-

- 59 -

material modifications to the documents Filed with the Court, including Confirmation Exhibits or documents forming part of the evidentiary record at the Hearing, in their reasonable business judgment as may be necessary; *provided*, *however*, the Debtors shall provide the Creditors' Committee and the Unions with 5 days' notice of such non-material modifications.

71.     On the Effective Date, the Official Committees, to the extent not previously dissolved, shall dissolve, and the members of the Official Committees and their respective Professionals shall cease to have any role arising from or related to the Chapter 11 Cases; *provided*, *however*, that the Creditors' Committee (a) shall continue to exist for the purpose of objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) to the extent (i) an appeal to this Order is pending as of the Effective Date and (ii) the Creditors' Committee is a party to and is actively participating in such appeal, the Creditors' Committee shall continue to exist for the purpose of participating in such appeal; and *provided further*, that the Retiree Committee shall continue to exist solely for the purpose of fully and finally resolving the claim for the termination of non-pension retiree benefits of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers AFL-CIO (the "Boilermakers") who were formerly employed at the Debtors' heavy axle facility in Marion, Ohio (the "Boilermaker Claim") and for such reasonable time thereafter for purposes of either effecting payment to each of the retirees and/or their surviving spouses and eligible dependents formerly employed at the Debtors' heavy axle facility in Marion, Ohio and affiliated with the Boilermakers (the "Boilermaker Retirees") or informing each Boilermaker Retiree of any Allowed Claim.

72.     Upon the later of (a) the resolution of the Creditors' Committee's outstanding objections to any Fee Claims and applications for fees and expenses under

section 503(b) of the Bankruptcy Code and (b) the resolution of any appeal of this Order in which the Creditors' Committee is actively participating, the Creditors' Committee shall dissolve, and its Professionals shall cease to have any role arising from or relating to the Chapter 11 Cases. Upon the full and final resolution of the Boilermaker Claim and effecting payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any Allowed Claim, the Retiree Committee shall dissolve, and its Professionals (both legal and actuarial) shall cease to have any role arising from or relating to these Chapter 11 Cases. The Reorganized Debtors shall pay the reasonable expenses of the members of the Creditors' Committee and the reasonable fees and expenses of the Creditors' Committee's Professionals incurred in connection with (a) objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) to the extent applicable, actively participating in an appeal of this Order, without further Court approval. The Reorganized Debtors shall pay the reasonable expenses of the Retiree Committee and the reasonable fees and expenses of the Retiree Committee's Professionals (legal and/or actuarial) incurred in connection with the full and final resolution of the Boilermaker Claim and effecting payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any Allowed Claim without the need for further Bankruptcy Court approval.

73.    The Professionals retained by the Official Committees (legal and, if deemed necessary by the Retiree Committee, financial and actuarial) and the respective members thereof shall not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with (a) any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served

CLI-1556545v22

after the Effective Date pursuant to Section II.A.1.i.ii.A of the Plan; (b) with respect to the

Retiree Committee's efforts in fully and finally resolving the Boilermaker Claim and effecting

payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any Allowed

Claim; and (c) with respect to the Creditors' Committee (i) objecting to and litigating Fee Claims

and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (ii) to

the extent applicable, the Creditors' Committee's active participation in any appeal of the

Confirmation Order.

      74.    Nothing contained in paragraphs 71 through 73 shall, or shall be deemed

to, limit, abridge or otherwise affect the exculpations and limitations on liability to which the

foregoing parties may be entitled under Article IV of the Plan.

      75.    As to the United States, its agencies, departments or agents (collectively

the "United States") and the Indiana Department of Environmental Management (the "IDEM"),

nothing in the Plan or this Confirmation Order, including Sections IV.E.4, 5, 6 and 7 of the Plan,

shall discharge, release, or otherwise preclude:  (a) any liability of the Debtors or Reorganized

Debtors first arising on or after the Confirmation Date; (b) any liability that is not a Claim;

(c) any valid right of setoff or recoupment against a Debtor or Reorganized Debtor; (d) any

police or regulatory action against a Debtor or Reorganized Debtor to the extent excepted from

the automatic stay provisions of section 362 of the Bankruptcy Code; (e) any environmental

liability that a Debtor or Reorganized Debtor may have as an owner or operator of real property

owned or operated by a Debtor or Reorganized Debtor on or after the Confirmation Date; and

(f) any liability to the United States or the IDEM on the part of any Persons other than the

Debtors and Reorganized Debtors.  Notwithstanding the foregoing and for the avoidance of

doubt, other than as set forth in this paragraph, all Claims of the United States and the IDEM

against any Debtor or Reorganized Debtor are discharged as of the Effective Date to the extent such Claims are discharged under the Plan.  In addition,  proof of claim number 11790 filed by the IDEM against Dana is not a Tort Claim.

76.    Nothing in the Plan or this Confirmation Order shall be construed to limit, expand, modify or otherwise affect relief granted in the Opinion and Order of the United States District Court for the Southern District of New York, dated November 20, 2007, in Case No. 07 Civ. 8160 (SAS) (the "Withdrawal Order"), which approved the motion of the United States Environmental Protection Agency and certain other federal agencies (collectively, the "EPA") pursuant to 28 U.S.C. § 157(d) to withdraw the reference in connection with the Debtors' pending objection to the EPA's proofs of claims identified as Claim Numbers 13321, 13796 and 14958 and related estimation proceeding, as long as such Order remains in effect. See Withdrawal Order at 27 (indicating that the District Court is "withdrawing the reference to the bankruptcy court of all proceedings relating to the Government's claims, including but not limited to the Claim Objection and the Estimation Motion").  In addition, notwithstanding any other provision of this Order or the Plan, the Debtors shall not reduce the specific reserve amount established for any particular Claim (or group of Claims) identified on Exhibit A to the Claims Reserve Order without either (a) obtaining the written agreement of the holder of the Claim(s), (b) an order of the Bankruptcy Court addressing the allowance or estimation of the Claim(s) or (c) compliance with the additional reserve procedures in paragraph 4(a) of the Claims Reserve Order.

77.    The Reorganized Debtors shall file a consolidated report of their activities and financial affairs with the Court on a quarterly basis, within 30 days after the conclusion of each such period, with the first such report being due 30 days after the conclusion of the first

calendar quarter following the Effective Date. Any such reports shall be prepared substantially consistent with (both in terms of content and format) the applicable Court and U.S. Trustee guidelines for such matters.

78.    Notwithstanding anything to the contrary contained in this Order, the Plan or section 1141 of the Bankruptcy Code, the obligations of Dana Corporation, Torque Traction Manufacturing Technologies, LLC. and Dana Heavy Axle Mexico, S.A. de C.V. under that certain Settlement Agreement between Dana and Sypris Solutions, Inc., Sypris Technologies, Inc., Sypris Technologies Marion, LLC and Sypris Technologies Mexico, S. de R.L. de C.V. and the New Agreement (defined in the Settlement Agreement), approved by this Court on August 7, 2007, shall survive entry of the Confirmation Order unimpaired.

79.    With respect to federal tax liabilities incurred by Debtors after the Petition Date and before the Confirmation Date, the Internal Revenue Service expressly reserves the right to seek to recover as Administrative Claims under the Plan penalties and interest with respect to such tax liabilities accruing on or after the Petition Date until the date that such tax liabilities are paid in full as Allowed Administrative Claims under the Plan and the Debtors and Reorganized Debtors reserve the right to object to such Claims. In addition, Allowed Priority Tax Claims of the Internal Revenue Service will accrue Post-Effective Date Interest until paid, and the Internal Revenue Service and the Debtors will work expeditiously to resolve and finalize all such Priority Tax Claims.

80.    The Claims of Pine Tree Independent School District (Proof of Claim No. 14746), Longview Independent School District (Proof of Claim No. 14746), County of Harrison (Proof of Claim No. 14748), Hallsville Independent School District (Proof of Claim No. 14748), Dallas County (Proof of Claim No. 14841) and Gregg County (Proof of Claim No.

- 64 -

14693) (collectively, the "Taxing Authorities") are Secured Tax Claims that will be paid on the

Effective Date, or as soon thereafter as such Claims are Allowed.  Payment of such Allowed

Secured Tax Claims shall include prepetition interest at the applicable statutory rate, Postpetition

Interest and Post-Effective Date Interest, but will not include any penalties, which are hereby

waived.  To the extent any postpetition Taxes owing to the Taxing Authorities are not timely

paid before delinquency, they shall accrue both penalties and interest as provided in section

503(b)of the Bankruptcy Code.  Property taxes for 2007 and any subsequent years owing to the

Taxing Authorities shall be paid in the ordinary course without the requirement of the filing of an

Administrative Claim, or any request for payment of such.  Further, any ad valorem property tax

liens of the Taxing Authorities for prepetition Taxes as well as for the postpetition tax years are

hereby expressly preserved and shall remain attached to the corresponding property with the

same validity, force, effect and priority as provided under applicable non-bankruptcy law until

payment as provided for herein.

        81.     Nothing in the Plan or this Order shall be construed to alter, amend, limit,

expand or modify the Lead Plaintiffs' right, if any, to seek recovery against the Debtors in

respect of Proof of Claim No. 10820, to the extent such Claim is eventually Allowed or

otherwise resolved by a court of competent jurisdiction, solely to the extent of available

proceeds, if any, under applicable Insurance Contracts, if any.

        82.     Nothing in the Plan or this Order shall be construed to alter, amend, limit,

expand or modify the rights of Ogre Holdings, Inc. f/k/a Acraline Products, Inc. ("Ogre"), if any,

to pursue a claim  for available proceeds, if any, under applicable Insurance Contracts, if any (an

"Insurance Action"), on account of the costs for required environmental remediation for the site

located at 641 Cleveland Street in Tipton County, Tipton, Indiana (the "Tipton Site"), as set forth

in Proof of Claim No. 11615 filed in these cases by Ogre (as it may be amended, the "Ogre Claim"); provided, however, that (a) Ogre shall not pursue any such Insurance Action to the extent that the Reorganized Debtors may incur any direct or indirect liabilities to Ogre as a result of such Insurance Action, and Ogre shall be permitted to name any of the Reorganized Debtors solely as a nominal party in any Insurance Action; and (b) Ogre shall not initiate any such Insurance Action until both the Ogre Claim and Proof of Claim No. 11790 (as it may be amended) asserted by the Indiana Department of Environmental Management with respect to the Tipton Site are Allowed or otherwise resolved by agreement or a final nonappealable order of the Bankruptcy Court. For the avoidance of doubt, (a) nothing in the preceding sentence shall limit or modify the discharge of the Ogre Claim pursuant to sections 1141 and 524 of the Bankruptcy Code upon the entry of this Order; and (b) the rights of the Reorganized Debtors or any other parties under applicable non-bankruptcy law to challenge any Insurance Action brought by Ogre on any and all available grounds are fully preserved.

83. The terms and conditions of the Exit Facility and any documents related thereto are approved and ratified as being entered in good faith and being critical to the success and feasibility of the Plan. The Reorganized Debtors are hereby authorized to execute and deliver the loan agreement for the Exit Facility, all mortgages, security documents and all other related documents (the "Exit Facility Documents") and perform their obligations thereunder. The Exit Facility Documents shall constitute the legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. On the Effective Date, all of the liens and security interests to be granted in accordance with the Exit Facility Documents shall be deemed approved and shall be legal, valid, binding and enforceable liens on the collateral in accordance with the terms of the Exit Facility Documents.

- 66 -

84.     Except as otherwise provided in the Plan and this Order, notice of all subsequent pleadings in the Chapter 11 Cases shall be limited to counsel to the Debtors, counsel for the Claims Monitor, counsel for Centerbridge, the United States Trustee and any party known to be directly affected by the relief sought.

85.     Failure specifically to include or reference particular sections or provisions of the Plan or any related agreement in this Order shall not diminish or impair the effectiveness of such sections or provisions, it being the intent of the Court that the Plan be confirmed and such related agreements be approved in their entirety.

86.     Any document related to the Plan that refers to a plan of reorganization of the Debtors other than the Plan confirmed by this Order shall be, and it hereby is, deemed to be modified such that the reference to a plan of reorganization of the Debtors in such document shall mean the Plan confirmed by this Order, as appropriate.

87.     Without intending to modify any prior Order of this Court (or any agreement, instrument or document addressed by any prior Order), in the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in such agreement, instrument, or document).  In the event of any inconsistency between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

88.     In accordance with Section IV.D of the Plan, if the Effective Date does not occur, then:  (a) the Plan shall be null and void in all respects, including with respect to (i) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy

CLI-1556545v22

Code, (ii) the assumptions, assignments or rejections of Executory Contracts or Unexpired

Leases pursuant to section II.E of the Plan and (iii) the releases described in section IV.E of the

Plan; and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims

by or against, or any Interest in, any Debtor or (ii) prejudice in any manner the rights of the

Debtors or any other party in interest.

        89.    The business and assets of the Debtors shall remain subject to the

jurisdiction of this Court until the Effective Date.  Notwithstanding the entry of this Order, from

and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Cases as

is legally permissible, including jurisdiction over those matters and issues described in Article IX

of the Plan.

Dated: New York, New York
       December 26, 2007

                     /s/ Burton R. Lifland            
                     UNITED STATES BANKRUPTCY JUDGE

- 68 -

**APPENDIX I**

**PLAN OF REORGANIZATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| Dana Corporation, *et al.,* | : | Case No. 06-10354 (BRL) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

-------------------------------------------------------------------x

**THIRD AMENDED JOINT PLAN OF**
**REORGANIZATION OF DEBTORS**
**AND DEBTORS IN POSSESSION**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)

-AND-

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox (HL 3046)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)

-AND-

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman (JE 5638)

Attorneys for Debtors and Debtors in
Possession

October 23, 2007

**TABLE OF CONTENTS**

Page

ARTICLE I.    DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME.......... 1

    A.    Defined Terms ............................................................................................... 1

    B.    Rules of Interpretation and Computation of Time ...................................... 20

        1.    Rules of Interpretation ................................................................... 20

        2.    Computation of Time ...................................................................... 20

ARTICLE II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS; CRAMDOWN; EXECUTORY CONTRACTS & UNEXPIRED LEASES............................... 20

    A.    Unclassified Claims .................................................................................... 21

        1.    Payment of Administrative Claims ................................................ 21

        2.    Payment of Priority Tax Claims ..................................................... 23

    B.    Classified Claims and Interests .................................................................. 24

        1.    Priority Claims Against the Consolidated Debtors (Class 1A Claims)........................... 24

        2.    Priority Claims Against EFMG (Class 1B Claims) ....................... 24

        3.    Secured Claims Against the Consolidated Debtors Other Than the Port Authority Secured Claim (Class 2A Claims) ................. 24

        4.    Secured Claims Against EFMG (Class 2B Claims)....................... 24

        5.    Port Authority Secured Claim (Class 2C Claim) ........................... 25

        6.    Asbestos Personal Injury Claims (Class 3 Claims)........................ 25

        7.    Convenience Claims Against the Consolidated Debtors (Class 4 Claims) .................... 25

        8.    General Unsecured Claims Against EFMG (Class 5A Claims)...................................... 25

        9.    General Unsecured Claims Against the Consolidated Debtors (Class 5B Claims)......... 25

        10.    Union Claim (Class 5C Claim) ...................................................... 25

        11.    Prepetition Intercompany Claims (Class 6A Claims) ..................... 25

        12.    Claims of Wholly-Owned and Majority-Owned Non-Debtor Affiliates Other than DCC (Class 6B Claims) .................................... 26

        13.    DCC Claim (Class 6C Claim)........................................................ 26

        14.    Section 510(b) Securities Claims Against the Consolidated Debtors (Class 6D Claims)........................................................................... 26

        15.    Old Common Stock of Dana (Class 7A Interests) .......................... 26

        16.    Section 510(b) Old Common Stock Claims Against the Consolidated Debtors (Class 7B Claims) ................................................ 26

        17.    Subsidiary Debtor Equity Interests (Class 8 Interests) ................... 26

    C.    Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery.................................................................. 26

    D.    Confirmation Without Acceptance by All Impaired Classes ..................... 27

# TABLE OF CONTENTS
(continued)

**Page**

E.   Treatment of Executory Contracts and Unexpired Leases ............................................ 27

    1.   Executory Contracts and Unexpired Leases to Be Assumed ........................................ 27

    2.   Approval of Assumptions and Assignments; Assignments Related to Restructuring Transactions ............................................................................................ 28

    3.   Payments Related to the Assumption of Executory Contracts or Unexpired Leases ....................................................................................................................... 28

    4.   Contracts and Leases Entered Into or Assumed After the Petition Date..................... 29

    5.   Rejection of Executory Contracts and Unexpired Leases.............................................. 29

    6.   Bar Date for Rejection Damages ................................................................................ 29

    7.   Executory Contract and Unexpired Lease Notice Provisions ....................................... 29

    8.   Special Executory Contract and Unexpired Lease Issues ............................................. 30

    9.   No Change in Control .............................................................................................. 30

ARTICLE III.   THE GLOBAL SETTLEMENT ............................................................................. 30

A.   Assumption and Assignment of Collective Bargaining Agreements ............................... 31

B.   Cessation of Union Retiree and Long Term Disability Benefits..................................... 31

C.   Contributions to UAW Union Retiree VEBA and USW Union Retiree VEBA .............. 31

D.   Assumption and Assignment of Pension Benefits ...................................................... 31

E.   Emergence Bonus for Union Employees ................................................................... 31

F.   The New Equity Investment.................................................................................... 31

G.   New Employment Agreements ............................................................................... 32

H.   Limitations on Sales of Core Businesses Prior to Effective Date ................................ 32

ARTICLE IV.   CONFIRMATION OF THE PLAN .......................................................................... 32

A.   Conditions Precedent to Confirmation..................................................................... 32

B.   Conditions Precedent to the Effective Date .............................................................. 32

C.   Waiver of Conditions to the Confirmation or Effective Date ...................................... 33

D.   Effect of Nonoccurrence of Conditions to the Effective Date ..................................... 33

E.   Effect of Confirmation of the Plan .......................................................................... 34

    1.   Dissolution of Official Committees ............................................................................ 34

    2.   Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Recovery Actions ..................................................................................................... 34

    3.   Comprehensive Settlement of Claims and Controversies............................................. 34

    4.   Discharge of Claims and Termination of Interests ...................................................... 35

    5.   Injunction .............................................................................................................. 35

    6.   Releases ................................................................................................................ 36

    7.   Exculpation ........................................................................................................... 37

**TABLE OF CONTENTS**
(continued)

|  |  |  |  |
|---|---|---|---|
|  | 8. | Termination of Certain Subordination Rights and Settlement of Related Claims and Controversies | 37 |
| ARTICLE V. |  | MEANS FOR IMPLEMENTATION OF THE PLAN | 38 |
| A. |  | Continued Corporate Existence and Vesting of Assets | 38 |
| B. |  | Restructuring Transactions | 38 |
|  | 1. | Restructuring Transactions Generally | 38 |
|  | 2. | Obligations of Any Successor Corporation in a Restructuring Transaction | 39 |
| C. |  | Corporate Governance and Directors and Officers | 39 |
|  | 1. | Certificates of Incorporation and Bylaws of New Dana Holdco and the Other Reorganized Debtors | 39 |
|  | 2. | Directors and Officers of New Dana Holdco and the Other Reorganized Debtors | 39 |
|  | 3. | Compliance with Exchange Act by New Dana Holdco | 40 |
| D. |  | New Dana Holdco Common Stock | 40 |
|  | 1. | Issuance and Distribution of New Dana Holdco Common Stock | 40 |
|  | 2. | Listing | 40 |
|  | 3. | Section 1145 Exemption | 40 |
| E. |  | Employment, Retirement and Other Related Agreements; Cessation of Retiree Benefits; Workers' Compensation Programs | 40 |
|  | 1. | Employment-Related Agreements | 40 |
|  | 2. | Cessation of Retiree Benefits | 40 |
|  | 3. | Continuation of Workers' Compensation Programs | 41 |
|  | 4. | Emergence Bonus for Non-Union Employees | 41 |
|  | 5. | Equity Incentive Plan | 41 |
| F. |  | Corporate Action | 41 |
| G. |  | Litigation Trust | 41 |
|  | 1. | Creation | 41 |
|  | 2. | Rights and Responsibilities | 42 |
|  | 3. | Fees and Expenses of the Litigation Trust | 42 |
|  | 4. | Tax Treatment | 42 |
|  | 5. | No Transfer | 42 |
| H. |  | Special Provisions Regarding Insured Claims | 43 |
|  | 1. | Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims | 43 |
|  | 2. | Assumption and Continuation of Insurance Policies | 43 |
|  | 3. | Liquidation of Asbestos Personal Injury Claims | 43 |
| I. |  | Cancellation and Surrender of Instruments, Securities and Other Documentation | 43 |

**TABLE OF CONTENTS**
(continued)

Page

|   |   |   |   |   |
|---|---|---|---|---|
| | 1. | Bonds | 43 |
| | 2. | Old Common Stock | 44 |
| J. | | Settlement Pool | 44 |
| | 1. | Purpose of Settlement Pool | 44 |
| | 2. | Payments from Settlement Pool | 44 |
| | 3. | Condition to Funding of Settlement Pool | 44 |
| | 4. | Evidence of Allowed Ineligible Unsecured Claims | 44 |
| K. | | Release of Liens | 44 |
| L. | | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 44 |
| ARTICLE VI. | | PROVISIONS GOVERNING DISTRIBUTIONS | 45 |
| A. | | Distributions for Claims and Interests Allowed as of the Effective Date | 45 |
| B. | | Method of Distributions to Holders of Claims and Interests | 45 |
| C. | | Distributions on Account of Bondholder Claims | 45 |
| D. | | Compensation and Reimbursement for Services Related to Distributions | 45 |
| E. | | Provisions Governing Disputed Unsecured Claims Reserve | 46 |
| | 1. | Funding of the Disputed Unsecured Claims Reserve | 46 |
| | 2. | Dividends and Distributions | 46 |
| | 3. | Recourse | 46 |
| | 4. | Voting of Undelivered New Dana Holdco Common Stock | 46 |
| | 5. | Tax Treatment | 47 |
| | 6. | No Transfer of Rights | 47 |
| F. | | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 47 |
| | 1. | Delivery of Distributions | 47 |
| | 2. | Undeliverable Distributions Held by Disbursing Agents | 48 |
| G. | | Timing and Calculation of Amounts to Be Distributed | 49 |
| | 1. | Distributions to Holders of Allowed Claims in Classes Other than 5B, 6D and 7B | 49 |
| | 2. | Valuation of New Dana Holdco Common Stock | 49 |
| | 3. | Postpetition Interest on Claims | 49 |
| | 4. | Post-Effective Date Interest on Claims | 49 |
| | 5. | Distributions to Holders of Allowed Claims in Class 5B | 49 |
| | 6. | Distributions to Holders of Allowed Claims in Class 6D | 50 |
| | 7. | Distributions to Holders of Allowed Interests in Class 7A and Allowed Claims in Class 7B | 50 |
| | 8. | Distributions of New Dana Holdco Common Stock - No Fractional Shares; Rounding | 51 |

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 9. | De Minimis Distributions | 51 |
| | 10. | Administration and Distribution of Union Emergence Shares | 51 |
| H. | | Distribution Record Date | 51 |
| I. | | Means of Cash Payments | 51 |
| J. | | Foreign Currency Exchange Rate | 52 |
| K. | | Establishment of Reserves | 52 |
| L. | | Surrender of Canceled Instruments or Securities | 52 |
| | 1. | Tender of Bonds | 52 |
| | 2. | Lost, Stolen, Mutilated or Destroyed Bonds | 52 |
| | 3. | Failure to Surrender Bonds | 52 |
| | 4. | Tender of Old Common Stock of Dana | 52 |
| | 5. | Lost, Stolen, Mutilated or Destroyed Old Common Stock of Dana | 53 |
| | 6. | Failure to Surrender Old Common Stock of Dana | 53 |
| M. | | Withholding and Reporting Requirements | 53 |
| N. | | Setoffs | 53 |
| O. | | Application of Distributions | 54 |
| ARTICLE VII. | | PROCEDURES FOR RESOLVING DISPUTED CLAIMS | 54 |
| A. | | Treatment of Disputed Claims | 54 |
| | 1. | ADR Procedures | 54 |
| | 2. | Tort Claims | 54 |
| | 3. | Disputed Insured Claims | 55 |
| | 4. | No Distributions Until Allowance; No Settlement Payments Unless Allowed by Effective Date | 55 |
| B. | | Prosecution of Objections to Claims | 55 |
| | 1. | Objections to Claims | 55 |
| | 2. | Authority to Prosecute Objections | 55 |
| | 3. | Authority to Amend Schedules | 55 |
| C. | | Distributions on Account of Disputed Claims Once Allowed | 56 |
| D. | | Consent to Resolution of Certain Disputes | 56 |
| ARTICLE VIII. | | CONSOLIDATION OF THE DEBTORS | 56 |
| A. | | Consolidation | 56 |
| B. | | Order Granting Consolidation | 56 |
| ARTICLE IX. | | RETENTION OF JURISDICTION | 57 |
| ARTICLE X. | | MISCELLANEOUS PROVISIONS | 58 |
| A. | | Modification of the Plan | 58 |

# TABLE OF CONTENTS
(continued)

**Page**

B.     Revocation of the Plan ................................................................................................ 58

C.     Severability of Plan Provisions .................................................................................. 58

D.     Successors and Assigns ............................................................................................... 58

E.     The New Investment Agreement and Union Settlement Agreements ......................... 59

F.     Service of Documents ................................................................................................. 59

     1.     The Debtors and Reorganized Debtors ......................................................... 59

     2.     The Creditors' Committee ............................................................................. 59

     3.     The Retiree Committee .................................................................................. 60

     4.     The Ad Hoc Bondholders' Committee .......................................................... 60

     5.     Centerbridge and CBP .................................................................................. 60

     6.     The Unions ..................................................................................................... 60

**TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit I.A.63 | Debtors in the Chapter 11 Cases |
| Exhibit I.A.88 | Principal Terms of the Exit Facility |
| Exhibit I.A.113 | Litigation Trust Agreement |
| Exhibit I.A.124 | New Series B Subscription Agreement |
| Exhibit I.A.136 | Pension Plans to Be Assumed and Assigned |
| Exhibit II.E.1.a | Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit II.E.1.c | Joint Venture Agreements to be Assumed and Assigned |
| Exhibit II.E.4 | Previously Assumed Executory Contracts and Unexpired Leases to be Assigned |
| Exhibit II.E.5 | Executory Contracts and Unexpired Leases to be Rejected |
| Exhibit III.A | Collective Bargaining and Related Agreements to be Assumed and Assigned |
| Exhibit V.B.1 | Restructuring Transactions |
| Exhibit V.C.1.a | Certificate of Incorporation (or Comparable Constituent Documents) of New Dana Holdco, including New Dana Holdco's Certificate of Designations and Form Certificates of Incorporation (or Comparable Constituent Documents) for the Other Reorganized Debtors |
| Exhibit V.C.1.b | Bylaws (or Comparable Constituent Documents) of New Dana Holdco and Form Bylaws (or Comparable Constituent Documents) for the Other Reorganized Debtors |
| Exhibit V.C.2 | Initial Directors and Officers of New Dana Holdco and Each Other Reorganized Debtor |

**INTRODUCTION**

Dana Corporation, a Virginia corporation, and the other above-captioned debtors and debtors in possession (collectively, as further defined below, the "Debtors") propose the following third amended joint plan of reorganization for the resolution of the outstanding claims against and equity interests in the Debtors.  The Debtors are the proponents of the Plan (as such term is defined below) within the meaning of section 1129 of the Bankruptcy Code (as such term is defined below).  Reference is made to the Debtors' third amended Disclosure Statement (as such term is defined below), distributed contemporaneously with the Plan, for a discussion of the Debtors' history, business, results of operations, historical financial information, projections and properties and for a summary and analysis of the Plan.  Other agreements and documents supplement the Plan and have been or will be filed with the Bankruptcy Court (as such term is defined below).  These supplemental agreements and documents are referenced in the Plan and the Disclosure Statement and will be available for review.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION**
**AND COMPUTATION OF TIME**

**A.    Defined Terms**

As used in the Plan, capitalized terms have the meanings set forth below.  Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules (as each such term is defined below), will have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.    "5.85% Bonds" means the unsecured notes issued under the 5.85% Bonds Indenture.

2.    "5.85% Bonds Indenture" means the Indenture for Senior Securities between Dana, as Issuer, and Citibank, N.A., as Trustee, dated December 10, 2004, as supplemented by the First Supplemental Indenture, dated October 10, 2004, relating to the $450 million 5.85% Notes due January 15, 2015, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

3.    "6.5% and 7% Bonds" means the unsecured notes issued under the 6.5% and 7% Bonds Indenture.

4.    "6.5% and 7% Bonds Indenture" means the Indenture for Senior Securities between Dana, as Issuer, and Citibank, N.A., as Trustee, dated December 15, 1997, as supplemented by the First Supplemental Indenture, dated March 16, 1998, and the Second Supplemental Indenture, dated February 26, 1999, relating to the (a) $350 million 6.5% Notes due March 1, 2009, (b) $400 million 7% Notes due March 1, 2029, (c) $150 million 6.5% Notes due March 15, 2008 and (d) $200 million 7% Notes due March 15, 2028, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

5.    "9% Bonds" means the unsecured notes issued under the 9% Bonds Indenture.

6.    "9% Bonds Indenture" means the Indenture between Dana, as Issuer, and Citibank, N.A., as Trustee, Registrar and Paying Agent for the Dollar Securities, and Citibank, N.A., London Branch, as Registrar and Paying Agent for the Euro Securities, dated August 8, 2001, relating to the (a) $575 million 9% Dollar Securities due August 15, 2011 and (b) €200 9% Euro Securities due August 15, 2011, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

7.    "10.125% Bonds" means the unsecured notes issued under the 10.125% Bonds Indenture.

8.    "10.125% Bonds Indenture" means the Indenture between Dana, as Issuer, and Citibank, N.A., as Trustee, Registrar and Paying Agent, dated March 11, 2002, relating to the $250 million 10.125% Notes due March 15, 2010, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

9.      "Acquired Bond Claims" means Qualified Bond Claims that are transferred to a Person (a) who is a QIB and (b) who assumes all of the obligations of the transferor under the Plan Support Agreement in connection with such transfer.  Acquired Bond Claims (as such term is defined in the preceding sentence) that are subsequently transferred to a Person who (a) is a QIB and (b) assumes all of the obligations of the transferor under the Plan Support Agreement and delivers a signature page to the Plan Support Agreement to Dana and Centerbridge within five Business Days of the closing of such transfer (but in no event later than the Confirmation Date) shall continue to be deemed Acquired Bond Claims.

10.      "Ad Hoc Bondholders' Committee" means the ad hoc committee of holders of Bonds represented by Stroock & Stroock & Lavan LLP.

11.      "Ad Hoc Steering Committee" means Avenue Special Situations Fund IV, L.P.; Avenue Special Situations Fund V, L.P.; Avenue International, Ltd.; Avenue Investments, L.P.; Avenue-CDP Global Opportunities Fund, L.P.; Davidson Kempner Capital Management, LLC (together with investment vehicles advised by Davidson Kempner Capital Management, LLC and/or its Affiliates); Dune Capital Management, L.P.; Dune Capital, LLC; Franklin Mutual Advisers, LLC; QDRF Master Ltd., Quadrangle Debt Recovery Income Fund Master Ltd. and Quadrangle Debt Opportunities Fund Master Ltd; and Silver Point Capital, L.P.

12.      "Administrative Claim"  means a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, commissions for services and payments for inventories, leased equipment and premises); (b) Claims under the DIP Credit Agreement; (c) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Fee Claims; (d) any Allowed Claims for reclamation under section 546(c)(1) of the Bankruptcy Code; (e) Claims, pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' businesses; (f) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930; (g) any Claims entitled to administrative priority under the Union Settlement Agreements as approved by the Global Settlement Order; (h) any Claims of Centerbridge entitled to superpriority under the New Investment Agreement as approved by the Global Settlement Order; (i) any Claims of the B-2 Backstop Investors entitled to superpriority under the B-2 Backstop Commitment Letter and any order approving same; and (j) all Postpetition Intercompany Claims other than Postpetition Intercompany Claims entered into a Debtor's "intercompany equity" account for internal accounting purposes after the close of 2006.

13.      "ADR Order" means the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019, Approving Alternative Dispute Resolution Procedures to Promote the Resolution of Certain Prepetition Claims (Docket No. 5372), entered by the Bankruptcy Court on May 23, 2007, as it may be amended or supplemented from time to time.

14.      "ADR Procedures" means the alternative dispute resolution procedures approved by the ADR Order, as such procedures may be modified by further Order of the Bankruptcy Court.

15.      "Affiliate" means any Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under Common Control with, another Person; *provided that*, Centerbridge and CBP are not to be considered Affiliates of Dana.

16.      "Allowed … Claim" or "Allowed … Interest" means an Allowed Claim or Allowed Interest, as the case may be, in the particular Class or category specified.

17.    "Allowed Claim" when used:

a.    with respect to any Claim other than an Administrative Claim, means a Claim that is not a Disallowed Claim and:

(i) (A) is listed on a Debtor's Schedules and not designated in the Schedules as either disputed, contingent or unliquidated and (B) is not otherwise a Disputed Claim;

(ii) (A) as to which no objection to allowance has been interposed on or before the Claims Objection Bar Date or such other applicable period of limitation fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such Claims and (B) is not otherwise a Disputed Claim;

(iii) that is allowed:  (A) in any Stipulation of Amount and Nature of Claim executed by the applicable Claim holder on or after the Effective Date, (B) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court, (C) pursuant to a Final Order or (D) pursuant to the terms of the Plan;

(iv) is asserted in a liquidated proof of Claim that is accepted, and is designated for allowance, by the Debtors, as set forth in one or more notices Filed with the Bankruptcy Court on or before the Effective Date; or

(v) is any Claim that is not a Disputed Claim; provided, however, that, to the extent that (A) any portion of any Disputed General Unsecured Claim is identified in the Debtors' Schedules in a liquidated, non-contingent, non-disputed amount, (B) no proof of Claim was Filed seeking a different priority or a lower amount than listed in the Schedules, (C) no objection has been filed with respect to such Disputed Claim seeking to modify the priority or reduce the amount below the amount set forth in the Schedules and (D) the scheduled portion of such Disputed Claim has not been settled, waived, paid or otherwise satisfied or resolved, then such portion of the Disputed General Unsecured Claim will be deemed an Allowed Claim as set forth in a notice to be filed no later than 5 business days prior to the Trade Claims Record Date, with a final updated notice of all Allowed Claims as of the Effective Date to be filed no later than five business days after the Effective Date or such later date that is reasonably agreed upon by the Debtors and the Creditors' Committee; and provided further that the deemed Allowance of a portion of any Disputed General Unsecured Claim under this Section I.A.17.a.v shall not limit the Debtors', the Reorganized Debtors' or, to the extent applicable, other parties' ability to object to the remaining disputed portion of such Claim; and

b.    with respect to an Administrative Claim, means an Administrative Claim that is not a Disallowed Claim and:

(i) (A) as to which no objection to allowance has been interposed on or before the Claims Objection Bar Date or such other applicable period of limitation fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such Claims and (B) is not otherwise a Disputed Claim;

(ii) that is allowed:  (A) in any Stipulation of Amount and Nature of Claim executed by the applicable Claim holder on or after the Effective Date, (B) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Bankruptcy Court, (C) pursuant to a Final Order or (D) pursuant to Section II.A.1; or

(iii) is asserted in a liquidated proof of Claim that is accepted, and is designated for allowance, by the Debtors, as set forth in one or more notices Filed with the Bankruptcy Court on or before the Effective Date.

18.    "Allowed Interest" means an Interest registered in the stock register, membership interest register or any similar register or schedule maintained by or on behalf of a Debtor as of the Distribution Record Date and not timely objected to or that is allowed by a Final Order.

19.     "Asbestos Personal Injury Claim" means any Claim, remedy, liability or demand, held by or asserted on behalf of an individual, now existing or hereafter arising against any Debtor, whether or not such Claim, remedy, liability or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, whether or not the facts of or legal bases therefor are known or unknown, under any theory of law, equity, admiralty or otherwise (including piercing the corporate veil, alter ego and similar theories), for death, bodily injury, sickness, disease, medical monitoring or other personal injuries (whether physical, emotional or otherwise) to the extent allegedly arising out of or based on, directly or indirectly, in whole or in part, the presence of or exposure to asbestos or asbestos-containing products or things that were installed, engineered, designed, manufactured, fabricated, constructed, sold, supplied, produced, specified, selected, distributed, released, marketed, serviced, maintained, repaired, purchased, owned, occupied, used, removed, replaced or disposed of by any Debtor or an entity for whose products or operations any Debtor allegedly has liability or for which any Debtor is otherwise allegedly liable, including any Claim, remedy, liability or demand for compensatory damages (such as loss of consortium, lost wages or other opportunities, wrongful death, medical monitoring, survivorship, proximate, consequential, general and special damages) or punitive damages related thereto, and any Claim under any settlement entered into by or on behalf of any Debtor prior to or after the Petition Date of an Asbestos Personal Injury Claim.  Asbestos Personal Injury Claim does not include (a) a workers' compensation claim brought directly by a past or present employee of any Debtor under an applicable workers' compensation statute or (b) a Claim for indemnity, contribution or reimbursement asserted on account of an Asbestos Personal Injury Claim (as such term is defined in the preceding sentence) by entities other than the allegedly injured individual.

20.     "Assets" means all of a Debtor's property, rights and interest that are property of a Debtor's Estate pursuant to section 541 of the Bankruptcy Code.

21.     "B-2 Backstop Commitment Letter" means the letter between Dana, Centerbridge and the B-2 Backstop Investors dated October 18, 2007, pursuant to which the B-2 Backstop Investors agreed to purchase up to 2,900,000 unsubscribed shares of the New Series B Preferred Stock.

22.     "B-2 Backstop Investors" means those investors that have executed signature pages to the B-2 Backstop Commitment Letter.

23.     "Ballot" means the form or forms distributed to each holder of an impaired Claim or Interest entitled to vote on the Plan on which the holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim or Interest under the Plan.

24.     "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended, as applicable to these Chapter 11 Cases.

25.     "Bankruptcy Court" means the United States District Court having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to 28 U.S.C. § 157, the bankruptcy unit of such District Court.

26.     "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

27.     "Bar Date" means the applicable bar date by which a proof of Claim must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including a Bar Date Order and the Confirmation Order.

28.     "Bar Date Order" means any order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claim in the Chapter 11 Cases, including the Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof, entered on July 19, 2006 (Docket No. 2073), as the same may be amended, modified or supplemented.

29.     "Bondholder" means a holder of a Bondholder Claim.

30.     "Bondholder Claim" means any Claim against a Debtor under or evidenced by a Bond, which Claim includes, but is not limited to, principal and interest as of the Petition Date and, only if applicable, Postpetition Interest and Post-Effective Date Interest.

31.     "Bondholder Record Date" means August 13, 2007.

32.     "Bonds" means, collectively:  (a) the 5.85% Bonds; (b) the 6.5% and 7% Bonds; (c) the 9% Bonds; and (d) the 10.125% Bonds.

33.     "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "Case Management Order" means the Amended Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure, Establishing Case Management and Scheduling Procedures (Docket No. 574), entered on March 23, 2006, as it may be amended from time to time.

35.     "Cash" means legal tender of the United States of America and equivalents thereof.

36.     "Cash Investment Yield" means the net yield earned by the applicable Disbursing Agent from the investment of Cash held pending distribution pursuant to the Plan (including any Cash received by the Disbursing Agent on account of dividends and other distributions on the Reserved Shares), which investment will be in a manner consistent with Dana's investment and deposit guidelines.

37.     "Catch-Up Distribution" means:  (a) with respect to each holder of an Allowed Claim in Class 5B that was previously a Disputed Claim, the amount of Reserved Shares and Reserved Excess Minimum Cash equal to the aggregate amount of any (i) Distributable Shares of New Dana Holdco Common Stock, (ii) Distributable Excess Minimum Cash, (iii) Reserved Shares and (iv) Reserved Excess Minimum Cash (if any) that such holder would have received if its Claim had been an Allowed Claim on the Effective Date and each Periodic Distribution Date preceding the date the Claim became Allowed; (b) with respect to each holder of an Allowed Claim in Class 6D that was previously a Disputed Claim, the amount of Reserved Shares and Reserved Excess Minimum Cash equal to the aggregate amount of any Reserved Shares and Reserved Excess Minimum Cash (if any) that such holder would have received if its Claim had been an Allowed Claim on the Periodic Distribution Date upon which (i) all Disputed Claims in Classes other than Class 6D and Class 7B entitled to distributions from the Disputed Unsecured Claims Reserve were resolved and (ii) all distributions to which the holders of such Claims were entitled pursuant to the terms of the Plan were made from the Disputed Unsecured Claims Reserve; and (c) with respect to each holder of an Allowed Claim in Class 7B that was previously a Disputed Claim, the amount of Reserved Shares and Reserved Excess Minimum Cash equal to the aggregate amount of any Reserved Shares and Reserved Excess Minimum Cash (if any) that such holder would have received if its Claim had been an Allowed Claim on the Periodic Distribution Date upon which (i) all Disputed Claims in Classes other than Class 7B entitled to distributions from the Disputed Unsecured Claims Reserve were resolved and (ii) all distributions to which the holders of such Claims were entitled pursuant to the terms of the Plan were made from the Disputed Unsecured Claims Reserve.

38.     "CBP" means CBP Parts Acquisition Co. LLC, one of the New Equity Investors, or a successor or assign of CBP pursuant to the terms of the New Investment Agreement.

39.     "Centerbridge" means Centerbridge Capital Partners, L.P.

40.     "Centerbridge Purchaser Entities" means CBP and its permitted successors and assigns under the New Investment Agreement.

41.     "Chapter 11 Cases" means, collectively, the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors in the Bankruptcy Court.

42.     "Charging Lien" means any lien or other priority in payment to which the Indenture Trustee is entitled under each Indenture against distributions to be made to applicable Bondholders under each Indenture.

43.      "Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor.

44.      "Claims and Noticing Agent" means BMC Group, Inc.

45.      "Claims Objection Bar Date" means, for all Claims, including Claims asserting priority under section 503(b)(9) of the Bankruptcy Code, other than Allowed Claims, the latest of: (a) 150 days after the Effective Date, subject to extension by order of the Bankruptcy Court; (b) 90 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation as may be specifically fixed by the Plan, the Confirmation Order, the Bankruptcy Rules or a Final Order for objecting to such a Claim.

46.      "Class" means a class of Claims or Interests, as described in Article II.

47.      "Confirmation" means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

48.      "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

49.      "Confirmation Exhibits" means, collectively, the documents listed on the "Table of Exhibits" included herein, which documents will be Filed no later than five days before the Confirmation Hearing, to the extent not filed earlier; *provided*, *however*, that Exhibits II.E.1.a, II.E.1.c, II.E.4 and II.E.5 will be filed no later than five Business Days prior to the Voting Deadline.  All Confirmation Exhibits will be made available on the Document Websites once they are Filed.  The Debtors reserve the right, in accordance with the terms hereof, to modify, amend, supplement, restate or withdraw any of the Confirmation Exhibits after they are Filed and shall promptly make such changes available on the Document Websites.

50.      "Confirmation Hearing" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, as such hearing may be continued from time to time.

51.      "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

52.      "Consolidated Debtors" means, collectively, all of the Debtors other than EFMG.

53.      "Contract Procedures Order" means an order of the Bankruptcy Court, entered on or prior to the Confirmation Date, which approves procedures to address the treatment of certain agreements in the Chapter 11 Cases in conjunction with the Plan, including the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases, and establishes the form and manner of notice to be given to counterparties to such agreements with the Debtors.

54.      "Control," "Controlled by" and "under Common Control with" means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

55.      "Convenience Claims" means General Unsecured Claims (other than Bondholder Claims and Participating Claims) against any of the Consolidated Debtors that otherwise would be classified in Class 5B, but, with respect to each such Claim, either (a) the aggregate amount of such Claim is equal to or less than $5,000 or (b) the aggregate amount of such Claim is reduced to $5,000 pursuant to an election by the Claim holder made on the Ballot provided for voting on the Plan by the Voting Deadline; *provided*, *however*, that where any portion(s) of a single Claim has been transferred to a transferee, (a) the amount of all such portions will be aggregated to determine whether a Claim qualifies as a Convenience Claim and for purposes of the Convenience Claim election and (b) unless all transferees make the Convenience Claim election on the applicable Ballots, the Convenience Claim election will not be recognized for such Claim.

56.     "Creditors' Committee" means the statutory official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such appointment has been subsequently modified.

57.     "Creditors' Committee Website" means the internet site address http://www.danacreditorcommittee.com at which all of the exhibits and schedules to the Plan and the Disclosure Statement will be available to creditors of the Debtors.

58.     "Cure Amount Claim" means a Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor under section 365 of the Bankruptcy Code to the extent required by section 365 of the Bankruptcy Code.

59.     "Dana" means Debtor Dana Corporation.

60.     "DCC" means Dana Credit Corporation, a Delaware corporation and a non-debtor affiliate of the Debtors.

61.     "DCC Bonds" means the:  (a) $8.0 million 7.18% notes due April 8, 2006; (b) $12.0 million 6.93% notes due April 8, 2006; (c) $30.0 million 7.91% notes due August 16, 2006; (d) $30.0 million 6.88% notes due August 28, 2006; (e) $275.0 million 8.375% notes due August 15, 2007; and (f) $37.0 million 6.59% notes due December 1, 2007.

62.     "DCC Claim" means the $325 million General Unsecured Claim against Dana, Allowed pursuant to the Order Approving Settlement Agreement among the Debtors and Dana Credit Corporation (Docket No. 4199), entered on November 30, 2006.

63.     "Debtors" means, collectively, the above-captioned debtors and debtors in possession identified on Exhibit I.A.63.

64.     "Derivative Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) or cause of action against any Released Party that is the property of any of the Debtors' Estates pursuant to section 541 of the Bankruptcy Code, including, without limitation, those claims and causes of action asserted in *Staehr v. Burns et al.*, Civil Action No. 3:06-cv-07069-JGC, N.D. Ohio (2006) and *Casden v. Burns et al.*, Civil Action No. 3:06-cv-07068-JGC, N.D. Ohio (2006).

65.     "DIP Credit Agreement" means, collectively:  (a) the Senior Secured Superpriority Debtor-In-Possession Credit Agreement among Dana (as borrower), the other Debtors (as guarantors), Citicorp North America, Inc., as administrative agent, Bank of America, N.A. and JPMorgan Chase Bank, N.A., as co-syndication agents, and Citigroup Capital Markets Inc., J.P. Morgan Securities Inc. and Banc of America Securities LLC, as Joint Lead Arrangers and Joint Bookrunners, and the other lenders party thereto; (b) all amendments thereto and extensions thereof; and (c) all security agreements and instruments related to the documents identified in (a) and (b).

66.     "DIP Lender Claim" means any Claim against a Debtor under or evidenced by (a) the DIP Credit Agreement and (b) the Final DIP Order.

67.     "DIP Lenders" means, collectively:  (a) those entities identified as "Lenders" in the DIP Credit Agreement and their respective permitted successors and assigns (solely in their capacity as "Lenders" under the DIP Credit Agreement); and (b) any agent bank named therein (solely in its capacity as agent bank under the DIP Credit Agreement).

68.     "Disallowed," when used with respect to a Claim, means a Claim that has been disallowed by a Final Order.

69.    "Disbursing Agent" means any Reorganized Debtor in its capacity as disbursing agent pursuant to Section VI.B or any Third Party Disbursing Agent.

70.    "Disclosure Statement" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to the Plan and has been prepared and distributed by the Debtors, as plan proponents, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

71.    "Disputed Claim" means:

a.    a Claim that is listed on a Debtor's Schedules as either disputed, contingent or unliquidated;

b.    a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted by the holder varies from the nature or amount of such Claim as it is listed on the Schedules;

c.    a Claim that is not listed on a Debtor's Schedules;

d.    a Claim as to which the applicable Debtor or Reorganized Debtor, or, prior to the Confirmation Date, any other party in interest, has Filed an objection by the Claims Objection Bar Date and such objection has not been withdrawn or denied by a Final Order;

e.    a Claim for which a proof of Claim or request for payment of Administrative Claim is required to be Filed under the Plan and no such proof of Claim or request for payment of Administrative Claim is timely filed;

f.    a Tort Claim; or

g.    a Claim that is submitted to the ADR Procedures.

72.    "Disputed Insured Claim" and "Disputed Uninsured Claim" mean, respectively, an Insured Claim or an Uninsured Claim that is also a Disputed Claim.

73.    "Disputed Unsecured Claims Reserve" means the reserve of Disputed Unsecured Claims Reserve Assets, which reserve (a) will maintain the Disputed Unsecured Claims Reserve Assets in trust for (i) Pro Rata distributions to holders of  Disputed Claims that become Allowed Claims in Class 5B and (ii) periodic Pro Rata distributions to holders of Allowed Claims in Class 5B, pursuant to the terms of the Plan, and (b) will not constitute property of the Reorganized Debtors.

74.    "Disputed Unsecured Claims Reserve Assets" means (a) the Reserved Shares and (b) any Reserved Excess Minimum Cash.

75.    "Distributable Excess Minimum Cash" means the Excess Minimum Cash, *less* the Reserved Excess Minimum Cash, to be distributed Pro Rata on the Effective Date to holders of Allowed Claims in Class 5B.

76.    "Distributable Shares of New Dana Holdco Common Stock" means the shares of New Dana Holdco Common Stock issued on the Effective Date, *less* (a) the Reserved Shares and (b) the Emergence Shares, to be distributed Pro Rata on the Effective Date to holders of Allowed Claims in Class 5B.

77.    "Distribution Record Date" means the close of business on the Confirmation Date.

78.    "Document Websites" means (a) the internet site address http://www.dana.bmcgroup.com at which all of the Exhibits and schedules to the Plan and the Disclosure Statement will be available to any party in interest and the public; and (b) the Creditors' Committee Website.

79.     "DTC" means The Depository Trust Company.

80.     "Effective Date" means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date in Section IV.B have been met or waived in accordance with Section IV.C.

81.     "EFMG" means EFMG LLC, a Virginia limited liability company and one of the Debtors.

82.     "Emergence Shares" means, collectively, the Union Emergence Shares and the Non-Union Emergence Shares.

83.     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461.

84.     "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

85.     "Excess Minimum Cash" means Cash in excess of (a) the minimum Cash required by the Reorganized Debtors to operate their businesses on the Effective Date and thereafter, *plus* (b) the amount of Cash needed, pursuant to the terms of the Plan, to satisfy all (i) Allowed Secured Claims, Allowed DIP Lender Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Claims and Allowed Claims in Classes 4, 5A, 6B and 6C and (ii) Secured Claims, DIP Lender Claims, Administrative Claims, Priority Tax Claims, Priority Claims or Claims in Classes 4, 5A, 6B and 6C that (A) are Disputed Claims and (B) may become Allowed Claims after the Effective Date, *plus* (c) the amount of Cash needed to satisfy the Remaining Non-Union Retiree VEBA Contribution, the USW Union Retiree VEBA Contribution and the UAW Union Retiree VEBA Contribution. To the extent there is a dispute as to the amount of Excess Minimum Cash, the amount of Excess Minimum Cash will be decided by the Bankruptcy Court prior to the Effective Date.

86.     "Exchange Act" means the Securities Exchange Act of 1934, as amended.

87.     "Executory Contract or Unexpired Lease" means a contract or lease to which a Debtor is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code and includes any modifications, amendments, addenda or supplements thereto or restatements thereof.

88.     "Exit Facility" means a senior secured credit facility that:  (a) includes (i) funded commitments not to exceed $1.5 billion and (ii) unfunded commitments; and (b) will be entered into by the Reorganized Debtors, the Exit Facility Agent and the other financial institutions party thereto on the Effective Date on substantially the terms set forth on Exhibit I.A.88.

89.     "Exit Facility Agent" means the agent under the Exit Facility.

90.     "Face Amount" means either (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; (b) if no proof of Claim is Filed by the Bar Date or otherwise deemed timely Filed under applicable law, the full amount of the Claim listed on the Debtors' Schedules, *provided that* such amount is not listed as disputed, contingent or unliquidated; or (c) the amount of the Claim (i) acknowledged by the applicable Debtor, Reorganized Debtor or, prior to the Effective Date, the Creditors' Committee in conjunction with the Debtors in any objection Filed to such Claim, (ii) estimated by the Bankruptcy Court for such purpose pursuant to section 502(c) of the Bankruptcy Code, or (iii) proposed by the Debtors in consultation with the Creditors' Committee or the Reorganized Debtors if (A) no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law and  such amount is not listed in the Debtors' Schedules or is listed in the Debtors' Schedules as disputed, contingent or unliquidated or (B) the proof of Claim specifies an unliquidated amount (in whole or in part).

91.    "Federal Judgment Rate" means the federal post-judgment interest rate, as established by 28 U.S.C. § 1961(a), of 4.74% on the Petition Date.

92.    "Fee Claim" means a Claim under sections 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other entity for services rendered or expenses incurred in the Chapter 11 Cases.

93.    "Fee Order" means the Order, Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a) and Local Bankruptcy Rule 2016-1, Establishing Procedures for Interim Monthly Compensation for Professionals (Docket No. 732), entered by the Bankruptcy Court on March 29, 2006.

94.    "File," "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

95.    "Final DIP Order" means the Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. Sections 105(a), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. Section 363, and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. Sections 361, 362, 363 and 364 (Docket No. 721), entered by the Bankruptcy Court on March 29, 2006.

96.    "Final Distribution Date" means the date that is 90 days after all Disputed Claims have been resolved (or as soon as reasonably practicable thereafter), which shall be the date a final distribution is made under this Plan.

97.    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in the Chapter 11 Cases or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or petition for certiorari or move for a new trial, reargument or rehearing has expired, and as to which no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing that has been timely taken is pending, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

98.    "General Unsecured Claim" means any Claim and, only if applicable, Postpetition Interest and Post-Effective Date Interest, that is not an Administrative Claim, Secured Claim, Cure Amount Claim, Priority Claim, Priority Tax Claim, Section 510(b) Securities Claim, Section 510(b) Old Common Stock Claim, Asbestos Personal Injury Claim, DCC Claim, Prepetition Intercompany Claim or the Union Claim.  For the avoidance of doubt, General Unsecured Claims include but are not limited to (a) all Liabilities related to real property not owned or leased by the Debtors as of the Petition Date, (b) Bondholder Claims and (c) the Unions' potential $908 million Claim against the Debtors under Appendix R to the Union Settlement Agreements.

99.    "Global Settlement" means the settlement among the Debtors, the Unions, certain Bondholders, and involving Centerbridge and CBP, documented in the Union Settlement Agreements, the Plan Support Agreement, the New Investment Agreement and their respective exhibits and appendices.

100.    "Global Settlement Order" means the Order Pursuant to 11 U.S.C. §§ 1113 and 1114(e) and Federal Rule of Bankruptcy Procedure 9019, Approving Settlement Agreements with the United Steelworkers and United Autoworkers, and Pursuant to 11 U.S.C. §§ 105(a), 363(b), 364(c), 503 and 507, Authorizing the Debtors to Enter Into Plan Support Agreement, Investment Agreement and Related Agreements, entered August 1, 2007 (Docket No. 5879), and the exhibits thereto.

101.    "Indenture Trustee" means Wilmington Trust Company, as successor indenture trustee under the Indentures pursuant to the Instrument of Resignation, Appointment and Acceptance, dated December 5, 2005, by and among the Issuer, Citibank, N.A., as the resigning trustee, and Wilmington Trust Company, as successor trustee.

102.    "Indenture Trustee Fee Claim" means, individually and collectively, a Claim against the Debtors arising from and after the Petition Date pursuant to the applicable Indentures relating to any compensation, disbursements, fees and expenses, including any Claim under such Indenture relating to reasonable fees and expenses of counsel of the Indenture Trustee, which Claims shall be satisfied and discharged in accordance with Section II.A.1.h.

103.    "Indentures" means, collectively:  (a) the 6.5% and 7% Bonds Indenture; (b) the 9% Bonds Indenture; (c) the 10.125% Bonds Indenture; and (d) the 5.85% Bonds Indenture.

104.    "Independent Director" means a director of New Dana Holdco who qualifies as an "independent director" of New Dana Holdco under (a) NYSE Rule 303(A)(2) or (b) if New Dana Holdco is listed or quoted on another securities exchange or quotation system that has an independence requirement, the comparable rule or regulation of such securities exchange or quotation system on which the New Dana Holdco Common Stock is listed or quoted (whether by final rule or otherwise).  In addition, in order for a director designated by Centerbridge to be deemed to be an "Independent Director," such director would also have to be considered an "independent director" of Centerbridge and the Centerbridge Purchaser Entities under NYSE Rule 303(A)(2), assuming for this purpose that (a) such director were a director of Centerbridge and the Centerbridge Purchaser Entities (whether or not such director actually is or has been a director of Centerbridge or the Centerbridge Purchaser Entities) and (b) Centerbridge and the Centerbridge Purchaser Entities are each deemed to be a NYSE listed company.

105.    "Ineligible Unsecured Claims" means, collectively, General Unsecured Claims that are either Allowed or estimated by the Bankruptcy Court under section 502(c) of the Bankruptcy Code on or prior to the Effective Date and are held by a Person who is not, nor are any of its affiliates, a Qualified Investor but without regard to clauses (c) and (d) of that definition; *provided, however*, that Bondholder Claims which are not Participating Claims will be Ineligible Unsecured Claims even if held by such Persons.  In no event will Union Claims, DCC Claims, any Claims of the non-union retirees represented by the Retiree Committee, Intercompany Claims, Convenience Claims or Asbestos Personal Injury Claims be Ineligible Unsecured Claims.

106.    "Insurance Contract" means any policy of third party liability insurance under which any of the Debtors could have asserted or did assert, or may in the future assert, a right to coverage for any claim, together with any other contracts which pertain or relate to such policy (including, by way of example and not limitation, any insurance settlement agreements, coverage-in-place agreements, or the agreement known as "the Wellington Agreement").

107.    "Insured Claim" means that portion of any Claim arising from an incident or occurrence alleged to have occurred prior to the Effective Date:  (a) as to which any Insurer is obligated pursuant to the terms, conditions, limitations, and exclusions of its Insurance Contract(s), to pay any judgment, settlement, or contractual obligation with respect to the Debtors, or (b) that any Insurer otherwise agrees to pay as part of a settlement or compromise of a claim made under the applicable Insurance Contract(s).

108.    "Insurer" means any company or other entity that issued, or is responsible for, a policy of third party liability insurance under which any of the Debtors could have asserted or did assert, or may in the future assert, a right to coverage for any claim under an Insurance Contract.

109.    "Intercompany Claim" means any Claim by any Debtor against another Debtor.

110.    "Interest" means the rights and interests of the holders of the Old Common Stock of any Debtor, any other instruments evidencing an ownership interest in a Debtor and the rights of any entity to purchase or demand the issuance of any of the foregoing, including:  (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends); (b) liquidation preferences; and (c) stock options and warrants.

111.    "Liabilities" means any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Recovery Actions, Derivative Claims, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or

otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

112.    "Litigation Trust" means the trust established pursuant to Section V.G to oversee the Reorganized Debtors' resolution of certain General Unsecured Claims and prosecute certain Recovery Actions and other causes of action of the Estates not released pursuant to the Plan as identified in the Litigation Trust Agreement.

113.    "Litigation Trust Agreement" means the trust agreement, which shall be in form and substance reasonably acceptable to the Creditors' Committee, the Debtors, the Reorganized Debtors, Centerbridge and the Ad Hoc Steering Committee, establishing the terms governing the Litigation Trust, substantially in the form of Exhibit I.A.113.

114.    "Litigation Trustee" means the trustee for the Litigation Trust selected by the Debtors, with the consent of the Creditors' Committee, after consultation with the Ad Hoc Steering Committee, pursuant to Section V.G and identified in the Litigation Trust Agreement (or any successor trustee), in his or her or its capacity as the trustee of the Litigation Trust.

115.    "Minimum Emergence Liquidity" means, as of the Effective Date, the sum, after giving effect to all Cash distributions to be made on the Effective Date pursuant to the Plan, of (a) Cash and Cash equivalents of the Debtors and their subsidiaries and (b) unused commitments under the Exit Facility.

116.    "New Dana Holdco" means Dana Corporation Holdings, a Delaware corporation.

117.    "New Dana Holdco Common Stock" means the shares of common stock, $0.01 par value per share, of New Dana Holdco, authorized pursuant to the certificate of incorporation of New Dana Holdco, of which up to 100,000,000 shares shall be initially issued pursuant to the Plan as of the Effective Date.

118.    "New Equity Investment" means the $790,000,000 investment to be made by the New Equity Investors on the Effective Date in connection with the purchase of New Preferred Stock, pursuant to and in accordance with the New Investment Agreement, the New Series B Subscription Agreements and the B-2 Backstop Commitment Letter.

119.    "New Equity Investors" means, individually and collectively, CBP, the B-2 Backstop Investors and those holders of Allowed Claims that are determined to be Qualified Investors who have agreed to purchase the New Preferred Stock pursuant to and in accordance with the New Investment Agreement, the New Series B Subscription Agreements and the B-2 Backstop Commitment Letter.

120.    "New Investment Agreement" means, collectively, the Investment Agreement by and between Dana and Centerbridge and CBP, dated July 26, 2007, and the exhibits thereto, approved by the Global Settlement Order, as it may be amended, modified, supplemented or assigned in accordance with its terms, pursuant to which, among other things, CBP has agreed to purchase the New Series A Preferred Stock and up to 2,500,000 unsubscribed shares of New Series B Preferred Stock.

121.    "New Preferred Stock" means, collectively, the New Series A Preferred Stock and the New Series B Preferred Stock.

122.    "New Series A Preferred Stock" means, collectively, the 2,500,000 shares of 4.0% series A convertible preferred stock, $0.01 par value per share, of New Dana Holdco, authorized pursuant to the certificate of incorporation (or comparable constituent documents) and certificate of designations of New Dana Holdco, the terms of which shall not be altered in any material manner without the reasonable consent of the Creditors' Committee and the Ad Hoc Steering Committee and; *provided*, *however*, that the number of shares authorized may not be increased without the consent of the Creditors' Committee and the Ad Hoc Steering Committee.

123.    "New Series B Preferred Stock" means, collectively, the 5,400,000 shares of 4.0% Series B convertible preferred stock, $0.01 par value per share, of New Dana Holdco, authorized pursuant to the certificate of

incorporation (or comparable constituent documents) and certificate of designations of New Dana Holdco, the terms of which shall not be altered in any material manner without the reasonable consent of the Creditors' Committee and the Ad Hoc Steering Committee and; *provided*, *however*, that the number of shares authorized may not be increased without the consent of the Creditors' Committee and the Ad Hoc Steering Committee.

124.     "New Series B Subscription Agreement" means the agreement by and between Dana and each of the New Equity Investors, other than CBP, substantially in the form of Exhibit I.A.124, pursuant to which each of the New Equity Investors, other than CBP, will subscribe to purchase the New Series B Preferred Stock.

125.     "Non-Union Emergence Shares" means the shares of New Dana Holdco Common Stock to be reserved by New Dana Holdco for issuance as a post-emergence bonus to non-union hourly and salaried non-management employees as discussed in Section V.E.4.

126.     "Non-Union Retiree Settlement Order" means the Stipulation and Agreed Order Between Dana Corporation and the Official Committee of Non-Union Retirees (Docket No. 5356), entered by the Bankruptcy Court on May 22, 2007.

127.     "Non-Union Retiree VEBA" means the voluntary employees' beneficiary association established pursuant to the Non-Union Retiree Settlement Order.

128.     "Notice Parties" means (a) prior to the Effective Date, the Debtors, the Creditors' Committee, Centerbridge and the Unions; and (b) on or after the Effective Date, the Reorganized Debtors, Centerbridge and the Unions.

129.     "NYSE" means the New York Stock Exchange.

130.     "NYSE Rule 303(A)(2)" means New York Stock Exchange Rule 303A(2), as such rule may be amended, supplemented or replaced from time to time.

131.     "Official Committees" means, collectively, the Creditors' Committee and the Retiree Committee.

132.     "Old Common Stock" means, when used with reference to a particular Debtor, the common stock, membership interests, partnership interests or other capital stock issued by such Debtor and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto.

133.     "Ordinary Course Professionals Order" means the Order, Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code and Bankruptcy Rule 2014(a), Authorizing Debtors and Debtors in Possession to Retain, Employ and Pay Certain Professionals in the Ordinary Course of Their Businesses (Docket No. 76), entered by the Bankruptcy Court on March 6, 2006.

134.     "Participating Claims" means Qualified Bond Claims, Acquired Bond Claims and/or Qualified Trade Claims.

135.     "PBGC" means the Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and an agency of the United States that administers the defined benefit pension plan termination insurance program under Title IV of ERISA.

136.     "Pension Plans" means, individually and collectively, the pension plans listed on Exhibit I.A.136 (a) that are tax-qualified defined benefit pension plans covered by ERISA and (b) for which the Debtors are contributing sponsors. *See* 29 U.S.C. §§ 1301(a)(13) and (14).

137.     "Per Share Value" means the midpoint value per share of New Dana Holdco Common Stock as set forth in the Disclosure Statement, subject to modification by the Confirmation Order.

138.    "Periodic Distribution Date" means the twentieth day of the month following the end of each calendar quarter after the Effective Date (or as soon as reasonably practicable thereafter); *provided*, *however*, that if the Effective Date is within 45 days of the end of a calendar quarter, the first Periodic Distribution Date will be the twentieth day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

139.    "Person" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity.

140.    "Petition Date" means March 3, 2006, the date on which the Debtors Filed their petitions for relief commencing the Chapter 11 Cases.

141.    "Plan" means this joint plan of reorganization for the Debtors, and all exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented.

142.    "Plan Support Agreement" means, collectively, the Amended Plan Support Agreement among Dana, Centerbridge, the Unions and certain holders of General Unsecured Claims, dated as of July 26, 2007, and the exhibits thereto, approved by the Global Settlement Order, as it may be further amended, modified or supplemented.

143.    "Plan Term Sheet" means Exhibit B to the Plan Support Agreement.

144.    "Port Authority" means the Toledo Lucas County Port Authority.

145.    "Port Authority Lease" means the Lease Agreement between the Port Authority and Spicer Driveshaft, Inc. (n/k/a Debtor Torque-Traction Technologies, LLC), dated October 1, 2002, as amended in accordance with the Port Authority Settlement Agreement.

146.    "Port Authority Secured Claim" means the Port Authority's $18.875 million Secured Claim against Debtor Torque-Traction Technologies, LLC, allowed pursuant to the Port Authority Settlement Order.

147.    "Port Authority Settlement Agreement" means the Settlement Agreement by and among Dana, Debtor Torque-Traction Technologies, LLC, the Port Authority, the Director of Development of the State of Ohio, The Huntington National Bank and The Bank of New York Trust Company, N.A., dated August 1, 2007, approved by the Bankruptcy Court on August 22, 2007, as it may be amended, supplemented or modified.

148.    "Port Authority Settlement Order" means the Order, Pursuant to Bankruptcy Rule 9019, for an Order (I) Approving a Settlement Agreement by and among Certain Debtors, The Toledo-Lucas County Port Authority and Certain Other Parties, and (II) Allowing Claims of Toledo-Lucas County Port Authority Against Dana Corporation and Torque-Traction Technologies, LLC (Docket No. 6002), entered by the Bankruptcy Court on August 22, 2007.

149.    "Postpetition Intercompany Claim" means any Intercompany Claim that is not a Prepetition Intercompany Claim.

150.    "Postpetition Interest" means:  (a) for a Bondholder Claim, the contractual rate of interest set forth in the applicable Indenture; (b) the rate of interest set forth in the contract or other applicable document between the holder of a Claim and the applicable Debtor giving rise to such holder's Claim; (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the applicable Debtor; or (d) if none of the foregoing apply, the Federal Judgment Rate.

151.    "Post-Effective Date Interest" means:  (a) for a Bondholder Claim, the contractual rate of interest set forth in the applicable Indenture; (b) the rate of interest set forth in the contract or other applicable document between the holder of a Claim and the applicable Debtor giving rise to such holder's Claim; (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the applicable Debtor; or (d) if none of the foregoing apply, the Federal Judgment Rate.

152.    "Prepetition Intercompany Claim" means an Intercompany Claim that arose prior to the Petition Date.

153.    "Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

154.    "Priority Tax Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

155.    "Pro Rata" means, when used with reference to a distribution of property to holders of Allowed Claims or Allowed Interests in a particular Class or other specified group of Claims or Interests pursuant to Article II, proportionately so that with respect to a particular Allowed Claim or Allowed Interest in such Class or in such group, the ratio of (a)(i) the amount of property to be distributed on account of such Claim or Interest to (ii) the amount of such Claim or Interest, is the same as the ratio of (b)(i) the amount of property to be distributed on account of all Allowed Claims or Interests in such Class or group of Claims or Interests to (ii) the amount of all Allowed Claims or Allowed Interests, as the case may be, in such Class or group of Claims or Interests. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their Face Amount for purposes of calculating Pro Rata distribution of property to holders of Allowed Claims in such Class.

156.    "Professional" means any professional employed in the Chapter 11 Cases pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code or any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code. For the avoidance of doubt, "Professional" shall include any professional or other entity rendering services to the Unions in connection with the Chapter 11 Cases to the extent that the compensation or reimbursement of expenses sought by such professional or other entity is governed by the Union Fee Order.

157.    "QIB" means a "qualified institutional buyer," as such term is defined in Rule 144A promulgated under the Securities Act.

158.    "Qualified Bond Claims" means the net Bondholder Claims (after subtracting short positions and/or other hedge positions) that are beneficially owned as of the Bondholder Record Date by a Person who (a) together with its Affiliates, holds Bondholder Claims and/or Trade Claims in an aggregate amount equal to or greater than the Threshold Amount; (b) is a QIB; and (c) executes and delivers a signature page to the Plan Support Agreement on or before the Bondholder Record Date.

159.    "Qualified Investor" means a Person, other than the Unions, who (a) together with its Affiliates, beneficially owns Participating Claims in an aggregate amount equal to or greater than the Threshold Amount; (b) is a QIB; (c) is qualified to make the representations and warranties in, and who delivers to the Subscription Agent by the Subscription Deadline, a duly executed copy of, a New Series B Subscription Agreement; and (d) has not at any time during the period from the Bondholder Record Date through and including the Effective Date, engaged in any short sales of New Dana Holdco Common Stock or Claims, any transactions involving options (including exchange-traded options), puts, calls or other derivatives involving securities of New Dana Holdco or any other transactions of any type that would have the effect of providing such Person with any other economic gain in the event of a decrease in the current or future market price of Claims or New Dana Holdco Common Stock (unless the Person has engaged in such activity pursuant to Section 4.7 of the Plan Support Agreement) or otherwise breached any covenants or agreements in the New Series B Subscription Agreement.

160.    "Qualified Investor Record Date" means the Bondholder Record Date or the Trade Claims Record Date, as applicable.

161.    "Qualified Trade Claims" means Trade Claims that are beneficially owned as of the Trade Claims Record Date by a Person who (a) together with its Affiliates, beneficially owns Trade Claims, Qualified Bond Claims and/or Acquired Bond Claims in an aggregate amount equal to or greater than the Threshold Amount; (b) is a QIB; and (c) executes and delivers a signature page to the Plan Support Agreement on or before the Trade Claims Record Date.

162.    "Real Property Executory Contract or Unexpired Lease" means, collectively, an Executory Contract or Unexpired Lease relating to a Debtor's interest in real property and any Executory Contract or Unexpired Lease granting rights or interests related to or appurtenant to the applicable real property, including all easements; licenses; permits; rights; privileges; immunities; options; rights of first refusal; powers; uses; usufructs; reciprocal easement or operating agreements; vault, tunnel or bridge agreements or franchises; development rights; and any other interests in real estate or rights *in rem* related to the applicable real property.

163.    "Recovery Actions" means, collectively and individually, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 542, 544, 547, 548, 549 and 550 of the Bankruptcy Code and other similar state law claims and causes of action.

164.    "Reinstated" or "Reinstatement" means rendering a Claim or Interest unimpaired within the meaning of section 1124 of the Bankruptcy Code.  Unless the Plan specifies a particular method of Reinstatement, when the Plan provides that a Claim or Interest will be Reinstated, such Claim or Interest will be Reinstated, at Dana's sole discretion, in accordance with one of the following:

> a.    The legal, equitable and contractual rights to which such Claim or Interest entitles the holder will be unaltered; or
>
> b.    Notwithstanding any contractual provisions or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:
>
> > i.    any such default that occurred before or after the commencement of the applicable Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, will be cured;
> >
> > ii.    the maturity of such Claim or Interest as such maturity existed before such default will be reinstated;
> >
> > iii.    the holder of such Claim or Interest will be compensated for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
> >
> > iv.    if such Claim arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, the holder of such Claim will be compensated for any actual pecuniary loss incurred by such holder as a result of such failure; and
> >
> > v.    the legal, equitable or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest will not otherwise be altered.

165.    "Released Parties" means, collectively and individually, the Debtors, the Reorganized Debtors, the Official Committees and their members (solely in their capacity as such), the Unions and any consultants of the Unions, the DIP Lenders (solely in their capacity as such and not in their capacity as the Debtors' prepetition lenders), Centerbridge, CBP, Centerbridge Capital Partners Strategic, L.P., Centerbridge Capital Partners SBS, L.P. and permitted successors and assigns under the New Investment Agreement, the Ad Hoc Steering Committee and its predecessor members from and after July 5, 2007 (solely in their capacity as such), the Indenture Trustee and the Representatives of each of the foregoing.

166.    "Remaining Non-Union Retiree VEBA Contribution" means $53.8 million in Cash.

167.    "Reorganized . . . " means, when used in reference to a particular Debtor, such Debtor on or after the Effective Date.

-16-

168.    "Reorganized Debtors" means the Debtors on and after the Effective Date and any entities created as part of the Restructuring Transactions, including but not limited to New Dana Holdco.

169.    "Representatives" means, with respect to any entity, successor, predecessor, officer, director, partner, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other Professional of such entity, and committee of which such entity is a member, in each case in such capacity, serving on or after February 28, 2006.

170.    "Reserved Excess Minimum Cash" means (a) the Excess Minimum Cash to be contributed to the Disputed Unsecured Claims Reserve, (b) any Cash dividends or other distributions received by the Disbursing Agent on account of the Reserved Shares, (c) any Cash deposited into the Disputed Unsecured Claims Reserve by the Litigation Trust or Litigation Trustee and (d) any related Cash Investment Yield.

171.    "Reserved Shares" means the shares of New Dana Holdco Common Stock to be contributed to the Disputed Unsecured Claims Reserve.

172.    "Restructuring Transactions" means, collectively, those mergers, consolidations, restructurings, dispositions, liquidations or dissolutions that the Debtors determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or otherwise to simplify the overall corporate structure of the Reorganized Debtors, as described in greater detail in Section V.B.1.

173.    "Retiree Committee" means the official committee of non-union retired employees appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

174.    "Schedules" means the schedules of assets and liabilities and the statement of financial affairs Filed by a Debtor on June 30, 2006, as required by section 521 of the Bankruptcy Code, as the same may have been or may be amended, modified or supplemented.

175.    "SEC" means the United States Securities and Exchange Commission.

176.    "Secondary Liability Claim" means a Claim that arises from a Debtor being liable as a guarantor of, or otherwise being jointly, severally or secondarily liable for, any contractual, tort, guaranty or other obligation of another Debtor, including any Claim based on:  (a) vicarious liability; (b) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; (c) guaranties of collection, payments or performance; (d) indemnity bonds, obligations to indemnify or obligations to hold harmless; (e) performance bonds; (f) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor or relating to the obligations or performance of another Debtor; (g) several liability of a member of a consolidated (or equivalent) group of corporations for Taxes of other members of the group or of the entire group; or (h) any other joint or several liability, including Claims for indemnification or contribution, that any Debtor may have in respect of any obligation that is the basis of a Claim.

177.    "Section 510(b) Old Common Stock Claim" means any Claim against any of the Debtors: (a) arising from rescission of a purchase or sale of Old Common Stock; (b) for damages arising from the purchase or sale of Old Common Stock; or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

178.    "Section 510(b) Securities Claim" means any Claim against any of the Debtors:  (a) arising from rescission of a purchase or sale of a Bond or any other security of a Consolidated Debtor other than Old Common Stock; (b) for damages arising from the purchase or sale of a Bond or any other security of a Consolidated Debtor other than Old Common Stock; or (c) for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

179.    "Secured Claim" means a Claim that is secured by a lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

180.    "Secured Tax Claim" means a Secured Claim arising out of a Debtor's liability for any Tax.

181.    "Securities Act" means the Securities Act of 1933, as amended.

182.    "Securities Litigation" means the putative class action captioned *Howard Frank, Individually and On Behalf of All Others Similarly Situated v. Dana Corporation, et al*, Case No. 3:05-cv-07393, N.D. Ohio (2005).

183.    "Settlement Pool" means Cash equal to $40 million, which shall be funded from the proceeds from the sale of New Series B Preferred Stock as described in Section V.J and which amount of Cash shall not be altered in any manner, or any other consideration added or reduced, without the consent of the Ad Hoc Steering Committee and the Creditors' Committee.

184.    "Stipulation of Amount and Nature of Claim" means a stipulation or other agreement between a Debtor or Reorganized Debtor and a holder of a Claim or Interest, that, prior to the Effective Date, is approved by the Bankruptcy Court, or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim or Interest, including any agreements made pursuant to that authority granted in the Order Establishing Claims Objection and Settlement Procedures (Docket No. 4044), entered on November 9, 2006 or other orders of the Bankruptcy Court.  Any such stipulation or other agreement between a Reorganized Debtor and a holder of a Claim or Interest executed after the Effective Date is not subject to approval of the Bankruptcy Court; *provided, however*, that if the Litigation Trustee Files an objection, as permitted by Section V.G.2, to such stipulation or other agreement within ten days of receiving written notice of such stipulation or other agreement, Bankruptcy Court approval will be required.

185.    "Subscription Agent" means BMC Group, Inc.

186.    "Subscription Deadline" means 5:00 p.m. Eastern Time on December 5, 2007.

187.    "Subsidiary Debtor" means any Debtor other than Dana.

188.    "Subsidiary Debtor Equity Interests" means, as to a particular Subsidiary Debtor, any Interests in such Debtor.

189.    "Supporting Creditor" means any holder of a General Unsecured Claim that has (a) timely submitted an executed signature page to the Plan Support Agreement to the Debtors or (b) timely executed a transferee acknowledgment in accordance with the Plan Support Agreement.

190.    "Tax" means:  (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

191.    "Third Party Disbursing Agent" means an entity (including but not limited to the Indenture Trustee) designated by a Debtor or Reorganized Debtor, in consultation with the Creditors' Committee, to act as a Disbursing Agent pursuant to Article VI.B.

192.    "Threshold Amount" means $25 million.

193.     "Tort Claim" means any Claim, other than an Asbestos Personal Injury Claim, that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to health, safety, hazardous substances or the environment.

194.     "Trade Claims" means all Allowed Claims in Class 5B that are not Bondholder Claims.

195.     "Trade Claims Record Date" means November 28, 2007.

196.     "UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its applicable affiliated entities, including local unions.

197.     "UAW Settlement Agreement" means, collectively, the Settlement Agreement between Dana Corporation and the International Union, UAW, dated July 5, 2007, and the exhibits thereto, approved by the Global Settlement Order, as it may be amended, supplemented or modified.

198.     "UAW Union Retiree VEBA" means the VEBA established pursuant to the UAW Settlement Agreement.

199.     "UAW Union Retiree VEBA Contribution" means the $465.3 million Cash contribution to be made by the Reorganized Debtors to the UAW Union Retiree VEBA pursuant to the UAW Settlement Agreement.

200.     "Uninsured Claim" means any Claim that is not an Insured Claim.

201.     "Union Claim" means the Claim of the Unions arising out of the Union Settlement Agreements, asserted by the Unions in the aggregate amount of $1.1 billion.

202.     "Union Emergence Shares" means the shares of New Dana Holdco Common Stock reserved by New Dana Holdco for issuance as emergence bonuses to employees of the Unions in accordance with Appendix J to the Union Settlement Agreements pursuant to Section III.E.

203.     "Union Fee Order" means the Order, Pursuant to Sections 105(a), 363 and 503(c)(3) of the Bankruptcy Code, Approving Amended Agreement for the Payment of Certain Reasonable Fees and Expenses of Advisors to the Debtors' Unions (Docket No. 5819), entered by the Bankruptcy Court on July 26, 2007.

204.     "Union Retiree Benefit Termination Date" means the later of January 1, 2008 or the Effective Date.

205.     "Union Settlement Agreements" means, collectively, the UAW Settlement Agreement and the USW Settlement Agreement.

206.     "Unions" means, collectively, the UAW and USW.

207.     "United States Trustee" means the Office of the United States Trustee for the Southern District of New York.

208.     "USW" means the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union and its applicable affiliated entities, including local unions.

209.     "USW Settlement Agreement" means the Settlement Agreement between Dana Corporation and the United Steelworkers, dated July 5, 2007, and the exhibits thereto, approved by the Global Settlement Order, as it may be amended, supplemented or modified.

210.    "USW Union Retiree VEBA" means the VEBA established pursuant to the USW Settlement Agreement.

211.    "USW Union Retiree VEBA Contribution" means the $298.7 million Cash contribution to be made by the Reorganized Debtors to the USW Union Retiree VEBA pursuant to the USW Settlement Agreement.

212.    "VEBA" means a voluntary employees' beneficiary association.

213.    "Voting Deadline" means the deadline for submitting Ballots to either accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code that is specified in the Disclosure Statement, the Ballots or related solicitation documents approved by the Bankruptcy Court.

214.    "Wholly-Owned and Majority-Owned Non-Debtor Affiliates Other than DCC" means all wholly-owned and majority-owned non-debtor direct or indirect subsidiaries of Dana other than DCC.

**B.    Rules of Interpretation and Computation of Time**

**1.    Rules of Interpretation**

For purposes of the Plan, unless otherwise provided herein:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan, Confirmation Order or otherwise; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors, assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any contract, articles or certificates of incorporation, bylaws, codes of regulation, similar constituent documents, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply to the extent not inconsistent with any other provision of this Section I.B.1.

**2.    Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

**ARTICLE II.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS;**
**CRAMDOWN; EXECUTORY CONTRACTS & UNEXPIRED LEASES**

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the following Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described in Section II.A, have not been classified and thus are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

A.    **Unclassified Claims**

    1.    **Payment of Administrative Claims**

        a.    **Administrative Claims in General**

Except as specified in this Section II.A.1, and subject to the bar date provisions herein, unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or Reorganized Debtor, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim either (i) on the Effective Date or (ii) if the Administrative Claim is not allowed as of the Effective Date, 30 days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.

        b.    **Statutory Fees**

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 will be paid in Cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the applicable Reorganized Debtor in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

        c.    **Ordinary Course Liabilities**

Allowed Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.E.4 and Intercompany Claims that are Administrative Claims, will be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to those Administrative Claims, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court.

        d.    **Claims Under the DIP Credit Agreement**

Unless otherwise agreed by the DIP Lenders pursuant to the DIP Credit Agreement, on or before the Effective Date, DIP Lender Claims that are Allowed Administrative Claims will be paid in Cash equal to the amount of those Allowed Administrative Claims.

        e.    **Administrative Claims of Centerbridge**

Unless otherwise agreed by the Debtors or Reorganized Debtors and Centerbridge, any Administrative Claims of Centerbridge and the CBP Purchaser Entities arising under Article 7 of the New Investment Agreement (as approved by the Global Settlement Order) will be paid by the Reorganized Debtors in the ordinary course of their businesses without further action by Centerbridge or further approval by the Bankruptcy Court.

        f.    **Administrative Claims of B-2 Backstop Investors**

Unless otherwise agreed by the Debtors or Reorganized Debtors and the B-2 Backstop Investors, any Administrative Claims of the B-2 Backstop Investors arising under the B-2 Backstop Commitment Letter and the order approving the same will be paid by the Reorganized Debtors in the ordinary course of their businesses without further action by the B-2 Backstop Investors or further approval by the Bankruptcy Court as long as the B-2 Backstop Commitment Letter remains in full force and effect.

g.    **Contribution to Non-Union Retiree VEBA**

On the Effective Date, the Reorganized Debtors will make the Remaining Non-Union Retiree VEBA Contribution.

h.    **Special Provisions Regarding the Claims of the Indenture Trustee**

In full satisfaction of the Indenture Trustee Fee Claims, on the Effective Date, the Indenture Trustee Fee Claims shall be allowed as an Administrative Claim against the Debtors pursuant to section 503(b) of the Bankruptcy Code and shall be paid by the Reorganized Debtors without the need for the Indenture Trustee to file an application for allowance with the Bankruptcy Court.  To receive payment pursuant to this Section II.A.1.h, the Indenture Trustee shall provide reasonable and customary detail or invoices in support of its Claims to counsel to the Reorganized Debtors and counsel to Centerbridge no later than ten days after the Effective Date.  Such parties shall have the right to File objections to such Claims based on a "reasonableness" standard within 20 days after receipt of supporting documentation.  The Reorganized Debtors shall pay any such Claims by the later of (i) 30 days after the receipt of supporting documentation from the Indenture Trustee, or (ii) ten Business Days after the resolution of any objections to the Claims of the Indenture Trustee.  Any disputed amount of the Indenture Trustee Fee Claims shall be subject to the jurisdiction of, and resolution by, the Bankruptcy Court.  In the event that the relevant objecting party is unable to resolve a dispute with respect to an Indenture Trustee Fee Claim, the Indenture Trustee may, in its sole discretion, elect to (i) submit any such dispute to the Bankruptcy Court for resolution or (ii) assert its Charging Lien to obtain payment of such disputed Indenture Trustee Claim.  The Charging Lien held by the Indenture Trustee against distributions to Bondholders on account of the Indenture Trustee Fee Claim will be deemed released upon payment of the Indenture Trustee Fee Claim in accordance with the terms of the applicable Indentures and this Plan. Except as provided herein, distributions received by Bondholders on account of Allowed Bondholder Claims pursuant to the Plan will not be reduced on account of the payment of the Indenture Trustee's Claims.

i.    **Bar Dates for Administrative Claims**

i.    **General Bar Date Provisions**

Except as otherwise provided in Section II.A.1.i.ii or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than 30 days after the Effective Date.  Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date will be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property, and such Administrative Claims will be deemed discharged as of the Effective Date.  Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the latest of (A) 150 days after the Effective Date, (B) 60 days after the Filing of the applicable request for payment of Administrative Claims or (C) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

ii.    **Bar Dates for Certain Administrative Claims**

A.    **Professional Compensation**

Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; *provided, however,* that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).  Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party by the later of (1) 90 days after the Effective Date, (2) 30 days

after the Filing of the applicable request for payment of the Fee Claim or (3) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims.  To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims; *provided*, *however*, that Fee Claims Filed by Union Professionals will continue to be governed by, and paid in accordance with, the Union Fee Order.

### B.    Ordinary Course Liabilities

Holders of Administrative Claims arising from liabilities incurred by a Debtor in the ordinary course of its business on or after the Petition Date, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.E.4 and Intercompany Claims that are Administrative Claims, will not be required to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.c.  Any Administrative Claims that are filed contrary to this Section II.A.1.i.ii.B shall be deemed disallowed and expunged, subject to resolution and satisfaction in the ordinary course outside these Chapter 11 Cases.

### C.    Claims Under the DIP Credit Agreement and Related Orders

Holders of Administrative Claims on account of DIP Lender Claims will not be required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims will be satisfied pursuant to Section II.A.1.d.

### D.    Administrative Claims of Centerbridge

Centerbridge and the CBP Purchaser Entities will not be required to File or serve any request for payment or application for allowance of its Administrative Claims, if any, arising under Article 7 of the New Investment Agreement (as approved by the Global Settlement Order) and such Administrative Claims will be satisfied pursuant to Section II.A.1.e.

### E.    Administrative Claims of the B-2 Backstop Investors

So long as the B-2 Commitment Letter remains in full force and effect, the B-2 Backstop Investors will not be required to File or serve any request for payment or application for allowance of their Administrative Claims, if any, arising under the B-2 Backstop Commitment Letter or the order approving same and such Administrative Claims will be satisfied pursuant to Section II.A.1.f.

### iii.    No Modification of Bar Date Order

The Plan does not modify any Bar Date Order already in place, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

### 2.    Payment of Priority Tax Claims

### a.    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim either (i) on the Effective Date or (ii) if the Priority Tax Claim is not allowed as of the Effective Date, 30 days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.

**b.**      **Other Provisions Concerning Treatment of Priority Tax Claims**

Notwithstanding the provisions of Section II.A.2.a or Section I.A.190, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Classes 5A or 5B, as applicable, if not subordinated to Class 5A or 5B Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, Reorganized Debtors or their respective property (other than as a holder of a Class 5A or 5B Claim).

**B.**      **Classified Claims and Interests**

**1.**      **Priority Claims Against the Consolidated Debtors (Class 1A Claims) are unimpaired.** On the Effective Date, each holder of an Allowed Claim in Class 1A will receive Cash equal to the amount of such Allowed Claim, unless the holder of such Priority Claim and the applicable Debtor or Reorganized Debtor agree to a different treatment.

**2.**      **Priority Claims Against EFMG (Class 1B Claims) are unimpaired.** On the Effective Date, each holder of an Allowed Claim in Class 1B will receive Cash equal to the amount of such Allowed Claim, unless the holder of such Priority Claim and EFMG or Reorganized EFMG agree to a different treatment.

**3.**      **Secured Claims Against the Consolidated Debtors Other Than the Port Authority Secured Claim (Class 2A Claims) are unimpaired.** On the Effective Date, unless otherwise agreed by a Claim holder and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Claim in Class 2A will receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A, B or C below, at the election of the applicable Debtor. The applicable Debtor will be deemed to have elected Option B except with respect to (a) any Allowed Secured Claim as to which the applicable Debtor elects either Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing and (b) any Allowed Secured Tax Claim, with respect to which the applicable Debtor will be deemed to have elected Option A.

*Option A*: On the Effective Date, Allowed Claims in Class 2A with respect to which the applicable Debtor elects Option A will receive Cash equal to the amount of such Allowed Claim.

*Option B*: On the Effective Date, Allowed Claims in Class 2A with respect to which the applicable Debtor elects or is deemed to have elected Option B will be Reinstated.

*Option C*: On the Effective Date, a holder of an Allowed Claim in Class 2A with respect to which the applicable Debtor elects Option C will be entitled to receive (and the applicable Debtor or Reorganized Debtor shall release and transfer to such holder) the collateral securing such Allowed Claim.

Notwithstanding either the foregoing or Section I.A.190, the holder of an Allowed Secured Tax Claim in Class 2A will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 5B, if not subordinated to Class 5B Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, Reorganized Debtors or their respective property (other than as a holder of a Class 5B Claim).

**4.**      **Secured Claims Against EFMG (Class 2B Claims) are unimpaired.** On the Effective Date, unless otherwise agreed by a Claim holder and EFMG or Reorganized EFMG, each holder of an Allowed Claim in Class 2B will receive treatment on account of such Allowed Secured Claim in the manner set forth in Option A, B or C below, at the election of EFMG. EFMG will be deemed to have elected Option B except with respect to (a) any Allowed Secured Claim as to which EFMG elects either Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing and (b) any Allowed Secured Tax Claim, with respect to which EFMG will be deemed to have elected Option A.

*Option A*:   On the Effective Date, Allowed Claims in Class 2B with respect to which EFMG elects Option A will receive Cash equal to the amount of such Allowed Claim.

*Option B*:   On the Effective Date, Allowed Claims in Class 2B with respect to which EFMG elects or is deemed to have elected Option B will be Reinstated.

*Option C*:   On the Effective Date, a holder of an Allowed Claim in Class 2B with respect to which EFMG elects Option C will be entitled to receive (and EFMG or Reorganized EFMG shall release and transfer to such holder) the collateral securing such Allowed Claim.

Notwithstanding either the foregoing or Section I.A.190, the holder of an Allowed Secured Tax Claim in Class 2B will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with such Allowed Secured Tax Claim.  Any such Claim or demand for any such penalty will be subject to treatment in Class 5A, if not subordinated to Class 5A Claims pursuant to an order of the Bankruptcy Court.  The holder of an Allowed Secured Tax Claim will not assess or attempt to collect such penalty from the Debtors, Reorganized Debtors or their respective property (other than as a holder of a Class 5A Claim).

5.       **Port Authority Secured Claim (Class 2C Claim) is impaired.**  In accordance with and subject to the terms of the Port Authority Settlement Agreement, on or as soon as practicable after the Effective Date, the Port Authority Secured Claim will be satisfied by:  (a) Reorganized Torque-Traction Technologies, LLC entering into and assuming as amended the Port Authority Lease in the form attached to the Port Authority Settlement Agreement as Exhibit 1; (b) New Dana Holdco executing and delivering an amended guaranty in the form attached to the Port Authority Settlement Agreement as Exhibit 2; and (c) Reorganized Torque-Traction Technologies, LLC and New Dana Holdco executing and delivering any other agreements necessary to implement the Port Authority Settlement Agreement.

6.       **Asbestos Personal Injury Claims (Class 3 Claims) are unimpaired.**  On the Effective Date, the Asbestos Personal Injury Claims will be Reinstated.

7.       **Convenience Claims Against the Consolidated Debtors (Class 4 Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed Convenience Claim will receive Cash equal to the amount of such Allowed Claims (as reduced, if applicable, pursuant to an election by the holder thereof in accordance with Section I.A.55).

8.       **General Unsecured Claims Against EFMG (Class 5A Claims) are unimpaired.**  On the Effective Date, each holder of an Allowed General Unsecured Claim against EFMG will receive Cash equal to the amount of such Allowed Claim.

9.       **General Unsecured Claims Against the Consolidated Debtors (Class 5B Claims) are impaired.**  In full satisfaction of its Allowed Claim, each holder of an Allowed Claim in Class 5B will receive (a) on the Effective Date, its Pro Rata share, based upon the principal amount of each holder's Allowed Claim of the Distributable Shares of New Dana Holdco Common Stock and the Distributable Excess Minimum Cash; and (b) after the Effective Date, such periodic distributions of Reserved Shares and Reserved Excess Minimum Cash as are set forth in Section VI.G.5.b.

10.      **Union Claim (Class 5C Claim) is impaired.**  On the Effective Date, in full satisfaction of  the Union Claim, the Debtors will make the UAW Retiree VEBA Contribution and the USW Retiree VEBA Contribution.

11.      **Prepetition Intercompany Claims (Class 6A Claims) are impaired.**  On the Effective Date, Prepetition Intercompany Claims in Class 6A that are not eliminated by operation of law in the Restructuring Transactions will be deemed settled and compromised in exchange for the consideration and other benefits provided to the holders of Prepetition Intercompany Claims and not entitled to any distribution of Plan consideration under the Plan.  Each holder of a Class 6A Claim will be deemed to have accepted the Plan.

12.      **Claims of Wholly-Owned and Majority-Owned Non-Debtor Affiliates Other than DCC (Class 6B Claims) are unimpaired.**  On the Effective Date, Claims of Wholly-Owned and Majority-Owned Non-Debtor Affiliates Other than DCC against the Debtors will be Reinstated.

13.      **DCC Claim (Class 6C Claim) is impaired.**  On the Effective Date, in full satisfaction of the DCC Claim, the Reorganized Debtors will satisfy in Cash DCC's outstanding liability under the DCC Bonds.

14.      **Section 510(b) Securities Claims Against the Consolidated Debtors (Class 6D Claims) are impaired.**  Holders of Section 510(b) Securities Claims in Class 6D will receive, in full satisfaction of such Allowed Claim, a contingent, residual interest in the Disputed Unsecured Claims Reserve Assets that will entitle each holder of an Allowed Claim in Class 6D to receive, to the extent holders of Allowed Claims in Class 5B have been paid in full plus Postpetition Interest and Post-Effective Date Interest, its Pro Rata share of any remaining Disputed Unsecured Claims Reserve Assets.  Notwithstanding the foregoing, because the Debtors do not currently anticipate that holders of Class 6D Claims will receive any distribution pursuant to the Plan, and consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Class 6D Claim will be deemed to have rejected the Plan.

15.      **Old Common Stock of Dana (Class 7A Interests) are impaired.**  On the Effective Date, the Old Common Stock of Dana and all Interests related thereto will be canceled, and each holder of an Allowed Interest in Class 7A will receive, in full satisfaction of such Allowed Interest, a contingent, residual interest in the Disputed Unsecured Claims Reserve Assets that will entitle each holder of an Allowed Interest in Class 7A to receive, to the extent holders of Allowed Claims in Classes 5B and 6D have been paid in full plus Postpetition Interest and Post-Effective Date Interest, its Pro Rata share, based upon the number of shares of Old Common Stock of Dana (a) owned by the holder on the Distribution Record Date and (b) to which the holder would have been entitled upon the conversion of any related Interests owned on the Distribution Record Date and taking into account Allowed Claims in Class 7B (which are *pari passu* with Allowed Interests in Class 7A), of any remaining Disputed Unsecured Claims Reserve Assets.  Notwithstanding the foregoing, because the Debtors do not currently anticipate that holders of Class 7A Interests will receive any distribution pursuant to the Plan, and consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Class 7A Interest will be deemed to have rejected the Plan.

16.      **Section 510(b) Old Common Stock Claims Against the Consolidated Debtors (Class 7B Claims) are impaired.**  Holders of Section 510(b) Old Common Stock Claims in Class 7B will receive, in full satisfaction of such Allowed Claim, a contingent, residual interest in the Disputed Unsecured Claims Reserve Assets that will entitle each holder of an Allowed Claim in Class 7B to receive, to the extent holders of Allowed Claims in Classes 5B and 6D have been paid in full plus Postpetition Interest and Post-Effective Date Interest, its Pro Rata share and taking into account Allowed Interests in Class 7A (which are *pari passu* with Allowed Claims in Class 7B), of any remaining Disputed Unsecured Claims Reserve Assets.  Notwithstanding the foregoing, because the Debtors do not currently anticipate that holders of Class 7B Claims will receive any distribution pursuant to the Plan, and consistent with the language of section 1126(g) of the Bankruptcy Code, each holder of a Class 7B Claim will be deemed to have rejected the Plan.

17.      **Subsidiary Debtor Equity Interests (Class 8 Interests) are unimpaired.**  On the Effective Date, the Subsidiary Debtor Equity Interests will be Reinstated, subject to the Restructuring Transactions.

C.      **Special Provisions Regarding the Treatment of Allowed Secondary Liability Claims; Maximum Recovery**

The classification and treatment of Allowed Claims under the Plan take into consideration all Allowed Secondary Liability Claims.  On the Effective Date, Allowed Secondary Liability Claims will be treated as follows:

1.      The Allowed Secondary Liability Claims arising from or related to any Debtor's joint or several liability for the obligations under any Executory Contract or Unexpired Lease that is being assumed or deemed assumed by another Debtor or under any Executory Contract or Unexpired Lease that is being assumed by and assigned to another Debtor will be Reinstated.

2.      Except as provided in Section II.C.1, holders of Allowed Secondary Liability Claims against any Consolidated Debtor will be entitled to only one distribution in respect of the Liabilities related to such Allowed Secondary Liability Claim and will be deemed satisfied in full by the distributions on account of the related underlying Allowed Claim.  Notwithstanding the existence of a Secondary Liability Claim, no multiple recovery on account of any Allowed Claim against any Consolidated Debtor will be provided or permitted.

3.      Notwithstanding any provision hereof to the contrary, holders of Allowed Secondary Liability Claims against a Consolidated Debtor and EFMG may not receive in the aggregate from all Debtors more than 100% of the value of the underlying Claim giving rise to such multiple Claims.

## D.      Confirmation Without Acceptance by All Impaired Classes

The Debtors request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

## E.      Treatment of Executory Contracts and Unexpired Leases

### 1.      Executory Contracts and Unexpired Leases to Be Assumed

#### a.      Assumption and Assignment Generally

Except as otherwise provided in the Plan, in any contract, instrument, release or other agreement or document entered into in connection with the Plan or in a Final Order of the Bankruptcy Court, or as requested in any motion Filed on or prior to the Effective Date, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, the applicable Debtor or Debtors will assume or assume and assign, as indicated, each Executory Contract or Unexpired Lease listed on Exhibit II.E.1.a; *provided*, *however*, that the Debtors and Reorganized Debtors reserve the right, at any time on or prior to the Effective Date, to amend Exhibit II.E.1.a to:  (i) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to Section II.E.5; (ii) add any Executory Contract or Unexpired Lease thereto, thus providing for its assumption or assumption and assignment pursuant to this Section II.E.1.a.; or (iii) modify the amount of the Cure Amount Claim.  Moreover, pursuant to the Contract Procedures Order, the Debtors reserve the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.E.1.a to identify or change the identity of the Reorganized Debtor party that will be an assignee of an Executory Contract or Unexpired Lease.  Each contract and lease listed on Exhibit II.E.1.a will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit II.E.1.a will not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease (including any related agreements as described in Section II.E.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

#### b.      Assumptions and Assignments of Ancillary Agreements

Each Executory Contract or Unexpired Lease listed on Exhibit II.E.1.a will include any modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such contract or lease, irrespective of whether such agreement, instrument or other document is listed on Exhibit II.E.1.a, unless any such modification, amendment, supplement, restatement or other agreement is rejected pursuant to Section II.E.5 or designated for rejection in accordance with Section II.E.2.

#### c.      Joint Venture Agreements

The joint venture agreements listed on Exhibit II.E.1.c shall be deemed assumed and assigned to New Dana Holdco in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### d.    Customer Agreements

To the extent (i) the Debtors are party to any contract, purchase order or similar agreement providing for the sale of the Debtors' products or services, (ii) any such agreement constitutes an Executory Contract or Unexpired Lease and (iii) such agreement (A) has not been rejected pursuant to a Final Order of the Bankruptcy Court, (B) is not subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (C) is not subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (D) is not listed on Exhibit II.E.1.a, (E) is not listed on Exhibit II.E.5 or (F) has not been designated for rejection in accordance with Section II.E.2, such agreement (including any related agreements as described in Section II.E.1.b), purchase order or similar agreement will be assumed by the Debtors and assigned to the Reorganized Debtor that will be the owner of the business that performs the obligations to the customer under such agreement, or such Reorganized Debtor's parent company, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The Cure Amount Claim to be paid in connection with the assumption of such a customer-related contract, purchase order or similar agreement that is not specifically identified on Exhibit II.E.1.a shall be $0.00. Listing a contract, purchase order or similar agreement providing for the sale of the Debtors' products or services on Exhibit II.E.5 will not constitute an admission by a Debtor or Reorganized Debtor that such agreement (including related agreements as described in Section II.E.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.

### 2.    Approval of Assumptions and Assignments; Assignments Related to Restructuring Transactions

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption (including any related assignment resulting from the Restructuring Transactions or otherwise) of Executory Contracts or Unexpired Leases pursuant to Section II.E as of the Effective Date, except for Executory Contracts or Unexpired Leases that (a) have been rejected pursuant to a Final Order of the Bankruptcy Court, (b) are subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such Executory Contract or Unexpired Lease, (c) are subject to a motion to reject such Executory Contract or Unexpired Lease Filed on or prior to the Effective Date, (d) are rejected pursuant to Section II.E.5 or (e) are designated for rejection in accordance with the last sentence of this paragraph. As of the effective time of an applicable Restructuring Transaction, any Executory Contract or Unexpired Lease to be held by any Debtor or Reorganized Debtor and assumed hereunder or otherwise in the Chapter 11 Cases, if not expressly assigned to a third party previously in the Chapter 11 Cases or assigned to a particular Reorganized Debtor pursuant to the procedures described above, will be deemed assigned to the surviving, resulting or acquiring corporation in the applicable Restructuring Transaction, pursuant to section 365 of the Bankruptcy Code. If an objection to a proposed assumption, assumption and assignment or Cure Amount Claim is not resolved in favor of the Debtors or the Reorganized Debtors, the applicable Executory Contract or Unexpired Lease may be designated by the Debtors or the Reorganized Debtors for rejection within five Business Days of the entry of the order of the Bankruptcy Court resolving the matter against the Debtors. Such rejection shall be deemed effective as of the Effective Date.

### 3.    Payments Related to the Assumption of Executory Contracts or Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, at the option of the applicable Debtor or Reorganized Debtor: (a) by payment of the Cure Amount Claim in Cash on the Effective Date or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding: (a) the amount of any Cure Amount Claim, (b) the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to the assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made within 30 days following the entry of a Final Order or the execution of a Stipulation of Amount and Nature of Claim resolving the dispute and approving the assumption.

4.    **Contracts and Leases Entered Into or Assumed After the Petition Date**

Contracts, leases and other agreements entered into after the Petition Date by a Debtor, including, without limitation, the Union Settlement Agreements and any Executory Contracts or Unexpired Leases assumed by a Debtor, will be performed by such Debtor or Reorganized Debtor in the ordinary course of its business, as applicable.  Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order; *provided*, *however*, that any Executory Contracts or Unexpired Leases assumed by a Debtor and not previously assigned will be assigned to the Reorganized Debtor identified on Exhibit II.E.4.  The Debtors and Reorganized Debtors reserve the right, at any time until the date that is 30 days after the Effective Date, to amend Exhibit II.E.4 to identify or change the identity of the Reorganized Debtor party that will be the assignee of an Executory Contract or Unexpired Lease.

5.    **Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Section II.E (including any related agreements assumed pursuant to Section II.E.1.b), each Executory Contract or Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code.  The Executory Contracts or Unexpired Leases to be rejected will include the Executory Contracts or Unexpired Leases listed on Exhibit II.E.5.  Each contract and lease listed on Exhibit II.E.5 will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease.  Listing a contract or lease on Exhibit II.E.5 will not constitute an admission by a Debtor or Reorganized Debtor that such contract or lease (including related agreements as described in Section II.E.1.b) is an Executory Contract or Unexpired Lease or that a Debtor or Reorganized Debtor has any liability thereunder.  Irrespective of whether an Executory Contract or Unexpired Lease is listed on Exhibit II.E.5, it will be deemed rejected unless such contract (a) is listed on Exhibit II.E.1.a or Exhibit II.E.1.c, (b) was not previously assumed, assumed and assigned or rejected by order of the Bankruptcy Court or (c) is not deemed assumed pursuant to the other provisions of this Section II.E.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the later of:  (a) the Effective Date; or (b) the resolution of any objection to the proposed rejection of an Executory Contract or Unexpired Lease.  Any Claims arising from the rejection of any Executory Contract or Unexpired Lease will be treated as a Class 5A Claim or Class 5B Claim, as applicable (General Unsecured Claims), subject to the provisions of section 502 of the Bankruptcy Code.

6.    **Bar Date for Rejection Damages**

Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be Filed with the Bankruptcy Court on or before the later of:  (a) 30 days after the Effective Date or (b) for Executory Contracts identified on Exhibit II.E.5, 30 days after (i) the service of a notice of such rejection is served under the Contract Procedures Order, if the contract counterparty does not timely file an objection to the rejection in accordance with the Contract Procedures Order or (ii) if such an objection to rejection is timely filed with the Bankruptcy Court in accordance with the Contract Procedures Order, the date that an Order is entered approving the rejection of the applicable contract or lease or the date that the objection to rejection is withdrawn.  Any Claims not Filed within such applicable time periods will be forever barred from receiving a distribution from the Debtors, the Reorganized Debtors or the Estates.

7.    **Executory Contract and Unexpired Lease Notice Provisions**

In accordance with the Contract Procedures Order, the Debtors or Reorganized Debtors, as applicable, will provide (a) notice to each party whose Executory Contract or Unexpired Lease is being assumed pursuant to the Plan of:  (i) the contract or lease being assumed; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; (iii) any assignment of an Executory Contract or Unexpired Lease (pursuant to the Restructuring Transactions or otherwise); and (iv) the procedures for such party to object to the assumption of the applicable Executory Contract or Unexpired Lease, the amount of the proposed Cure Amount Claim or any assignment of an Executory Contract or Unexpired Lease;

(b) notice to each party whose Executory Contract or Unexpired Lease is being rejected pursuant to the Plan; (c) notice to each party whose Executory Contract or Unexpired Lease is being assigned pursuant to the Plan; (d) notice of any amendments to Exhibit II.E.1.a, Exhibit II.E.1.c, Exhibit II.E.4 or Exhibit II.E.5; and (e) any other notices relating to the assumption, assumption and assignment or rejection Executory Contracts or Unexpired Leases required under the Plan or Contract Procedures Order in accordance with the Contract Procedures Order.

> **8.      Special Executory Contract and Unexpired Lease Issues**
>
> > **a.      Obligations to Indemnify Directors, Officers and Employees**
> >
> > > i.      Prior to the Effective Date, Dana shall make arrangements to continue liability and fiduciary (including ERISA) insurance for the benefit of its directors, officers and employees for the period from and after the Effective Date, and, prior to the Effective Date, shall fully pay the annual premium for such insurance. With respect to its pre-Effective Date officers and directors' liability insurance, Dana shall obtain and pay for a run-off policy continuing existing policy limits on substantially the same terms and conditions as existing officers and directors' liability policies, for a term of six years, and providing coverage to all parties covered by policies in effect during the pendency of the cases.
> > >
> > > ii.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees on or after February 28, 2006 by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Reorganized Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.
> > >
> > > iii.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who was serving as one of its directors, officers or employees prior to February 28, 2006 by reason of such person's prior service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise as of the Effective Date; *provided*, *however*, that to the extent that such indemnification obligations no longer give rise to contingent Claims that can be disallowed pursuant to section 502(e) of the Bankruptcy Code, such indemnification obligations will be deemed and treated as Executory Contracts that are rejected by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date, and any Claims arising from such indemnification obligations (including any rejection damage claims) will be subject to the Bar Date provisions of Section II.E.6.

> **9.      No Change in Control**

The consummation of the Plan, the implementation of the Restructuring Transactions or the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to another Reorganized Debtor is not intended to, and shall not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

**ARTICLE III.**
**THE GLOBAL SETTLEMENT**

The provisions of the Plan are intended to continue the implementation of the Global Settlement and the transactions contemplated thereby, as approved by the Global Settlement Order. Transactions to be implemented pursuant to the Global Settlement include, but are not limited to, the following:

A.    **Assumption and Assignment of Collective Bargaining Agreements**

On the Effective Date, Reorganized Dana will assume and assign to the applicable Reorganized Debtor, in consultation with the applicable Unions, (1) the collective bargaining agreements listed on Exhibit III.A, which include the Union Settlement Agreements and the new collective bargaining agreements to be entered into by the Debtors and the UAW or USW at the following bargaining units:  (a) Fort Wayne, IN – Local Union 903; (b) Henderson, KY – Local Union 9443-02; (c) Marion, IN – Local Union 113; (d) Auburn Hills, MI – UAW Local 771; (e) Rochester Hills, MI – UAW Local 771; (f) Longview, TX – UAW Local 3057; (g) Lima, OH – UAW Local 1765; (h) Elizabethtown, KY – UAW Local 3047; and (i) Pottstown, PA – UAW Local 644, (2) any new collective bargaining agreements entered into between Dana and the UAW or USW, (3) the respective Neutrality Agreements (as defined in the Union Settlement Agreements) and (4) any and all other related agreements necessary to effect the Union Settlement Agreements.  Upon assumption, all proofs of claim filed by the Unions or any individual relating to such collective bargaining agreements will be deemed withdrawn.  Ordinary course obligations arising under the assumed agreements shall be unaltered by the Plan and shall be satisfied in the ordinary course of business.

B.    **Cessation of Union Retiree and Long Term Disability Benefits**

On the Union Retiree Benefit Termination Date, the Reorganized Debtors, in accordance with the Union Settlement Agreements, will cease providing and paying (1) all retiree benefits (as defined in section 1114(a) of the Bankruptcy Code) to all UAW and USW-represented retirees and (2) all long term disability income and medical benefits to individuals who are Union Disableds (as defined in the Union Settlement Agreements).

C.    **Contributions to UAW Union Retiree VEBA and USW Union Retiree VEBA**

On or after the Effective Date, in accordance with the terms of the Union Settlement Agreements, the Reorganized Debtors will make (1) the UAW Union Retiree VEBA Contribution and (2) the USW Union Retiree VEBA Contribution; *provided*, *however*, that, to the extent the Debtors pursue a transaction other than the New Equity Investment with Centerbridge, including a majority investment transaction, a sale of substantially all of the Debtors' assets and any similar transaction, the Unions may elect to receive, in accordance with the terms of the Union Settlement Agreements, either an Allowed Administrative Claim in the amount of $764 million or an Allowed General Unsecured Claim in Class 5B in the amount of $908 million.

D.    **Assumption and Assignment of Pension Benefits**

On the Effective Date, Reorganized Dana shall assume and assign the Pension Plans to New Dana Holdco, which will become the sponsor and continue to administer the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the Pension Plans in accordance with their terms and the provisions of ERISA and the Internal Revenue Code.  Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or the Debtors' successors from any liability imposed under any law or regulatory provision with respect to the Pension Plans.  Neither the PBGC, the Pension Plans nor any participant or beneficiary of the Pension Plans shall be enjoined or precluded from enforcing such liability with respect to the Pension Plans.

E.    **Emergence Bonus for Union Employees**

In accordance with the terms of the Union Settlement Agreements, New Dana Holdco will reserve New Dana Holdco Common Stock having a maximum aggregate Per Share Value of $22.53 million to be distributed to certain current and former union employees as a post-emergence bonus in accordance with Appendix J to the Union Settlement Agreements.

F.    **The New Equity Investment**

On the Effective Date, New Dana Holdco, will (1) issue the New Preferred Stock and (2) receive the New Equity Investment in accordance with the terms and conditions of the New Investment Agreement, the New

Series B Subscription Agreements and the B-2 Backstop Commitment Letter.  New Dana Holdco is authorized to execute and deliver those documents necessary or appropriate to facilitate the offer and issuance of the New Preferred Stock and to take any necessary or appropriate actions in connection therewith.

**G.      New Employment Agreements**

Prior to the Effective Date, the individuals who will serve as directors of New Dana Holdco, shall appoint a three-person committee of such directors to negotiate, in consultation with Centerbridge, post-Effective Date employment agreements with New Dana Holdco's anticipated senior management team.  Such employment agreements shall (1) be at market terms, (2) be reasonably acceptable in form and substance to Centerbridge, in consultation with the Ad Hoc Steering Committee as set forth in the Plan Term Sheet, and (3) be approved by New Dana Holdco's board of directors on the Effective Date.

**H.      Limitations on Sales of Core Businesses Prior to Effective Date**

Except for the sale of certain businesses specified by the Debtors and disclosed in confidence to the Unions, the Creditors' Committee and Centerbridge on or before July 1, 2007, and in addition to any requirements or consents required by the DIP Lenders under the DIP Facility, the Debtors will not sell any business line within their Automotive Systems Group or Commercial Vehicles Group prior to the Effective Date without (1) the agreement of the International President of the affected Union(s) (or any designee(s) of such officer(s)) and (2) the consent of Centerbridge.

**ARTICLE IV.
CONFIRMATION OF THE PLAN**

**A.      Conditions Precedent to Confirmation**

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Section IV.C:

1.      The Confirmation Order will be reasonably acceptable in form and substance to (a) the Debtors, (b) Centerbridge, (c) the Unions, (d) the Creditors' Committee and (e) the Ad Hoc Steering Committee.

2.      The Plan shall not have been materially amended, altered or modified from the Plan as Filed on October 23, 2007, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan.

3.      All Exhibits to the Plan are in form and substance reasonably satisfactory to (a) the Debtors, (b) the Unions, (c) Centerbridge, (d) the Creditors' Committee and (e) the Ad Hoc Steering Committee.

4.      Any modification of, amendment, supplement or change to the Plan or any Plan Exhibit that (a) alters in any way the Settlement Pool or the parties to whom it shall be made available; (b) makes available any consideration to Ineligible Unsecured Claims other than the Settlement Pool; or (c) provides for the receipt of additional consideration for Centerbridge or any of its subsidiaries or affiliates shall not have been made without the consent of the Ad Hoc Steering Committee and the Creditors' Committee.

**B.      Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section IV.C:

1.      The Bankruptcy Court shall have entered the Confirmation Order on or before February 28, 2008.

2.      The Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) approving and authorizing the Debtors and the Reorganized Debtors to take all actions necessary or

appropriate to implement the Plan, including completion of the Restructuring Transactions and the other transactions contemplated by the Plan and the implementation and consummation of the contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan.

3.      No stay of the Confirmation Order shall then be in effect.

4.      The documents effectuating the Exit Facility shall be in form and substance reasonably satisfactory to the Debtors and Centerbridge and shall have been executed and delivered by the Reorganized Debtors, the Exit Facility Agent and each of the lenders under the Exit Facility.

5.      The total amount of Allowed General Unsecured Claims (excluding any General Unsecured Claims held by the Unions (including the Union Claim), any General Unsecured Claims held by the Retiree Committee, Convenience Claims, General Unsecured Claims against EFMG, Prepetition Intercompany Claims and the DCC Claim) shall not exceed $3.25 billion.

6.      The total amount of funded debt of the Reorganized Debtors, on a consolidated basis, shall not exceed $1.5 billion.

7.      The Reorganized Debtors' Minimum Emergence Liquidity shall be reasonably acceptable to the Unions and Centerbridge.

8.      The Effective Date shall occur on or before May 1, 2008.

9.      The Plan and all Exhibits to the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan.

10.     Any modification of, amendment, supplement or change to the Plan or any Plan Exhibit that (a) alters in any way the Settlement Pool or the parties to whom it shall be made available; (b) makes available any consideration to Ineligible Unsecured Claims other than the Settlement Pool; or (c) provides for the receipt of additional consideration for Centerbridge or any of its subsidiaries or Affiliates shall not have been made without the consent of the Ad Hoc Steering Committee and the Creditors' Committee.

11.     The Debtors shall have complied with their obligations under the B-2 Backstop Commitment Letter to sell New Series B Preferred Stock to the Series B-2 Investors in accordance with the terms of the B-2 Backstop Commitment Letter,  provided the B-2 Backstop Commitment Letter has not been terminated and the B-2 Investors shall have funded the purchase of New Series B Preferred Stock thereunder.

**C.      Waiver of Conditions to the Confirmation or Effective Date**

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or in part at any time by the agreement of (1) the Debtors, (2) Centerbridge, (3) the Unions, (4) the Creditors' Committee and (5) the Ad Hoc Steering Committee without an order of the Bankruptcy Court, *provided*, *however*, that (a) the condition precedent to the Effective Date in Section IV.B.5 may be waived only by the Creditors' Committee acting reasonably and consistently with its fiduciary duties to all unsecured creditors and after taking into account the efforts that the Debtors, the Creditors' Committee and other parties, if applicable, have made to resolve unsecured Claims and (b) the condition precedent to the Confirmation Date and the Effective Date in Sections IV.A.4 and IV.B.10, respectively, may be waived only with the consent of Centerbridge, the Creditors' Committee and the Ad Hoc Steering Committee.

**D.      Effect of Nonoccurrence of Conditions to the Effective Date**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section IV.C, then upon motion by the Debtors made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be

vacated by the Bankruptcy Court; *provided*, *however*, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to this Section IV.D: (1) the Plan will be null and void in all respects, including with respect to (a) the discharge of Claims and termination of Interests pursuant to section 1141 of the Bankruptcy Code, (b) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section II.E and (c) the releases described in Section IV.E; and (2) nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against, or any Interest in, any Debtor or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

E.       **Effect of Confirmation of the Plan**

    1.       **Dissolution of Official Committees**

        On the Effective Date, the Official Committees, to the extent not previously dissolved, will dissolve, and the members of the Official Committees and their respective Professionals will cease to have any role arising from or related to the Chapter 11 Cases; *provided*, *however*, that the Creditors' Committee (a) shall continue to exist for the purpose of objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) to the extent (i) an appeal to the Confirmation Order is pending as of the Effective Date and (ii) the Creditors' Committee is a party to and is actively participating in such appeal, the Creditors' Committee shall continue to exist for the purpose of participating in such appeal. The Professionals retained by the Official Committees and the respective members thereof will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with (a) any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section II.A.1.i.ii.A and (b) with respect to the Creditors' Committee (i) objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (ii) to the extent applicable, the Creditors' Committee's active participation in any appeal of the Confirmation Order. Upon the later of (a) the resolution of the Creditors' Committee's outstanding objections to any Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) the resolution of any appeal of the Confirmation Order in which the Creditors' Committee is actively participating, the Creditors' Committee will dissolve, and its Professionals will cease to have any role arising from or relating to the Chapter 11 Cases. The Reorganized Debtors will pay the reasonable expenses of the members of the Creditors' Committee and the reasonable fees and expenses of the Creditors' Committee's Professionals incurred in connection with (a) objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) to the extent applicable, actively participating in an appeal of the Confirmation Order, without further Bankruptcy Court approval.

    2.       **Preservation of Rights of Action by the Debtors and the Reorganized Debtors; Recovery Actions**

        Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement, including the Litigation Trust Agreement, entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and causes of action that the Debtors or the Estates may hold against any entity, including any Recovery Actions, to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court.

    3.       **Comprehensive Settlement of Claims and Controversies**

        Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim (including Prepetition Intercompany Claims) or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or

controversies and the Bankruptcy Court's finding that all such compromises or settlements are in the best interests of the Debtors, Reorganized Debtors, Estates and their respective property and Claim and Interest holders and are fair, equitable and reasonable.

4.    **Discharge of Claims and Termination of Interests**

a.    **Complete Satisfaction, Discharge and Release**

Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date and immediately after cancellation of the Old Common Stock of Dana:  (i) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (C) the holder of a Claim based on such debt has accepted the Plan; and (ii) terminate all Interests and other rights of holders of Interests in the Debtors.

b.    **Discharge and Termination**

In accordance with the foregoing, except as provided in the Plan, the Confirmation Order will be a judicial determination, as of the Effective Date and immediately after the cancellation of the Old Common Stock of Dana, but prior to the issuance of the New Dana Holdco Common Stock, of a discharge of all Claims and other debts and Liabilities against the Debtors and a termination of all Interests and other rights of the holders of Interests in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

5.    **Injunction**

On the Effective Date, except as otherwise provided herein or in the Confirmation Order,

a.    all Persons who have been, are or may be holders of Claims against or Interests in a Debtor shall be enjoined from taking any of the following actions against or affecting a Debtor, its Estate or its Assets with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan and appeals, if any, from the Confirmation Order):

1.    commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against a Debtor, its Estate, its Assets or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor (including, without limitation, all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

2.    enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order against a Debtor, its Estate or its Assets or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor;

3.    creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien against a Debtor, its Estate or its Assets, or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor other than as contemplated by the Plan;

4.    except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Debtor, its Estate or its Assets, or any direct or indirect successor in interest to a Debtor, or any assets or property of such successor; and

5.    proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth herein to the extent such settlements have been approved by the Bankruptcy Court in connection with Confirmation of the Plan.

b.    All Persons that have held, currently hold or may hold any Liabilities released or exculpated pursuant to Sections IV.E.6 and IV.E.7, respectively, will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

c.    Notwithstanding the foregoing and except with respect to Derivative Claims and holders of Claims that vote in favor of the Plan, nothing in the Plan shall enjoin the prosecution of the claims asserted, or to be asserted, solely on account of alleged conduct occurring prior to the Petition Date, against any non-Debtor defendant in the Securities Litigation.  In addition, nothing in the Plan shall prevent the holders of Asbestos Personal Injury Claims from exercising their rights against any applicable Debtor or Reorganized Debtor or its Estate or Assets with respect to their Asbestos Personal Injury Claims.  Solely with respect to Asbestos Personal Injury Claims, the automatic stay imposed by section 362 of the Bankruptcy Code will be terminated as of the date that is 60 days after the Effective Date and, pursuant to section 108(c) of the Bankruptcy Code, the applicable statute of limitations with respect to any such Claim that did not expire prior to the Petition Date will cease to be tolled as of that date.

6.    **Releases**

a.    **General Releases by Debtors and Reorganized Debtors**

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them, will forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan, the Global Settlement and the B-2 Backstop Commitment Letter; *provided*, *however*, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct, or any actions of the Debtors' prepetition lenders with respect to the Debtors' prepetition credit facility.

b.    **General Releases by Holders of Claims or Interests**

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code). Notwithstanding the foregoing and except with respect to Derivative Claims and holders of Claims that vote in favor of the Plan, nothing in the Plan shall release the claims asserted, or to be asserted, solely on account of alleged conduct occurring prior to the Petition Date, against any non-Debtor defendant in the Securities Litigation.  In addition, nothing in the Plan shall be deemed to release any applicable Debtor or Reorganized Debtor from any Liability arising from or related to Asbestos Personal Injury Claims.

c.      **Release of Released Parties by Other Released Parties**

From and after the Effective Date, except with respect to obligations arising under the Plan, the Global Settlement and the B-2 Backstop Commitment Letter, to the fullest extent permitted by applicable law, the Released Parties shall release each other from any and all Liabilities that any Released Party is entitled to assert against any other Released Party in any way relating to any Debtor, the Chapter 11 Cases, the Estates, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan, or the property to be distributed under the Plan, the Confirmation Exhibits, the Disclosure Statement, any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy; *provided, however,* that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

7.      **Exculpation**

From and after the Effective Date, the Released Parties shall neither have nor incur any liability to any Person for any act taken or omitted to be taken in connection with the Debtors' restructuring, including the formulation, preparation, dissemination, implementation, confirmation or approval of the Global Settlement, the Plan, the Confirmation Exhibits, the Disclosure Statement or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; *provided, however,* that this section shall not apply to the obligations arising under the Plan, the Global Settlement and the B-2 Backstop Commitment Letter of the parties thereto; and *provided further, however,* that the foregoing provisions shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Any of the foregoing parties in all respects shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

8.      **Termination of Certain Subordination Rights and Settlement of Related Claims and Controversies**

a.      **Termination**

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  Except as provided in Section IV.E.8.c, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined.  Accordingly, distributions pursuant to the Plan to holders of Allowed Claims will not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

b.      **Settlement**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim, except as provided in Section IV.E.8.c.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Reorganized Debtors and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

c.     **Preservation of Subordination under Section 510(b)**

Notwithstanding anything to the contrary contained in Section IV.E.8, the provisions of section 510(b) of the Bankruptcy Code, to the extent applicable, are expressly preserved and shall be enforced pursuant to the Plan.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.     Continued Corporate Existence and Vesting of Assets**

Except as otherwise provided herein (including with respect to the Restructuring Transactions described in Section V.B):  (1) on or before the Effective Date, New Dana Holdco will be incorporated and shall exist as a separate corporate entity, with all corporate powers in accordance with the laws of the state of Delaware and the certificates of incorporation, bylaws and certificate of designations attached hereto as Exhibits V.C.1.a and V.C.1.b; (2) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law; (3) on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest, subject to the Restructuring Transactions, in such Reorganized Debtor free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

**B.     Restructuring Transactions**

**1.     Restructuring Transactions Generally**

On or after the Confirmation Date, the applicable Debtors or Reorganized Debtors may enter into such Restructuring Transactions and may take such actions as the Debtors or Reorganized Debtors may determine to be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a corporate restructuring of their respective businesses or simplify the overall corporate structure of the Reorganized Debtors, including but not limited to the restructuring transactions identified on Exhibit V.B.1, all to the extent not inconsistent with any other terms of the Plan.  Unless otherwise provided by the terms of a Restructuring Transaction, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate.  The actions to effect these transactions may include:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors.

2.        **Obligations of Any Successor Corporation in a Restructuring Transaction**

The Restructuring Transactions may result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Reorganized Debtors vesting in one or more surviving, resulting or acquiring corporations.  In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Reorganized Debtor, such surviving, resulting or acquiring corporation will perform the obligations of the applicable Reorganized Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Reorganized Debtor, except as provided in the Plan or in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Reorganized Debtor will perform such obligations.

C.        **Corporate Governance and Directors and Officers**

1.        **Certificates of Incorporation and Bylaws of New Dana Holdco and the Other Reorganized Debtors**

As of the Effective Date, the certificates of incorporation and the bylaws (or comparable constituent documents) of New Dana Holdco and the other Reorganized Debtors, including the certificate of designations with respect to New Dana Holdco, will be substantially in the forms set forth in Exhibits V.C.1.a and V.C.1.b, respectively.  The certificates of incorporation and bylaws (or comparable constituent documents) of New Dana Holdco and each other Reorganized Debtor, among other things, will:  (a) prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code; (b) with respect to New Dana Holdco, authorize (i) the issuance of New Dana Holdco Common Stock in amounts not less than the amounts necessary to permit the distributions required or contemplated by the Plan and (ii) the issuance of the New Preferred Stock.  After the Effective Date, New Dana Holdco and each other Reorganized Debtor may amend and restate their articles of incorporation or bylaws (or comparable constituent documents) as permitted by applicable state law, subject to the terms and conditions of such constituent documents.  On the Effective Date, or as soon thereafter as is practicable, New Dana Holdco and each other Reorganized Debtor shall file such certificates of incorporation (or comparable constituent documents) with the secretaries of state of the states in which New Dana Holdco and such other Reorganized Debtors are incorporated or organized, to the extent required by and in accordance with the applicable corporate law of such states.

2.        **Directors and Officers of New Dana Holdco and the Other Reorganized Debtors**

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date:  (a) the initial officers of New Dana Holdco and the other Reorganized Debtors will consist of the individuals identified on Exhibit V.C.2; (b) the initial board of directors of New Dana Holdco will be comprised of seven members (to be identified on Exhibit V.C.2 as selected), as follows: (i) three directors (one of whom must be independent) chosen by Centerbridge, (ii) two Independent Directors chosen by the Creditors' Committee, (iii) one Independent Director chosen by the Creditors' Committee from a list of three Independent Directors proffered by Centerbridge, *provided*, *however*, if none of the Independent Directors on the list are reasonably satisfactory to the Creditors' Committee, then Centerbridge shall proffer the names of additional Independent Directors until the name of an Independent Director reasonably satisfactory to the Creditors' Committee is put forth and at any time during that process, the Creditors' Committee may submit its own list, which would then be subject to the same proffer process and (iv) the Chief Executive Officer of New Dana Holdco; and (c) the initial board of directors of each of the other Reorganized Debtors will consist of the individuals identified, or will be designated pursuant to the procedures specified, on Exhibit V.C.2.  Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of New Dana Holdco or the applicable other Reorganized Debtor and state law.

3.    **Compliance with Exchange Act by New Dana Holdco**

From and after the Effective Date, New Dana Holdco shall timely file with the SEC the annual reports, quarterly reports and other periodic reports required to be filed with the SEC pursuant to sections 13(a) or 15(d) of the Exchange Act.

D.    **New Dana Holdco Common Stock**

1.    **Issuance and Distribution of New Dana Holdco Common Stock**

The New Dana Holdco Common Stock, when issued or distributed as provided in the Plan, will be duly authorized, validly issued and, if applicable, fully paid and nonassessable.  Each distribution and issuance under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each person or entity receiving such distribution or issuance.

2.    **Listing**

New Dana Holdco will apply to list the New Dana Holdco Common Stock on a national exchange on or as soon as practicable after the Effective Date when New Dana Holdco meets the applicable listing requirements.  If New Dana Holdco is not able to list the New Dana Holdco Common Stock on a national exchange, it will cooperate with any registered broker-dealer who may seek to initiate price quotations for the New Dana Holdco Common Stock on the OTC Bulletin Board.

3.    **Section 1145 Exemption**

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable nonbankruptcy law, the issuance of the New Dana Holdco Common Stock under the Plan will be exempt from registration under the Securities Act and all rules and regulations promulgated thereunder.

E.    **Employment, Retirement and Other Related Agreements; Cessation of Retiree Benefits; Workers' Compensation Programs**

1.    **Employment-Related Agreements**

As of the Effective Date, the Reorganized Debtors will have authority to:  (a) maintain, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active directors, officers and employees, subject to the terms and conditions of any such agreement; and (b) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active employees.

2.    **Cessation of Retiree Benefits**

Prior to the Effective Date, the Debtors ceased providing and paying all retiree benefits (as defined in section 1114(a) of the Bankruptcy Code) to:  (a) non-union retirees and their dependents in accordance with the Non-Union Retiree Settlement Order; and (b) retirees who had been members of the International Association of Machinists and Aerospace Workers and their dependents in accordance with the Agreed Order Approving Settlement Agreement Between Dana Corporation and the International Association of Machinists and Aerospace Workers (Docket No. 5180), dated April 27, 2007.  Retiree benefits (as defined in section 1114(a) of the Bankruptcy Code) to all UAW and USW-represented retirees will be terminated in accordance with the Global Settlement Order and Section III.B above.

3.        **Continuation of Workers' Compensation Programs**

From and after the Effective Date, (a) the Reorganized Debtors will continue to administer and pay all valid claims for benefits and liabilities arising under the Debtors' workers' compensation programs for which the Debtor or Reorganized Debtors are responsible under applicable state workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the Debtors' prepetition practices and procedures, applicable plan documents and governing state workers' compensation law, and (b) nothing in the Plan shall discharge, release, or relieve the Debtors or Reorganized Debtors from any current or future liability under applicable state workers' compensation law in the jurisdictions where the Debtors or Reorganized Debtors participate in workers' compensation programs, including guarantees given to Michigan's Workers' Compensation Agency by Dana on account of payment obligations of certain Debtor subsidiaries.  The Debtors expressly reserve the right to challenge the validity of any claim for benefits or liabilities arising under any workers' compensation program.

4.        **Emergence Bonus for Non-Union Employees**

Nothing in the Plan shall prevent, as applicable, (a) New Dana Holdco from reserving or (b) the Debtors from seeking Bankruptcy Court approval of New Dana Holdco's reservation of, New Dana Holdco Common Stock having an aggregate Per Share Value of $22.0 million for distribution after the Effective Date as a post-emergence bonus to non-union hourly and salaried non-management employees, excluding in all events employees that will be eligible for management bonus programs after the Effective Date.  Such Non-Union Emergence Shares would be issued on terms and conditions established by the Debtors or the Reorganized Debtors consistent with the description of such terms and conditions previously provided to the Unions.

5.        **Equity Incentive Plan**

The Debtors anticipate that after the Effective Date, New Dana Holdco will implement an equity incentive plan for management that will reserve up to 5-10% of the fully-diluted outstanding shares of New Dana Holdco Common Stock.  The Debtors anticipate that a copy of the equity incentive plan will be Filed as a supplement to the Plan.

F.        **Corporate Action**

The Restructuring Transactions; the adoption of new or amended and restated certificates of incorporation and bylaws (or comparable constituent documents) for New Dana Holdco and the other Reorganized Debtors and the certificate of designations for New Dana Holdco; the initial selection of directors and officers for each Reorganized Debtor; the entry into the Exit Facility and receipt of the proceeds thereof; the establishment of the Litigation Trust and appointment of the Litigation Trustee; the issuance of the New Preferred Stock and New Dana Holdco Common Stock; the distribution of the New Dana Holdco Common Stock and Cash pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, retirement income plans, welfare benefit plans and other employee plans and related agreements; and the other matters provided for under the Plan involving the corporate structure of the Debtors and Reorganized Debtors or corporate action to be taken by or required of a Debtor or Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

G.        **Litigation Trust**

1.        **Creation**

On or before November 25, 2007, the Creditors' Committee, in consultation with the Ad Hoc Steering Committee, will provide the Debtors with the names of two candidates to serve as a Litigation Trustee.  The

Debtors will solicit bids from such candidates, as well as two candidates selected by the Debtors, and, with the consent of the Creditors' Committee (in consultation with the Ad Hoc Steering Committee), will select the most cost-effective and qualified candidate to serve as Litigation Trustee and the Debtors, in consultation with Centerbridge, the Creditors' Committee and the Ad Hoc Steering Committee, will negotiate and enter into the Litigation Trust Agreement.  The identity of the Litigation Trustee and the Litigation Trust Agreement shall be Filed no later than five days prior to the Confirmation Hearing and will be effective as of the Effective Date.

2.    **Rights and Responsibilities**

The powers, rights and responsibilities of the Litigation Trust and Litigation Trustee shall be specified in the Litigation Trust Agreement and shall be limited to the authority and responsibility to:  (a) consult with the Reorganized Debtors with respect to any proposed Stipulation of Amount and Nature of Claim, settlement, other agreement or agreed order that would result in an Allowed General Unsecured Claim in excess of $500,000; (b) File an objection to any proposed Stipulation of Amount and Nature of Claim, settlement, other agreement or agreed order that would result in an Allowed General Unsecured Claim in excess of $500,000 within ten days of receiving written notice of such proposed Stipulation of Amount and Nature of Claim, settlement, other agreement or agreed order; (c) object to any General Unsecured Claim in excess of $500,000 where (i) the Litigation Trustee has requested the Debtors in writing to object to a General Unsecured Claim, which written request shall in no event be served upon the Reorganized Debtors prior to the later of (A) 60 days after the Effective Date or (B) 45 days after the Filing of a proof of Claim for such General Unsecured Claim, and (ii) the Debtors have not filed the objection requested by the Litigation Trustee within 20 days of the Reorganized Debtors' receipt of such request; and (d) prosecute Recovery Actions and other Estate causes of action not released by the Plan or in any other order of the Bankruptcy Court (including the Confirmation Order), including potential Recovery Actions against the Debtors' prepetition secured lenders, to the extent that such causes of action are transferred pursuant to, and identified in, the Litigation Trust Agreement.  In connection with its responsibilities, the Litigation Trust may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties under the Plan.  Notwithstanding anything to the contrary in the Litigation Trust Agreement or the Plan, the consultation and objection rights of the Litigation Trustee with respect to Claims shall be limited to General Unsecured Claims that, if Allowed pursuant to a Stipulation of Amount and Nature of Claim, other settlement, other agreement or agreed order, would result in an Allowed General Unsecured Claim in excess of $500,000.  Any net proceeds recovered by the Litigation Trust from the prosecution or resolution of the Recovery Actions and other Estate causes of action discussed above shall be deposited into the Disputed Unsecured Claims Reserve for distribution in accordance with the Plan.

3.    **Fees and Expenses of the Litigation Trust**

Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary fees and expenses of the Litigation Trust and the Litigation Trustee (including the reasonable and necessary fees and expenses of any professionals assisting the Litigation Trust in carrying out its duties under the Plan) will be funded by the Reorganized Debtors in accordance with the Litigation Trust Agreement without further order from the Bankruptcy Court.

4.    **Tax Treatment**

The Litigation Trust is intended to be treated, for U.S. federal income Tax purposes, as a grantor trust, the sole beneficiary of which is the Disputed Unsecured Claims Reserve, a disputed ownership fund within the meaning of Treasury Regulations section 1.468B-9(b)(1), and which, accordingly, is a part of the Disputed Unsecured Claims Reserve.

5.    **No Transfer**

The beneficial interest of the Disputed Unsecured Claims Reserve in the Litigation Trust will be non-transferable.

H.    **Special Provisions Regarding Insured Claims**

    1.    **Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims**

        Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing in this Section V.H will constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

    2.    **Assumption and Continuation of Insurance Policies**

        From and after the Effective Date, each of the Insurance Contracts will be, as applicable, either deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Section V.A of the Plan or continued in accordance with its terms such that each of the parties' contractual, legal and equitable rights under each Insurance Contract shall remain unaltered, and the parties to each Insurance Contract will continue to be bound by such Insurance Contract as if the Chapter 11 Cases had not occurred. Nothing in the Plan, shall affect, impair or prejudice the rights and defenses of the Insurers or the Reorganized Debtors under the Insurance Contracts in any manner, and such Insurers and Reorganized Debtors shall retain all rights and defenses under the Insurance Contracts, and the Insurance Contracts shall apply to, and be enforceable by and against, the Reorganized Debtors and the applicable Insurer(s) as if the Chapter 11 Cases had not occurred. In addition, notwithstanding anything to the contrary in the Plan (a) from and after the Effective Date, the litigation currently pending in the United States District Court for the Northern District of Ohio captioned, collectively, as *Fireman's Fund Insurance Company v. Hartford Accident and Indemnity Company*, Case No. 03-03CV7168; *American Insurance Company v. Celotex Corp.*, No. 85-7997; and *Dana Corp. v. Fireman's Fund Insurance Company*, No. 83-1153, shall continue before the United States District Court for the Northern District of Ohio, and Claims relating to such litigation shall be adjudicated and resolved in the course of such litigation, rather than in the Bankruptcy Court and (b) nothing in the Plan (including any other provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing any party's legal, equitable or contractual rights and/or obligations under any Insurance Contract, if any, in any respect. Any such rights and obligations shall be determined under the Insurance Contracts, any agreement of the parties and applicable law.

    3.    **Liquidation of Asbestos Personal Injury Claims**

        All Asbestos Personal Injury Claims will be liquidated, determined or otherwise resolved in the appropriate non-bankruptcy forum, and no Asbestos Personal Injury Claim will be subject to the Claims allowance process set forth in the Plan.

I.    **Cancellation and Surrender of Instruments, Securities and Other Documentation**

    1.    **Bonds**

        Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan or as otherwise provided for herein, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI, the Indentures and the Bonds will be deemed canceled and of no further force and effect against the Debtors, without any further action on the part of any Debtor. The holders of the Bonds will have no rights against the Debtors arising from or relating to such instruments and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; *provided*, *however*, that no distribution under the Plan will be made to or on behalf of any holder of an Allowed Bondholder Claim until such Bonds are surrendered to and received by the applicable Third Party Disbursing Agent to the extent required in Section VI.L. Notwithstanding the foregoing and anything contained in the Plan, the applicable provisions of the Indentures will continue in effect solely for the purposes of (a) allowing the Indenture Trustee or other Disbursing Agent to make distributions on account of Bondholder Claims under the Plan as provided in Section VI.F of the Plan and (b) permitting the Indenture Trustee to maintain or assert any rights or Charging Liens it may have on

distributions to Bondholders for the Indenture Trustee Fee Claim pursuant to the terms of the Plan and the applicable Indenture. The Reorganized Debtors shall have not have any obligations to the Indenture Trustee for any fees, costs or expenses except as expressly provided in the Plan.

### 2.    Old Common Stock

The Old Common Stock of Dana shall be deemed canceled and of no further force and effect on the Effective Date. The holders of or parties to such canceled securities and other documentation will have no rights arising from or relating to such securities and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan.

## J.    Settlement Pool

### 1.    Purpose of Settlement Pool

The Settlement Pool will be established to settle a dispute between the Creditors' Committee, the Debtors, the Ad Hoc Steering Committee and Centerbridge and provides for settlement payments to holders of Allowed Ineligible Unsecured Claims.

### 2.    Payments from Settlement Pool

Each holder of an Allowed Ineligible Unsecured Claim will receive, on the 45th day following the Effective Date, its pro rata portion of the Settlement Pool, which under no circumstances shall exceed $.085 per $1.00 of each such Allowed Ineligible Unsecured Claim. Any funds remaining in the Settlement Pool after all payments have been made to holders of Allowed Ineligible Unsecured Claims will be deemed Minimum Excess Cash.

### 3.    Condition to Funding of Settlement Pool

The Settlement Pool will be funded from the proceeds from the sale of the New Series B Preferred Stock, pursuant to the New Investment Agreement and B-2 Backstop Commitment Letter, in excess of $500 million.

### 4.    Evidence of Allowed Ineligible Unsecured Claims

In order for a holder of an Allowed Ineligible Unsecured Claim to receive a payment from the Settlement Pool on account of such Claim, each holder will be required to provide the Debtors or Reorganized Debtors, as applicable, reasonable evidence that its Claims are Allowed Ineligible Unsecured Claims no later than 15 days after the Effective Date. The Debtors anticipate sending out requests for such information no later than 15 days prior to the Effective Date.

## K.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and except as specified in the treatment provided for Claims and Interests in Article II, all mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to such collateral thereunder, will revert to the applicable Reorganized Debtor and its successors and assigns. As of the Effective Date, the Reorganized Debtors shall be authorized to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of this Section V.K.

## L.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The President, Chief Executive Officer, Chief Financial Officer or any Vice President of each Debtor or Reorganized Debtor, as applicable, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The Secretary or any Assistant Secretary of each Debtor or

Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax or similar Tax:  (1) the issuance, transfer or exchange of New Dana Holdco Common Stock and New Preferred Stock; (2) the creation of any mortgage, deed of trust, lien or other security interest; (3) the making or assignment of any lease or sublease; (4) the execution and delivery of the Exit Facility; (5) any Restructuring Transaction; or (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

**A.** **Distributions for Claims and Interests Allowed as of the Effective Date**

Except as otherwise provided in this Article VI, distributions of Cash (including Distributable Excess Minimum Cash) and Distributable Shares of New Dana Holdco Common Stock to be made on the Effective Date to holders of Claims or Interests as provided by Article II that are allowed as of the Effective Date shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than:  (1) 60 days after the Effective Date; or (2) with respect to any particular Claim, such later date when the applicable conditions of Section II.E.3 (regarding cure payments for Executory Contracts and Unexpired Leases being assumed), Section VI.F.2 (regarding undeliverable distributions) or Section VI.L (regarding surrender of canceled instruments and securities), as applicable, are satisfied.  Distributions on account of Claims and Interests that become Allowed Claims or Allowed Interests, respectively, after the Effective Date will be made pursuant to Section VII.C.

**B.** **Method of Distributions to Holders of Claims and Interests**

The Reorganized Debtors, or such Third Party Disbursing Agents as the Reorganized Debtors, may employ in their sole discretion, will make all distributions of Cash, New Dana Holdco Common Stock and other instruments or documents required under the Plan.  Each Disbursing Agent will serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan.  The duties of any Third Party Disbursing Agent shall be set forth in the applicable agreement retaining such Third Party Disbursing Agent.

**C.** **Distributions on Account of Bondholder Claims**

Distributions on account of Allowed Bondholder Claims shall be made (1) to the Indenture Trustee or (2) with the prior written consent of the Indenture Trustee, through the facilities of DTC or, if applicable, a Third Party Disbursing Agent.  If a distribution is made to the Indenture Trustee, the Indenture Trustee, in its capacity as Third Party Disbursing Agent, shall administer the distributions in accordance with the Plan and the applicable Indenture and be compensated in accordance with Section VI.D below.

**D.** **Compensation and Reimbursement for Services Related to Distributions**

Each Third Party Disbursing Agent providing services related to distributions pursuant to the Plan will receive from the Reorganized Debtors, without further Bankruptcy Court approval, reasonable compensation for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services.  These payments will be made by the Reorganized Debtors and will not be deducted from distributions to be made pursuant to the Plan to holders of Allowed Claims receiving distributions from a Third Party Disbursing Agent.  For purposes of reviewing the reasonableness of the fees and expenses of any Third Party Disbursing Agent, the Reorganized Debtors shall be provided with copies of invoices of each Third Party Disbursing Agent in the form typically rendered in the regular course of the applicable Third Party Disbursing Agent's business but with sufficient detail that reasonableness may be assessed.  To the extent that there are any disputes that the Reorganized Debtors

are unable to resolve with a Third Party Disbursing Agent, the Reorganized Debtors may submit such dispute to the Bankruptcy Court for resolution.

**E.    Provisions Governing Disputed Unsecured Claims Reserve**

**1.    Funding of the Disputed Unsecured Claims Reserve**

On the Effective Date or otherwise prior to the initial distributions under Section VI.G.1, the Disputed Unsecured Claims Reserve will be established by the Disbursing Agent and the Reserved Shares and/or Reserved Excess Minimum Cash will be placed in the Disputed Unsecured Claims Reserve by the Disbursing Agent for the benefit of holders of Allowed Claims in Class 5B and Disputed Claims that become Allowed Claims in Class 5B. For the purpose of calculating the amount of New Dana Holdco Common Stock and/or Excess Minimum Cash to be contributed to the Disputed Unsecured Claims Reserve, all Disputed Claims will be treated (solely for purposes of establishing the Disputed Unsecured Claims Reserve) as Allowed Claims in the Face Amount of such Claims as of the Effective Date. In addition, Disputed Claims rendered duplicative as a result of the consolidation of the Consolidated Debtors pursuant to Section VIII.A will only be counted once for purposes of establishing the Disputed Unsecured Claims Reserve. As Disputed Claims are resolved, the Disbursing Agent shall make adjustments to the reserves for Disputed Claims, but the Reorganized Debtors shall not be required to increase such reserves from and after the Effective Date. The Debtors may File a motion seeking an order of the Bankruptcy Court approving additional procedures for the establishment of the Disputed Unsecured Claims Reserve.

**2.    Dividends and Distributions**

Cash dividends and other distributions received by the Disbursing Agent on account of the Reserved Shares and any Cash deposited into the Disputed Unsecured Claims Reserve from the Litigation Trust, along with any Cash Investment Yield on Cash held in the Disputed Unsecured Claims Reserve, will (a) be deposited in a segregated bank account in the name of the Disbursing Agent for the benefit of holders of Allowed Claims in Class 5B and Disputed Claims that become Allowed Claims in Class 5B, (b) will be accounted for separately and (c) will not constitute property of the Reorganized Debtors. The Disbursing Agent will invest any Cash held in the Disputed Unsecured Claims Reserve in a manner consistent with Dana's investment and deposit guidelines.

**3.    Recourse**

Each holder of an Allowed Claim in Class 5B and each holder of a Disputed Claim that ultimately becomes an Allowed Claim in Class 5B will have recourse only to the initial distribution of Distributable Shares of New Dana Holdco Common Stock and Distributable Excess Cash and the Disputed Unsecured Claims Reserve Assets and not to any other assets held by the Reorganized Debtors, their property or any assets previously distributed on account of any Allowed Claim or Allowed Interest. Each holder of an Allowed Claim in Class 6D will have recourse, to the extent each holder of an Allowed Claim in Class 5B has been paid in full, plus Postpetition Interest and Post-Effective Date Interest, only to the Disputed Unsecured Claims Reserve Assets, if any, and not to any other assets held by any Disbursing Agent, the Reorganized Debtors, their property or any assets previously distributed on account of any Allowed Claim. Each holder of an Allowed Interest in Class 7A or an Allowed Claim in Class 7B will have recourse, to the extent each holder of an Allowed Claim in Classes 5B and 6D has been paid in full, plus Postpetition Interest and Post-Effective Date Interest, only to the Disputed Unsecured Claims Reserve Assets, if any, and not to any other assets held by any Disbursing Agent, the Litigation Trust, the Litigation Trustee, the Reorganized Debtors, their property or any assets previously distributed on account of any Allowed Claim or Allowed Interest.

**4.    Voting of Undelivered New Dana Holdco Common Stock**

The Disbursing Agent shall vote, and shall be deemed to vote, the Reserved Shares held by it in its capacity as Disbursing Agent in the same proportion as all outstanding shares of New Dana Holdco Common Stock properly cast in a shareholder vote.

5.        **Tax Treatment**

The Disputed Unsecured Claims Reserve is intended to be treated, for U.S. federal income Tax purposes, as a disputed ownership fund within the meaning of Treasury Regulations section 1.468B-9(b)(1).

6.        **No Transfer of Rights**

The rights of holders of Allowed Claims to receive distributions from the Disputed Unsecured Claims Reserve in accordance with the Plan will be non-transferable, except with respect to a transfer by will, the laws of descent and distribution or operation of law.

F.        **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

1.        **Delivery of Distributions**

a.        **Generally**

Except as provided in Section VI.F.1.b, distributions to holders of Allowed Claims and, to the extent applicable, Allowed Interests, will be made by a Disbursing Agent:  (i) at (A) the addresses set forth on the respective proofs of Claim Filed by holders of such Claims and (B) the address of such record holder listed with the registrar or transfer agent for such Interest; (ii) at the address for a Claim transferee set forth in a valid notice of transfer of Claim; (iii) at the addresses set forth in any written certification of address change delivered to the Claims and Noticing Agent after the date of Filing of any related proof of Claim; (iv) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (v) if clauses (i) through (iv) are not applicable, at the last address directed by such holder in a Filing made after such Claim or Interest becomes an Allowed Claim or Allowed Interest.

b.        **Special Provisions for Distributions to Holders of Bondholder Claims and Interests on Account of Old Common Stock of Dana**

i.        Except as provided in Section VI.C, and subject to the requirements of Section VI.L and Section VI.F.1.b.ii below, distributions to holders of Allowed Bondholder Claims will be made by a Disbursing Agent to the record holders of the Bonds as of the Distribution Record Date, as identified on a record holder register to be provided to the Disbursing Agent by the Indenture Trustee within five Business Days after the Distribution Record Date.  This record holder register (A) will provide the name, address and holdings of each respective registered holder as of the Distribution Record Date and (B) must be consistent with the applicable holder's Claim, if Filed, or as otherwise determined by the Court.

ii.        Except as provided in Section VI.C, with respect to the Allowed Bondholder Claims, on the Effective Date (or as soon as practicable thereafter in accordance with Section VI.A), a Disbursing Agent will distribute the Distributable Shares of New Dana Holdco Common Stock and Distributable Excess Minimum Cash on account of the Allowed Bondholder Claims to the Indenture Trustee.  The Indenture Trustee then will distribute the New Dana Holdco Common Stock and Distributable Excess Minimum Cash in accordance with the Plan to the holders of the Allowed Bondholder Claims who surrender the Bonds to the Indenture Trustee in accordance with Sections V.I.1 and VI.L.  For purposes of distributions under this Section, the Indenture Trustee shall be considered a Third Party Disbursing Agent.

iii.        Subject to the requirements of Section VI.L, any distributions to holders of Allowed Interests on account of Old Common Stock of Dana will be made by a Disbursing Agent at the address of such record holder listed with the registrar or transfer agent for such Interest, to be provided by such registrar or transfer agent to the Disbursing Agent within five Business Days after the Distribution Record Date.

iv.        The Debtors, the Reorganized Debtors and any Disbursing Agent shall only be required to act and make distributions in accordance with the terms of the Plan.  Such parties shall have no

(A) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (B) obligation or liability for distributions under the Plan to any party who does not hold a Claim against or Interest in the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan, including Sections V.I and VI.L.

v.    Notwithstanding any of the foregoing, nothing herein shall be deemed to impair, waive or extinguish any rights of the Indenture Trustee with respect to a Charging Lien, *provided*, *however*, that any such Charging Lien will be released upon payment of the Indenture Trustee's reasonable fees and expenses in accordance with the terms of the applicable Indentures and this Plan.

2.    **Undeliverable Distributions Held by Disbursing Agents**

a.    **Holding of Undeliverable Distributions; Undelivered New Dana Holdco Common Stock**

i.    Subject to Section VI.F.2.c, distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing Agent pursuant to this Section VI.F.2.a.i until such time as a distribution becomes deliverable.  Subject to Section VI.E.6F.2.c, undeliverable Cash or New Dana Holdco Common Stock will be held by the applicable Disbursing Agent for the benefit of the potential claimants of such Cash or New Dana Holdco Common Stock.

ii.    Pending the distribution of any New Dana Holdco Common Stock, the Disbursing Agent shall vote, and shall be deemed to vote, all New Dana Holdco Common Stock held by such Disbursing Agent, whether relating to undeliverable distributions or undelivered distributions, in the same proportion as all outstanding shares of New Dana Holdco Common Stock properly cast in a shareholder vote.

b.    **After Distributions Become Deliverable**

On each Periodic Distribution Date, the applicable Disbursing Agent will make all distributions that become deliverable to holders of Allowed Claims and, as applicable, Allowed Interests during the preceding calendar quarter; *provided*, *however*, that the applicable Disbursing Agent may, in its sole discretion, establish a record date prior to each Periodic Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic distribution.  Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, to the extent it determines a distribution on any Periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Periodic Distribution Date.

c.    **Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim or Allowed Interest that does not assert a claim pursuant to the Plan for an undeliverable distribution to be made by a Disbursing Agent within one year after the later of (i) the Effective Date and (ii) the last date on which a distribution was deliverable to such holder will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against the Reorganized Debtors.  In such cases, unclaimed distributions held by a Third Party Disbursing Agent will be returned to New Dana Holdco.  If, on the later of (i) one year after the Effective Date and (ii) the first Business Day after the Final Distribution Date, (A) Allowed Claims in Class 5B have not been paid in full plus Postpetition Interest and Post-Effective Date Interest and (B) the aggregate amount of such unclaimed distributions would result in a Pro Rata distribution exceeding $500 to holders of Allowed Claims in Class 5B, such unclaimed distributions will be distributed Pro Rata to holders of Allowed Claims in Class 5B in accordance with Section VI.G.5.  Any unclaimed distributions not distributed pursuant to the foregoing proviso, or any such distributions that are returned as undeliverable, will become property of New Dana Holdco, free of any restrictions thereon.  Nothing contained in the Plan will require any Debtor, Reorganized Debtor or Disbursing Agent to attempt to locate any holder of an Allowed Claim or an Allowed Interest.

**G.**     **Timing and Calculation of Amounts to Be Distributed**

**1.**     **Distributions to Holders of Allowed Claims in Classes Other than 5B, 6D and 7B**

Subject to Section VI.A, on the Effective Date, each holder of an Allowed Claim in a Class other than 5B, 6D and 7B will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  No later than each Periodic Distribution Date, distributions also will be made to holders of Disputed Claims in any such Class that were allowed during the preceding calendar quarter.  Such periodic distributions also will be in the full amount that the Plan provides for Allowed Claims in the applicable Class.

**2.**     **Valuation of New Dana Holdco Common Stock**

For the purposes of (a) establishing the value of all distributions of New Dana Holdco Common Stock to be made pursuant to the Plan and (b) calculating the amount of New Dana Holdco Common Stock to be reserved under the Plan, each share of New Dana Holdco Common Stock shall be valued at the Per Share Value.

**3.**     **Postpetition Interest on Claims**

Except as expressly provided in the Plan, the Confirmation Order or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or as required by applicable bankruptcy law, Postpetition Interest shall not accrue on account of any Claim.

**4.**     **Post-Effective Date Interest on Claims**

Except as expressly provided in the Plan, Post-Effective Date Interest shall not accrue on account of any Claim.

**5.**     **Distributions to Holders of Allowed Claims in Class 5B**

**a.**     **Initial Distributions to Holders of Allowed Claims in Class 5B**

Subject to Section VI.A and VI.C, on the Effective Date, the Disbursing Agent will distribute to each holder of an Allowed Claim in Class 5B its Pro Rata share of the Distributable Shares of New Dana Holdco Common Stock and Distributable Excess Minimum Cash.

If, prior to a Periodic Distribution Date, a Disputed Claim in Class 5B is Disallowed or Allowed in an amount that is less that the amount utilized by the Disbursing Agent in calculating the initial distribution, the applicable amount of Reserved Shares and Reserved Excess Minimum Cash will be distributed, subject to Section VI.G.5.b, to the applicable holders of Allowed Claims in Class 5B on the next Periodic Distribution Date.

**b.**     **Periodic Distributions to Holders of Allowed Claims in Class 5B**

On the applicable Periodic Distribution Date, the Disbursing Agent will distribute to each holder of an Allowed Claim in Class 5B its Pro Rata share of the Reserved Shares and Reserved Excess Minimum Cash, until such time as all Disputed Claims entitled to such distributions have been resolved.  On an applicable Periodic Distribution Date, a holder of an Allowed Claim in Class 5B that ceased being a Disputed Claim subsequent to the Effective Date will receive a Catch-Up Distribution as its first distribution after such Claim is Allowed.  The Disbursing Agent may, in its sole discretion, establish a record date prior to each Periodic Distribution Date, such that only Claims holding shares as of the record date will participate in such periodic distribution.  Notwithstanding the foregoing, the Disbursing Agent reserves the right, to the extent it determines a distribution on any Periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Periodic Distribution Date.

6. **Distributions to Holders of Allowed Claims in Class 6D**

   a. **Initial Distributions to Holders of Allowed Claims in Class 6D**

On the Periodic Distribution Date upon which (i) all Disputed Claims in Class 5B entitled to distributions have been resolved and (ii) all distributions to which the holders of such Claims are entitled pursuant to the terms of the Plan will be made from the Disputed Unsecured Claims Reserve, the Disbursing Agent will distribute to each holder of an Allowed Claim in Class 6D its Pro Rata share of the Disputed Unsecured Claims Reserve Assets, if any.

If, prior to a Periodic Distribution Date, a Disputed Claim in Class 6D is Disallowed or Allowed in an amount that is less that the amount utilized by the Disbursing Agent in calculating the initial distribution to Class 6D, the applicable Disputed Unsecured Claims Reserve Assets will be distributed, subject to Section VI.G.6.b, to the applicable holders of Allowed Claims in Class 6D on the next Periodic Distribution Date.

   b. **Periodic Distributions to Holders of Allowed Claims in Class 6D**

On the applicable Periodic Distribution Date, the Disbursing Agent will distribute to each holder of an Allowed Claim in Class 6D its Pro Rata share of the Disputed Unsecured Claims Reserve Assets, until such time as all Disputed Claims in Class 6D entitled to such distributions have been resolved.  On an applicable Periodic Distribution Date, a holder of an Allowed Claim in Class 6D that ceased being a Disputed Claim subsequent to the Effective Date will receive a Catch-Up Distribution as its first distribution after such Claim is Allowed.  The Disbursing Agent may, in its sole discretion, establish a record date prior to each Periodic Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic distribution.  Notwithstanding the foregoing, the Disbursing Agent reserves the right, to the extent it determines a distribution on any Periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Periodic Distribution Date.

7. **Distributions to Holders of Allowed Interests in Class 7A and Allowed Claims in Class 7B**

   a. **Initial Distributions to Holders of Allowed Interests in Class 7A and Allowed Claims in Class 7B**

On the Periodic Distribution Date upon which (a) all Disputed Claims in Classes 5B and 6D entitled to distributions have been resolved and (b) all distributions to which the holders of such Claims are entitled pursuant to the terms of the Plan have been made from the Disputed Unsecured Claims Reserve, the Disbursing Agent will distribute to each holder of an Allowed Interest in Class 7A and an Allowed Claim in Class 7B its Pro Rata share of the Disputed Unsecured Claims Reserve Assets remaining in the Disputed Unsecured Claims Reserve, if any.  For the purpose of calculating the amount of Disputed Unsecured Claims Reserve Assets to be initially distributed to holders of Allowed Interests in Class 7A and Allowed Claims in Class 7B, (i) all Allowed Interests will be valued based on the per share value of Old Dana Common Stock at the close of business on the Petition Date and (ii) all Disputed Claims in Class 7B will be treated as though such Claims will be Allowed Claims in the principal amount of such Claims, or as estimated by the Bankruptcy Court, as applicable.

If, prior to a Periodic Distribution Date, a Disputed Claim in Class 7B is Disallowed or Allowed in an amount that is less that the amount utilized by the Disbursing Agent in calculating the initial distribution, the applicable Disputed Unsecured Claims Reserve Assets will be distributed, subject to Section VI.G.7.b, to the applicable holders of Allowed Interests in Class 7A and Allowed Claims in Class 7B on the next Periodic Distribution Date.

   b. **Periodic Distributions to Holders of Allowed Interests in Class 7A and Allowed Claims in Class 7B**

On the applicable Periodic Distribution Date, the Disbursing Agent will distribute to each holder of an Allowed Interest in Class 7A and an Allowed Claim in Class 7B its Pro Rata share of the Disputed Unsecured

Claims Reserve Assets, until such time as all Disputed Claims in Class 7B entitled to such distributions have been resolved. On an applicable Periodic Distribution Date, a holder of an Allowed Claim in Class 7B that ceased being a Disputed Claim subsequent to the Effective Date will receive a Catch-Up Distribution as its first distribution after such Claim is Allowed. The Disbursing Agent may, in its sole discretion, establish a record date prior to each Periodic Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic distribution. Notwithstanding the foregoing, the Disbursing Agent reserves the right, to the extent it determines a distribution on any Periodic Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Periodic Distribution Date.

**8.      Distributions of New Dana Holdco Common Stock - No Fractional Shares; Rounding**

Notwithstanding any other provision of the Plan, only whole numbers of shares of New Dana Holdco Common Stock will be distributed. For purposes of all distributions other than the distribution on the Final Distribution Date, fractional shares of New Dana Holdco Common Stock will be carried forward to the next Periodic Distribution Date. On the Final Distribution Date, fractional shares of New Dana Holdco Common Stock will be rounded up or down to the nearest whole number or zero, as applicable. No New Dana Holdco Common Stock will be distributed on account of fractional shares that are rounded down.

**9.      De Minimis Distributions**

A Disbursing Agent will not distribute Cash (including Excess Minimum Cash) to the holder of an Allowed Claim or Allowed Interest, as applicable, if the amount of Cash (including Excess Minimum Cash) to be distributed on any Periodic Distribution Date is less than $500.

**10.      Administration and Distribution of Union Emergence Shares**

Notwithstanding anything in the Plan to the contrary, the Union Emergence Shares shall be administered and distributed in accordance with Appendix J to the Union Settlement Agreements.

**H.      Distribution Record Date**

1.      A Disbursing Agent will have no obligation to, and will not, recognize the transfer of, or the sale of any participation in, any Allowed Claim or Allowed Interest that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims and Allowed Interests that are holders of such Claims and Interests, or participants therein, as of the Distribution Record Date.

2.      As of the close of business on the Distribution Record Date, each transfer register for (a) the Bonds, as maintained by the Indenture Trustee, and (b) the Old Common Stock of Dana, as maintained by the transfer agent, will be closed. The applicable Disbursing Agent will have no obligation to, and will not, recognize the transfer or sale of any Bondholder Claim or any Interest on account of Old Common Stock of Dana that occurs after the close of business on the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims or Interests as of the close of business on the Distribution Record Date.

3.      Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

**I.      Means of Cash Payments**

Except as otherwise specified herein, Cash payments made pursuant to the Plan will be by checks drawn on a domestic bank or foreign bank, as applicable, selected by the applicable Disbursing Agent or, at the option of the applicable Disbursing Agent, by wire transfer from a domestic bank or foreign bank, as applicable.

**J.**     **Foreign Currency Exchange Rate**

        Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any General Unsecured Claim asserted in a currency other than U.S. dollars shall automatically be deemed converted to the equivalent U.S. dollar value using the exchange rate as of March 2, 2006, as set forth in the Federal Reserve Statistical Release for such date.

**K.**     **Establishment of Reserves**

        The Debtors or Reorganized Debtors may establish any reserves that they deem necessary or advisable to make distributions to holders of Allowed Claims or otherwise to satisfy their obligations under the Plan.

**L.**     **Surrender of Canceled Instruments or Securities**

**1.**     **Tender of Bonds**

        a.     Except as provided in Section VI.L.2 for lost, stolen, mutilated or destroyed Bonds and except as provided in subsection (b) below, each holder of any Bond not held through book entry must tender such Bond to the applicable Third Party Disbursing Agent in accordance with a letter of transmittal to be provided to such holders by the Third Party Disbursing Agent as promptly as practicable on the Effective Date.  The letter of transmittal will include, among other provisions, customary provisions with respect to the authority of the holder of such Bond to act and the authenticity of any signatures required thereon.  All surrendered Bonds will be marked as canceled and delivered to the Reorganized Debtors.

        b.     If the record holder of a Bondholder Claim is DTC or its nominee or such other securities depository or custodian thereof, or if a Bondholder Claim is held in book-entry or electronic form pursuant to a global security held by DTC, then the beneficial holder of such a Bondholder Claim shall be deemed to have surrendered such holder's security, note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

**2.**     **Lost, Stolen, Mutilated or Destroyed Bonds**

        Any holder of an Allowed Bondholder Claim with respect to which the underlying Bond has been lost, stolen, mutilated or destroyed must, in lieu of surrendering such Bond, deliver to the Third Party Disbursing Agent:  (a) evidence satisfactory to the Third Party Disbursing Agent of the loss, theft, mutilation or destruction; and (b) such security or indemnity as may be required by the Third Party Disbursing Agent to hold the Third Party Disbursing Agent, the Debtors and Reorganized Debtors harmless from any damages, liabilities or costs incurred in treating such individual as a holder of such Bond.  Upon compliance with this Section VI.L.2 by a holder of an Allowed Bondholder Claim, such holder will, for all purposes under the Plan, be deemed to have surrendered the applicable Bond.

**3.**     **Failure to Surrender Bonds**

        Any holder of a Bond not held through book entry that fails to surrender or is deemed not to have surrendered the applicable Bond within one year after the Effective Date will have its right to distributions pursuant to the Plan on account thereof discharged and will be forever barred from asserting any such Claim against the Reorganized Debtors or their respective property.  In such case, any New Dana Holdco Common Stock held for distribution on account thereof will be treated pursuant to the provisions set forth in Section VI.F.2.c.

**4.**     **Tender of Old Common Stock of Dana**

        Except as provided in Section VI.L.5 for lost, stolen, mutilated or destroyed certificates of Old Common Stock of Dana, each holder of Old Common Stock of Dana not held through book entry must tender the Old Common Stock of Dana certificates to the Third Party Disbursing Agent in accordance with a letter of transmittal to be provided to such holders by the Third Party Disbursing Agent on or before the Effective Date.  The

letter of transmittal will include, among other provisions, customary provisions with respect to the authority of the holder of such certificates to act and the authenticity of any signatures required thereon.  All surrendered certificates of Old Common Stock of Dana will be marked as canceled and delivered to the Reorganized Debtors.

**5.      Lost, Stolen, Mutilated or Destroyed Old Common Stock of Dana**

Any holder of an Allowed Interest on account of Old Common Stock of Dana with respect to which the underlying Old Common Stock of Dana certificate has been lost, stolen, mutilated or destroyed must, in lieu of surrendering such certificate, deliver to the Third Party Disbursing Agent:  (a) evidence satisfactory to the Third Party Disbursing Agent of the loss, theft, mutilation or destruction; and (b) such security or indemnity as may be required by the Third Party Disbursing Agent to hold the Third Party Disbursing Agent, the Debtors and the Reorganized Debtors harmless from any damages, liabilities or costs incurred in treating such individual as a holder of such Old Common Stock of Dana.  Upon compliance with this Section VI.L.5 by a holder of an Allowed Interest on account of Old Common Stock of Dana, such holder will, for all purposes under the Plan, be deemed to have surrendered the applicable stock certificate.

**6.      Failure to Surrender Old Common Stock of Dana**

Any holder of an Allowed Interest on account of Old Common Stock of Dana not held through book entry that fails to surrender or is deemed not to have surrendered the applicable stock certificate will have its right to receive distributions pursuant to the Plan on account of its Allowed Interest discharged and will be forever barred from asserting any such Interest or related Claims against the Debtors, Reorganized Debtors or their respective property.

**M.      Withholding and Reporting Requirements**

1.      In connection with the Plan, to the extent applicable, each Disbursing Agent will comply with all applicable Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, each Disbursing Agent will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate, including requiring Claim holders to submit appropriate Tax and withholding certifications.  To the extent any Claim holder fails to submit appropriate Tax and withholding certifications as required by the Disbursing Agent, such Claim holder's distribution will be deemed undeliverable and subject to Section VI.F.2.

2.      Notwithstanding any other provision of the Plan, each entity receiving a distribution of Cash or New Dana Holdco Common Stock pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of the distribution, including income, withholding and other Tax obligations.

3.      The Debtors reserve the right to allocate and distribute all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

**N.      Setoffs**

Except with respect to claims of a Debtor or Reorganized Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, each Reorganized Debtor or, as instructed by a Reorganized Debtor, a Third Party Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of the Claim (before any distribution is made on account of the Claim) the claims, rights and causes of action of any nature that the applicable Debtor or Reorganized Debtor may hold against the holder of the Allowed Claim; *provided*, *however*, that neither the failure to effect a

setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the applicable Debtor or Reorganized Debtor of any claims, rights and causes of action that the Debtor or Reorganized Debtor may possess against the Claim holder.

**O.    Application of Distributions**

To the extent applicable, all distributions to a holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, will apply to any interest accrued on such Claim after the Petition Date.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

**A.    Treatment of Disputed Claims**

**1.    ADR Procedures**

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any Disputed Claim may be submitted to the ADR Procedures in accordance with the terms of the ADR Procedures.  Disputed Claims not resolved through the ADR Procedures will be resolved pursuant to the Plan.

**2.    Tort Claims**

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 11 Cases) not resolved through the ADR Procedures or a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  The Debtors or the Reorganized Debtors may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Debtors or the Reorganized Debtors have exercised such option.  Upon a Debtor's or Reorganized Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code, or after the Effective Date, the discharge injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s).  Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the United States District Court having jurisdiction over the Chapter 11 Cases) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable.  Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VII.A.2 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, as applicable, in Classes 5A and 5B against the applicable Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with any applicable insurance policy and is not satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' insurance policies will be treated as an Allowed Claim for the purposes of distributions under the Plan.  In no event will a distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the applicable Debtor's deductible or self-insured retention under any applicable insurance policy.  In the event a Tort Claim is determined and liquidated pursuant to a judgment or order that is obtained in accordance with this Section VII.A.2 and is no longer appealable or subject to review, and applicable non-bankruptcy law provides for no recovery against the applicable Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim.  Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or cause of action that a Debtor may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code.  All claims, demands, rights, defenses and causes of action that the Debtors or the Reorganized Debtors may have

against any person or entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

        **3.**      **Disputed Insured Claims**

        The resolution of Disputed Insured Claims, including Tort Claims, pursuant to this Section VII.A shall be subject to the provisions of Section V.H of the Plan.

        **4.**      **No Distributions Until Allowance; No Settlement Payments Unless Allowed by Effective Date**

        Notwithstanding any other provision of the Plan, no payments or distributions will be made on account of a Disputed Claim until (a) such Claim (or a portion of such Claim) becomes an Allowed Claim, if ever and (b) solely with respect to Allowed Ineligible Unsecured Claims, any portion of such Claim becomes an Allowed Claim as of the Effective Date.  In lieu of distributions under the Plan to holders of Disputed Claims in Class 5B, the Disputed Unsecured Claims Reserve will be established on the Effective Date to hold the Disputed Unsecured Claims Reserve Assets for the benefit of those Claim holders.

**B.**      **Prosecution of Objections to Claims**

        **1.**      **Objections to Claims**

        All objections to Claims must be Filed and served on the holders of such Claims, and any amendment to the Schedules to reduce the scheduled Claim of such holder, must be made by the Debtors or the Reorganized Debtors by the Claims Objection Bar Date.  If an objection has not been Filed to a Claim or an amendment has not been made to the Schedules with respect to a scheduled Claim by the Claims Objection Bar Date, the particular Claim will be treated as an Allowed Claim if such Claim has not been allowed earlier.

        **2.**      **Authority to Prosecute Objections**

        **a.**      **Objections Filed Prior to the Effective Date**

        After the Confirmation Date, but prior to the Effective Date, the Debtors and the Creditors' Committee will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, including pursuant to any alternative dispute resolution or similar procedures approved by the Bankruptcy Court.

        **b.**      **Objections Filed On or After the Effective Date**

        Except as provided in Section V.G of the Plan, on or after the Effective Date, the Reorganized Debtors will have the sole authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims.

        **c.**      **Settlement or Compromise of Disputed Claims On or After the Effective Date**

        On or after the Effective Date, only the Reorganized Debtors, subject to Section V.G of the Plan, may settle or compromise any Disputed Claim or any objection or controversy relating to any Claim, without approval of the Bankruptcy Court.

        **3.**      **Authority to Amend Schedules**

        The Debtors or Reorganized Debtors, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or Reorganized Debtor will provide (a) the holder of such Claim and (b) the Creditors' Committee or Litigation Trustee (as applicable) with notice of such amendment and such parties will have 20 days to File an objection to such amendment with the Bankruptcy Court.  If no such objection is Filed, the

applicable Disbursing Agent may proceed with distributions based on such amended Schedules without approval of the Bankruptcy Court.

**C.      Distributions on Account of Disputed Claims Once Allowed**

Distributions on account of Disputed Claims that become Allowed Claims after the Effective Date shall be made in accordance with Article VI of the Plan.

**D.      Consent to Resolution of Certain Disputes**

If (1) the resolution by the Debtors of an objection to the Plan or Disclosure Statement made by or on behalf of a holder of a Class 5B Claim or (2) a resolution of the appeal of the order approving the Global Settlement with Appaloosa Management, L.P. or any Affiliate thereof would require, in either such case, a payment to be made by the Debtors or other consideration to be provided to the non-Debtor party, the Debtors may agree to such resolution only with the reasonable consent of the Series B-2 Backstop Investors, Centerbridge and the Creditors' Committee.

**ARTICLE VIII.**
**CONSOLIDATION OF THE DEBTORS**

**A.      Consolidation**

Pursuant to the Confirmation Order, the Bankruptcy Court shall approve the consolidation of the Consolidated Debtors solely for the purpose of implementing the Plan, including for purposes of voting, Confirmation and distributions to be made under the Plan.  Pursuant to such order:  (1) all assets and Liabilities of the Consolidated Debtors will be deemed merged; (2) all guarantees by one Consolidated Debtor of the obligations of any other Consolidated Debtor will be deemed eliminated so that any Claim against any Consolidated Debtor and any guarantee thereof executed by any other Consolidated Debtor and any joint or several liability of any of the Consolidated Debtors will be deemed to be one obligation of the Consolidated Debtors; and (3) each and every Claim Filed or to be Filed in the Chapter 11 Case of any of the Consolidated Debtors will be deemed Filed against the Consolidated Debtors and will be deemed one Claim against and a single obligation of the Consolidated Debtors.

Such consolidation (other than for the purpose of implementing the Plan) shall not affect:  (1) the legal and corporate structures of the Consolidated Debtors, subject to the right of the Consolidated Debtors to effect restructurings as provided in Section V.B; (2) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (a) in connection with contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and Unexpired Leases that have been or will be assumed or (b) pursuant to the Plan; (3) Interests between and among the Consolidated Debtors; (4) distributions from any insurance policies or proceeds of such policies; (5) the revesting of assets in the separate Reorganized Debtors pursuant to Section V.A. In addition, such consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

**B.      Order Granting Consolidation**

This Plan serves as a motion seeking entry of an order consolidating the Consolidated Debtors, as described and to the limited extent set forth in Section VIII.A above.  Unless an objection to such consolidation is made in writing by any creditor affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section X.F on or before five days before either the Voting Deadline or such other date as may be fixed by the Bankruptcy Court, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto shall occur at or before the Confirmation Hearing.  Notwithstanding this provision, nothing herein shall affect the obligation of each and every Debtor to pay quarterly fees to the Office of the United States Trustee in accordance with 28 U.S.C. § 1930.

## ARTICLE IX.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

A.    Allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (other than Asbestos Personal Injury Claims and any Claim of an Insurer or any other litigation between or among any Reorganized Debtor and any Insurer arising under or relating to an Insurance Contract that has been assumed or continued under the Plan), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Interests;

B.    Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

C.    Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor or Reorganized Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

D.    Ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

E.    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor or any Reorganized Debtor that may be pending on the Effective Date or brought thereafter (other than with respect to any litigation between or among any Reorganized Debtor and any Insurer arising under or relating to an Insurance Contract that has been assumed or continued under the Plan);

F.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Litigation Trust Agreement, the Disclosure Statement or the Confirmation Order;

G.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Litigation Trust Agreement or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, the Litigation Trust Agreement or any entity's rights arising from or obligations incurred in connection with the Plan, the Litigation Trust Agreement or such documents;

H.    Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

I.    Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

J.        Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

K.       Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

L.        Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

M.       Enter a final decree or decrees closing the Chapter 11 Cases;

N.        Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

O.        Recover all assets of the Debtors and their Estates, wherever located; and

P.        Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE X.
## MISCELLANEOUS PROVISIONS

### A.        Modification of the Plan

Subject to the restrictions on alteration, amendment and modification set forth in section 1127 of the Bankruptcy Code, the New Investment Agreement, the Plan Support Agreement and Appendix R to the Union Settlement Agreements, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date; however, with respect to any such modification identified in Section IV.A.4, the Debtors may not do so without the consent of the Ad Hoc Steering Committee and the Creditors' Committee

### B.        Revocation of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any claims by or against, or any Interests in, any Debtor; (2) prejudice in any manner the rights of any Debtor or any other party in interest; or (3) constitute an admission of any sort by any Debtor or any other party in interest.

### C.        Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### D.        Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

E.      **The New Investment Agreement and Union Settlement Agreements**

        Nothing in this Plan or the Disclosure Statement shall be deemed to be an amendment of the New Investment Agreement or the Union Settlement Agreements.  To the extent there is a conflict between the terms of the Plan and the New Investment Agreement and/or the Union Settlement Agreements, the terms of the New Investment Agreement and/or the Union Settlement Agreements shall control; *provided*, *however*, that to the extent there is a conflict between the terms of the Plan and the Plan Term Sheet, the terms of the Plan shall control.

F.      **Service of Documents**

        Any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to (1) the Debtors and the Reorganized Debtors; (2) the Creditors' Committee; (3) the Retiree Committee; (4) the Ad Hoc Bondholders' Committee; (5) Centerbridge and CBP; or (6) the Unions must be sent by overnight delivery service, facsimile transmission, courier service or messenger to:

      1.      **The Debtors and  Reorganized Debtors**

        Corinne Ball, Esq.
        Richard H. Engman, Esq.
        JONES DAY
        222 East 41st Street
        New York, New York  10017
        Telephone:  (212) 326-3939
        Facsimile:  (212) 755-7306

           - and -

        Heather Lennox, Esq.
        Carl E. Black, Esq.
        Ryan T. Routh, Esq.
        JONES DAY
        North Point
        901 Lakeside Avenue
        Cleveland, Ohio  44114
        Telephone:  (216) 586-3939
        Facsimile:  (216) 579-0212

           - and -

        Jeffrey B. Ellman, Esq.
        JONES DAY
        1420 Peachtree Street, N.E.
        Suite 800
        Atlanta, Georgia  30309-3053
        Telephone:  (404) 521-3939
        Facsimile:  (404) 581-8330

        (Counsel to the Debtors and Reorganized Debtors)

      2.      **The Creditors' Committee**

        Thomas Moers Mayer, Esq.
        Matthew J. Williams, Esq.
        Stephen D. Zide, Esq.
        KRAMER LEVIN NAFTALIS & FRANKEL LLP

1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Facsimile)

(Counsel to the Creditors' Committee)

**3.      The Retiree Committee**

Trent P. Cornell, Esq.
Jon Cohen, Esq.
STAHL COWEN CROWLEY LLC
55 West Monroe Street
Suite 1200
Chicago, Illinois  60603
(312) 641-0060 (Telephone)
(312) 641-6959 (Facsimile)

(Counsel to the Retiree Committee)

**4.      The Ad Hoc Bondholders' Committee**

Kristopher M. Hansen, Esq.
Sayan Bhattacharyya, Esq.
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York  10038
(212) 806-6056 (Telephone)
(212) 806-9056 (Facsimile)

(Counsel to the Ad Hoc Bondholders' Committee)

**5.      Centerbridge and CBP**

Matthew A. Feldman, Esq.
Paul V. Shalhoub, Esq.
Morris J. Massel, Esq.
WILLKIE FARR GALLAGHER LLP
787 Seventh Avenue
New York, New York  10019
(212) 728-8000 (Telephone)
(212) 728-8111 (Facsimile)

(Counsel to Centerbridge and CBP)

**6.      The Unions**

Niraj R. Ganatra, Esq.
Associate General Counsel
International Union, United Automobile, Aerospace
   and Agricultural Implement Workers of America
8000 East Jefferson Avenue
Detroit, Michigan  48214
(313) 926-5216 (Telephone)
(313) 926-5240 (Facsimile)

- and -

Lowell Peterson, Esq.
Meyer Suozzi English & Klein PC
1350 Broadway
Suite 501
New York, New York  10018
(212) 239-4999 (Telephone)
(212) 239-1311 (Facsimile)

(Counsel to the UAW)

- and -

David R. Jury, Esq.
Associate General Counsel
United Steel, Paper and Forestry, Rubber, Manufacturing,
   Energy, Allied Industrial and Service Workers International Union
Five Gateway Center
Suite 807
Pittsburgh, Pennsylvania  15222
(412) 562-2400 (Telephone)
(412) 562-2574 (Facsimile)

- and -

Babette Ceccotti, Esq.
Cohen Weiss and Simon LLP
330 West 42nd Street
New York, New York  10036
(212) 356-0227 (Telephone)
(646) 473-8227 (Facsimile)

(Counsel to the Unions)

Dated:  October 23, 2007

Respectfully submitted,

Dana Corporation, on its own behalf and on behalf of
each affiliate Debtor

By:      /s/   Marc S. Levin
Name:    Marc S. Levin
Title:    Acting Secretary

COUNSEL:

Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Heather Lennox (HL 3046)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman (JE 5638)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

# **APPENDIX II**

# **MODIFICATIONS TO PLAN**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Heather Lennox (HL 3046)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330
Jeffrey B. Ellman (JE 5638)

Attorneys for Debtors
  and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                                            :
In re                                                       :   Chapter 11
                                                            :
Dana Corporation, et al.,                                   :   Case No. 06-10354 (BRL)
                                                            :
                                                            :   (Jointly Administered)
                             Debtors.                       :
------------------------------------------------------------ x
```

## FIRST MODIFICATIONS TO THIRD AMENDED JOINT PLAN
## OF REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION

        The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby propose the following additions and modifications to the Third Amended Joint Plan of

Reorganization of Debtors and Debtors in Possession, dated October 23, 2007 (Docket No. 6671)

(the "<u>Plan</u>"), pursuant to section 1127 of the Bankruptcy Code, and Section X.A of the Plan:[1]

1.    Section I.A. 102 of the Plan is modified and restated as follows:

"Indenture Trustee Fee Claim" means, individually and collectively, a Claim against the Debtors <u>(a)</u> arising from and after the Petition Date pursuant to the applicable Indentures relating to any compensation, disbursements, fees and expenses, including any Claim under such Indenture relating to reasonable fees and expenses of counsel of the Indenture Trustee <u>and (b) in the amount of $34,696.49 arising prior to the Petition Date and owing to the Indenture Trustee and its predecessor pursuant to the applicable Indentures</u>, which Claims shall be satisfied and discharged in accordance with Section II.A.1.h.

2.    Section I.A.105 of the Plan is modified and restates as follows:

"Ineligible Unsecured Claims" means, collectively, General Unsecured Claims that are either Allowed or estimated by the Bankruptcy Court under section 502(c) of the Bankruptcy Code on or prior to the Effective Date and <u>(i)</u> are held by a Person who is not, nor are any of its affiliates, a Qualified Investor but without regard to clauses (c) and (d) of that definition<u>; and (ii) were not Participating Claims as of the Subscription Deadline</u>; *provided*, *however*, that Bondholder Claims which are not Participating Claims will be Ineligible Unsecured Claims even if held by such Persons.  In no event will Union Claims, DCC Claims, any Claims of the non-union retirees represented by the Retiree Committee, Intercompany Claims, Convenience Claims or Asbestos Personal Injury Claims be Ineligible Unsecured Claims.

3.    Sections I.A.112, 113 and 114 of the Plan are deleted in their entirety.

4.    Section I.A.116 of the Plan is modified and restated as follows:

"New Dana Holdco" means ~~Dana Corporation Holdings~~ <u>Dana Holding Corporation</u>, a Delaware corporation.

5.    Section I.A.150 of the Plan is modified and restated as follows:

"Postpetition Interest" means:  (a) for a Bondholder Claim, the contractual rate of interest set forth in the applicable Indenture; (b) the rate of interest set forth in the contract or other applicable document between the holder of a Claim and the applicable Debtor giving rise to such holder's Claim; (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the applicable Debtor; ~~or~~ (d) <u>with respect to Secured Tax Claims or Priority Tax Claims, the rate of interest determined under applicable nonbankruptcy law; or (e)</u> if none of the foregoing apply, the Federal Judgment Rate.

6.    Section I.A.151 of the Plan is modified and restated as follows:

---

[1]    All modified and restated Plan provisions are marked to reflect the modifications thereto.  Capitalized terms not otherwise defined herein have the meanings given to them in the Plan.

"Post-Effective Date Interest" means:  (a) for a Bondholder Claim, the contractual rate of interest set forth in the applicable Indenture; (b) the rate of interest set forth in the contract or other applicable document between the holder of a Claim and the applicable Debtor giving rise to such holder's Claim; (c) such interest, if any, as otherwise agreed to by the holder of a Claim and the applicable Debtor; or (d) with respect to Secured Tax Claims or Priority Tax Claims, the rate of interest determined under applicable nonbankruptcy law; or (e) if none of the foregoing apply, the Federal Judgment Rate.

       7.        Section I.A.165 of the Plan is modified and restated as follows:

"Released Parties" means, collectively and individually, the Debtors, the Reorganized Debtors, the Official Committees and their current and former members (solely in their capacity as such), the Unions and any consultants of the Unions, the DIP Lenders (solely in their capacity as such and not in their capacity as the Debtors' prepetition lenders), Centerbridge, CBP, Centerbridge Capital Partners Strategic, L.P., Centerbridge Capital Partners SBS, L.P. and permitted successors and assigns under the New Investment Agreement, the Ad Hoc Steering Committee and its predecessor members from and after July 5, 2007 (solely in their capacity as such), the Indenture Trustee and the Representatives of each of the foregoing.

       8.        Section I.A. 170 of the Plan is modified and restated as follows:

"Reserved Excess Minimum Cash" means (a) the Excess Minimum Cash to be contributed to the Disputed Unsecured Claims Reserve, (b) any Cash dividends or other distributions received by the Disbursing Agent on account of the Reserved Shares, (c) any Cash Preference Recovery Net Proceeds deposited into the Disputed Unsecured Claims Reserve by the Litigation Trust or Litigation Trustee Debtors or Reorganized Debtors and (d) any related Cash Investment Yield.

       9.        Section I.A.184 of the Plan is modified and restated as follows:

"Stipulation of Amount and Nature of Claim" means a stipulation or other agreement between a Debtor or Reorganized Debtor and a holder of a Claim or Interest, that, prior to the Effective Date, is approved by the Bankruptcy Court, or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim or Interest, including any agreements made pursuant to that authority granted in the Order Establishing Claims Objection and Settlement Procedures (Docket No. 4044), entered on November 9, 2006 or other orders of the Bankruptcy Court.  Any such stipulation or other agreement between a Reorganized Debtor and a holder of a Claim or Interest executed after the Effective Date is not subject to approval of the Bankruptcy Court; *provided*, *however*, that if the Litigation Trustee Claims Monitor Files an objection, as permitted by Section V.G.2, to such stipulation or other agreement within ten days of receiving written notice of such stipulation or other agreement, Bankruptcy Court approval will be required.

       10.      Section I.A.199 is modified and restated as follows:

"UAW Union Retiree VEBA Contribution" means the $465.3 million Cash contribution to be made by the Reorganized Debtors to the UAW Union Retiree VEBA pursuant to the UAW Settlement Agreement.

11.     Section I.A.211 is modified and restated as follows:

"USW Union Retiree VEBA Contribution" means the ~~$298.7 million~~ Cash contribution to be made by the Reorganized Debtors to the USW Union Retiree VEBA pursuant to the USW Settlement Agreement.

12.     Section I.A.215 is added to the Plan:

"Claims Monitor" means <u>Ocean Ridge Capital Advisors, LLC</u>.

13.     Section I.A. 216 is added to the Plan:

"Claims Reserve Order" means the Order Approving (A) Disputed Unsecured Claims Reserves for Certain Unliquidated Claims in Connection with Distributions to Be Made Under the Debtors' Third Amended Joint Plan of Reorganization, as It May Be Amended; and (B) Additional Procedures Related to Plan Reserves (Docket No. 7236), entered by the Bankruptcy Court on November 28, 2007.

14.     Section I.A.217 is added to the Plan:

<u>"Net Preference Recovery Proceeds" means, with respect to any Specified Recovery Action as to which Cash proceeds are received by the Debtors or Reorganized Debtors as contemplated by Section VI.E.2, such Cash proceeds, if any, remaining after subtracting therefrom [(a)] all out-of-pocket costs and expenses incurred by the Debtors or Reorganized Debtors (including the fees and expenses of counsel) in the pursuit of such Specified Recovery Action and (b) a charge for the services provided by employees of the Debtors or Reorganized Debtors in connection with the pursuit of such Specified Recovery Action (determined based on the fully allocated cost to the Debtors or Reorganized Debtors, as applicable, of such employees).</u>

15.     Section I.A. 218 is added to the Plan:

<u>"Specified Recovery Actions" means, collectively, any actions brought by the Reorganized Debtors under section 547 of the Bankruptcy Code.</u>

16.     Section II.A.1.h of the Plan is modified and restated as follows:

In full satisfaction of the Indenture Trustee Fee Claims <u>through and including the Effective Date</u>, on the Effective Date, the Indenture Trustee Fee Claims shall be allowed as an Administrative Claim against the Debtors pursuant to section 503(b) of the Bankruptcy Code and shall be paid by the Reorganized Debtors without the need for the Indenture Trustee to file an application for allowance with the Bankruptcy Court.  To receive payment pursuant to this Section II.A.1.h, the Indenture Trustee shall provide reasonable and customary detail or invoices in support of its Claims to counsel to the Reorganized Debtors and counsel to Centerbridge no later than ten days after the Effective Date.  Such parties shall have the right to File objections to such Claims based on a "reasonableness" standard within 20 days after receipt of supporting documentation.  The Reorganized Debtors shall pay any such Claims by the later of (i) 30 days after the receipt of supporting documentation from the Indenture Trustee, or (ii) ten Business Days after the resolution of any objections to the Claims of the Indenture Trustee <u>with respect to the</u>

portion of the Indenture Trustee Fee Claims subject to such objection. Any disputed amount of the Indenture Trustee Fee Claims shall be subject to the jurisdiction of, and resolution by, the Bankruptcy Court. In the event that the relevant objecting party is unable to resolve a dispute with respect to an Indenture Trustee Fee Claim, the Indenture Trustee may, in its sole discretion, elect to (i) submit any such dispute to the Bankruptcy Court for resolution or (ii) assert its Charging Lien to obtain payment of such disputed Indenture Trustee Claim. The Charging Lien held by the Indenture Trustee against distributions to Bondholders on account of the Indenture Trustee Fee Claim will be deemed released upon payment of the Indenture Trustee Fee Claim in accordance with the terms of the applicable Indentures and this Plan. Except as provided herein, distributions received by Bondholders on account of Allowed Bondholder Claims pursuant to the Plan will not be reduced on account of the payment of the Indenture Trustee's Claims. Nothing herein shall be deemed to impair, waive or extinguish the Charging Lien with respect to fees and expenses of the Indenture Trustee incurred after the Effective Date. Reasonable fees and expenses incurred by the Indenture Trustee after the Effective Date (a) in its capacity as a Disbursing Agent, (b) for matters relating to distributions to Bondholders, (c) for matters relating to any dispute concerning the Indenture Trustee Fee Claims, (d) for matters relating to any dispute concering the Claims of the Indenture Trustee and (e) matters relating to enforcement of the Plan will be paid in accordance with Section VI.D and any dispute between the Reorgnaized Debtors and the Indenture Trustee regarding the reasonableness of such fees and expenses will be submitted to the Bankruptcy Court for resolution.

17.    Section II.E.1.c of the Plan is modified and restated as follows:

The joint venture agreements listed on Exhibit II.E.1.c shall be deemed assumed and assigned to ~~New Dana Holdco~~ the Reorganized Debtors identified on Exhibit II.E.1.c in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. The Debtors and Reorganized Debtors reserve the right to amend Exhibit II.E.1.c consistent with their rights to amend Exhibit II.E.1.a.

18.    Section III.D of the Plan is modified and restated as follows:

On the Effective Date, Reorganized Dana shall assume and assign the Pension Plans to ~~New Dana Holdco~~ Dana Limited, which will become the sponsor and continue to administer the Pension Plans, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the Pension Plans in accordance with their terms and the provisions of ERISA and the Internal Revenue Code. Furthermore, nothing in the Plan shall be construed as discharging, releasing or relieving the Debtors or the Debtors' successors from any liability imposed under any law or regulatory provision with respect to the Pension Plans. Neither the PBGC, the Pension Plans nor any participant or beneficiary of the Pension Plans shall be enjoined or precluded from enforcing such liability with respect to the Pension Plans.

19.    Section IV.E.2 of the Plan is modified and restated as follows:

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement, including the Litigation Trust Agreement, entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce any claims, demands, rights, defenses and causes of action that the Debtors or the Estates may hold against any entity, including any Recovery Actions, to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court.  If the Reorganized Debtors determine to pursue any Specified Recovery Action and, as a result, receive Cash proceeds through a settlement or other compromise of, or a judgment in connection with, such Specified Recovery Action, then promptly following the receipt of such Cash proceeds, the Reorganized Debtors will deposit the Net Preference Recovery Proceeds, if any, with respect to such Specified Recovery Action in the Disputed Unsecured Claims Reserve.  All decisions and determinations by the Reorganized Debtors in connection with the Specified Recovery Actions, including without limitation decisions and determinations regarding whether to pursue or at any time to abandon any Specified Recovery Action and decisions and determinations regarding the terms for any settlement or other compromise of any Specified Recovery Action that is pursued, will be made in the sole and absolute discretion of the Reorganized Debtors and none of the Reorganized Debtors, Affiliates of the Reorganized Debtors or Representatives of the Reorganized Debtors or their Affiliates will have liability for any act or omission in connection with the Specified Recovery Actions, including without limitation the pursuit, abandonment or resolution or other compromise thereof.

20.    Section IV.E.6.c of the Plan is modified and restated as follows:

Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan, with respect to such Claim, to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided herein and under the Confirmation Order and the Bankruptcy Code).  Notwithstanding the foregoing and except with respect to Derivative Claims and holders of Claims that vote in favor of the Plan, nothing in the Plan shall release the claims asserted, or to be asserted, solely on account of alleged conduct occurring prior to the Petition Date, against any non-Debtor defendant in the Securities Litigation.  In addition, nothing in the Plan shall be deemed to release any applicable Debtor or Reorganized Debtor from any Liability arising from or related to Asbestos Personal Injury Claims.

21.    Section V.C.2 of the Plan is modified and restated as follows:

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date:  (a) the initial officers of New Dana Holdco and the other Reorganized Debtors will consist of the individuals identified on Exhibit V.C.2; (b) the initial board of directors of New Dana Holdco will be comprised of seven

nine members (to be identified on Exhibit V.C.2 as selected), as follows:  (i) ~~three~~ four directors
(~~one~~ two of whom must be independent) chosen by Centerbridge, (ii) ~~two~~ three Independent
Directors chosen by the Creditors' Committee, (iii) one Independent Director chosen by the
Creditors' Committee from a list of three Independent Directors proffered by Centerbridge,
*provided*, *however*, if none of the Independent Directors on the list are reasonably satisfactory to
the Creditors' Committee, then Centerbridge shall proffer the names of additional Independent
Directors until the name of an Independent Director reasonably satisfactory to the Creditors'
Committee is put forth and at any time during that process, the Creditors' Committee may submit
its own list, which would then be subject to the same proffer process and (iv) the Chief Executive
Officer of New Dana Holdco; and (c) the initial board of directors of each of the other
Reorganized Debtors will consist of the individuals identified, or will be designated pursuant to
the procedures specified, on Exhibit V.C.2.  Each such director and officer will serve from and
after the Effective Date until his or her successor is duly elected or appointed and qualified or until
his or her earlier death, resignation or removal in accordance with the terms of the certificate of
incorporation and bylaws (or comparable constituent documents) of New Dana Holdco or the
applicable other Reorganized Debtor and state law.

22.    Section V.F of the Plan is modified and restated as follows:

The Restructuring Transactions; the adoption of new or amended and restated certificates
of incorporation and bylaws (or comparable constituent documents) for New Dana Holdco and the
other Reorganized Debtors and the certificate of designations for New Dana Holdco; the initial
selection of directors and officers for each Reorganized Debtor; the entry into the Exit Facility and
receipt of the proceeds thereof; the ~~establishment of the Litigation Trust and appointment~~
engagement of the ~~Litigation Trustee~~ Claims Monitor; the issuance of the New Preferred Stock
and New Dana Holdco Common Stock; the distribution of the New Dana Holdco Common Stock
and Cash pursuant to the Plan; the adoption, execution, delivery and implementation of all
contracts, leases, instruments, releases and other agreements or documents related to any of the
foregoing; the adoption, execution and implementation of employment, retirement and
indemnification agreements, incentive compensation programs, retirement income plans, welfare
benefit plans and other employee plans and related agreements; and the other matters provided for
under the Plan involving the corporate structure of the Debtors and Reorganized Debtors or
corporate action to be taken by or required of a Debtor or Reorganized Debtor will be deemed to
occur and be effective as of the Effective Date, if no such other date is specified in such other
documents, and will be authorized and approved in all respects and for all purposes without any
requirement of further action by the stockholders or directors of the Debtors or the Reorganized
Debtors.

23.    Section V.G of the Plan is deleted in its entirety and replaced with the following:

Claims Monitor

1.    Retention

The Debtors, in consultation with the Creditors' Committee, Ad Hoc Steering Committee and Centerbridge, will negotiate and enter into an engagement letter with the Claims Montior on terms consistent with this Section V.G. prior to the Effective Date.

2.    Powers, Rights and Responsibilities

The powers, rights and responsibilities of the Claims Monitor shall be to: (a) consult with the Reorganized Debtors with respect to any proposed Stipulation of Amount and Nature of Claim, other settlement, other agreement or agreed order that would result in an Allowed General Unsecured Claim in excess of $500,000; (b) File an objection to any proposed Stipulation of Amount and Nature of Claim, other settlement, other agreement or agreed order that would result in an Allowed General Unsecured Claim in excess of $500,000; (c) object to any General Unsecured Claim in excess of $500,000 where (i) the Claims Monitor has expressly requested in writing that the Reorganized Debtors object to a General Unsecured Claim, which written request shall in no event be served upon the Reorganized Debtors prior to the later of (A) 60 days after the Effective Date or (B) 45 days after the Filing of a proof of Claim for such General Unsecured Claim, and (ii) the Reorganized Debtors have not Filed the objection requested by the Claims Monitor within 20 days of the Reorganized Debtors' receipt of such request; and (d) monitor the Reorganized Debtors' administration of the Disputed Unsecured Claims Reserve as described in the following sentence, and, in connection therewith, the Claims Monitor shall have the rights designated for the "Litigation Trustee" in paragraphs 4(a) and 4(d) of the Claims Reserve Order.  If the Claims Monitor believes that the Reorganized Debtors are unreasonably maintaining excess reserves in the Disputed Unsecured Claims Reserve, then (a) no sooner than 120 days after the Effective Date, the Claims Monitor may provide written notice of such belief to the Reorganized Debtors, with a request for the Reorganized Debtors to make a specific adjustment the Disputed Unsecured Claims Reserve consistent with the Plan and the Claims Reserve Order, along with the justifications for such adjustment; and (b) if the Reorganized Debtors do not adjust the Disputed Unsecured Claims Reserve as requested in such written notice by the next Periodic Distribution Date occurring at least 30 days after the written notice, the Claims Monitor may File a motion with the Bankruptcy Court seeking to compel adjustments to, and distributions from, the Disputed Unsecured Claims Reserve.  In connection with its responsibilities, the Claims Monitor may employ, without further order of the Bankruptcy Court, professionals reasonably necessary to assist the Claims Monitor in carrying out its powers, rights and responsibilities under the Plan.  For the avoidance of doubt and notwithstanding anything to the contrary in the Plan, the powers, rights and responsibilities of the Claims Monitor with respect to Claims (a) shall be limited to General Unsecured Claims that, if Allowed pursuant to a Stipulation of Amount and Nature of Claim, other settlement, other agreement or order of the Bankruptcy Court, would result in an Allowed General Unsecured Claim in excess of $500,000

and (b) shall be exercised by the Claims Monitor in good faith based on its reasoned and informed judgment regarding the best interests of holders of General Unsecured Claims.

3. Procedures for Proposed Settlements

After the Effective Date, the following procedures will govern any proposed Stipulation of Amount and Nature of Claim, other settlement, other agreement or agreed order that would result in an Allowed General Unsecured Claim in excess of $500,000.

a. Notice of Proposed Settlement

In connection with any proposed Stipulation of Amount and Nature of Claim, other settlement, other agreement or agreed order that would result in an Allowed General Unsecured Claim in excess of $500,000 (a "Proposed Settlement"), the Reorganized Debtors will provide the Claims Monitor with notice of such Proposed Settlement and its terms (each, a "Notice of Proposed Settlement") at least 15 calendar days prior to the filing by the Reorganized Debtors of a motion seeking Bankruptcy Court approval of such Proposed Settlement. Any document executed by the Reorganized Debtors in connection with a Proposed Settlement will expressly state that the terms thereof are subject to Bankruptcy Court approval to the extent the Claims Monitor objects, either informally or formally, to the Proposed Settlement and such objection is not consensually resolved.

b. Contents of Notice of Proposed Settlement

Each Notice of Proposed Settlement will contain, for each General Unsecured Claim that is the subject of the Proposed Settlement to which such Notice of Proposed Settlement relates, the following information: (i) the amount of such General Unsecured Claim set forth in the applicable proof of claim; (ii) the amount of such General Unsecured Claim scheduled by the Debtors, if any; (iii) the amount of such General Unsecured Claim that would be Allowed by the Proposed Settlement; and (iv) a brief statement regarding the merits of the Proposed Settlement.

c. Settlement Procedures

Following its receipt of a Notice of Proposed Settlement, the Claims Monitor will have 15 calendar days to review and consider the Proposed Settlement to which such Notice of Proposed Settlement relates. If within such 15-day period the Claims Monitor does not deliver to the Reorganized Debtors written notice of its objection to such Proposed Settlement, the Reorganized Debtors may effectuate the Proposed Settlement without further Bankruptcy Court approval of the Proposed Settlement. If within such 15-day period the Claims Monitor does deliver to the Reorganized Debtors written notice of its objection to such Proposed Settlement, the Claims Monitor and the Reorganized Debtors will negotiate in good faith to resolve such objection. If they cannot resolve such objection within ten calendar days after receipt by the Reorganized Debtors of such notice of objection, the Reorganized Debtors may file a motion with the Bankruptcy Court seeking approval of such Proposed Settlement and the Claims Monitor may object to such Proposed Settlement, provided that, with respect to any Proposed Settlement that would result in an Allowed General Unsecured Claim of greater than $25 million, the Reorganized

Debtors will not seek Bankruptcy Court approval without the prior consent of the Claims Monitor (which consent may not be unreasonably withheld or delayed). To the extent that the Reorganized Debtors believe that that the Claims Monitor is unreasonably withholding or delaying consent, the Reorganized Debtors may seek appropriate relief from the Bankruptcy Court.

4.     Fees and Expenses

Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary fees and expenses of the Claims Monitor (including the reasonable and necessary fees and expenses of any professionals assisting the Claims Monitor in carrying out its powers, rights and responsibilities under the Plan) will be funded by the Reorganized Debtors without further order from the Bankruptcy Court.

5.     Exculpation

Neither the Claims Monitor nor any of its counsel, directors, members, officers, employees, agents, professionals, principals or other representatives, acting in such capacity shall be liable for any act or omission taken or omitted to be take in connection with its rights and responsibilities under the Plan, other than acts or omissions resulting from willful misconduct or gross negligence.

6.     Confidentiality

All (a) information, documents and matters of whatever nature and kind disclosed by the Debtors or Reorganized Debtors to the Claims Monitor that are identified by the Debtors or Reorganized Debtors in writing as being confidential (subject to the right of the Claims Monitor to seek a determination of the Bankruptcy Court after notice to the Debtors or Reorganized Debtors declaring that such information, documents or matters are not confidential) and (b) information or documents generated by the Claims Monitor or its professionals for use by the Claims Monitor and which are identified by Claims Monitor as confidential (collectively, "Confidential Material"), will, except as otherwise provided herein, be kept confidential and not be disclosed in any manner whatsoever. Notwithstanding the foregoing, Confidential Material may be disclosed (w) to the Claims Monitor's directors, officers, employees, members, principals, professional advisors, agents or other representatives who need to know such information and agree to maintain its confidentiality; (x) to governmental or regulatory or self-regulatory authorities as deemed necessary by counsel to the Claims Monitor, (y) to any third party if the Claims Monitor is obligated by law to do so provided that the Claims Monitor seeks to have the third party agree to maintain the confidentiality of the Confidential Material or provides advance written notice to the Debtors or Reorganized Debtors and an opportunity to seek appropriate confidentiality protections, or (z) to the extent such Confidential Material becomes generally available to the public other than as a result of disclosure by the Claims Monitor. Notwithstanding the Claims Monitor's resignation or removal, the resigning or removed Claims Monitor and its representatives shall remain bound by the confidentiality provisions of this Agreement.

7.     Duration

The Claims Monitor's engagement will terminate on the later of (a) the date that the last Disputed General Unsecured Claim in excess of $500,000 is resolved and (b) the date that the last distribution is made from the Disputed Unsecured Claims Reserve.

24.     Section V.I.1 of the Plan is modified and restated as follows:

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan or as otherwise provided for herein, on the Effective Date and concurrently with the applicable distributions made pursuant to Article VI, the Indentures and the Bonds will be deemed canceled and of no further force and effect against the Debtors, without any further action on the part of any Debtor.  The holders of the Bonds will have no rights against the Debtors arising from or relating to such instruments and other documentation or the cancellation thereof, except the rights provided pursuant to the Plan; *provided, however*, that no distribution under the Plan will be made to or on behalf of any holder of an Allowed Bondholder Claim until such Bonds are surrendered to and received by the applicable Third Party Disbursing Agent to the extent required in Section VI.L.  Notwithstanding the foregoing and anything contained in the Plan, the applicable provisions of the Indentures will continue in effect solely for the purposes of (a) allowing the Indenture Trustee or other Disbursing Agent to make distributions on account of Bondholder Claims under the Plan as provided in Section VI.F of the Plan and for the Indenture Trustee to perform such other functions with respect thereto under the Indentures and to have the benefit of all the protections and other provisions of the applicable Indentures with respect to the Bondholders in doing so, (b) permitting the Indenture Trustee to maintain or assert any rights or Charging Liens it may have on distributions to Bondholders for the Indenture Trustee Fee Claim pursuant to the terms of the Plan and the applicable Indenture.  The Reorganized Debtors shall have not have any obligations to the Indenture Trustee for any fees, costs or expenses except as expressly provided in the Plan.

25.     Section V.L of the Plan is modified and restated as follows:

The President, Chief Executive Officer, Chief Financial Officer, ~~or~~ any Vice President, Treasurer, Assistant Treasurer or Secretary of each Debtor or Reorganized Debtor, as applicable, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan.  The Secretary or any Assistant Secretary of each Debtor or Reorganized Debtor will be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax or similar Tax: (1) the issuance, transfer or exchange of New Dana Holdco Common Stock and New Preferred Stock; (2) the creation of any mortgage, deed of trust, lien or other security interest; (3) the making or assignment of any lease or sublease; (4) the execution and delivery of the Exit Facility; (5) any Restructuring Transaction; or (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

26.    Section VI.E.1 of the Plan is modified and restated as follows:

On the Effective Date or otherwise prior to the initial distributions under Section VI.G.1, the Disputed Unsecured Claims Reserve will be established by the Disbursing Agent and the Reserved Shares and/or Reserved Excess Minimum Cash will be placed in the Disputed Unsecured Claims Reserve by the Disbursing Agent for the benefit of holders of Allowed Claims in Class 5B and Disputed Claims that become Allowed Claims in Class 5B.  For the purpose of calculating the amount of New Dana Holdco Common Stock and/or Excess Minimum Cash to be contributed to the Disputed Unsecured Claims Reserve, all Disputed Claims will be treated (solely for purposes of establishing the Disputed Unsecured Claims Reserve) as Allowed Claims in the Face Amount of such Claims as of the Effective Date.  In addition, Disputed Claims rendered duplicative as a result of the consolidation of the Consolidated Debtors pursuant to Section VIII.A will only be counted once for purposes of establishing the Disputed Unsecured Claims Reserve. As Disputed Claims are resolved, ~~the Disbursing Agent shall make adjustments to the reserves for Disputed Claims, but the Reorganized Debtors shall not be required to increase such reserves from and after the Effective Date.  The Debtors may File a motion seeking an order of the Bankruptcy Court approving additional procedures for the establishment of the Disputed Unsecured Claims Reserve.~~, the Reorganized Debtors shall make (or direct the Disbursing Agent to make) appropriate adjustments to the reserves for Disputed Claims consistent with the Plan and the Claims Reserve Order, but the Reorganized Debtors (and any Disbursing Agent) shall not be required to increase such reserves from and after the Effective Date.  The Debtors and the Reorganized Debtors retain the right to seek additional relief from the Bankruptcy Court relating to the Disputed Unsecured Claims Reserve, as they deem necessary or appropriate, including to implement additional or different procedures not inconsistent with the terms of the Plan with respect to certain Claims or groups of Claims.  The Disputed Unsecured Claims Reserve will be administered by the Reorganized Debtors consistent to the Plan, the Claims Reserve Order and any further orders of the Bankruptcy Court.

27.    Section VI.E.2 of the Plan is modified and restated as follows:

Cash dividends and other distributions received by the Disbursing Agent on account of the Reserved Shares ~~and any Cash deposited into the Disputed Unsecured Claims Reserve from the Litigation Trust~~, along with any Cash Investment Yield on Cash, including Net Preference Recovery Proceeds, if any, held in the Disputed Unsecured Claims Reserve, will (a) be deposited in a segregated bank account in the name of the Disbursing Agent for the benefit of holders of Allowed Claims in Class 5B and Disputed Claims that become Allowed Claims in Class 5B, (b) will be accounted for separately and (c) will not constitute property of the Reorganized Debtors.  The Disbursing Agent will invest any Cash held in the Disputed Unsecured Claims Reserve in a manner consistent with Dana's investment and deposit guidelines.

28.    Section VI.E.3 of the Plan is modified and restated as follows:

Each holder of an Allowed Claim in Class 5B and each holder of a Disputed Claim that ultimately becomes an Allowed Claim in Class 5B will have recourse only to the initial distribution of Distributable Shares of New Dana Holdco Common Stock and Distributable Excess Cash and the Disputed Unsecured Claims Reserve Assets and not to any other assets held by the Reorganized Debtors, their property or any assets previously distributed on account of any

Allowed Claim or Allowed Interest. Each holder of an Allowed Claim in Class 6D will have recourse, to the extent each holder of an Allowed Claim in Class 5B has been paid in full, plus Postpetition Interest and Post-Effective Date Interest, only to the Disputed Unsecured Claims Reserve Assets, if any, and not to any other assets held by any Disbursing Agent, the Reorganized Debtors, their property or any assets previously distributed on account of any Allowed Claim. Each holder of an Allowed Interest in Class 7A or an Allowed Claim in Class 7B will have recourse, to the extent each holder of an Allowed Claim in Classes 5B and 6D has been paid in full, plus Postpetition Interest and Post-Effective Date Interest, only to the Disputed Unsecured Claims Reserve Assets, if any, and not to any other assets held by any Disbursing Agent, ~~the Litigation Trust, the Litigation Trustee,~~ the Reorganized Debtors, their property or any assets previously distributed on account of any Allowed Claim or Allowed Interest.

29.    Section VI.F.1.b.v of the Plan is modified and restated as follows:

Notwithstanding any of the foregoing, nothing herein shall be deemed to impair, waive or extinguish any rights of the Indenture Trustee with respect to a Charging Lien, *provided*, *however*, that any such Charging Lien will be released <u>to the extent provided in the Plan</u> upon payment of the Indenture Trustee's reasonable fees and expenses in accordance with the terms of the applicable Indentures and this Plan.

30.    Section VI.G.4 of the Plan is modified and restated as follows:

Except as expressly provided in the Plan<u> or the Confirmation Order</u>, Post-Effective Date Interest shall not accrue on account of any Claim.

31.    Section VII.A.2 of the Plan is modified and restated as follows:

At the Debtors' or, after the Effective Date, the Reorganized Debtors' option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Chapter 11 Cases) not resolved through the ADR Procedures or a Final Order of the Bankruptcy Court will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction. The Debtors or the Reorganized Debtors may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Tort Claim that the Debtors or the Reorganized Debtors have exercised such option. Upon a Debtor's or Reorganized Debtor's service of such notice, the automatic stay provided under section 362 of the Bankruptcy Code, or after the Effective Date, the discharge injunction, will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s). Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtors' right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the United States District Court having jurisdiction over the Chapter 11 Cases) pursuant to section 157(b)(2)(B) of title 28 of the United States Code, as may be applicable. Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with this Section VII.A.2 and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim, as applicable, in Classes 5A and 5B against the

applicable Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is ~~less than or equal to the Debtor's self insured retention or deductible in connection with any applicable insurance policy and is~~ not satisfied from proceeds of insurance payable to the holder of such Allowed Claim under the Debtors' insurance policies will be treated as an Allowed Claim for the purposes of distributions under the Plan. ~~In no event will a distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the applicable Debtor's deductible or self insured retention under any applicable insurance policy.~~ In the event a Tort Claim is determined and liquidated pursuant to a judgment or order that is obtained in accordance with this Section VII.A.2 and is no longer appealable or subject to review, and applicable non-bankruptcy law provides for no recovery against the applicable Debtor, such Tort Claim will be deemed expunged without the necessity for further Bankruptcy Court approval upon the applicable Debtor's service of a copy of such judgment or order upon the holder of such Tort Claim. Nothing contained in this Section will constitute or be deemed a waiver of any claim, right or cause of action that a Debtor may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and causes of action that the Debtors or the Reorganized Debtors may have against any person or entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

32.    Section VII.B.3 of the Plan is modified and restated as follows:

The Debtors or Reorganized Debtors, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor or Reorganized Debtor will provide (a) the holder of such Claim and (b) the Creditors' Committee or ~~Litigation Trustee~~ the Claims Monitor (as applicable) with notice of such amendment and such parties will have 20 days to File an objection to such amendment with the Bankruptcy Court. If no such objection is Filed, the applicable Disbursing Agent may proceed with distributions based on such amended Schedules without approval of the Bankruptcy Court.

33.    Section IX.F of the Plan is modified and restated as follows:

Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, ~~the Litigation Trust Agreement,~~ the Disclosure Statement or the Confirmation Order;

34.    Section IX.G of the Plan is modified and restated as follows:

Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan~~, the Litigation Trust Agreement~~ or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan~~, the Litigation Trust Agreement~~ or any entity's rights arising from or obligations incurred in connection with the Plan~~, the Litigation Trust Agreement~~ or such documents;

Except as expressly provided herein, no other provision of the Plan is modified by these First Modifications.

Dated:  December 6, 2007

Respectfully submitted,

Dana Corporation, on its own behalf and on behalf of each affiliate Debtor

By:     /s/ Marc S. Levin
Name: Marc S. Levin
Title:   Acting Secretary

COUNSEL:

Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Heather Lennox (HL 3046)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman (JE 5638)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309-3053
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------X
                                                         :
In re                                                    :   Chapter 11
                                                         :
                                                         :   Case No. 06-10354 (BRL)
Dana Corporation, et al.,                                :
                                                         :   (Jointly Administered)
                                                         :
                          Debtors.                       :
                                                         :
--------------------------------------------------------- x
```

**STIPULATION AND AGREED ORDER BETWEEN THE DEBTORS**
**AND THE OFFICIAL COMMITTEE OF NON-UNION RETIREES**

The above captioned debtors and debtors in possession (collectively, the "Debtors") and

the Official Committee of Non-Union Retired Employees (the "Retiree Committee"), by and

through their respective attorneys, have agreed, by this Stipulation and Agreed Order (this

"Agreed Order"), that the Non-Pension Retiree Benefits (defined below) provided to the

Boilermaker Retirees will be terminated as of February 1, 2008, and that the Debtors will

establish a cash reserve with respect to the claim amount, if any, resulting from the Debtors'

termination of such Non-Pension Retiree Benefits.  The parties stipulate and agree, as follows:

**RECITALS**

WHEREAS, on March 3, 2006 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the

United States Bankruptcy Court for the Southern District of New York;

WHEREAS, on August 31, 2006, the Office of the United States Trustee for the Southern

District of New York appointed the Retiree Committee, pursuant to section 1114(d) of the

Bankruptcy Code, to represent the interests of those individuals receiving retiree benefits (within

the meaning of section 1114(a) of the Bankruptcy Code) not covered by a collective bargaining agreement;

WHEREAS, both prior to and since the Petition Date, the Debtors have offered non-pension retiree benefits consisting of healthcare and/or life insurance (collectively "Non-Pension Retiree Benefits") to the retirees and/or their surviving spouses and eligible dependents formerly employed at the Debtors' heavy axle facility in Marion, Ohio and affiliated with the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers AFL-CIO (the "Boilermaker Retirees");

WHEREAS, as part of the Debtors' efforts to restructure their North American operations, the Debtors determined that it is necessary for them to stop providing Non-Pension Retiree Benefits to all of their union and non-union retirees, including the Boilermaker Retirees;

WHEREAS, on November 19, 2007, after several weeks of discussion, outside counsel to the Boilermakers advised the Debtors that the Boilermakers would not be representing the interests of the Boilermaker Retirees with respect to the Non-Pension Retiree Benefits being provided to such retirees;

WHEREAS, pursuant to the Stipulation between the Debtors and the Retiree Committee approved by the Court on December 5, 2007, the Retiree Committee is representing the interests of the Boilermaker Retirees with respect to the Non-Pension Retiree Benefits that the Boilermaker Retirees are currently receiving from the Debtors;

WHEREAS, on October 23, 2007, the Debtors filed their Third Amended Joint Plan of Reorganization, as same may be amended, restated or supplemented from time to time (the "Plan");

WHEREAS, the Debtors and the Retiree Committee entered into negotiations and have reached an agreement with respect to the Non-Pension Retiree Benefits being provided to the Boilermaker Retirees, as set forth in the terms and conditions below.

### AGREED ORDER

IT IS THEREFORE AGREED, AND UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED, AS FOLLOWS:

1.    This Agreed Order constitutes an agreement between the Debtors and the Retiree Committee, as authorized representative of the Boilermaker Retirees, pursuant to section 1114(e) of title 11 of the United States Code (the "Bankruptcy Code").

2.    The Debtors are authorized to terminate all Non-Pension Retiree Benefits being provided to the Boilermaker Retirees as of February 1, 2008, provided, however, that the Debtors will continue to provide all Non-Pension Retiree Benefits being provided to the Boilermaker Retirees under the terms of existing plans through and including January 31, 2008.  On and as of February 1, 2008, the Debtors will cease to sponsor or provide any Non-Pension Retiree Benefits to Boilermaker Retirees, and the Debtors shall have no obligation to provide any Non-Pension Retiree Benefits to Boilermaker Retirees after January 31, 2008, except for the payment of claims incurred by Boilermaker Retirees on or before January 31, 2008 and presented for payment no later than the usual cutoff date for submitting such claims.

3.    The Boilermaker Retirees will retain all rights to assert a claim against the Consolidated Debtors arising under sections 363, 1113 or 1114 of the Bankruptcy Code on account of the termination of Non-Pension Retiree Benefits set forth in paragraph 2 above (the "Boilermaker Retiree Benefits Claim"), and the Debtors and other parties in interest reserve the right to contest or object to the Boilermaker Retiree Benefits Claim on any and all grounds.  Any

Boilermaker Retiree Benefits Claim shall be satisfied by a cash payment to the Boilermaker

Retirees to be paid from the Reserve established in paragraph 6 below and, if necessary, in

accordance with the last sentence of paragraph 6 below.  If the amount and priority of the

Boilermaker Retiree Benefits Claim cannot be agreed upon between the Debtors and the Retiree

Committee, such matters will be determined as set forth in paragraph 5 below but without

affecting any other provision of this paragraph 3.  The Debtors and Reorganized Debtors shall

not be required to reserve for any Boilermaker Retiree Benefits Claim in the Disputed Unsecured

Claims Reserve established under the Plan, and any such claim will not affect distributions to

general unsecured creditors under the Plan.

      4.      In light of the date for the termination of the Non-Pension Retiree Benefits set

forth in paragraph 2 above, the Debtors and the Retiree Committee agree to work expeditiously

and in good faith to resolve the amount and priority of the Boilermaker Retiree Benefits Claim.

If the Debtors or Reorganized Debtors reach a consensual resolution of the Boilermaker Retiree

Benefits Claim, then the Debtors or Reorganized Debtors shall file a notice of presentment of

such resolution with the Court and provide parties identified on the Bankruptcy Rule 2002 list

maintained in the Chapter 11 Cases with seven (7) days notice thereof and an opportunity to file

an objection thereto (a "<u>Settlement Objection</u>").  If no objections are received, then the resolution

shall be presented to the Court for approval.

      5.      If a consensual resolution cannot be reached by January 7, 2008, then on such

date, the Debtors will file a motion with the Bankruptcy Court for determination of the amount

and priority of the Boilermakers Retiree Benefits Claim (the "<u>Claim Determination Motion</u>") and

will set a hearing on the Claim Determination Motion for the regularly scheduled hearing on

January 23, 2008.  It is further agreed that the Debtors shall comply with the information sharing

obligations reflected in section 1114(f)(1)(B) of the Bankruptcy Code during negotiations and/or during any period of litigation.  If the Debtors file the Claim Determination Motion, then the Debtors agree that the termination date for Non-Pension Retiree Benefits set forth in paragraph 2 above will be extended until the date that the Bankruptcy Court enters an order in respect of the Claim Determination Motion.  If, as a result of the immediately preceding sentence or as a result of a Settlement Objection that has not been resolved by the Court, the Debtors or Reorganized Debtors are required to provide Non-Pension Retiree Benefits to any Boilermaker Retiree after January 31, 2008, then any amounts paid by the Debtors or Reorganized Debtors for benefits provided after January 31, 2008 will reduce on a dollar-for-dollar basis any payment to be made on account of an allowed Boilermaker Retiree Benefits Claim.

6.      On the Effective Date, the Reorganized Debtors shall establish a reserve in the amount of $2,500,000.00 in respect of the Boilermaker Retiree Benefits Claim (the "Reserve"), which Reserve shall be maintained until such time as the amount of the Boilermaker Retiree Benefits Claim, if any, has been consensually agreed to by and between the Debtors and the Retiree Committee or determined by this Court in accordance with paragraphs 4 or 5 above.  The Reserve amount set forth above is based upon the Debtors' belief, after the review of their books and records, that there exist 26 Boilermaker Retirees and 13 spouses and/or dependants currently receiving and/or entitled to receive Non-Pension Retiree Benefits.  In the event that it is discovered during efforts to resolve the Boilermaker Retiree Benefits Claim and/or any litigation with respect thereto that there are additional Boilermaker Retirees and/or spouses or dependants, it is agreed that if, by agreement or as a result of litigation, a claim is awarded to the Boilermaker Retirees that would require a payment in excess of $2,500,000.00, then such additional amount shall be payable only by the Reorganized Debtors.

7.      To effectuate the terms of this Agreed Order, Section IV.E.1 of the Plan shall be modified as follows:

On the Effective Date, the Official Committees, to the extent not previously dissolved, will dissolve, and the members of the Official Committees and their respective Professionals will cease to have any role arising from or related to the Chapter 11 Cases; *provided*, *however*, that the Creditors' Committee (a) shall continue to exist for purpose of objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) to the extent (i) an appeal to the Confirmation Order is pending as of the Effective Date and (ii) the Creditors' Committee is a party to and is actively participating in such appeal, the Creditors' Committee shall continue to exist for the purpose of participating in such appeal; and *provided further,* that the Retiree Committee shall continue to exist solely for the purpose of fully and finally resolving the claim for the termination of non-pension retiree benefits of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers AFL-CIO who were formerly employed at the Debtors' heavy axle facility in Marion, Ohio (the "Boilermaker Claim") and for such reasonable time thereafter for purposes of either effecting payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any allowed claim.  The Professionals retained by the Official Committees (legal and, if deemed necessary by the Retiree Committee, financial and actuarial) and the respective members thereof will not be entitled to assert any Fee Claim for any services rendered or expenses incurred after the Effective Date, except for reasonable fees for services rendered, and actual and necessary expenses incurred, in connection with (a) any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section II.A.1.i.ii.A; (b) with respect to the Retiree Committee's efforts in fully and finally resolving the Boilermaker Claim and effecting payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any allowed claim; and (bc) with respect to the Creditors' Committee (i) objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (ii) to the extent applicable, the Creditors' Committee's active participation in any appeal of the Confirmation Order.  Upon the later of (a) the resolution of the Creditors' Committee's outstanding objections to any Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) the resolution of any appeal of the Confirmation Order in which the Creditors' Committee is actively participating, the Creditors' Committee will dissolve, and its Professionals will cease to have any role arising from or relating to the Chapter 11 Cases.  Upon the full and final resolution of the Boilermaker Claim and effecting payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any allowed claim, the Retiree Committee will dissolve, and its Professionals (both legal and actuarial) will cease to have any role arising from or relating to these Chapter 11 Cases.  The Reorganized Debtors will pay the reasonable expenses of the members of the Creditors' Committee and the reasonable fees and expenses of the Creditors' Committee's Professionals incurred in connection with (a) objecting to and litigating Fee Claims and applications for fees and expenses under section 503(b) of the Bankruptcy Code and (b) to the extent applicable, actively participating in an appeal of the Confirmation Order, without further Bankruptcy Court approval.  The Reorganized Debtors will pay the reasonable expenses of the Retiree Committee and the reasonable fees and expenses of the Retiree Committee's Professionals (legal and/or actuarial) incurred in connection with the full and final resolution of the Boilermaker Claim and effecting payment to each Boilermaker Retiree or informing each Boilermaker Retiree of any allowed claim without the need for further Bankruptcy Court approval.

8.      To effectuate the terms of this Agreed Order, the Plan shall be deemed to be modified to include the terms of this Agreed Order.  Pursuant to section 1127 of the Bankruptcy Code, the Plan, as modified by this Agreed Order and any other modifications filed with the Court, shall become the Plan.

9.     The Retiree Committee shall support and not file any objections to confirmation of the Plan.

10.     Pursuant to sections 1125 and 1127 of the Bankruptcy Code, the Debtors shall not be required to resolicit acceptance of the Plan or prepare and distribute a new disclosure statement with respect to the Plan.

11.     The Debtors are authorized to execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers, and to take any and all actions reasonably necessary to consummate and implement any and all obligations contemplated herein.

12.     The Debtors reserve all of their rights to seek further modifications to the Plan pursuant to section 1127 of the Bankruptcy Code, provided that any such modifications are not inconsistent with this Agreed Order.

13.     This Agreed Order may be modified, amended or supplemented by the parties thereto in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court; provided that such modification, amendment or supplement is not material.  No statement made or action taken in the negotiation of this Agreed Order may be used by any party for any purpose whatsoever.

14.     Notwithstanding the possible applicability of Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Agreed Order shall be effective and enforceable immediately upon its entry.

15.     This Court retains jurisdiction to interpret, enforce and implement this Agreed Order, and all amendments thereto, any waiver and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to resolve any disputes, controversies or claims arising under or related to

the Boilermakers Retiree Benefits Claim or the Plan, and interpret, implement and enforce the

provisions of this Agreed Order.

Dated: December 11, 2007

s/ Corinne Ball                                          s/ Trent P. Cornell
Corinne Ball (CB 8203)                              Trent P. Cornell (Admitted *Pro Hac Vice*)
Jayant Tambe (JT 0118)                             Jon D. Cohen
Pedro A. Jimenez (PJ 1026)                         STAHL COWEN CROWLEY LLC
JONES DAY                                                55 West Monroe Street, Suite 1200
222 East 41st Street                                   Chicago, Illinois 60603
New York, New York 10017                         Telephone: (312) 641-0060
Telephone: (212) 326-3939                          Facsimile: (312) 641-6959
Facsimile: (212) 755-7306
                                                            ATTORNEYS FOR THE RETIREE
Heather Lennox (HL 3046)                           COMMITTEE
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212

ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION

SO ORDERED THIS 11TH DAY OF DECEMBER, 2007.

/s/Burton R. Lifland
UNITED STATES BANKRUPTCY JUDGE

# **APPENDIX III**

## **CONFIRMATION NOTICE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                            :
In re                                       :    Chapter 11
                                            :
Dana Corporation, *et al.,*                 :    Case No. 06-10354 (BRL)
                                            :
                          Debtors.          :    (Jointly Administered)
                                            :
------------------------------------------------------------x

**NOTICE OF ENTRY OF ORDER**
**CONFIRMING THE THIRD AMENDED JOINT PLAN**
**OF REORGANIZATION OF DEBTORS AND DEBTORS IN POSSESSION**

PLEASE TAKE NOTICE OF THE FOLLOWING:

      **1.**    **Confirmation of the Plan.**  On December [___], 2007, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order (the "Confirmation Order") confirming the Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession, dated October 23, 2007 (as it may have been amended, supplemented or modified, the "Plan"), in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").  Unless otherwise defined in this Notice, capitalized terms and phrases used herein have the meanings given to them in the Plan and the Confirmation Order.

      **2.**    **Discharge of Claims and Termination of Interests.**

      a.    Except as provided in the Plan or in the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from and after the Petition Date.  Except as provided in the Plan or in the Confirmation Order, Confirmation shall, as of the Effective Date and immediately after cancellation of the Old Common Stock of Dana:  (i) discharge the Debtors from all Claims or other debts that arose on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (A) a proof of Claim based on such debt is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (B) a Claim based on such debt is allowed pursuant to section 502 of the Bankruptcy Code or (C) the holder of a Claim based on such debt has accepted the Plan; and (ii) terminate all Interests and other rights of holders of Interests in the Debtors.

      b.    In accordance with the foregoing, except as provided in the Plan, the Confirmation Order constitutes a judicial determination, as of the Effective Date and immediately after the cancellation of the Old Common Stock of Dana, but prior to the issuance of the New Dana Holdco Common Stock, of a discharge of all Claims and other debts and Liabilities against the Debtors and a termination of all Interests and other rights of the holders of Interests in the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

3.    **Releases.**

a.    <u>General Releases by Debtors and Reorganized Debtors</u>.  Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to claim by, through, for or because of them, shall forever release, waive and discharge all Liabilities that they have, had or may have against any Released Party except with respect to obligations arising under the Plan, the Global Settlement and the B-2 Backstop Commitment Letter; *provided*, *however*, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted gross negligence or willful misconduct.

b.    <u>General Releases by Holders of Claims or Interests</u>.  Without limiting any other applicable provisions of, or releases contained in, the Plan, as of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the consideration and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim that votes in favor of the Plan (solely with respect to the Claim(s) that such holder voted in favor of the Plan) to the fullest extent permissible under law, will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the Confirmation Exhibits or the Disclosure Statement that such entity has, had or may have against any Released Party (which release will be in addition to the discharge of Claims and termination of Interests provided in the Plan and under the Confirmation Order and the Bankruptcy Code).  Notwithstanding the foregoing and except with respect to Derivative Claims and holders of Claims that vote in favor of the Plan (solely with respect to the Claim(s) that such holder voted in favor of the Plan), nothing in the Plan shall release the claims asserted, or to be asserted, solely on account of alleged conduct occurring prior to the Petition Date, against any non-Debtor defendant in the Securities Litigation.  In addition, nothing in the Plan shall be deemed to release any applicable Debtor or Reorganized Debtor from any Liability arising from or related to Asbestos Personal Injury Claims.

c.    <u>Release of Released Parties by Other Released Parties</u>.  From and after the Effective Date, except with respect to obligations arising under the Plan, the Global Settlement, the Union Fee Order and the B-2 Backstop Commitment Letter, to the fullest extent permitted by applicable law, the Released Parties shall release each other from any and all Liabilities that any Released Party is entitled to assert against any other Released Party in any way relating to any Debtor, the Chapter 11 Cases, the Estates, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan (or the property to be distributed under the Plan), the Confirmation Exhibits, the Disclosure Statement, any contract, employee pension or other benefit plan, instrument, release or other agreement or document related to any Debtor, the Chapter 11 Cases or the Estates created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Party or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy; *provided*, *however*, that the foregoing provisions shall not affect the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

4.    **Injunctions.**  On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order,

a.    all entities and Persons that have been, are or may be holders of Claims against or Interests in a Debtor are enjoined from taking any of the following actions against or affecting a Debtor, its Estate, its Assets, any direct or indirect successor in interest to a Debtor or any assets or

property of such successor with respect to such Claims or Interests (other than actions brought to enforce any rights or obligations under the Plan): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien (other than as contemplated by the Plan); (iv) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due to any Debtor, its Estate, its Assets, any direct or indirect successor in interest to a Debtor or any assets or property of such successor; and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth therein (including, without limitation, the Settlements).

b.      All Persons that have held, currently hold or may hold any Liabilities released or exculpated pursuant to Sections IV.E.6 and IV.E.7 of the Plan, respectively, are permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released Liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) except as provided in the Plan, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

c.      Except with respect to Derivative Claims and holders of Claims that vote in favor of the Plan (solely with respect to the Claim(s) that such holder voted in favor of the Plan), nothing in the Confirmation Order or in the Plan shall enjoin the prosecution of the claims asserted, or to be asserted, solely on account of alleged conduct occurring prior to the Petition Date, against any non-Debtor defendant in the Securities Litigation.  In addition, nothing in this Order or in the Plan shall prevent the holders of Asbestos Personal Injury Claims from exercising their rights against any applicable Debtor or Reorganized Debtor or its Estate or Assets with respect to their Asbestos Personal Injury Claims.  With respect to Asbestos Personal Injury Claims, the automatic stay imposed by section 362 of the Bankruptcy Code is terminated as of the Effective Date, and, pursuant to section 108(c) of the Bankruptcy Code, the applicable statute of limitations with respect to any such Claim that did not expire prior to the Petition Date will cease to be tolled as of the Effective Date.

5.      **Termination of Certain Subordination Rights and Settlement of Related Claims and Controversies.**

a.      The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  Except as provided in Section IV.E.8.c of the Plan, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.  Accordingly, distributions pursuant to the Plan to holders of Allowed Claims shall not be subject to payment to a beneficiary of such terminated subordination rights or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

b.      Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights

that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim, except as provided in Section IV.E.8.c of the Plan. The Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Reorganized Debtors and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

## 6.    Bar Dates.

a.    Except as otherwise provided in Section II.A.1.i.ii of the Plan or in a Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Notice Parties[1] pursuant to the procedures specified in the Confirmation Order no later than 30 days after the Effective Date. Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests must be Filed and served on the Notice Parties and the requesting party by the latest of (i) 150 days after the Effective Date, (ii) 60 days after the Filing of the applicable request for payment of Administrative Claims or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims. The Plan does not modify any Bar Date Order already in place, including Bar Dates for Claims entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

b.    Professionals or other entities asserting a Fee Claim for services rendered before the Effective Date must File and serve on the Notice Parties and such other entities who are designated by the Bankruptcy Rules, the Fee Order, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 60 days after the Effective Date; provided, however, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order). Objections to any Fee Claim must be Filed and served on the Notice Parties and the requesting party by the later of (i) 90 days after the Effective Date, (ii) 30 days after the Filing of the applicable request for payment of the Fee Claim or (iii) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Fee Claims. To the extent necessary, the Confirmation Order amends and supersedes any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims; provided, however, that Fee Claims Filed by Union Professionals will continue to be governed by, and paid in accordance with, the Union Fee Order.

c.    Holders of Administrative Claims arising from liabilities incurred by a Debtor in the ordinary course of its business on or after the Petition Date, including Administrative Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Debtor's business, Administrative Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), Administrative Claims arising from those contracts and leases of the kind described in Section II.E.4 of the Plan and Intercompany Claims that are Administrative Claims, shall not be required

---

[1]    "Notice Parties" means (a) prior to the Effective Date, the Debtors, the Creditors' Committee, Centerbridge and the Unions; and (b) on or after the Effective Date, the Reorganized Debtors, Centerbridge and the Unions.

to File or serve any request for payment of such Administrative Claims.  Such Administrative Claims shall be satisfied pursuant to Section II.A.1.c of the Plan.  Any Administrative Claims that are Filed contrary to Section II.A.1.i.ii.B of the Plan shall be deemed disallowed and expunged, subject to resolution and satisfaction in the ordinary course outside these Chapter 11 Cases.

        d.       Holders of Administrative Claims on account of DIP Lender Claims shall not be required to File or serve any request for payment or application for allowance of such Claims.  Such Administrative Claims shall be satisfied pursuant to Section II.A.1.d of the Plan.

        e.       Centerbridge and the CBP Purchaser Entities shall not be required to File or serve any request for payment or application for allowance of its Administrative Claims, if any, arising under Article 7 of the New Investment Agreement (as approved by the Global Settlement Order) and such Administrative Claims shall be satisfied pursuant to Section II.A.1.e of the Plan.

        f.       So long as the B-2 Commitment Letter remains in full force and effect, the B-2 Backstop Investors shall not be required to File or serve any request for payment or application for allowance of their Administrative Claims, if any, arising under the B-2 Backstop Commitment Letter or the order approving same and such Administrative Claims shall be satisfied pursuant to Section II.A.1.f of the Plan.

        g.       Except as otherwise provided in a Final Order of the Bankruptcy Court approving the rejection of an Executory Contract or Unexpired Lease, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be Filed with the Bankruptcy Court on or before the later of:  (i) 30 days after the Effective Date or (ii) for Executory Contracts identified on Exhibit II.E.5 to the Plan, 30 days after (A) the service of a notice of such rejection is served under the Contract Procedures Order, if the contract counterparty does not timely File an objection to the rejection in accordance with the Contract Procedures Order or (B) if such an objection to rejection is timely Filed with the Bankruptcy Court in accordance with the Contract Procedures Order, the date that an Order is entered approving the rejection of the applicable contract or lease or the date that the objection to rejection is withdrawn.  Any Claims not Filed within such applicable time periods shall be forever barred from receiving a distribution from the Debtors, the Reorganized Debtors or the Estates.

        **7.**       **Objections to Proposed Rejection of Certain Executory Contracts or Unexpired Leases.**  Any party that wishes to object to the proposed rejection of an Executory Contract or Unexpired Lease under the Plan must File with the Bankruptcy Court and serve on counsel to the Debtors a written objection (a "Rejection Objection") setting forth the basis for opposing rejection of the applicable agreement.  For Executory Contracts or Unexpired Leases that are to be rejected under the Plan but are not identified on Exhibit II.E.5 to the Plan, a Rejection Objection must be Filed with the Bankruptcy Court and served on counsel to the Debtors no later than 20 days after the Effective Date. The Debtors may File a reply to a Rejection Objection no later than 20 days after the Filing of the Rejection Objection.  If no Rejection Objection is properly and timely Filed and served with respect to an Executory Contract or Unexpired Lease, the proposed rejection of the applicable Executory Contract or Unexpired Lease shall be deemed approved in accordance with the Plan and the Confirmation Order, effective as of, and conditioned upon the occurrence of, the Effective Date.  To facilitate settlement discussions, the deadline to File a Rejection Objection or a reply thereto may be extended by a written agreement of the contract counterparty and the Debtors or the Reorganized Debtors.

        **8.**       **Bankruptcy Court Address.**  For purposes of Filing requests for payment of Administrative Claims, applications for allowance of Fee Claims or proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases, the address of the Bankruptcy Court is One Bowling Green, New York, New York 10004-1408.  Original proofs of Claim must be received by the

Bankruptcy Court on or before the applicable bar date to be timely Filed.  Proofs of Claim submitted by facsimile or e-mail shall not be accepted.

          **9.**      **Notice Parties' Service Addresses.**  For purposes of serving requests for payment of Administrative Claims and applications for allowance of Fee Claims on the Notice Parties, such requests for payment should be served, as applicable, on:  (a) DANA CORPORATION, 4500 Dorr Street, Toledo, Ohio 43615 (Attn: Marc S. Levin, Esq.); (b) counsel to the Debtors, JONES DAY, 222 East 41st Street, New York, New York 10017 (Attn: Corinne Ball, Esq. and Veerle Roovers, Esq.), JONES DAY, North Point, 901 Lakeside Avenue, Cleveland, Ohio 44114 (Attn: Heather Lennox, Esq. and Carl E. Black, Esq.); (c) counsel to the Creditors' Committee, KRAMER LEVIN NAFTALIS & FRANKEL LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq. and Matthew J. Williams, Esq.); (d) counsel to Centerbridge Partners LP, WILLKIE FARR & GALLAGHER LLP, 787 Seventh Avenue, New York, New York 10019 (Attn: Matthew A. Feldman, Esq., Paul V. Shalhoub, Esq. and Morris J. Massel, Esq.); (e) counsel to the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, MEYER SUOZZI ENGLISH & KLEIN PC, 1350 Broadway, Suite 501, New York, New York 10018 (Attn: Lowell Peterson, Esq.); and (f) counsel to the (i) International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and (ii) United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, COHEN WEISS AND SIMON LLP, 330 West 42nd Street, New York, New York 10036 (Attn: Babette Ceccotti, Esq.).

          **10.**      **Service Upon Claims and Noticing Agent.**  Requests for payment of Administrative Claims, applications for allowance of Fee Claims or proofs of Claim arising from the rejection of Executory Contracts or Unexpired Leases should be served on the Debtors' claims and noticing agent, BMC Group, Inc., P.O. Box 952, El Segundo, California 90245-0952.

          **11.**      **Effective Date.**  A separate notice of the occurrence of the Effective Date shall be served on all known holders of Claims and Interests as soon as practicable after the occurrence thereof.

**12.    Copies of Confirmation Order.**  Copies of the Confirmation Order may be obtained at **www.dana.bmcgroup.com** or from BMC Group, Inc. by calling 888-819-7921 (toll-free).

Dated:  December [____], 2007                    BY ORDER OF THE COURT


Corinne Ball (CB 8203)
Richard H. Engman (RE 7861)
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

Heather Lennox (HL 3046)
Carl E. Black (CB 4803)
Ryan T. Routh (RR 1994)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Jeffrey B. Ellman (JE 5638)
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia  30309 3053
Telephone:  (404) 521-3939
Facsimile:  (404) 581-8330

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION