JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)

Attorneys for Appellees Dana Corporation, *et al.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re:                                              :        Chapter 11
                                                    :
DANA CORPORATION, *et al.*,                         :        Bankruptcy Case No. 06-10354 (BRL)
                                                    :
                        Debtors.                    :        Jointly Administered
                                                    :
———————————————————                                 :
                                                    :
AD HOC COMMITTEE OF ASBESTOS                        :
PERSONAL INJURY CLAIMANTS and                       :
JOSÉ ANGEL VALDEZ,                                  :
                                                    :
                        Appellants,                 :        No. 1:08-CV-1037 (PAC)
                                                    :
vs.                                                 :        Judge Paul A. Crotty
                                                    :
DANA CORPORATION, *et al.*                          :
                                                    :
                        Appellees.                  :
———————————————————— x


**APPELLEES' BRIEF (I) IN SUPPORT OF MOTION OF APPELLEES
TO DISMISS AS MOOT THE CONSOLIDATED APPEALS OF AD HOC
COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS AND JOSÉ
ANGEL VALDEZ AND (II) ON THE MERITS OF THE CONSOLIDATED APPEAL**

# TABLE OF CONTENTS

**Page**

ISSUES PRESENTED.................................................................................................. 1

STANDARD OF REVIEW ......................................................................................... 2

STATEMENT OF THE CASE.................................................................................... 4

    Preliminary Statement............................................................................................ 4

    Procedural History ................................................................................................. 5

    Statement Of Facts ................................................................................................ 6

    A.    The Plan Has Been Substantially Consummated.................................... 6

    B.    Dana's Asbestos Liability Is Low And Declining.................................. 7

ARGUMENT .............................................................................................................. 9

I.    BECAUSE THE PLAN HAS BEEN SUBSTANTIALLY CONSUMMATED, THE CONSOLIDATED APPEAL MUST BE DISMISSED AS EQUITABLY MOOT.................................................................................................................. 9

    A.    The Reorganized Debtors' Plan Has Been Substantially Consummated ............. 10

    B.    Appellants Cannot Rebut The Presumption Of Mootness................................... 11

        1.    The Court Cannot Order Effective Relief (Chateaugay Factor 1) ........... 11

        2.    Any Relief Would Unravel Intricate Restructuring Transactions (Chateaugay Factors 2 and 3) ................................................................. 13

        3.    Parties Who Would Be Impacted By These Appeals Have Not Had Notice (Chateaugay Factor 4) ................................................................. 14

        4.    Appellants' Failure To Seek A Stay Of The Confirmation Order Renders Their Appeals Moot (Chateaugay Factor 5) .............................. 14

II.    IF THE CONSOLIDATED APPEAL IS NOT DISMISSED AS MOOT, THE CONFIRMATION ORDER SHOULD BE AFFIRMED................................................ 15

    A.    Asbestos Personal Injury Claims Are Not Impaired By The Plan....................... 15

        1.    The Restructuring Transactions Do Not Impair Asbestos Personal Injury Claims ....................................................................................... 16

        2.    Asbestos Personal Injury Claims Are Not "Impaired By Definition" Under The Plan ................................................................... 17

        3.    The Plan's Exculpation Provisions Do Not Impair Asbestos Personal Injury Claims ....................................................................... 18

    B.    The Debtors Are Not Obliged To Comply With The Requirements Of Section 524(g) Of The Bankruptcy Code ......................................................... 19

# TABLE OF CONTENTS
(continued)

**Page**

C.    Asbestos Personal Injury Claims Were Properly Classified Under The Plan ......................................................................................................... 21

D.    The Plan Provides Identical Treatment To All Asbestos Personal Injury Claims ..................................................................................................... 23

E.    The Plan Is "Feasible" Within The Meaning Of Section 1129(a)(11) Of The Bankruptcy Code .......................................................................... 25

F.    The Plan Satisfies The Requirements Of Section 1129(a)(7) Of The Bankruptcy Code .................................................................................... 29

CONCLUSION........................................................................................................... 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

In re Adelphia Bus. Solutions, Inc., 341 B.R. 415 (Bankr. S.D.N.Y. 2003) ..........................26, 27

Allstate Ins. Co. v. Hughes, 174 B.R. 884 (S.D.N.Y. 1994) ............................................................2

In re Am. Solar King Corp., 90 B.R. 808 (Bankr. W.D. Tex. 1988) .............................................17

In re Armstrong World Indus., Inc., 348 B.R. 136 (D. Del. 2006)................................................21

In re Atlantic Terrace Apartment Corp., 226 B.R. 535 (Bankr. E.D.N.Y. 1998) .........................16

Bartel v. Bar Harbor Airways, Inc., 196 B.R. 268 (S.D.N.Y. 1996) ............................................12

Carey v. Crescenzi, 923 F.2d 18 (2d Cir. 1991) ..........................................................................19

In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2005) ....................................................21, 25

In re Congoleum Corp., 362 B.R. 198 (Bankr. D.N.J. 2007) ........................................................20

In re Continental Airlines, 91 F.3d 553 (3d Cir. 1996)..................................................................14

Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc.
      (In re Croton River Club, Inc.), 52 F.3d 41 (2d Cir. 1995)................................................28

In re Dana Corp., No. 06-10354 (BRL), 2007 WL 4589331
      (Bankr. S.D.N.Y. Dec. 26, 2007) (Confirmation Order) ..............................1, 2, 15, 23, 28

Deutsche Bank AG v. Metromedia Fiber Network, Inc.
      (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005) ..................9, 10, 14

In re Dow Corning Corp., 255 B.R. 445 (E.D. Mich. 2000) ........................................................24

In re Drexel Burnham Lambert Group Inc., 138 B.R. 723
      (Bankr. S.D.N.Y. 1992) ................................................................................................26, 27

Frank v. U.S., 78 F.3d 815 (2d Cir. 1996), vacated on other grounds,
      521 U.S. 1114 (1997)...........................................................................................................2

Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.),
      10 F.3d 944 (2d Cir. 1993)..........................................................................11, 13, 14, 15

### TABLE OF AUTHORITIES (cont'd.)

<u>Page</u>

In re G-I Holdings, Inc., 323 B.R. 583 (Bankr. D.N.J. 2005).......................................21

In re Kaiser Aluminum Corp., No. 02-10429 (JKF), 2006 WL 616243
    (Bankr. D. Del. Feb. 6, 2006) ...............................................................22

Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) .................................25, 26

Keating v. U.S. Lines, Inc. (In re U.S. Lines, Inc.), No. 04 Civ. 6614 (LTS),
    2006 WL 1559237 (S.D.N.Y. Jun. 7, 2006) .............................................3

Kenton County Bondholders Comm. v. Delta Air Lines, Inc.
    (In re Delta Air Lines, Inc.), 374 B.R. 516 (S.D.N.Y. 2007)..........................3, 12

In re Lafayette Hotel P'ship, 227 B.R. 445 (S.D.N.Y. 1998)........................................23

Leighton v. E-II Holdings Inc. (In re E-II Holdings Inc.), No. 94 Civ. 2246 (LAP),
    1995 WL 387650 (S.D.N.Y. Jun. 30, 1995) ....................................... 12-13, 15

In re Leslie Fay Cos., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) .......................................26

Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380 (2d Cir. 1997)............15

Loral Stockholders Protective Comm. v. Loral Space & Commc'ns Ltd.
    (In re Loral Space & Commc'ns Ltd.), 342 B.R. 132, 140 (S.D.N.Y. 2006).....................14

In re Mirant Corp., No. 03-46590DML11, 2007 WL 1258932
    (N.D. Tex. Apr. 27, 2007)...............................................................29

Norton v. Sam's Club, 145 F.3d 114 (2d Cir. 1998) .................................................2

Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp.
    (In re Adelphia Commc'ns Corp.), 371 B.R. 660 (S.D.N.Y. 2007) .....................3

Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v.
    Official Comm. of Unsecured Creditors of LTV Steel Co.
    (In re Chateaugay Corp.), 988 F.2d 322 (2d Cir. 1993)....................................10

In re Quigley Co., No. 04-15739 (SMB), 2007 WL 3077310
    (Bankr. S.D.N.Y. Oct. 23, 2007) (Bernstein, C.J.) .....................................22, 24

Regency Savings Bank, F.S.B. v. Fours on Seventh, LLC
    (In re Fours on Seventh, LLC), 251 B.R. 784 (S.D.N.Y. 2000) .................................12, 13

## TABLE OF AUTHORITIES (cont'd.)

**Page**

Resolution Trust Corp. v. Best Prods. Co.
(In re Best Prods. Co.), 177 B.R. 791 (S.D.N.Y. 1995)...................................10, 12, 14, 15

Robinson v. Sunbeam Corp. (In re Sunbeam Corp.), No. 03 Civ. 536 (DC),
2004 WL 136941 (S.D.N.Y. Jan. 27, 2004) ...................................................................3, 15

S&P, Inc. v. Pfeifer, 189 B.R. 173 (N.D. Ind. 1995).........................................................27

Shugrue v. Air Line Pilots Ass'n, Int'l.
(In re Ionosphere Clubs, Inc.), 922 F.2d 984 (2d Cir 1990),
cert. denied, 502 U.S. 808 (1991) .........................................................................................3

Six W. Retail Acquisition, Inc. v. In re Loews Cineplex Entm't Corp.,
286 B.R. 239 (S.D.N.Y. 2002)......................................................................................10, 12

In re Smith, 123 B.R. 863 (Bankr. C.D. Cal. 1991)...........................................................18

In re Spirited, Inc., 23 B.R. 1004 (Bankr. E.D. Pa. 1982) ...............................................17

In re Texaco, Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988)...................................................29

Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco),
92 B.R. 38 (S.D.N.Y. 1988)...............................................................................................11

UNARCO Bloomington Factory Workers v. UNR Indus., Inc.,
124 B.R. 268 (N.D. Ill. 1990) ...........................................................................................22

U.S. v. Mitchell, 966 F.2d 92 (2d Cir. 1992).......................................................................3

U.S. Trustee v. Andover Togs, Inc. (In re Andover Togs, Inc.),
Nos. 96 Civ 7601 (DAB) and 97 Civ 6710 (DAB),
2001 WL 262605 (S.D.N.Y. Mar. 15, 2001) ......................................................................3

Upstream Energy Servs. Enron Corp. (In re Enron Corp.),
326 B.R. 497 (S.D.N.Y. 2005)................................................................................10, 11, 15

Vienna Park Props. v. United Postal Savs. Ass'n.
(In re Vienna Park Props.), 976 F.2d 106 (2d Cir. 1992) ..................................................18

Whitman Corp. v. Home Holdings, Inc. (In re Home Holdings, Inc.),
No. 98 Civ 5690 (DAB), 2001 WL 262750 (S.D.N.Y. Mar. 16, 2001) ............................11

**TABLE OF AUTHORITIES (cont'd.)**

**Page**

In re WorldCom, Inc., No. 02-13533 (AJG), 2003 WL 23861928
    (Bankr. S.D.N.Y. Oct. 31, 2003) ........................................................................21

**FEDERAL STATUTES**

11 U.S.C. § 1101 ....................................................................................................10

11 U.S.C. § 1122 ...............................................................................................22, 23

11 U.S.C. § 1123 ...........................................................................................23, 24, 25

11 U.S.C. § 1124 .........................................................................................2, 9, 22, 29

11 U.S.C. § 1129(a)(7) ........................................................................................29, 30

11 U.S.C. § 1129(a)(8) ............................................................................................... 2

11 U.S.C. § 1129(a)(11) .............................................................................................25

11 U.S.C. § 1129(b)(1) ............................................................................................... 2

11 U.S.C. § 524 .........................................................................................19, 20, 21

**STATE STATUTES**

N.Y. Debt. & Cred. Law § 273-a ...............................................................................19

**MISCELLANEOUS**

4 Collier on Bankruptcy ¶ 524.07[2]
    (Alan N. Resnick and Henry J. Sommer eds., 15th ed. rev. 2008) ..................................20

7 Collier on Bankruptcy ¶ 1122.03[1][a]
    (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev. 2008)......................................22

7 Collier on Bankruptcy ¶ 1129.03[7][b]
    (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev. 2008)......................................29

7 Collier on Bankruptcy ¶ 1129.03[11]
    (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev. 2008)......................................27

Appellee Dana Corporation ("Dana") and the other above-captioned reorganized debtors (collectively with Dana, the "Reorganized Debtors" or "Appellees") respectfully file this brief: (i) in support of the Motion of Appellees to Dismiss as Moot the Consolidated Appeals of Ad Hoc Committee of Asbestos Personal Injury Claimants and José Angel Valdez, filed by the Appellees contemporaneously herewith (the "Motion to Dismiss"); and (ii) in opposition to the consolidated appeals (together, the "Consolidated Appeal") by (a) the Ad Hoc Committee of Asbestos Personal Injury Claimants (the "Ad Hoc Committee") and (b) José Angel Valdez ("Valdez" and, together with the Ad Hoc Committee, "Appellants") of the Order Confirming the Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession (the "Confirmation Order"),[1] entered on December 26, 2007, by Judge Burton R. Lifland, United States Bankruptcy Judge for the Southern District of New York (the "Bankruptcy Court").

## ISSUES PRESENTED

As a threshold matter, because the unstayed Confirmation Order has resulted in a comprehensive change in the Reorganized Debtors' circumstances and the Plan has been substantially consummated, the Consolidated Appeal is equitably moot and, therefore, must be dismissed.

---

[1]    See Designation of Items to Be Included in Record on Appeal (Docket No. 2), filed by the Ad Hoc Committee (the "Ad Hoc Record"), R.58; Designation of Content of Record on Appeal (Docket No. 2; Case No. 1:08-cv-1038 (PAC)), filed by Valdez (the "Valdez Record"), R.30. All citations in the form "R.___" refer to the Ad Hoc Record, unless otherwise noted. All citations will refer to the record on appeal when possible. All docket citations herein refer to the docket of Case No. 1:08-cv-1037 (PAC), unless otherwise noted. For purposes of consistency and ease of reference, all citations to the Confirmation Order in this brief will be to the slip copy issued by the Bankruptcy Court, available at In re Dana Corp., No. 06-10354 (BRL), 2007 WL 4589331 (Bankr. S.D.N.Y. Dec. 26, 2007). Capitalized terms not defined herein have the meanings given to them in the Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession (as amended, modified and supplemented, the "Plan"). See R.12.

On the merits of the Consolidated Appeal, Appellants' opening briefs raise eight discrete issues, which are identified in each of Appellants' opening briefs with some minor variation.[2]

### STANDARD OF REVIEW

With respect to the Motion to Dismiss, "[t]he Second Circuit has indicated that it is appropriate to scrutinize appeals [of a confirmation order] for mootness in two situations:  when an unstayed order has resulted in a comprehensive change in circumstances, and when a reorganization is substantially consummated."[3]  In such circumstances, plan implementation

---

[2]      In its Statement of Issues on Appeal (Docket No. 2, at Attachment 1) (the "Ad Hoc Statement of Issues"), the Ad Hoc Committee identified 28 issues on appeal.  In his Statement of Issues on Appeal  (Case No. 1:08-cv-1038 (PAC) (the "Valdez Docket"), at Docket No. 4) (the "Valdez Statement of Issues"), Valdez identified 24 issues on appeal.  The opening brief filed by the Ad Hoc Committee (Docket No. 9) (the "Ad Hoc Brief"), however, presented only six issues on appeal and the opening brief filed by Valdez (Valdez Docket No. 11) (the "Valdez Brief") presented only five issues (briefing four).  In the Second Circuit, issues identified in an appellant's statement of issues on appeal that are not briefed by the appellant are considered waived.  See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("[i]ssues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); Frank v. U.S., 78 F.3d 815, 832-33 (2d Cir. 1996) (same), vacated on other grounds, 521 U.S. 1114 (1997).  Accordingly, the Reorganized Debtors respond herein only to those issues actually briefed and not waived by Appellants.

Further, although the Valdez Brief references the issue of whether the requirements of section 1129(a)(8) of the Bankruptcy Code were met with respect to the Plan, neither Valdez nor the Ad Hoc Committee briefed this issue.  Accordingly, this issue is similarly waived on appeal.  In any event, Valdez's assertion that the Bankruptcy Court held that the requirements of section 1129(a)(8) of the Bankruptcy Code had been satisfied is factually incorrect.  Rather, the Bankruptcy Court found that section 1129(a)(8) of the Bankruptcy Code had not been satisfied, but that the Plan nevertheless was "confirmable because it satisfies section 1129(b)(1) of the Bankruptcy Code with respect to . . . non-accepting Classes of Claims and Interests."  See Confirmation Order, 2007 WL 4589331, at *9.  Neither the Ad Hoc Committee nor Valdez has appealed the Confirmation Order on grounds that the Bankruptcy Court mistakenly applied Section 1129(b)(1).  Accordingly, the Consolidated Appeal on this issue should be dismissed.

Finally, of the issues briefed by Appellants, there exists substantial overlap with respect to the issues of (a) the alleged impairment of Asbestos Personal Injury Claims under section 1124 of the Bankruptcy Code, (b) classification of claims under section 1122 of the Bankruptcy Code and (c) the feasibility of the Plan within the meaning of section 1129(a)(11) of the Bankruptcy Code.  The Reorganized Debtors have consolidated their responses to the overlapping issues herein.  The Ad Hoc Brief presents the issue of the alleged impairment of Asbestos Personal Injury Claims more obliquely than does the Valdez Brief.  If the Ad Hoc Committee intends to argue that the Bankruptcy Court erred when it deemed Class 3 to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code (which section provides that (a) unimpaired classes of claims under a plan of reorganization are conclusively presumed to accept the plan and (b) the solicitation of votes from holders of claims in unimpaired classes is unnecessary), the threshold question of impairment would be dispositive.  Accordingly, the substance of the issue presented by the Ad Hoc Brief (and the Ad Hoc Committee's briefing of the issue at pages 7 through 14 of the Ad Hoc Brief) mirrors Valdez's more straightforward presentation of the impairment question.  See Ad Hoc Brief, at 1; Valdez Brief, at 1.

[3]      Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) (internal citations and quotations omitted).

"raises a strong presumption in favor of dismissing an appeal as moot."[4]  Once a plan of

reorganization has been substantially consummated, an appeal of the order confirming the plan

will be dismissed as moot unless the appellant can rebut this presumption.[5]

On the merits of the appeal, the Bankruptcy Court's findings of fact must be accepted

unless clearly erroneous, while its conclusions of law are reviewed *de novo*.[6]  A finding of fact is

clearly erroneous only when, "although there is evidence to support it, the reviewing court on the

entire evidence is left with the definite and firm conviction that a mistake has been committed."[7]

This Court reviews matters falling within the discretion of the Bankruptcy Court under

the "abuse of discretion" standard.[8]  An abuse of discretion may be found "only . . . where (1) the

decision was based on an erroneous conclusion of law; (2) the record contains _no_ evidence on

which the judge could have based his decision; or (3) supposed facts found are erroneous as

found."[9]

---

[4]     Robinson v. Sunbeam Corp. (In re Sunbeam Corp.), No. 03 Civ. 536 (DC), 2004 WL 136941, at *2 (S.D.N.Y. Jan. 27, 2004) (internal citation omitted).

[5]     See Kenton County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.), 374 B.R. 516, 522 (S.D.N.Y. 2007).

[6]     See Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 988-89 (2d Cir 1990), cert. denied, 502 U.S. 808 (1991).

[7]     U.S. v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992); see also Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 371 B.R. 660, 665 (S.D.N.Y. 2007) ("If the bankruptcy court's factual findings are plausible in light of the record viewed in its entirety, [the district court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (quotation omitted).

[8]     See Keating v. U.S. Lines, Inc. (In re U.S. Lines, Inc.), No. 04 Civ. 6614 (LTS), 2006 WL 1559237, at *7 (S.D.N.Y. Jun. 7, 2006).

[9]     U.S. Trustee v. Andover Togs, Inc. (In re Andover Togs, Inc.)., Nos. 96 Civ. 7601 (DAB) and 97 Civ. 6710 (DAB), 2001 WL 262605, at *2 (S.D.N.Y. Mar. 15, 2001) (emphasis added).

## STATEMENT OF THE CASE

### Preliminary Statement

The Consolidated Appeal arises from the Bankruptcy Court's confirmation of the Plan. The Plan — which became effective on January 31, 2008 (the "Effective Date") — was the successful result of nearly two years of painstaking restructuring initiatives.  Since the Effective Date, the Reorganized Debtors have taken hundreds of integral and irreversible measures to implement and substantially consummate the Plan.[10]  Appellants — members or representatives of a creditor constituency left *wholly unaffected* by the Reorganized Debtors' restructuring — seek to undo the Reorganized Debtors' achievement through willful mischaracterization of the Plan and its treatment of Asbestos Personal Injury Claims.

This perverse effort — the attempt to unravel a plan that reinstates Asbestos Personal Injury Claims against a significantly healthier company than existed prepetition — is fatally flawed.  As a threshold matter, the Consolidated Appeal must be dismissed as equitably moot. Substantial consummation of the innumerable, interrelated transactions necessary to implement the Plan, taken in reliance on the unstayed Confirmation Order, renders it impossible for this or any other court to undo the restructuring transactions that are the subject of the Consolidated Appeal.  The comprehensive change in the Reorganized Debtors' circumstances since the Effective Date requires dismissal of the Consolidated Appeal.

Moreover, even if dismissal of the Consolidated Appeal were not required, this Court should affirm the Confirmation Order inasmuch as none of Appellants' arguments withstand scrutiny.

---

[10]    In so doing, the Reorganized Debtors became (a) the first multi-billion dollar enterprise to emerge from chapter 11 under the abbreviated timetable established by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 and (b) the first debtors of any significant size to emerge from chapter 11 with full funding since the collapse of the credit markets in late 2007.

**Procedural History**

On the Petition Date, the Reorganized Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On October 23, 2007, the Reorganized Debtors filed the Plan and a related Disclosure Statement.  The Court approved the Disclosure Statement by an order (R.13) entered on the same date and, thereafter, the Reorganized Debtors commenced soliciting votes on the Plan.  The Plan garnered overwhelming support from the Reorganized Debtors' creditors.[11]

A three-day evidentiary hearing to consider Plan confirmation was held on December 10 through December 12, 2007 (the "Confirmation Hearing").  Of the eleven timely objections to confirmation of the Plan that were filed by parties in interest, only two — filed by Appellants — were prosecuted at the Confirmation Hearing.[12]  At the Confirmation Hearing, the Bankruptcy Court heard testimony from 10 witnesses, all of whom were subject to either direct or cross examination from counsel for Appellants.  The overwhelming majority of this testimony was devoted to the merits of the Asbestos Plan Objections.  At the conclusion of the Confirmation Hearing, the Bankruptcy Court (i) announced its decision to overrule the Asbestos Plan Objections and confirm the Plan and (ii) requested that the Reorganized Debtors submit a proposed form of order.  Prior to that submission, the Reorganized Debtors circulated the form of order to Appellants and invited comments thereon.  The Ad Hoc Committee indicated that it had

---

[11]    See R.40, at ¶ 7 (Declaration of Jeffrey B. Ellman Certifying the Tabulation of Votes on, and the Results of Voting With Respect To, the Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession) (the "Ellman Declaration").  The Ellman Declaration certified that (a) the Reorganized Debtors' unions had unanimously voted to accept the Plan and (b) the general unsecured creditors of the Reorganized Debtors voted overwhelmingly in favor of the Plan, with 96% of such creditors in number (1710 votes) and 98% of such creditors in amount (voting over $1.4 billion in claims) voting to accept the Plan.

[12]    See R.27 (Ad Hoc Committee of Asbestos Personal Injury Claimants' Objection to the Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession) (the "Ad Hoc Objection"); and R.31 (Objection of José Angel Valdez to Third Amended Joint Plan of Reorganization of Debtors and Debtors in Possession) (together with the Ad Hoc Objection, the "Asbestos Plan Objections").

no comment on the proposed order, and Valdez did not respond to the Reorganized Debtors' invitation.  On December 26, 2007, the Court entered the Confirmation Order.

On January 3 and January 4, 2008, respectively, Appellants filed their Notices of Appeal (R.59; R.60) from the Confirmation Order.  At no time did either Appellant make an application, either in the Bankruptcy Court or in this Court, for a stay of the Confirmation Order during pendency of the appeal, nor did either Appellant ever file a motion to expedite consideration of the appeal.

## Statement Of Facts

### A.    The Plan Has Been Substantially Consummated

The Confirmation Order was entered on December 26, 2007, and the Effective Date occurred on January 31, 2008.  As described at length in the Declaration of Corinne Ball in support of the Motion to Dismiss (the "Ball Declaration"), filed contemporaneously herewith and incorporated herein by reference, on and after the Effective Date, the Reorganized Debtors have taken the following actions, among numerous others, in accordance with the Plan and the Confirmation Order:

- all shares of Dana's outstanding Old Common Stock have been canceled;

- New Dana Holdco sold (1) 2,500,000 shares of New Series A Preferred Stock to Centerbridge Capital Partners, L.P. ("Centerbridge") for $250 million and (2) 5,400,000 shares of New Series B Preferred Stock to 23 investment funds for $540 million;

- To date, New Dana Holdco has issued approximately 95 million shares of New Dana Holdco Common Stock for the benefit of certain holders of general unsecured claims;[13]

---

[13]    Of the shares of New Dana Holdco Common Stock issued:  (a) over 67 million shares have been distributed to over 2,200 holders of allowed general unsecured claims (including vendors, bondholders, employees, retirees and governmental agencies); and (b) approximately 27.6 million shares were issued to an escrow account as a reserve for future distribution to holders of allowed general unsecured claims.

- The Reorganized Debtors have made cash distributions exceeding (1) $31 million to more than 3,000 different holders of allowed secured claims, allowed priority claims and allowed administrative claims and (2) $38 million to over 1,700 holders of Allowed Ineligible Unsecured Claims;

- On February 1, 2008, shares of New Dana Holdco Common Stock began trading publicly on the NYSE under the ticker symbol "DAN";

- New Dana Holdco and certain of the Reorganized Debtors have entered into, and the lenders have funded, the $2.0 billion Exit Facility;[14] and

- The Reorganized Debtors made cash payments of: (1) $732.5 million to VEBA trusts for the benefit of retirees formerly represented by the Unions (the "Union Retirees");[15] (2) approximately $54 million as the final payment to fully fund the VEBA trust for the Reorganized Debtors' non-union retirees; and (3) $260,000 to settle all non-pension retiree benefit claims with the Boilermaker Retirees (as defined in the Ball Declaration).

## B.     Dana's Asbestos Liability Is Low And Declining

The Reorganized Debtors' chapter 11 cases were not filed as a result of, or to address, Dana's asbestos liabilities (R.6, at ¶ 7; R.44, at ¶ 10). Having steadily declined since 2002, the number of active pending Asbestos Personal Injury Claims stood at approximately 35,000 as of December 2007.[16] Dana has seen a complementary reduction in its defense and indemnity costs.[17]

---

[14]     The Exit Facility consists of a $650 million asset-based revolving credit facility and a $1.35 billion senior secured term loan facility (the "Term Loan Facility"). The entire amount of the Term Loan Facility was borrowed on the Effective Date, and proceeds from the Term Loan Facility and existing cash were used to repay amounts outstanding under the DIP Credit Agreement (terminating the DIP Credit Agreement and releasing all liens securing it). The remainder of the proceeds from the Exit Facility were used to make other payments required for the Reorganized Debtors' exit from bankruptcy, and such proceeds continue to provide necessary levels of liquidity to fund New Dana Holdco's working capital requirements.

[15]     Of this $732.5 million, approximately $446.2 million was used to fund a VEBA trust for Union Retirees formerly represented by the UAW and approximately $286.3 million was used to fund a VEBA trust for Union Retirees formerly represented by the USW. Pursuant to the Union Settlement Agreements, as of the Effective Date, the Reorganized Debtors ceased to provide non-pension retiree benefits to more than 14,000 Union Retirees and their surviving spouses and eligible dependents.

[16]     Prior to the Petition Date, the number of Asbestos Personal Injury Claims filed annually against Dana had been steadily declining (from a high of 63,081 in 2002 down to 11,582 in 2005) while the number of such claims resolved by Dana without payment had been steadily increasing (from 7,922 in 2001 to 66,622 in 2005). Owing to, among other things, tort reform and other initiatives enacted in various states in which Asbestos Personal Injury Claims against reorganized Dana ("Reorganized Dana") are pending, more than 75% of the Asbestos Personal Injury Claims against Reorganized Dana currently reside on inactive dockets. See R.62 (Transcript of Confirmation

(continued)

Reorganized Dana is solvent and expected to remain solvent for the foreseeable future.[18]

Specifically, on the Effective Date, Reorganized Dana retained *$1.497 billion* in insurance

resources[19] and has an initial balance sheet of $195 million in *unencumbered* assets.[20]

---

(continued)

Hearing, December 10, 2007 (the "12/10 Transcript")), at 245:17-245:20, 246:4-246:24, 247:2-247:7, 249:4-251:18; R.69 (Debtors' Witness Exhibits 23, 25, 30 and 31); R.44, at ¶ 28; R.63 (Transcript of Confirmation Hearing, December 11, 2007 (the "12/11 Transcript")), at 20:4-20:6. Asbestos Personal Injury Claims classified as "inactive" are unlikely to be the subject of litigation or payment unless and until the holders of such claims (each, an "Asbestos Personal Injury Claimant") develops an asbestos-related malignancy. See R.63 (12/11 Transcript, at 17:7-19:3).

[17]      See R.62 (12/10 Transcript, at 239:13-239:24); R.63 (12/11 Transcript, at 215:3-215:6); R.44, at ¶¶ 35-36. Looking forward, the number of claims that Dana will be required to defend, the percentage of those claims it ultimately pays and the sums that it will be required to spend to defend and resolve cases will continue to decline or at worst remain at their relatively low 2005 levels for the foreseeable future. See R.62 (12/10 Transcript, at 251:21-252:15); R.44, at ¶¶ 33-35, 37. This limited exposure is the result of Dana's important and distinct advantages compared to other companies with asbestos liabilities:  (a) the product (automotive gaskets) that has led to the overwhelming majority of claims against Dana was used in far fewer types of settings, and by far fewer categories of workers, than were the products of many other defendants; (b) Dana's gaskets could be and were used without releasing hazardous levels of asbestos fibers; and (c) exposure to chrysotile asbestos, the type of fiber incorporated into the Dana gaskets at issue, is generally insufficient to cause mesothelioma, particularly at the low levels of exposure (if any) arising from use of automotive gaskets. See R.62 (12/10 Transcript, at 233:20-235:11); R.44, at ¶¶ 11, 14, 38; R.69 (Debtors' Witness Exhibit 29).

[18]      See R.41, at ¶¶ 49, 59-63; R.44 (Attachment, *passim*); R.45, at ¶¶ 14, 28, 38; R.68 (Debtors' Witness Exhibit 7; Debtors' Witness Exhibit 8 (establishing Reorganized Dana's ability to satisfy Asbestos Personal Injury Claims over a 45-year time horizon)); R.62 (12/10 Transcript, at 174:13-183:17). Dr. Robin Cantor (an expert in econometrics, risk assessment, forecasting and asbestos claims analysis called by the Reorganized Debtors) forecast that Reorganized Dana's combined defense and indemnity costs for Asbestos Personal Injury Claims for the 15-year period after emergence from bankruptcy will most likely total between $133.0 and $200 million (not discounted for present value). See R.69 (Debtors' Witness Exhibit 34, at 1; Debtors' Witness Exhibit 35, at 3). Dr. Cantor further forecast that combined defense and indemnity costs for the period extending through 2049 will most likely total between $182.4 and $291.5 million (not discounted for present value). See R.69 (Debtors' Witness Exhibit 35, at 3). Employing a somewhat different methodology, Dr. Thomas Vasquez (an expert called by Appellants) forecast that Dana's combined defense and indemnity costs for the period extending through 2049 will likely total between $0.7 billion and $1.1 billion (again, not discounted for present value) (R.66, at 3). Dr. Cantor testified, however, that, by adopting Dr. Vasquez' methodology and then applying assumptions to reflect the improved defense litigation environment that Dr. Vasquez admitted now exists, Dr. Vasquez' forecast for Reorganized Dana's asbestos liabilities decreased to a range between $153 million and $244 million. See R.63 (12/11 Transcript, at 99:7–103:2; 177:15–177:20); R.69 (Debtors' Witness Exhibit 35, at 4).

[19]      Reorganized Dana retains approximately $1.497 billion in available aggregate product liability limits under commercial general liability insurance coverage from various foreign and domestic insurance carriers to help pay future asbestos defense and liability payments. See R.63 (12/11 Transcript, at 146:14-149:18); R.46, at ¶¶ 5-11. Some $1.238 billion of this insurance is already subject to "coverage-in-place" agreements establishing the manner in which the insurance company will pay Asbestos Personal Injury Claims. See R.63 (12/11 Transcript, at 149:16-150:4, 150:12-151:14); R.46, at ¶¶ 12-17. Over the range of reasonable forecasts of Reorganized Dana's future asbestos-related liabilities, 50% or more of those liabilities will be promptly paid by Reorganized Dana's insurers, and the percentage increases as the liability increases. See R.62 (12/10 Transcript, at 185:13-185:15); R.63 (12/11 Transcript, at 157:9-159:2); R.47, at ¶¶ 7-9.

[20]      See R.62 (12/10 Transcript, at 138:10-139:3; Testimony of Michael Burns) (stating, among other things, that "the assets of Reorganized Dana are going to be carved out from the [Exit Facility] lien pool.").

(representing nominal amounts for the next five years and present-valued amounts for years six through 45 at a 6% discount rate).[21]

Importantly, every legal and equitable right possessed by Appellants prepetition has been preserved under the Plan. Their claims against Reorganized Dana were not released under the Plan.[22] The Plan does not enjoin Appellants from taking any action, suing *any* party for *any* cause of action or litigating or settling any claim they may have;[23] and Appellants may continue to pursue their claims in the tort system against a now-solvent reorganized entity that retains the same insurance resources as existed prepetition.[24] The Plan simply "Reinstates" Asbestos Personal Injury Claims against a significantly healthier Reorganized Dana.[25]

## ARGUMENT

I.   **BECAUSE THE PLAN HAS BEEN SUBSTANTIALLY CONSUMMATED, THE CONSOLIDATED APPEAL MUST BE DISMISSED AS EQUITABLY MOOT**

The Consolidated Appeal must be dismissed because it is equitably moot. "Equitable mootness" is a "prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented." Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber

---

[21]    See R.68 (Debtors' Witness Exhibit 7); R.62 (12/10 Transcript, at 180:12-181:17).

[22]    See R.12 (Plan), at Section IV.E.5.b (carving Asbestos Personal Injury Claims out from the Plan's general releases by holders of Claims or Interests).

[23]    See R.12 (Plan), at Section IV.E.5.c (carving Asbestos Personal Injury Claims out from the injunctions established pursuant to the Plan).

[24]    See R.12 (Plan) at Section V.H.3 (providing that all Asbestos Personal Injury Claims will be liquidated, determined or otherwise resolved in the appropriate non-bankruptcy forum).

[25]    See R.12 (Plan), at Section II.B.6. Section II.B.6 of the Plan provides that "[o]n the Effective Date, the Asbestos Personal Injury Claims will be Reinstated." Section I.A.164 of the Plan provides, in relevant part:

> "Reinstated" or "Reinstatement" means rendering a Claim or Interest unimpaired within the meaning of section 1124 of the Bankruptcy Code. Unless the Plan specifies a particular method of Reinstatement, when the Plan provides that a Claim or Interest will be Reinstated, such Claim or Interest will be Reinstated, at Dana's sole discretion, in accordance with one of the following: (a) The legal, equitable and contractual rights to which such Claim or Interest entitles the holder will be unaltered[.]

R.12, at § I.A.164. Owing to the unique nature of the liabilities asserted, as well as substantial insurance coverage existing entirely for their benefit, Asbestos Personal Injury Claims were classified separately from all other claims and interests against the Reorganized Debtors. See R.12, at Section II.B.6.

Network, Inc.), 416 F.3d 136, 144 (2d Cir. 2005).  Pursuant to this doctrine, "[a]n appeal [of a

confirmation order] should . . . be dismissed as moot when, even though effective relief could

conceivably be fashioned, implementation of that relief would be inequitable."  Id. at 143

(quoting Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official

Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.), 988 F.2d 322, 325

(2d Cir. 1993)).

> ### A.    The Reorganized Debtors' Plan
> ### Has Been Substantially Consummated

The Reorganized Debtors have substantially consummated the Plan.[26]  Relevant

precedent in this District conclusively establishes that, in light of the various irreversible actions

taken by the Reorganized Debtors after the Effective Date (as described above and in the Ball

Declaration), the Plan has been substantially consummated.  See, e.g., Upstream Energy Servs. v.

Enron Corp. (In re Enron Corp.), 326 B.R. 497, 502 (S.D.N.Y. 2005) (debtors' plan substantially

consummated where "[a]ll property proposed by the Plan to be transferred has been transferred

and all equity interests in [the debtors] proposed to be cancelled have been cancelled.  The

reorganized debtor entities have assumed control of substantially all of the property covered by

the Plan . . . [and] distributions have been made in accordance with the plan . . . .").[27]

---

[26]    See Ball Declaration, *passim*. "Substantial consummation" is defined in the Bankruptcy Code as:
"(a) transfer of all the property proposed by the plan to be transferred; (b) assumption by the debtor or by the
successor to the debtor under the plan of the business or of the management of all or substantially all of the property
dealt with by the plan; and (c) commencement of distributions under the plan."  11 U.S.C. § 1101(2).

[27]    See also, e.g., Six W. Retail Acquisition, Inc. v. In re Loews Cineplex Entm't Corp., 286 B.R. 239, 245
(S.D.N.Y. 2002) (plan substantially consummated after cancellation of publicly traded stock, issuance of new
equity, termination of debtor-in-possession financing facility and closing on new creditor facility, filing of new
certificate of incorporation for reorganized debtors and payment of certain allowed claims in cash); Resolution Trust
Corp. v. Best Prods. Co. (In re Best Prods. Co.), 177 B.R. 791, 797 (S.D.N.Y. 1995) (plan substantially
consummated where post-confirmation events included:  distribution of cash, stock and warrants; reliance of transfer
agent firm and investor relations firm on issuance of common stock; listing of common stock; distribution of
promissory notes; appointment of new board of directors; merger and dissolution of various entities; termination of
debtor in possession financing; initiation of exit financing facility; and dismissal and settlement of actions pursuant
to plan).

**B.**     **Appellants Cannot Rebut The Presumption Of Mootness**

Because the Reorganized Debtors have substantially consummated the Plan, the law presumes that the Consolidated Appeal is equitably moot.  See Whitman Corp. v. Home Holdings, Inc. (In re Home Holdings, Inc.), No. 98 Civ 5690 (DAB), 2001 WL 262750, at *5 (S.D.N.Y. Mar. 16, 2001) (substantial consummation "raises a strong presumption in favor of dismissing an appeal as moot").  To overcome this presumption, Appellants must demonstrate *each* of the following five factors:

(1)     the court can still order some effective relief;

(2)     such relief will not affect the re-emergence of the debtor as a revitalized corporate entity;

(3)     such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court;

(4)     the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and

(5)     the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 952-53 (2d Cir. 1993) ("Chateaugay") (internal quotations and citations omitted); see also Enron Corp., 326 B.R. at 503 ("substantial consummation will not moot an appeal if *all* of the [Chateaugay factors] exist") (emphasis added).  Appellants cannot meet their burden with respect to even one, much less all, of the Chateaugay factors.

**1.     The Court Cannot Order Effective Relief**
**(Chateaugay Factor 1)**

In light of the substantial consummation of the Plan, Appellants are unable to show that "the court can . . . order some effective relief."  Chateaugay, 10 F.3d at 952-53; see also Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco), 92 B.R. 38, 46 (S.D.N.Y. 1988) ("[I]t is

inherently improbable, once there has been 'substantial consummation,' that an appellate court will be able to fashion effective relief.") (citations omitted).  If the Court overturns the Confirmation Order and belatedly revokes the Plan, *all* parties must be returned to the *status quo* that existed just prior to the Effective Date.[28]

Here, reinstatement of the *status quo* — which would require, among other things, disgorgement by creditors of all cash and stock distributions made by the Reorganized Debtors — is impossible.  Creditors have made an untold number of transactions involving the New Dana Holdco Common Stock, which has been trading on the NYSE since February 1, 2008, and the Reorganized Debtors have made thousands of cash distributions.  Seeking to undo these transactions is impossible and grossly inequitable.[29]

Further, the parties funding the Reorganized Debtors' Exit Facility cannot be returned to the *status quo*.  On the Effective Date, the Reorganized Debtors entered into the $2 billion Exit Facility, using the proceeds to (a) repay amounts outstanding under the DIP Credit Agreement; (b) make other payments required for the Reorganized Debtors' exit from bankruptcy; and (c) guaranty levels of liquidity required under the Plan to fund the Reorganized Debtors' working capital requirements.  Because these funds cannot be recouped, the Reorganized Debtors' lenders cannot be returned to the *status quo*.  See Leighton v. E-II Holdings Inc. (In re E-II Holdings

---

[28]    See Loews Cineplex Entertainment Corp., 286 B.R. at 246 (holding that court cannot order effective relief if it cannot return parties to their pre-emergence "*status quo*"); Best Products, 177 B.R. at 806 ("[T]his Court cannot order effective relief because it cannot restore the *status quo*"); Regency Savs. Bank, F.S.B. v. Fours on Seventh, LLC (In re Fours on Seventh, LLC), 251 B.R. 784, 795 (S.D.N.Y. 2000) (appeal moot because appellant "failed to provide — and my research did not reveal — any authority allowing me to reverse the substantially consummated Plan and return the parties to the *status quo*").

[29]    See, e.g., Delta Air Lines, 374 B.R. at 524 (bankruptcy appeal moot where "[t]he distributions . . . have already been made and the securities distributed have likely been traded to parties who are not before the Court and those distributions cannot reasonably be undone"); Bartel v. Bar Harbor Airways, Inc., 196 B.R. 268, 273 (S.D.N.Y. 1996) (appeal of confirmation order moot because "millions of dollars in distributions ha[d] already been made, and these assets and distributions [could not] be recouped"); Best Products, 177 B.R. at 805 (appeal moot where "[i]t is not now possible to reverse the multitude of transactions executed pursuant to the Plan and in reliance on the existence of reorganized Debtors").

Inc.), No. 94 Civ. 2246 (LAP), 1995 WL 387650, at *5 (S.D.N.Y. Jun. 30, 1995) ("the

procurement of financing for the post-bankruptcy corporation" could not be recouped and,

therefore, financers could not be returned to *status quo*).

### 2.    Any Relief Would Unravel Intricate Restructuring Transactions (<u>Chateaugay</u> Factors 2 and 3)

Even if the Court could fashion some relief for Appellants, implementing that relief

would require the impossible:  namely, the unraveling of a highly complex and interrelated set of

restructuring transactions.  As set forth at length in the Ball Declaration, this unraveling would

necessarily include, among other things, the disgorgement of hundreds of millions in cash

payments by the Reorganized Debtors, the resurrection of canceled securities and the unwinding

of countless corporate and new securities transactions (all at incalculable prejudice to the

Reorganized Debtors' creditors, employees, retirees, vendors and investors).  Even if such a

reversal of the Reorganized Debtors' restructuring were possible (which it is not), it would

"create an unmanageable, uncontrollable situation for the bankruptcy court."  <u>Chateaugay</u>,

10 F.3d at 953.

The consequences of returning to chapter 11 — and the possibility of subsequent

liquidation — are precisely why in every instance where courts in the Second Circuit have been

asked to vacate a confirmation order after substantial consummation they have refused to do so.[30]

---

[30]    <u>See</u>, <u>e.g.</u>, <u>Fours on Seventh</u>, 251 B.R. at 793-95 ("[w]here appellant seeks relief that would reverse a substantially consummated plan and thereby impact the debtor's reemergence, courts hold that the appeal is moot."); <u>E-II Holdings</u>, 1995 WL 387650, at *5 ("Even assuming that I could fashion some sort of relief in this case, disruption of the consummated Plan at this point undoubtedly would 'affect re-emergence of the debtor as a revitalized corporate entity' and 'unravel intricate transactions' between the debtor and third parties who relied upon the finality of the Plan.").

### 3.    Parties Who Would Be Impacted By These Appeals Have Not Had Notice (<u>Chateaugay</u> Factor 4)

The Reorganized Debtors' return to bankruptcy would impair the rights of thousands of third parties (<u>e.g.</u>, creditors, vendors, customers and stockholders) who have not received notice of the Consolidated Appeal. The Reorganized Debtors have entered into hundreds of transactions with these parties, each of whom relied on the fact that they had stable contracts with a reorganized, going concern. If the Confirmation Order were vacated, however, the party they contracted with would actually be a chapter 11 debtor, and these third parties would lose the benefit of their contracts with, or the stock they have purchased from or in, the Reorganized Debtors. Appellants have not tried to provide each of these thousands of parties with notice of the Consolidated Appeal, and it is infeasible for each of them to participate.[31]

### 4.    Appellants' Failure To Seek A Stay Of The Confirmation Order Renders Their Appeals Moot (<u>Chateaugay</u> Factor 5)

Finally, the Consolidated Appeal must be dismissed because Appellants made no attempt either to seek a stay of the Confirmation Order or to expedite their appeals. "A chief consideration under <u>Chateaugay</u> . . . is whether the appellant sought a stay of confirmation." <u>Metromedia</u>, 416 F.3d at 144. "[S]eeking a stay is of the utmost importance to an appellant desiring to preserve an appeal of a confirmation order . . . . The Second Circuit insist[s] that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one." <u>Loral Space & Commc'ns</u>, 342 B.R. at 140-41 (quoting <u>Metromedia</u>). Thus, Appellants' failure

---

[31]    <u>See Loral Stockholders Protective Comm. v. Loral Space & Commc'ns Ltd. (In re Loral Space & Commc'ns Ltd.)</u>, 342 B.R. 132, 140 (S.D.N.Y. 2006) (appellants failed to satisfy fourth <u>Chateaugay</u> factor where "those who would be adversely affected include the Reorganized Debtors' creditors, customers, vendors, and others who participated in and relied upon transactions approved in the Reorganization Plan and subsequently completed, and the further transactions taken in reliance thereon [and are not party to the appeal]"); <u>Best Products</u>, 177 B.R. at 805 (emphasizing the "rights of nonparties who entered into transactions with a reorganized debtor who now discover that the entity was, in fact, a chapter 11 debtor"); <u>see also In re Continental Airlines</u>, 91 F.3d 553, 562 (3d Cir. 1996) ("High on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on the finality of the transaction.").

even to attempt to stay consummation of the Plan, or to seek to expedite their respective appeals, in the face of substantial consummation is sufficient reason to dismiss the Consolidated Appeal. See Chateaugay, 10 F.3d at 953 (if appellants do not pursue "with diligence all available remedies to obtain a stay of execution of the [confirmed plan]," it is inequitable to reverse confirmation after substantial consummation has occurred).[32]  Appellants "in taking this appeal [are] in the same procedural posture as a person who shuts the barn door after the horse has been stolen.  It is too late."  Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 383 (2d Cir. 1997).

## II.    IF THE CONSOLIDATED APPEAL IS NOT DISMISSED AS MOOT, THE CONFIRMATION ORDER SHOULD BE AFFIRMED

If this Court does not dismiss the Consolidated Appeal as moot, the Confirmation Order should be affirmed.  Appellants have failed to show clear error in the Confirmation Order's factual findings or legal error in its conclusions of law.

### A.    Asbestos Personal Injury Claims Are Not Impaired By The Plan

The record shows, and the Bankruptcy Court found,[33] that Asbestos Personal Injury Claims were left unimpaired by the Plan.  Under the Plan, on the Effective Date, the legal, equitable and contractual rights of the Asbestos Personal Injury Claimants were Reinstated against a solvent Reorganized Dana in accordance with section 1124(1) of the Bankruptcy Code. Appellants cannot identify *any* provision of the Plan or Confirmation Order that enjoins or releases Asbestos Personal Injury Claims, because the Plan's releases and injunctions are

---

[32]       See also Enron Corp., 326 B.R. at 503 (appeal moot because appellant "failed to diligently pursue a stay of the Confirmation Order, nor did it seek expedited review of its appeal"); E-II Holdings, 1995 WL 387650, at *5 ("The case law is replete with examples where a reviewing court is unwilling to hear an appeal when the appellant fails to take all possible steps to stop consummation of the reorganization plan."); Best Products, 177 B.R. at 805 (appeal moot because court saw "no persuasive reason why [a stay] motion should not have been made"); Sunbeam, 2004 WL 136941, at *3 ("Given the [failure to attempt to stay the confirmation order] by appellants, equitable considerations require dismissal of the appeals.").

[33]       See Confirmation Order, 2007 WL 4589331, at *6.

*expressly inapplicable* to Asbestos Personal Injury Claims.  Under the Plan, Asbestos Personal Injury Claimants may continue to prosecute, and settle if they so choose, precisely the same claims and cases they possessed prior to the Petition Date against the same entities,[34] but the entities now enjoy significantly improved balance sheets and the same insurance resources.

### 1.     The Restructuring Transactions Do Not Impair Asbestos Personal Injury Claims

Appellants' overheated allegations that the Plan and the Restructuring Transactions leave Asbestos Personal Injury Claimants with "ethereal recourse" to an "assetless carcass" willfully misrepresent the facts.  See Ad Hoc Brief, at 6-7.  As the record amply demonstrates, the Restructuring Transactions — i.e., the rehabilitation of a sick company into a healthy one — did not impair Asbestos Personal Injury Claims.

Appellants labor to suggest that a decrease in the nominal value of Reorganized Dana's assets relative to the prepetition value of Dana's assets constitutes impairment of Asbestos Personal Injury Claims Reinstated against the reorganized entity.  Appellants cite no apposite precedent in support of this remarkable proposition.[35]  Moreover, Appellants ignore the fact that the value of assets transferred by Dana pursuant to the Restructuring Transactions was approximately $600 million *less than* the value of the liabilities from which Reorganized Dana was relieved.[36]

---

[34]     As part of the Restructuring Transactions, Dana has merged into Dana Companies LLC, with the surviving, merged entity possessing the same rights and obligations that Dana previously possessed.  See R.12, Exhibit V.C.1; R.41, at ¶ 47.

[35]     Valdez's citation to In re Atlantic Terrace Apartment Corp., 226 B.R. 535 (Bankr. E.D.N.Y. 1998), for the proposition that a debtor's "substitution of assets from which a creditor was entitled to recover constitute[s] impairment" (see Valdez Brief, at 9-10) borders on disingenuous.  Atlantic Terrace does not stand for, or even suggest, any such thing.  Nor could it, as Atlantic Terrace addresses a classic *single-asset* bankruptcy.  See Atlantic Terrace, 226 B.R. at 537.

[36]     See R.41, at ¶ 48 (demonstrating that Dana's liabilities exceeded its assets by $600 million); R.62 (12/10 Transcript, at 163:15-165:10); Confirmation Order, 2007 WL 4589331, at *17.

Indeed, Appellant's myopic focus upon the relative nominal value of Reorganized Dana's assets obscures the larger picture of Reorganized Dana's financial health.  As set forth above, Reorganized Dana is (a) solvent,[37] (b) insured for the majority of future indemnity and defense costs related to Asbestos Personal Injury Claims (the vast majority of which insurance is subject to coverage-in-place agreements)[38] and (c) adequately capitalized, sufficiently liquid, and, now, *completely free of encumbrances* so that valid Asbestos Personal Injury Claims can be satisfied in full as they come due into the foreseeable future, projected out to 45 years.[39]  The evidence proves that Reorganized Dana is significantly healthier than the Dana against which Asbestos Personal Injury Claimants had recourse prepetition.

### 2.    Asbestos Personal Injury Claims Are Not "Impaired By Definition" Under The Plan

Appellants allege that the failure of the Reorganized Debtors to estimate and pay Asbestos Personal Injury Claims pursuant to the Plan — indeed, that Reinstatement itself — renders such claims "impaired by definition."  <u>See</u> Valdez Brief, at 9.  For this novel proposition, Appellants cite <u>In re Spirited, Inc.</u>, 23 B.R. 1004, 1007 (Bankr. E.D. Pa. 1982) ("a class of claims or interests for which no payment is made in a plan is impaired").  This proposition has gained no traction in the 26 years since <u>Spirited</u> was decided, and, given the <u>Spirited</u> court's thorough misapplication of bankruptcy law, that is small wonder.  The court in <u>In re Am. Solar King Corp.</u>, 90 B.R. 808, 821 n.21 (Bankr. W.D. Tex. 1988), conclusively demolished <u>Spirited's</u> holding, stating that "[w]hat should have been but apparently was not obvious to [the <u>Spirited</u>] court is that not all interests by their 'previously established rights' have any right to payment or compensation."  Such is the case here.  Because the Asbestos Personal Injury Claimants do not

---

[37]    <u>See</u> R.68 (Debtors' Witness Exhibit 8).

[38]    <u>See</u> R.41, at ¶ 59; R.46, at ¶¶ 5-29; R.47, at ¶¶ 6-9.

[39]    <u>See</u> R.41, at ¶ 63; R.68 (Debtors' Witness Exhibit 8).

possess undisputed, liquidated claims that carry a right of immediate payment, the Asbestos

Personal Injury Claimants can assert no present "right to compensation" under the Plan.[40]

Indeed, at the heart of this argument is the Asbestos Personal Injury Claimants' evident

desire to receive an immediate windfall.  In light of the fact that Asbestos Personal Injury

Claimants have yet to prove up their claims, the clamoring for *immediate* payment is

unreasonable.  Because no claimant may leverage bankruptcy proceedings to obtain greater

rights against a debtor than that claimant enjoyed prepetition, the Bankruptcy Court did not err in

rejecting the view that Asbestos Personal Injury Claims were "impaired by definition."[41]

### 3. The Plan's Exculpation Provisions Do Not Impair Asbestos Personal Injury Claims

Appellants further allege that the combination of the Restructuring Transactions and the

exculpation provisions set forth at Section IV.E.7 of the Plan work to deny the Asbestos Personal

Injury Claimants recourse to certain remedies (e.g., actions to recover a fraudulent conveyance)

that were available to the Asbestos Personal Injury Claimants prior to the Petition Date.  See Ad

Hoc Brief, at 12-13.  In so arguing, Appellants ignore provisions of the Plan that expressly

---

[40]     The disputed and unliquidated nature of Asbestos Personal Injury Claims similarly distinguishes this matter from In re Smith, 123 B.R. 863, 866-67 (Bankr. C.D. Cal. 1991), also cited by Appellants.  In Smith, the objecting creditors were contract creditors of the debtor with liquidated claims, which status bestowed upon them the "right to have the validity and extent of their claim determined by [the bankruptcy] court; and the further right to receive property or payment equal to the allowed amount of their claim to the extent there are assets in the bankruptcy estate from which payment can be made."  Because the contract creditors in Smith were denied these rights, they were deemed impaired under the debtor's proposed plan of reorganization.  Smith, 123 B.R. at 866.  In sharp contrast, the Asbestos Personal Injury Claimants are personal injury tort creditors of Dana with disputed, unliquidated and contingent claims.  As tort creditors, the Asbestos Personal Injury Claimants enjoy no right identical to that denied the contract creditors in Smith; they do not possess undisputed, liquidated claims that carry a right of immediate payment.  Smith is, thus, inapposite.

[41]     See Vienna Park Props. v. United Postal Savs. Ass'n (In re Vienna Park Props.), 976 F.2d 106, 113 (2d Cir. 1992) (stating that a creditor should not receive "a windfall merely by reason of the happenstance of bankruptcy.") (quoting Butner v. U.S., 440 U.S. 48, 55 (1979)).

preserve Appellants' rights in this respect.  Appellants are specifically carved out of the Plan's injunction and release provisions; they can sue any entity at any time for any reason.[42]

As an example, section 273-a of the New York Debtor and Creditor Law (and any similar laws in other states) preserves the Asbestos Personal Injury Claimants' ability to pursue the Reorganized Debtors in the unlikely event that Reorganized Dana is unable to satisfy judgment upon an Asbestos Personal Injury Claim.  See N.Y. Debt. & Cred. Law § 273–a.[43]  The Plan does not — and could not — attempt to impair the Asbestos Personal Injury Claimants' remedy protected by this statute.  Moreover, the statute of limitations on any action commenced thereunder is tolled until a judgment actually goes unpaid.[44]  Accordingly, the Asbestos Personal Injury Claimants are well-protected against any risk of collection without regard to solvency and the Bankruptcy Court did not err in finding Asbestos Personal Injury Claims unimpaired.

### B.    The Debtors Are Not Obliged To Comply With The Requirements Of Section 524(g) Of The Bankruptcy Code

Appellants argue that the Bankruptcy Court erred in confirming a plan of reorganization that addressed pending and future Asbestos Personal Injury Claims without requiring the Reorganized Debtors to comply with the requirements of section 524(g) of the Bankruptcy Code. See Ad Hoc Brief, at 14-17; Valdez Brief, at 7.  This argument ignores the actual effect of the Restructuring Transactions and is entirely without legal foundation.

Appellants' attempt to equate the Restructuring Transactions with the creation of a section 524(g) trust and an attendant channeling injunction misrepresents the effect of the Plan.

---

[42]    See R.12 (Plan), at Sections IV.E.5.b, IV.E.5.c.

[43]    N.Y. Debt. & Cred. Law § 273–a provides that "[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment."

[44]    See, e.g., Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991) (stating that actions based on N.Y. Debt. & Cred. Law § 273–a do not accrue until after judgment is returned unsatisfied).

None of the hallmarks of a section 524(g) plan are present in the Plan or exhibited by Reorganized Dana.  For example, the Plan creates no trust or channeling injunction similar to those created under section 524(g) of the Bankruptcy Code (indeed, Asbestos Personal Injury Claims are not "channeled" anywhere by the Plan; they are *Reinstated* and may continue to be pursued in the tort system).  Appellants do not even attempt to argue otherwise.  Instead, Appellants repeatedly allege that Reorganized Dana is the analogue of a section 524(g) trust but make no attempt to substantiate that allegation.

Moreover, as counsel for Valdez *conceded on the record* at the Confirmation Hearing, the mere existence of asbestos-related liability did not oblige the Reorganized Debtors to propose a plan of reorganization incorporating a trust under section 524(g) of the Bankruptcy Code.  See R.62 (12/10 Transcript, at 54:17-22) ("Mr. Frank: . . .  And now [the Reorganized Debtors] want to frame the question before the court as whether or not a debtor with asbestos liability can confirm a plan under Chapter 11 of the Bankruptcy Code without resort to . . . [s]ection 524(g). And the reason they want to frame the question that way is because *the answer is obviously yes, they can*.") (emphasis added).[45]  Counsel for Valdez was incontestably correct.  It is well established that "simply because asbestos is involved . . . does not mean that a plan proponent's only recourse is to § 524(g)."  In re Congoleum Corp., 362 B.R. 198, 202 (Bankr. D.N.J. 2007)

---

[45]     The language of the statute itself indicates that section 524(g) of the Bankruptcy Code is not the exclusive means of addressing pending and future asbestos-related liabilities.  Section 524(g)(2)(B)(ii) of the Bankruptcy Code sets forth a series of threshold factual determinations that must be made by the court before issuing a channeling injunction.  One of these determinations is that the pursuit of asbestos demands outside the context of a "524(g) plan" is "likely to threaten the plan's purpose to deal equitably with claims and future demands." See 11 U.S.C. § 524(g)(2)(B)(ii)(III).  "In other words, if the court finds that the viability of the debtor or a successor, after reorganization, would not be seriously threatened by the assertion of [asbestos-related] claims and demands, such a finding should not be made."  4 Collier on Bankruptcy ¶ 524.07[2] (Alan N. Resnick and Henry J. Sommer eds., 15th ed. rev. 2008).  In circumstances such as those before the Bankruptcy Court (i.e., where Asbestos Personal Injury Claims did not threaten the viability of the Reorganized Debtors), not only was section 524(g) of the Bankruptcy Code not the exclusive means of addressing Asbestos Personal Injury Claims, it was not even an *available* means to do so.  Given the statutory language, and his counsel's admission on the record, Valdez's assertion that "Dana cavalierly chose to ignore section 524(g) [of the Bankruptcy Code]" is specious.  See Valdez Brief, at 7.

(citing In re G-I Holdings, Inc., 323 B.R. 583 (Bankr. D.N.J. 2005) (refusing to mandate

imposition of section 524(g) trust when debtor believed it could reorganize without trust)).[46]

### C.   Asbestos Personal Injury Claims Were Properly Classified Under The Plan

Appellants' arguments that Asbestos Personal Injury Claims were improperly classified

are contrary to (1) prevailing law in this and other jurisdictions and (2) the facts of these cases.

Because the Reorganized Debtors' basis for separately classifying all Asbestos Personal Injury

Claims in Class 3 was reasonable, the Bankruptcy Court did not err in finding that the Plan

satisfied the requirements of sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

Plan proponents may separately classify claims "as long as the debtor has a reasonable

basis for the separate classification." In re WorldCom, Inc., No. 02-13533 (AJG),

2003 WL 23861928, at *47 (Bankr. S.D.N.Y. Oct. 31, 2003).  Here, the Debtors properly

classified Asbestos Personal Injury Claims separately because holders of these claims are the

*only* unsecured creditors who can properly look to $1.497 billion in insurance assets and, largely

as a result thereof, could be Reinstated under the Plan (thus receiving *better* treatment than all

other unsecured creditors under the Plan).[47]

Moreover, courts have routinely blessed the discrete classification of asbestos personal

injury claims as reasonable.  See, e.g., In re Armstrong World Indus., Inc., 348 B.R. 136, 159-60

(D. Del. 2006) (finding that, without regard to section 524(g) of the Bankruptcy Code, "it is

appropriate to classify Asbestos Personal Injury Claims . . . in a separate class from Unsecured

---

[46]     Appellants' discussion of In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2005), at page 16 of the Ad Hoc Brief is inexplicable.  The question whether section 105 of the Bankruptcy Code may be employed to extend the channeling injunction imposed by section 524(g) of the Bankruptcy Code to non-debtor entities — which is the gravamen of Appellants' discussion of Combustion Engineering — is thoroughly irrelevant to the Consolidated Appeal.  Certainly, nowhere in Combustion Engineering did the Third Circuit even suggest that section 524(g) of the Bankruptcy Code is the exclusive means to address pending or future asbestos-related personal injury claims in chapter 11.

[47]     See R.62 (12/10 Transcript, at 184:7-184:11); R.63 (12/11 Transcript, at 145:14-145:22); R.46, at ¶¶ 5-11.

Claims. ").[48]  Accordingly, the Reorganized Debtors' separate classification of Asbestos Personal

Injury Claims satisfied the requirements of section 1122(a) of the Bankruptcy Code.

Further, section 1124 of the Bankruptcy Code grants a chapter 11 debtor the ability to

classify general unsecured claims separately when appropriate and advantageous to the debtor.

As a leading treatise has observed:

> If the drafters of the Code had intended that all claims of the same
> type be classified together, every holder of a general unsecured
> claim would be entitled to identical treatment under a plan.  This
> would, for example, make it impossible to make effective use of
> section 1124, which describes the conditions under which a claim
> is unimpaired (and therefore deemed to have accepted the plan
> under section 1126).  Since Congress obviously intended that the
> proponent of a plan have the flexibility to separately classify
> certain general unsecured claims, and thereby leave such claims
> unimpaired if such treatment was advantageous to the debtor, the
> argument that all claims of the same legal nature *must* be included
> within one class is not persuasive.

7 Collier on Bankruptcy ¶ 1122.03[1][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed.

rev. 2008) (emphasis in original).  In these cases, if the Reorganized Debtors could not separately

classify Asbestos Personal Injury Claims for purposes of Reinstatement, the Reorganized

Debtors would be deprived of the benefits of section 1124 of the Bankruptcy Code, a result

contrary to Congressional intent.

Courts within this District have held that, where a bankruptcy court applies the correct

legal standard to the question of claims classification (i.e., section 1122 of the Bankruptcy Code),

a reviewing court "may reverse the bankruptcy court only upon concluding that its factual

findings were clearly erroneous" while bearing in mind "the strong discretionary power that

---

[48]      See also UNARCO Bloomington Factory Workers v. UNR Indus., Inc., 124 B.R. 268, 271 (N.D. Ill. 1990)
(observing without comment that asbestos personal injury claimants had been separately classified under plan); In re
Quigley Co., No. 04-15739 (SMB), 2007 WL 3077310, at *4 (Bankr. S.D.N.Y. Oct. 23, 2007) (Bernstein, C.J.)
(approving separate classification of asbestos personal injury claimants); In re Kaiser Aluminum Corp.,
No. 02-10429 (JKF), 2006 WL 616243, at *6 (Bankr. D. Del. Feb. 6, 2006) (approving classification of asbestos
personal injury claimants separate from other unsecured claims and other personal injury tort claims).

bankruptcy judges possess in classifying claims under § 1122(a)."  See In re Lafayette Hotel
P'ship, 227 B.R. 445, 449 (S.D.N.Y. 1998).  Because the Reorganized Debtors' separate
classification of Asbestos Personal Injury Claims in Class 3 was reasonable, the Bankruptcy
Court properly determined that the Plan satisfied sections 1122(a) and 1123(a)(1) of the
Bankruptcy Code.

> **D.     The Plan Provides Identical Treatment
> To All Asbestos Personal Injury Claims**

Appellants further appeal the Bankruptcy Court's finding that "[i]n accordance with
section 1123(a)(4) of the Bankruptcy Code,[49] the Plan provides the same treatment for each
Claim or Interest of a particular Class unless the holder of such a Claim or Interest has agreed to
less favorable treatment."[50]  Specifically, Appellants suggest that certain postpetition settlements
between the Reorganized Debtors and certain Asbestos Personal Injury Claimants (collectively,
the "Asbestos Settlements") provide the settling claimants with "favored relief" compared to
non-settling claimants.  See Ad Hoc Brief, at 19-22.[51]  Because (1) the Plan provided all
Asbestos Personal Injury Claims with precisely the same treatment — Reinstatement — and
(2) the settling Asbestos Personal Injury Claimants agreed to less, not more, favorable treatment

---

[49]     Section 1123(a)(4) of the Bankruptcy Code requires that "a plan shall . . . provide the same treatment for
each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less
favorable treatment of such particular claim or interest."

[50]     See Confirmation Order, 2007 WL 4589331, at *3.

[51]     The Ad Hoc Committee frequently insinuates that the Asbestos Settlements (the order approving which is
the subject of a discrete appeal by the Ad Hoc Committee pending in this District before Judge Koeltl) constitute
"last-minute undisclosed settlements" and "last-minute secret dealing" on the part of the Reorganized Debtors.
These suggestions ignore the facts.  The material terms of the Asbestos Settlements — including the total number of
claims settled, a breakdown of the types of claims settled by class, the total number of settlement agreements, the
identity of the law firms representing the settling claimants and the expected aggregate settlement amount — have
been fully disclosed to all parties in interest, including the Creditors' Committee (the fiduciary for all unsecured
creditors, including those represented by the Ad Hoc Committee).  The only information regarding the Asbestos
Settlements that was not disclosed was (a) the personally identifying information of the settling claimants, (b) the
individual amounts to be paid to each claimant and (c) the medical and other criteria used to establish the right to
payment.  (R.16, passim)  Thus, the settlements are hardly "secret."

from the Reorganized Debtors, the Bankruptcy Court correctly found that the Plan satisfied section 1123(a)(4) of the Bankruptcy Code.

As noted above, all Asbestos Personal Injury Claims have been Reinstated against the Reorganized Debtors, whatever their present rights might be.[52]  The inconvenient but ultimately dispositive fact for Appellants' argument is that among the rights of such claimants is the right to settle their claims for whatever consideration they deem acceptable.

Indeed, the ability of debtors to settle classified claims without violating section 1123(a)(4) of the Bankruptcy Code is manifest in the statute itself.  Section 1123(a)(4) of the Bankruptcy Code requires a plan to "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  The Asbestos Settlements constitute precisely such "agreement[s] to a less favorable treatment."  Appellants' attempts to characterize the settling Asbestos Personal Injury Claimants as the recipients of "favored relief" and "a greater recovery" (see Ad Hoc Brief, at 21) turn the notion of "settlement" completely on its head.  As Chief Judge Bernstein observed in In re Quigley Co., No. 04-15739 (SMB), 2007 WL 3077310 (Bankr. S.D.N.Y. Oct. 23, 2007), "[a]greeing to settle, instead of litigating a claim, would permit a claimant to be treated differently, such as giving up more valuable consideration, in exchange for the settlement offer.  *This treatment is allowed under § 1123(a)(4).*"  Id. at *6 (emphasis added) (citing In re Dow Corning Corp., 255 B.R. 445, 497 (E.D. Mich. 2000), aff'd in relevant part and remanded in part, 280 F.3d 648 (6th Cir. 2002)).  By forgoing the right to litigate their Asbestos Personal Injury Claims against the Reorganized Debtors (which identical right remains with the unliquidated Asbestos Personal Injury Claims

---

[52]     Section II.B.6 of the Plan provides that all Asbestos Personal Injury Claims will be Reinstated and that the legal, equitable and contractual rights of such claimants will be unaltered.  R.12, §§ I.A.164, II.B.6.

held by Appellants), the settling Asbestos Personal Injury Claimants have agreed to *less* favorable treatment under the Plan, not more, which treatment is expressly contemplated by section 1123(a)(4) of the Bankruptcy Code.[53]

### E. The Plan Is "Feasible" Within The Meaning Of Section 1129(a)(11) Of The Bankruptcy Code

Appellants further appeal the Bankruptcy Court's holding that "[t]he Plan is feasible, within the meaning of section 1129(a)(11) of the Bankruptcy Code . . . . [and the Reorganized] Debtors have demonstrated a reasonable assurance of the Plan's prospects for success." See Confirmation Order, 2007 WL 4589331, at *9. The Valdez Brief, in particular, devotes more than six pages to a parade of hypothetical horribles that, if they came to pass, allegedly would undermine the ability of Reorganized Dana to satisfy all Reinstated Asbestos Personal Injury Claims in full. Conspicuously absent from either Appellant's brief, however, is any discussion of the legal standard for determining "feasibility" pursuant to section 1129(a)(11) of the Bankruptcy Code.

Contrary to Appellants' insinuations, section 1129(a)(11) of the Bankruptcy Code does not require a *guarantee* of a plan's success. Rather, the proper standard is whether the plan offers a "reasonable prospect" of success. See, e.g., Kane v. Johns-Manville Corp., 843 F.2d 636, 649

---

[53]     It is precisely the fact that settling Asbestos Personal Injury Claimants are agreeing to *less* favorable treatment than they would have received under the Plan that distinguishes this case from Combustion Engineering, cited by Appellants. See Ad Hoc Brief, at 21-22. In Combustion Engineering, the Third Circuit took issue not with the mechanism of the two-trust structure at issue in that case (Appellants' suggestion that "[t]he Third Circuit questioned the propriety of such a mechanism" in connection with its discussion of section 1123(a)(4) of the Bankruptcy Code is misleading at best), but with the substantially disparate recoveries to which the respective trust beneficiaries were entitled. In Combustion Engineering, certain asbestos claimants that settled with the debtor prepetition were entitled to an estimated 59% recovery while non-settling and future claimants were expected to receive no more than an 18% recovery. Unsurprisingly, the Third Circuit found the disparity between the two recoveries to suggest non-compliance with section 1123(a)(4) of the Bankruptcy Code and remanded the case for further findings with respect to that issue. See Combustion Engineering, 391 F.3d at 240-41. The matter before this Court, however, bears no resemblance to Combustion Engineering. In these cases, non-settling Asbestos Personal Injury Claimants with valid claims against the Reorganized Debtors will receive a 100% recovery on those claims, while settling claimants will receive *less* than 100%. Appellants' citation to Combustion Engineering is thus inapposite.

(2d Cir. 1988) ("As the Bankruptcy Court correctly stated, the feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").[54]

The record contains more than sufficient evidence to demonstrate the reasonable prospect of the Plan's success.  The evidence supporting Judge Lifland's finding that the Plan was feasible includes:

- Testimony from Ted Stenger (the Reorganized Debtors' chief restructuring officer) regarding, among other things:  (1) the nature and valuation of the unencumbered assets used to initially capitalize Reorganized Dana (see note 21 supra); (2) the solvency of Reorganized Dana in light of its projected asbestos-related liabilities for the next 45 years; (3) the costs of administration of Reorganized Dana; (4) Reorganized Dana's expected environmental liabilities; and (5) how Reorganized Dana's initial capitalization accounts for the possibility that high-side estimates of Reorganized Dana's aggregate asbestos-related liabilities may prove correct;[55]

- Testimony and supporting declarations from Thomas Radcliffe (national counsel for Dana with respect to asbestos litigation) and William Hanlon (counsel for Dana's national defense team) regarding:  (1) methods used to monitor pending Asbestos Personal Injury Claims against Dana as well as Dana's asbestos-related defense and indemnity costs; (2) significant advantages enjoyed by Dana with respect to defending against asbestos-related litigation (see note 17 supra); (3) Dana's litigation strategy with respect to asbestos-related personal injury claims and the recent successes produced by that strategy; (4) Dana's declining defense and indemnity costs in the years preceding the Petition Date (see note 17 supra); (5) the increase in the rate of dismissals of pending asbestos-related claims in the years preceding the Petition Date (see note 16 supra); (6) the negligible impact of the unfavorable verdict against Dana in the Hicks matter (which verdict is currently on appeal); (7) sweeping changes in the tort system that have substantially decreased the number of active Asbestos Personal Injury Claims pending against Dana and increased the number of claims resolved

---

[54]    See also In re Adelphia Bus. Solutions, Inc., 341 B.R. 415, 421 (Bankr. S.D.N.Y. 2003) (same, citing Kane); In re Leslie Fay Cos., 207 B.R. 764, 788 (Bankr. S.D.N.Y. 1997) ("Basically, feasibility involves the question of the emergence of the reorganized debtor in a solvent condition with reasonable prospects of financial stability and success."); In re Drexel Burnham Lambert Group Inc., 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) ("Feasibility does not, nor can it, require the certainty that a reorganized company will succeed.").

[55]    See R.62 (12/10 Transcript, at 174:25-183:17; 215:7-226:21); R.68 (Debtors' Witness Exhibits 7, 8). Appellants suggest that Reorganized Dana's assets are "speculatively-valued" (Valdez Brief, at 13), yet Appellants offer no evidence to rebut Mr. Stenger's testimony with respect to those asset values.  Moreover, Appellants suggest that the anticipated proceeds from the sale of certain environmentally-contaminated real estate will be more than canceled out by the environmental liabilities associated with those properties and carrying costs (Valdez Brief, at 14), yet Appellants ignore the fact that the pro forma operating balance sheet for Reorganized Dana accounted for those costs (R.68 (Debtors' Witness Exhibit 8)).

without payment (see note 16 *supra*); and (8) the extent and amount of reimbursement obligations that Dana has recovered, and Reorganized Dana expects to recover, from former members of the CCR;[56]

- Testimony from, and expert reports prepared by, Dr. Robin Cantor (the Reorganized Debtors' expert on econometrics, risk assessment, forecasting and asbestos claims analysis) demonstrating, among other things: (1) that Reorganized Dana's combined defense and indemnity costs for Asbestos Personal Injury Claims for the 15-year period after emergence from bankruptcy will most likely total between $133.0 and $200 million (not discounted for present value); (2) that combined defense and indemnity costs for the period extending through 2049 will most likely total between $182.4 and $291.5 million (not discounted for present value); and (3) the methodologies, assumptions and data used by Dr. Cantor in arriving at such forecasts;[57] and

- Testimony and a supporting declaration from John Heintz (insurance counsel for the Reorganized Debtors) regarding, among other things: (1) the $1.497 billion in Dana's available insurance coverage for Asbestos Personal Injury Claims (see page 8 *supra*); (2) the $1.238 billion in available insurance that is subject to "coverage-in-place" agreements (see note 19 *supra*); (3) the A or A- ratings enjoyed by over 75% of Dana's insurance agreements; (4) the coverage block system granting Dana substantial flexibility in the allocation of its insurance resources; and (5) the amount of liability for Asbestos Personal Injury Claims that would be subject to insurance coverage (i.e., more than 50%, which percentage increases along with asbestos liabilities).[58]

---

[56]    See R.62 (12/10 Transcript, at 209:20-253:20); R.63 (12/11 Transcript, at 10:13-23:10, 25:1-54:21); R.44 (Declaration of William Hanlon), *passim*; R.45 (Declaration of Thomas Radcliffe), *passim*; R.69 (Debtors' Witness Exhibits 21-25, 29-32, 37-38). The suggestion, at page 14 of the Valdez Brief, that Mr. Hanlon's isolated statement that "Your guess is as good as mine" with respect to the discrete issue of when Dana might expect specific reimbursement payments from GAF Corporation was intended to characterize the Reorganized Debtors' expectations with respect to all such reimbursement payments is thoroughly misleading. See R.63 (12/11 Transcript, at 38:1-38:8).

[57]    See R.63 (12/11 Transcript, at 95:2-103:13); R.69 (Debtors' Witness Exhibits 33B-33Q; 34 (Projection of Dana Corporation's U.S. Asbestos-Related Liability for Pending and Future Claims, February 2007), at 1; 35 (Expert Report of Dr. Robin Cantor, November 2007), at 3; 37). Appellants' invocation of the possibility that the Reorganized Debtors' estimates may ultimately prove mistaken falls well short of demonstrating the infeasibility of the Plan. See S&P, Inc. v. Pfeifer, 189 B.R. 173, 182-83 (N.D. Ind. 1995) ("Because '[t]he test is whether the things which are to be done after confirmation can be done as a practical matter under the facts,' . . . 'the mere potential for failure of the plan is insufficient to disprove feasibility.'") (quoting In re Bergman, 585 F.2d 1171, 1179 (2d Cir. 1978) and Drexel Burnham, 138 B.R. at 762); see also 7 Collier on Bankruptcy ¶ 1129.03[11] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev. 2008) ("Although creditors sometimes press the issue, the possibility of failure is not fatal . . . . The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (quotation omitted).

[58]    See R.63 (12/11 Transcript, at 144:23-159:2); R.46 (Declaration of John E. Heintz), *passim*. Appellants argue that the Reorganized Debtors will "likely face exhaustion/excess level issues, self-insured retention issues, and other insurance defenses that would cause certain [of the] Debtors' insurance carriers to deny coverage with respect to particular claims" as well as certain coverage exclusions (Valdez Brief, at 14). Appellants ignore that the

(continued)

In light of the foregoing, Appellants' contention that "[b]ased on the testimony at the Confirmation Hearing, there is insufficient evidence from which the Bankruptcy Court could reasonably determine" that the Plan is feasible (see Valdez Brief, at 18) unabashedly mischaracterizes the record.[59]

Finally, Valdez wrongly protests that the Bankruptcy Court "refused to hear appellant's evidence." The Bankruptcy Court heard two full days of testimony from the Reorganized Debtors and Appellants, almost all of which was devoted to the Asbestos Plan Objections. Appellants conducted either direct or cross examination of each witness called at the Confirmation Hearing, and Appellants introduced sundry exhibits into evidence. Appellants' attempt to dress up one isolated example of the Bankruptcy Court taking issue with the relevance of Appellants' evidence does not amount to a "refusal to hear appellant's evidence," and the Bankruptcy Court did not commit reversible error on this point.[60]

---

(continued)

Reorganized Debtors' estimates of available insurance already account for such contingencies. See R.46, at ¶ 5. Appellants further argue that the Reorganized Debtors may be subject to the assessment of substantial retroactive insurance premiums, yet Appellants ignore the facts that (a) the Reorganized Debtors' estimates account for reasonable retroactive premiums; and (b) Dr. Thomas Valdez (the Appellants' expert on claims estimation) explicitly dismissed the possibility of substantial assessments, correcting counsel for Valdez in doing so. See R.63 (12/11 Transcript, at 188:4-189:14).

[59]     Valdez' allegation that the Bankruptcy Court "provided absolutely no explanation for its decision to adopt the projection by the Debtors' expert" (Valdez Brief, at 18) is demonstrably false. At paragraph Q.xviii of the Confirmation Order, the Bankruptcy Court clearly indicated that "[t]he Court's conclusions in choosing among the numerous estimates that [Drs. Cantor and Vasquez] presented in their reports and in their testimony are based on the substance of those assumptions and methodologies." See Confirmation Order, 2007 WL 4589331, at *13. Similarly, Valdez' allegation that the Bankruptcy Court's alleged "failure to make specific factual findings that justify its conclusions and provide a basis for overruling Appellant's objections constitutes abuse of discretion and reversible error" is facially inaccurate. Rather, the Confirmation Order contains *pages* of asbestos-specific findings of fact that support the Bankruptcy Court's determination with respect to feasibility. See Confirmation Order, 2007 WL 4589331, at *9-15. Moreover, as described above, Appellants were each provided with the opportunity to review and comment on the proposed Confirmation Order, but provided no comments.

[60]     See, e.g., Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc. (In re Croton River Club, Inc.), 52 F.3d 41, 45 n.2 (2d Cir. 1995) (holding that bankruptcy court's exclusion of isolated evidence was "hardly reversible error;" stating that "[t]he bankruptcy court, as a trial court, has broad discretion regarding the admissibility of evidence and will be reversed only for abuse of that discretion.").

F.    **The Plan Satisfies The Requirements Of**
      **Section 1129(a)(7) Of The Bankruptcy Code**

As section 1129(a)(7) of the Bankruptcy Code[61] explicitly refers only to "*impaired*

class[es] of claims or interests . . . . " (emphasis added), it is black letter law that "if a class is

unimpaired under section 1124, its members do not get the protections of the best interest test;

instead they are left to their unaltered legal or equitable rights."  7 Collier on Bankruptcy

¶ 1129.03[7][b] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev. 2008).[62]  Accordingly,

because Asbestos Personal Injury Claims are unimpaired by the Plan, the Bankruptcy Court

properly held that the "best interests of creditors" test did not apply to Class 3.[63]

Moreover, although the finding is dicta,[64] the Bankruptcy Court correctly determined

that, even if section 1129(a)(7) of the Bankruptcy Code were applicable to Class 3 Asbestos

Personal Injury Claims (which it is not), it would have been satisfied.  Upon a liquidation of the

Reorganized Debtors on the Effective Date, Asbestos Personal Injury Claimants would have

done well to recover 60% on their claims.[65]  A comparison with the 100% recovery contemplated

---

[61]    Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each *impaired* class of claims or interests under a plan of reorganization, each holder of a claim or interest (a) has accepted the plan or (b) will receive or retain property of a value, as of the effective date of the plan, not less than what such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on that date. Section 1129(a)(7) of the Bankruptcy Code is commonly referred to as the "best interests of creditors" test.

[62]    See also In re Mirant Corp., No. 03-46590DML11, 2007 WL 1258932, at *10 (N.D. Tex. Apr. 27, 2007) ("Section 1129(a)(7) applies to 'impaired' classes of claims or equity interests.  As a result, if the members of a class are unimpaired, the 'best interests' test does not apply to them."); In re Texaco, Inc., 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (finding "best interests" test inapplicable to unimpaired classes of claims).

[63]    Appellants wrongly torture the Confirmation Order to suggest that the Bankruptcy Court "inherently recogniz[ed] that the 'best interests test' applied to the asbestos victims" (see Valdez Brief, at 12), when the Confirmation Order in fact states the opposite.

[64]    Having correctly found that section 1129(a)(7) of the Bankruptcy Code was inapplicable to Asbestos Personal Injury Claims, the Bankruptcy Court did not need to note that, even if the statute were applicable, it would have been satisfied.

[65]    As set forth in the Reorganized Debtors' liquidation analysis (R.68, Debtors' Witness Exhibit 10) and the unrebutted testimony of Ted Stenger (R.62 (12/10 Transcript, at 183:18-185:22)), upon a liquidation of the Reorganized Debtors' assets under chapter 7 of the Bankruptcy Code, holders of general unsecured claims against the Reorganized Debtors' estates would have received a hypothetical recovery of 6.9% on account of such claims. This recovery was calculated without considering the necessary estimation of the *pari passu* Asbestos Personal

(continued)

by the Plan demonstrates that reorganization benefits Asbestos Personal Injury Claims and that

section 1129(a)(7) of the Bankruptcy Code, had it been applicable (which it was not), would

have been satisfied.

## **CONCLUSION**

WHEREFORE, Appellees respectfully request that the Court enter an Order:

(i) dismissing the Consolidated Appeal as equitably moot; (ii) in the alternative, affirming the

Confirmation Order for the reasons set forth therein and in this Brief; and (iii) granting such

other and further relief as this Court may deem proper.


Dated: March 14, 2008                                    Respectfully submitted,
      New York, New York

                                                        s/Corinne Ball
                                                        JONES DAY
                                                        222 East 41st Street
                                                        New York, New York  10017
                                                        Telephone:  (212) 326-3939
                                                        Facsimile:  (212) 755-7306
                                                        Corinne Ball (CB 8203)
                                                        Steven C. Bennett (SB 2746)
                                                        Heather Lennox (HL 3046)
                                                        Robert W. Hamilton (RH 3130)

                                                        ATTORNEYS FOR APPELLEES

---

(continued)

Injury Claims, the inclusion of which would decrease this 6.9% recovery still further.  Asbestos Personal Injury Claims would remain entitled to recover from insurance, but, as described above, that recovery would be limited to approximately 50%.