JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Corinne Ball (CB 8203)
Steven C. Bennett (SB 2746)
Heather Lennox (HL 3046)
Robert W. Hamilton (RH 3130)

Attorneys for Appellees Dana Corporation, *et al.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x
                                              :
In re:                                        :   Chapter 11
                                              :
   DANA CORPORATION, *et al.*,                :   Bankruptcy Case No. 06-10354 (BRL)
                                              :
                              Debtors.        :   Jointly Administered
                                              :
————————————————————————      :
                                              :
   AD HOC COMMITTEE OF ASBESTOS               :
   PERSONAL INJURY CLAIMANTS and              :
   JOSÉ ANGEL VALDEZ,                         :
                                              :
                          Appellants,         :   No. 1:08-CV-1037 (PAC)
                                              :
vs.                                           :   Judge Paul A. Crotty
                                              :
   DANA CORPORATION, *et al.*                 :
                                              :
                          Appellees.          :
———————————————————————— x

**APPELLEES' REPLY BRIEF IN SUPPORT OF
MOTION OF APPELLEES TO DISMISS AS MOOT
THE CONSOLIDATED APPEALS OF AD HOC COMMITTEE OF
ASBESTOS PERSONAL INJURY CLAIMANTS AND JOSÉ ANGEL VALDEZ**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTORY STATEMENT ..................................................................................... 1

I.     THE PLAN MODIFICATION THAT APPELLANTS
       NOW SEEK IS NOT LEGALLY PERMISSIBLE ......................................................... 4

       A.     A Substantive Modification of a Chapter 11 Plan Is Not Legally
              Permissible After the Plan Has Been Substantially Consummated ...................... 4

       B.     Even if Appellants Were Successful on the Merits of their Appeal,
              They Would Not Be Entitled to an Order Compelling all the Reorganized
              Debtors To Guarantee Payment on all Asbestos Personal Injury Claims ............. 7

II.    THE PLAN MODIFICATION THAT APPELLANTS
       NOW SEEK IS NOT AN EQUITABLE REMEDY ......................................................... 9

       A.     Appellants' Requested Plan Modification Would
              Adversely Affect the Rights and Interests of Third Parties ................................. 9

       B.     Appellants' Failure To Seek a Stay or Expedited Appellate Review
              Requires the Dismissal of the Consolidated Appeal as Equitably Moot ............ 13

       CONCLUSION..................................................................................................... 15

## **TABLE OF AUTHORITIES**

**Page**

### **CASES**

*Antiquities of Nevada v. Bala Cynwyd Corp. (In re Antiquities of Nevada)*, 173 B.R. 926 (B.A.P. 9th Cir. 1994) ...........................................................................................5

*Butner v. United States*, 440 U.S. 48 (1979).................................................................9

*In re CF&I Fabricators of Utah, Inc.*, 169 B.R. 984 (D. Utah 1994) ...........................13

*In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Jan. 24, 2008)......................13

*Cartalemi v. Karta Corp. (In re KartaCorp.)*, 342 B.R. 45 (S.D.N.Y. 2006) ...............14

*In re Charterhouse, Inc.*, 84 B.R. 147 (Bankr. D. Minn. 1988) ....................................5

*In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) ...............................................10

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) .....................................................................13

*In re Earley*, 74 B.R. 560 (Bankr. C.D. Ill. 1987) ........................................................5

*Eubanks v. Wilkinson*, 937 F.2d 1118 (6th Cir. 1991)..................................................6

*In re Fansel Shoe Corp.*, 119 B.R. 28 (Bankr. S.D.N.Y. 1990) ...................................5

*Findley v. Blinken (In re Joint Eastern & Southern District Asbestos Litigation)*, 982 F.2d 721 (2d Cir. 1992), *modified on other grounds*, 993 F.2d 7 (2d Cir. 1993)............5, 6

*Goodman v. Phillip R. Curtis Enterprises, Inc. (In re Goodman)*, 809 F.2d 228 (4th Cir. 1987)...................................................................................................4

*International Paper Co. v. Corporex Constructors, Inc.*, 385 S.E.2d 553 (N.C. Ct. App. 1989) ......................................................................................................6

*In re Longardner & Associates, Inc.*, 855 F.2d 455 (7th Cir. 1988)............................4, 6

*In re MCorp Financial, Inc.*, 137 B.R. 219 (Bankr. S.D. Tex. 1992)............................4

*Manges v. Seattle-First National Bank (In re Manges)*, 29 F.3d 1034 (5th Cir. 1994)..................7

*In re Northtown Realty Co., L.P.*, 215 B.R. 906 (Bankr. E.D.N.Y. 1998) ....................5

*In re PWS Holdings Corp.*, 228 F.3d 224 (3d Cir. 2000) .............................................5

## TABLE OF AUTHORITIES
(cont'd)

**Page**

*Place at Vero Beach, Inc. v. Hanson*, 953 So. 2d 773 (Fla. Dist. Ct. App. 2007) ..........................6

*Planned Parenthood Affiliates of Michigan v. Engler*, 73 F.3d 634 (6th Cir. 1996) ......................6

*Product Action International, Inc. v. Mero*, 277 F. Supp. 2d 919 (S.D. Ind. 2003) ......................6

*Resolution Trust Corp. v. Best Products Co. (In re Best Products Co.)*, 177 B.R. 791
    (S.D.N.Y. 1995) ...........................................................................................................13, 14, 15

*In re Rickel & Associates, Inc.*, 260 B.R. 673 (Bankr. S.D.N.Y. 2001) .....................................4, 5

*Valley Medical Specialists v. Farber*, 194 Ariz. 363, 982 P.2d 1277 (1999) ................................6

*Vienna Park Properties v. United Postal Savings Association (In re Vienna Park
    Properties)*, 976 F.2d 106 (2d Cir. 1992) ...........................................................................9

## FEDERAL STATUTES

11 U.S.C. § 1127(b) .................................................................................................................4, 5, 6, 7

11 U.S.C. § 1127(e) ........................................................................................................................5

## FEDERAL RULES

Fed. R. Bankr. P. 3019 .....................................................................................................................10

Fed. R. Bankr. P. 3019 (Interim) .....................................................................................................10

Fed. R. Bankr. P. 8002 .....................................................................................................................14

The Reorganized Debtors respectfully file this reply brief in response to the oppositions filed by Appellants to the Reorganized Debtors' Motion to Dismiss the Consolidated Appeal as equitably moot.[1]

## INTRODUCTORY STATEMENT

In their Reply Briefs, Appellants, for the very first time in these proceedings in either the Bankruptcy Court or this Court, argue that the judicial relief they seek is not an order that simply denies or vacates confirmation of the Plan, but is instead an order that compels the Debtors to *modify* the Plan "without undoing a single Restructuring Transaction."  Ad Hoc Comm. Reply Brief at 1.

Appellants' descriptions of the Plan modification they are now seeking are vague and inconsistent.  For example, the Ad Hoc Committee asserts at the outset of their Reply Brief that Appellants seek a modification "that makes clear that all of the Reorganized Debtors *remain* liable to Class 3 asbestos personal injury claimants *to the same extent* as they were liable prior to the commencement of the bankruptcy case."  Id. at 4 (emphasis added).  Similarly, it later proposes express language for a modification that (i) provides that an asbestos claimant "may seek payment of its claim from any or all of the Reorganized Debtors without hindrance from any bar, discharge, injunction or other provision contained in the Plan prohibiting" that claimant "from seeking payment from the Reorganized Debtors," and (ii) amends the Plan's exculpation provision to state that it "shall not apply to prevent holders of Asbestos Personal Injury Claims from seeking to pursue any claims or causes of action against any applicable Debtor or

---

[1]    See Reply Brief of Appellant the Ad Hoc Committee of Asbestos Personal Injury Claimants and Response to Dana Corporation, et al.'s Motion To Dismiss (the "Ad Hoc Comm. Reply Brief") and Reply Brief of Appellant José Angel Valdez and Response to Motion of Appellees To Dismiss as Moot the Consolidated Appeals (the "Valdez Reply Brief").  Capitalized terms not defined herein have the meanings given to them in the Reorganized Debtors' opening brief, Appellees' Brief (I) in Support of Motion of Appellees To Dismiss as Moot the Consolidated Appeals of Ad Hoc Committee of Asbestos Personal Injury Claimants and José Angel Valdez, and (II) on the Merits of the Consolidated Appeal ("Appellees' Opening Brief"), and in the Plan.  See R.12.

Reorganized Debtor." Id. at 9. If those statements were truly an accurate description of the relief they are now seeking, there would be no need to adjudicate this appeal, as the Plan already provides for exactly what those statements seek, see R.12 (Plan), at Sections II.B.6, IV.E.5.b, IV.E.5.c, and IV.E.6.b—a point that the Reorganized Debtors have repeatedly made clear, both in the Bankruptcy Court and in this Court in their Opening Brief.[2] Because the language proposed by the Ad Hoc Committee adds nothing, there is no need to modify the Plan and Confirmation Order to include it.[3]

The nature and scope of the Plan modification that Appellants now claim they are seeking, however, is described much differently in other portions of their Reply Briefs. For example, Valdez requests a "modification of the Plan to allow the asbestos claimants to satisfy their claims from the assets of *all* of the entities that have emerged from bankruptcy . . . ." Valdez Reply Brief at 2 (emphasis added). Similarly, the Ad Hoc Committee elsewhere refers to a modification that would give asbestos claimants "recourse" and the "rights to seek recovery against the assets of *all* Reorganized Debtors rather than" from the assets of the particular

---

[2]    See R.11 (Disclosure Statement) at 66 ("Under the Plan," the Asbestos Personal Injury Claims "will be Reinstated pursuant to Section II.B.6 of the Plan and will, therefore, be passed through the Chapter 11 Cases unimpaired and will be retained, as applicable, as liabilities of the defendants against whom such Asbestos Personal Injury Claims have been asserted or could have been asserted. Liabilities related to Asbestos Personal Injury Claims are not being transferred or assigned to any other Debtor or any other entity."); Appellees' Opening Brief at 9 and nn.22-25 and at 18-19 and n.42 (emphasizing that "Appellants are specifically carved out of the Plan's injunction and release provisions; they can sue any entity at any time for any reason"). Indeed, both the Injunction section and the Release section of the Plan contain language that is functionally identical to the language proposed by the Ad Hoc Committee in its Reply Brief. See R.12 (Plan), at Section IV.E.5.c ("In addition, nothing in the Plan shall prevent the holders of Asbestos Personal Injury Claims from exercising their rights against any applicable Debtor or Reorganized Debtor or its Estate or Assets with respect to their Asbestos Personal Injury Claims."); id. at Section IV.E.6.b ("In addition, nothing in the Plan shall be deemed to release any applicable Debtor or Reorganized Debtor from any Liability arising from or related to Asbestos Personal Injury Claims.").

[3]    The language proposed by the Ad Hoc Committee as an insert to the Confirmation Order includes a second sentence that would provide: "This Confirmation Order shall not act as res judicata or collateral estoppel in any Class 3 claimant's or future asbestos claimant's subsequent lawsuit, or such claimant's efforts to seek payment from any of the Reorganized Debtors." Ad Hoc Comm. Reply Brief at 9. The Ad Hoc Committee provides no legal authority for such a provision, nor does it provide any justification or explanation for requiring parties to relitigate in future lawsuits issues that were or should have been raised and resolved at the Confirmation Hearing. As there is no authority nor justification for such language, it is not proper relief for this Court to grant in connection with the Consolidated Appeal.

defendant against whom their claims had or could have been asserted prepetition.  Ad Hoc

Comm. Reply Brief at 7, 10 (emphasis added).  Indeed, the Ad Hoc Committee elsewhere states

that it is seeking a modification "holding Dana Holding Corporation and other Reorganized

Debtors financially responsible" and "ultimately liable" for "unsatisfied payments to asbestos

personal injury claimants in the event that Dana Companies, LLC lacks the financial ability to

make any of those payments . . . ."  Id. at 8, 13.[4]  In essence, then, it appears that the relief that

Appellants are now seeking from this Court is really an order compelling the Reorganized

Debtors to modify their Plan to provide that each of the Reorganized Debtors—including New

Dana Holdco and each of its newly created operating subsidiaries—issue to every other

Reorganized Debtor an inter-corporate guarantee as to any liability that may be incurred as a

result of an Asbestos Personal Injury Claim.

       This ambiguity in the descriptions of the relief Appellants now seek does not appear to be

the result of confusion or carelessness.  Rather, it appears to be part of a calculated effort by

Appellants to mischaracterize the nature of their prepetition rights in order to conceal the

unprecedented and improper scope of their newly requested relief.  As detailed below, the

Consolidated Appeal should be dismissed as equitably moot because the Plan modification that

Appellants seek from this Court is neither legally permissible nor an equitable appellate remedy

in the circumstances of this case.

---

[4]      The prepetition defendant against whom most of the Asbestos Personal Injury Claims had been or could have been asserted was Dana.  See Appellees' Opening Brief at 7-8. nn.16-18.  As noted in Appellees' Opening Brief, id. at 16 n.34, as part of the Restructuring Transactions, Dana has merged into Dana Companies LLC, with the surviving, merged entity possessing the same rights and obligations that Dana previously possessed.

## I.    THE PLAN MODIFICATION THAT APPELLANTS NOW SEEK IS NOT LEGALLY PERMISSIBLE

### A.    A Substantive Modification of a Chapter 11 Plan Is Not Legally Permissible After the Plan Has Been Substantially Consummated

Appellants' argument that this Court can fashion effective appellate relief by ordering an affirmative modification to the Plan fails at the very outset because, pursuant to section 1127(b) of the Bankruptcy Code, only a plan proponent may modify the Plan; a court cannot.  11 U.S.C. § 1127(b).  Neither this Court nor the Bankruptcy Court have the authority to, *sua sponte*, modify a chapter 11 plan of reorganization.  See Goodman v. Phillip R. Curtis Enterprises, Inc. (In re Goodman), 809 F.2d 228 (4th Cir. 1987); In re MCorp Fin., Inc., 137 B.R. 219, 228 (Bankr. S.D. Tex. 1992).  Accordingly, the Bankruptcy Code does not permit Appellants to seek a modification of the Plan on appeal.  See In re Longardner & Associates, Inc., 855 F.2d 455, 462 n.8 (7th Cir. 1988) (rejecting creditors' request that appellate court order a modification to a confirmed plan as an alternative to reversing bankruptcy court's refusal to set aside confirmation order on ground that, under section 1127(b), "[o]nly the proponent . . . of a Chapter 11 reorganization plan can seek to have it modified").[5]

Moreover, even if it were permissible for a court to order a plan proponent to modify a chapter 11 plan, such an order would not be permissible where, as here, that plan has already

---

[5]    Although the Ad Hoc Committee implies that this Court could fashion the relief it seeks by simply modifying the Confirmation Order, as opposed to the Plan, there is no merit to that suggestion.  Neither the Bankruptcy Court nor this Court has the legal authority to order the Reorganized Debtors to issue an inter-corporate guarantee to anyone, nor is there any basis for this Court to find that, as a necessary consequence of the Restructuring Transactions, any Reorganized Debtor became "financially responsible" or "ultimately liable" for the liability of all other Reorganized Debtors for Asbestos Personal Injury Claims.  Accordingly, the inter-corporate guarantee that Appellants seek can only be obtained through a provision in a confirmed chapter 11 plan.  See also In re Rickel & Assocs., Inc., 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001) (rejecting effort to avoid limitations of section 1127(b) by proposing modification to confirmation order rather than plan: "It is true that the debtor has not technically proposed to disturb the Plan or modify it.  Instead, it has moved to modify the Confirmation Order.  The distinction, however, is irrelevant, and the result is the same.  A debtor cannot circumvent § 1127(b) and change the plan simply by calling its request a motion to modify the confirmation order. . . .  Regardless of what the debtor chooses to call it, the motion is one to modify the Plan, and is subject to § 1127(b).").

been substantially consummated.  Section 1127(b) of the Code permits the plan proponent to modify a plan after its confirmation ***only*** if that modification is made "before substantial consummation."  11 U.S.C. § 1127(b).  See Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.), 982 F.2d 721, 748 (2d Cir. 1992), modified on other grounds, 993 F.2d 7 (2d Cir. 1993) (reversing lower courts' alteration of plan documents after plan was confirmed and consummated on ground that section 1127(b) bars substantive changes to a chapter 11 plan after it has been substantially consummated); Rickel & Assocs., 260 B.R. at 677-78 ("the literal terms of § 1127(b) bar any effort to modify the Plan" after substantial consummation and a "bankruptcy court cannot exercise its equitable powers" to "disregard [this] specific command[]"); In re Northtown Realty Co., L.P., 215 B.R. 906, 911 (Bankr. E.D.N.Y. 1998); In re Fansel Shoe Corp., 119 B.R. 28, 30 (Bankr. S.D.N.Y. 1990) (stating that "[m]anifestly, a confirmed plan may not be modified after substantial consummation").[6]

The Ad Hoc Committee relies on the Third Circuit's decision in In re PWS Holdings Corp., 228 F.3d 224 (3d Cir. 2000), for the proposition that an appellant can seek "alterations" to a substantially consummated plan on appeal, Ad Hoc Comm. Reply Brief at 5-6, but that reliance is misplaced.  In PWS Holdings, the appellant challenged the legality of three provisions in the plan that released certain third parties.  The Third Circuit held that the appeal was not equitably moot because "[t]he releases (or some of the releases) could be stricken from the plan without undoing other portions of it."  PWS, 228 F.3d at 236.  The Court did ***not*** hold that striking illegal

---

[6]     Accord Antiquities of Nev. v. Bala Cynwyd Corp. (In re Antiquities of Nev.), 173 B.R. 926 (B.A.P. 9th Cir. 1994); In re Charterhouse, Inc., 84 B.R. 147, 151-52 (Bankr. D. Minn. 1988) ("[Section 1127(b)] operates to prohibit modification once 'substantial consummation' has occurred. H.R. REP. No. 595, 95th Cong., 1st Sess. 411 (1977); . . . .  As Debtor has substantially consummated its plan and completed its reorganization, no one—not even Debtor or, if one existed, a non-debtor proponent of its plan—may now seek court-approved modification of that plan."); In re Earley, 74 B.R. 560, 562 (Bankr. C.D. Ill. 1987).  Indeed, where Congress intended to permit post-consummation plan modifications, it expressly provided for them.  See, e.g., 11 U.S.C. § 1127(e) ("if the debtor is an individual, the plan may be modified at any time after confirmation of the plan but before the completion of payments under the plan, ***whether or not the plan has been substantially consummated***, upon the request" of certain parties for certain specified purposes) (emphasis added).

release provisions from the plan would constitute permissible affirmative "modifications" to the

plan notwithstanding section 1127(b)'s prohibition of such modifications after substantial

consummation.  Indeed, there is a dispositive distinction between, on the one hand, determining

whether an illegal plan provision can be severed from a plan without requiring reversal of the

order confirming it and, on the other hand, determining whether the provisions of a plan should

be affirmatively modified to provide new rights and create new obligations after the plan has

already been substantially consummated.  An appellate court has the authority to make the

former determination; section 1127(b) of the Bankruptcy Code, however, bars it from making the

latter determination, as the Second Circuit has repeatedly held.  <u>Findley v. Blinken</u>, 982 F.2d

at 748; <u>Longardner</u>, 855 F.2d at 462 n.8.[7]

In PWS, the Third Circuit found that the challenged release provisions could be severed

from the plan without unraveling or affecting the enforceability of the remainder of the plan.

---

[7]    This same general distinction between a court's authority to determine the severability of an illegal
provision and a court's inability to add new, affirmative terms is well recognized in the similar contexts of actions
that challenge the validity of contracts or statutes.  <u>See</u>, <u>e.g.</u>, <u>Product Action Int'l, Inc. v. Mero</u>, 277 F. Supp. 2d 919,
926-27 (S.D. Ind. 2003) (holding that a non-compete covenant was legally unenforceable as written and refusing to
amend the provision by adding new terms to make it comply with applicable law:  "[I]f a covenant is clearly
separated into parts, and if some parts are reasonable and others are not, the contract may be severed, or 'blue
penciled,' so that the reasonable portions may be enforced. . . .  Such efforts to save a covenant are limited to
applying terms that already exist in the contract; the court may not add terms."); <u>Valley Med. Specialists v. Farber</u>,
194 Ariz. 363, 372, 982 P.2d 1277, 1286 (1999) ("Although we will tolerate ignoring severable portions of a
covenant to make it more reasonable, we will not permit courts to add terms or rewrite provisions."); <u>Int'l Paper Co.
v. Corporex Constructors, Inc.</u>, 385 S.E.2d 553, 555 (N.C. Ct. App. 1989) (in severing an unreasonable term from a
contractual indemnity clause, appellate court distinguished between the addition of new terms to an agreement and
the excision of offending terms:  "By striking the offending language the Court does not rewrite the contract or
substitute its own terms in the provision for those of the parties.  We merely sever the portion that is void as against
public policy from an otherwise valid indemnity provision."); <u>Place at Vero Beach, Inc. v. Hanson</u>, 953 So. 2d 773,
776 (Fla. Dist. Ct. App. 2007) (affirming trial court's refusal to amend agreement to compel arbitration where "[t]he
trial judge correctly determined that he would be unable to simply sever a sentence from the provision, but would be
forced to add the requirements that Chapter 400 and the Florida rules of arbitration would apply"); <u>Eubanks v.
Wilkinson</u>, 937 F.2d 1118, 1127-28 (6th Cir. 1991) (holding that district court erred when it modified a statutory
provision by adding new terms to it rather than declaring the provision invalid and severing it from the constitutional
portions of the statute: "[W]hile a federal court may enjoin the operation of some provisions of a state statute and
leave others to operate, it cannot itself draft a new limiting condition, thus reframing the statute."); <u>Planned
Parenthood Affiliates of Mich. v. Engler</u>, 73 F.3d 634, 640 (6th Cir. 1996) ("although a court may permissibly <i>sever</i>
some provisions of a statute and leave others intact, a court may not <i>rewrite</i> a statute to render it constitutional")
(emphasis by the court).

Thus, the court never addressed the issue of whether the plan could be affirmatively modified by adding new provisions after its substantial consummation.[8] Here, however, Appellants do not ask this Court to strike or sever any specific provision of the Plan as illegal or unenforceable. Rather, they now ask the Court to order that the Plan be affirmatively modified by adding new terms that create new rights for asbestos claimants and new obligations for the Reorganized Debtors. Because section 1127(b) of the Bankruptcy Code bars such relief, the Consolidated Appeal must be dismissed as equitably moot.

**B.      Even if Appellants Were Successful on the Merits of their Appeal, They Would Not Be Entitled to an Order Compelling all the Reorganized Debtors To Guarantee Payment on all Asbestos Personal Injury Claims**

In their Reply Briefs, Appellants repeatedly characterize the Plan modification they are now seeking—one that would give Asbestos Personal Injury Claimants the right to recover from *all* the assets of *all* the Reorganized Debtors—as being one that "preserves" or "retains" the same rights they had with respect to those assets prepetition.[9] These characterizations are false. Prior to the filing of the Debtors' Chapter 11 Cases, each Asbestos Personal Injury Claimant, if it were to prevail on its claim, could recover only from the assets of the particular defendant

---

[8]      Indeed, had the court found that the release provisions were integral to other provisions in the plan and thus not severable from it, the appeal would have been equitably moot because section 1127(b) would have prevented the deletion of the release provisions from the plan. See Manges v. Seattle-First Nat'l Bank (In re Manges), 29 F.3d 1034, 1043 n.13 (5th Cir. 1994) (dismissing appeal of confirmation order as equitably moot and rejecting appellants' suggestion at oral argument that effective relief could be granted by striking offensive portion of plan without unraveling it: "We disagree. The Bankruptcy Code provides that a plan may not be modified or amended after substantial consummation has taken place. [Citations omitted.] In light of the facts that the Plan has been substantially consummated and that the tax provision is integral to the Plan as implemented, the requested modification is simply not possible.").

[9]      See Valdez Reply Brief at 2 (seeking "modification of the Plan to allow the asbestos claimants to satisfy their claims from the assets of all entities that have emerged from bankruptcy, *just as they could before Dana availed itself of the shelter of the Bankruptcy Court*") (emphasis added); id. at 4 (seeking relief "*preserving* his cause of action against the operating entities that have emerged from bankruptcy") (emphasis added); Ad Hoc Comm. Reply Brief at 10 (indicating that requested modification will enable Asbestos Personal Injury Claimants to "*retain* their rights to seek recovery against the assets of all Reorganized Debtors") (emphasis added); id. at 13 (indicating that requested modification will require New Dana Holdco "and the assets it received from the pre-bankruptcy Dana to *remain* ultimately liable for unsatisfied payments to asbestos personal injury claimants") (emphasis added).

against which it had or could have asserted the claim; that claimant had no right to recover from the assets of *other* subsidiaries of Dana.

Accordingly, any assertion that asbestos claimants had a prepetition right to recover on their claims from all the operating assets of all the Debtors has no basis in the record and is demonstrably false.  Indeed, Appellants' counsel expressly conceded that fact in response to direct questioning by the Bankruptcy Court on this very point at the Confirmation Hearing. See R.64 (12/12 Transcript, at 79-80).  Yet Appellants continue to press that false assertion in this Court, presumably in a calculated effort to conceal the overbroad and improper scope of the relief they now seek from this Court—a Plan modification that would make every Reorganized Debtor jointly liable for the full amount of any liability of every other Reorganized Debtor with respect to an Asbestos Personal Injury Claim.  There is simply no legal authority for expanding the rights of asbestos claimants in such dramatic fashion, even if one were to assume that Appellants were to succeed on the merits of their challenges to the Restructuring Transactions and the confirmability of the Plan.

Moreover, even if one were to pretend that all Asbestos Personal Injury Claimants *did* have a prepetition right to recover on any valid claims from all the assets of all of the Debtors, the scope of the Plan modification that Appellants now seek on appeal would still be improper. At the time the Chapter 11 Cases were commenced, those very same assets were also subject to roughly $3 billion in claims by other creditors, as well as subject to another $1.5 billion of accumulated post-retirement benefit obligations to the Debtors' retirees.  Pursuant to the Restructuring Transactions provided for in the Plan, the operating assets of Dana and its other Debtor subsidiaries were transferred to the newly-created operating subsidiaries of New Dana Holdco *in exchange for* shares of common stock of New Dana Holdco (which were used to satisfy and discharge these other $3 billion of prepetition claims) and the $790 million in

proceeds from the New Equity Investors' purchase of the preferred stock of New Dana Holdco (which was used to eliminate the Debtors' $1.5 billion APBO liability). Appellees, in requesting the Plan modification described in their Reply Briefs, are essentially asking this Court to allow asbestos claimants to simply disregard the transfers of the operating assets to New Dana Holdco's operating subsidiaries while at the same time allowing them to enjoy the benefits of the relief from the senior and *pari passu* liabilities for which these transfers provided consideration.

In short, Appellants want this Court to grant the asbestos claimants the windfall of having newly-created access to **all** of the prepetition Debtors' operating assets to satisfy their claims, with the additional windfall of having those assets scrubbed clean of more than $4 billion in competing claims by other creditors and retirees. Such relief would be an improper and impermissible perversion of the bankruptcy process. See Vienna Park Props. v. United Postal Savs. Ass'n (In re Vienna Park Props.), 976 F.2d 106, 113 (2d Cir. 1992) (a creditor should not receive "'a windfall merely by reason of the happenstance of bankruptcy'") (quoting Butner v. United States, 440 U.S. 48, 55 (1979)).

## II.    THE PLAN MODIFICATION THAT APPELLANTS NOW SEEK IS NOT AN EQUITABLE REMEDY

Even if one were to pretend that the Plan modification that Appellants now seek were legally permissible, the Consolidated Appeal still should be dismissed as equitably moot because the requested Plan modification is not an equitable appellate remedy in this case.

### A.    Appellants' Requested Plan Modification Would Adversely Affect the Rights and Interests of Third Parties

An order by this Court compelling New Dana Holdco and its newly-created operating subsidiaries to issue inter-corporate guarantees for all liability that may be incurred by Reorganized Dana and its subsidiaries with respect to Asbestos Personal Injury Claims would, by definition, impose additional risks of liability on New Dana Holdco and the assets of its

operating subsidiaries.  Those additional liability risks would adversely affect the interests of numerous third parties, including:  (1) the Debtors' prepetition unsecured creditors, because the value of the New Dana Holdco Common Stock that they received on account of their claims pursuant to the Plan would be adversely affected; (2) the holders of New Dana Holdco Common Stock who purchased their shares on the open market after the Effective Date, because the value of their shares would be adversely affected; (3) the New Equity Investors, because the value of the preferred stock of New Dana Holdco would be adversely affected; and (4) the Exit Lenders, because the value of the collateral that secures their loans to the Reorganized Debtors would be adversely affected.

The adverse effects on these third parties of the Plan modification that Appellants now seek render such relief inequitable, because all of these third parties relied on the finality of the Plan and the Restructuring Transactions once the Effective Date occurred and the Plan was substantially consummated.  See In re Continental Airlines, 91 F.3d 553, 562 (3d Cir. 1996) ("High on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on the finality of the transaction."); see also Fed. R. Bankr. P. 3019 and Interim Rule 3019 (providing that a plan modification filed by a plan proponent before or after confirmation of the plan shall be deemed accepted by all creditors who previously accepted the plan *only if* the court conducts a hearing and finds that the proposed modification "does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification").

Appellants advance two arguments in an attempt to downplay the inequity of imposing such adverse impacts on these third parties.  Neither argument has merit.

First, the Ad Hoc Committee suggests that this Court should simply disregard the adverse effect of its requested Plan modification on third parties because it has provided notice of its appeal to and served a copy of its appellate brief on all parties "who could conceivably be affected" by that Plan modification.  Ad Hoc Comm. Reply Brief at 15.  See also Valdez Reply Brief at 5 (arguing that "the investors and lenders chose to fund their obligations with full knowledge that an appeal was pending").[10]  Appellants, however, never sought their requested Plan modification in the Bankruptcy Court and did not disclose their intent to seek such relief on appeal until they included it in the Reply Briefs they filed only seven days ago.  There is simply no authority for the proposition that the interests of the third parties adversely affected by the Plan modification that Appellants now seek should be disregarded by this Court merely because those third parties were served seven days ago with electronic notices of Appellants' Reply Briefs.  Indeed, in these circumstances, any such argument does not pass the straight face test.

Second, Appellants attempt to minimize the potential adverse affect of their requested Plan modification by arguing that, if the Reorganized Debtors' contentions at the Confirmation Hearing and in their Opening Brief are correct and Reorganized Dana is sufficiently funded "to pay all asbestos claims well into the future," then their requested Plan modification "should be a wash with no impact on the assets of the operating entities."  Valdez Reply Brief at 5.  See also Ad Hoc Comm. Reply Brief at 13 ("If the Debtors' contentions are correct," then the requested Plan modification "would place Dana Holding Corporation at no appreciable future financial risk.").

This second argument fails because it starts with the wrong assumption.  To determine whether this Court can fashion effective relief on appeal, one must first assume that Appellants

---

[10]     Appellants do not claim to have provided notice of their appeal or served copies of their Reply Briefs on holders of New Dana Holdco Common Stock who purchased their shares on the open market after the Effective Date.

would *prevail* on the merits of the appeal, not fail.  But even under Appellants' erroneous construction of the applicable legal principles, they cannot prevail on their claims that the Restructuring Transactions "impaired" the Asbestos Personal Injury Claims and rendered the Plan not feasible with respect to Reorganized Dana if this Court were to affirm the Bankruptcy Court's finding that Reorganized Dana is sufficiently funded to meet its obligations with respect to the Asbestos Personal Injury Claims.  Thus, to determine whether this Court can fashion effective relief in this case, as Appellants claim it can, one must first assume that the Reorganized Debtors' evidence and arguments, and the Bankruptcy Court's finding, with respect to the adequacy of the funding of Reorganized Dana are *incorrect*, rather than assuming they are correct, as Appellants' argument presumes.  Thus, if one were to assume a finding by this Court that there is a material risk that Reorganized Dana is *not* adequately funded, that assumed material risk would make the adverse impact of the requested Plan modification on third parties sufficient to render the Consolidated Appeal equitably moot.

Moreover, whatever assumption one might make regarding the magnitude of the liability risk that Appellants' requested Plan modification would impose on New Dana Holdco and its operating subsidiaries, there remains the very real concern that imposing that modification by judicial fiat would open a Pandora's Box for potential mischief by parties, such as the New Equity Investors, who conceivably might contend that such a modification constitutes a breach of their rights under the Plan and the New Investment Agreement and then seek to rescind their investment or re-open the negotiations over its terms.  Indeed, there would be a very real risk that the Exit Lenders, eager to rescind or renegotiate the Exit Facility in light of the country's historically damaged and precarious credit markets, might seize on this Court's imposition of the Plan modification as an opportunity to allege a breach of, or default under, the Exit Facility, forcing the Reorganized Debtors into a litigation quagmire that could unravel the entire

reorganization.  See In re Calpine Corp., Case No. 05-60200 (BRL), Memorandum Decision and

order Denying Motion of Compania Internacional Financiera, et al., for a Limited Stay pending

Appeal of Confirmation Order and Plan Modification Order, dated January 24, 2008 (Bankr.

S.D.N.Y.) (copy attached as App. A) at 10 n.2 ("It is without contradiction that the Debtors'

advantageous financing arrangement was obtained when economic conditions were quite

different.  Given the current economic conditions, funders have been quick to exploit any

opportunity to withdraw commitments made in a more permissive debt market.").[11]  See

generally In re CF&I Fabricators of Utah, Inc., 169 B.R. 984, 993 (D. Utah 1994) (refusing to

modify plan and dismissing appeal as equitably moot:  "[Modifying the plan] would likely

unravel the deal altogether, putting the parties back at square one.  Such a prospect is

unacceptable, and this court refuses to play the 'Humpty Dumpty repairman' for such an

ominous task.").

> **B.** **Appellants' Failure To Seek a Stay or Expedited Appellate Review**
> **Requires the Dismissal of the Consolidated Appeal as Equitably Moot**

The inequity of imposing the Plan modification sought by Appellants at the expense of

the Reorganized Debtors and their creditors, investors and lenders is underscored by Appellants'

total failure to seek a stay of the Confirmation Order, to seek expedited review of their appeals

prior to the Effective Date, or even to proffer any explanation or justification for failing to do so

in their Reply Briefs.  As the Second Circuit observed in Deutsche Bank AG v. Metromedia

Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005),

"whether the appellant sought a stay of confirmation" is a "chief consideration under

Chateaugay" in determining whether an appeal is equitably moot.  Id. at 144.  See Resolution

---

[11]    See also Jeffrey McCracken and Nathan Koppel, "Solutia's Suit:  Banks Must Honor Bankruptcy Pact, " Wall Street Journal, Feb. 7, 2008, at C3 (copy attached as App. B); Henny Sender, "Solutia Sues Over Banks' Loan U-Turn," Financial Times, Feb. 7, 2008, available at http://www.ft.com/cms/s/0/13890136-d51e-11dc-9af1-0000779fd2ac.html (copy attached as App. C).

<u>Trust Corp. v. Best Products Co. (In re Best Products Co.)</u>, 177 B.R. 791, 805 (S.D.N.Y. 1995) (appeal moot because court saw "no persuasive reason why [a stay] motion should not have been made").

Valdez attempts to justify his failure to seek a stay or expedited appellate review by simply claiming that he had no obligation to do so, claiming support for this proposition from the decision in <u>Cartalemi v. Karta Corp. (In re Karta Corp.)</u>, 342 B.R. 45 (S.D.N.Y. 2006). Valdez Reply Brief at 3-4. Valdez' reliance on <u>Karta</u> is misplaced. In that case, the debtors "clearly sought to moot" any appeal by the appellant by attempting to consummate sale transactions immediately after the Confirmation Order was entered, "prior to the Effective Date of the Plan, knowing that [appellant] had objected to aspects of the Plan relating to those sales and that his time to appeal had not yet run." <u>Karta</u>, 342 B.R. at 53. Indeed, just two days after the bankruptcy court signed the confirmation order, the appellants filed a notice of appeal ***and*** a request to expedite review of the appeal. Moreover, the plan in that case was never substantially consummated. <u>Id.</u> Thus, the district court found: "Appellees' equitable mootness argument comes down to a single proposition: by failing to seek a stay of the consummation of sales either on the day the Order was entered (a Friday) or on the first business day thereafter, Appellant has equitably dis-entitled himself from proceeding with this appeal." <u>Id.</u>

The inaction by Valdez in this case bears no resemblance to the prompt action taken by the appellants in <u>Karta</u>. The Bankruptcy Court announced its decision to confirm the Plan at the conclusion of the Confirming Hearing on December 12, 2007, yet Valdez waited nearly three weeks before filing his notice of appeal. <u>See</u> Fed. R. Bankr. P. 8002 (permitting appellant to file notice of appeal any time after announcement of a decision, even before the order is entered). More than seven weeks elapsed between the announcement of the decision to confirm the Plan and the Effective Date, during which time Valdez made no effort to expedite his appeal to permit

review prior to the Effective Date.  Moreover, in this case, the Reorganized Debtors did not

consummate the Plan or the Restructuring Transactions until after the Effective Date occurred

more than a full month after the Confirmation Order was entered.  As Valdez had made no

application for a stay or expedited appellate review, there is no basis on which one could

conclude that the Reorganized Debtors' decision to go forward with consummation of the Plan

after the occurrence of the Effective Date constituted a purposeful and inequitable effort to moot

the appeal.  In these circumstances, the burden was on Valdez to seek a stay or expedited review

prior to the Effective Date, which he failed to do.  His failure to do so justifies dismissal of the

Consolidated Appeal as equitably moot.  <u>Resolution Trust Corp. v. Best Products</u>, 177 B.R. at

805.

<u>**CONCLUSION**</u>

For the foregoing reasons, and for the reasons set forth in their Opening Brief, Appellees

respectfully request that the Court enter an Order dismissing the Consolidated Appeal as

equitably moot and granting such other and further relief as this Court may deem proper.


Dated:  April 4, 2008                                    Respectfully submitted,
          New York, New York


                                                           s/Corinne Ball
                                                         _____
                                                         JONES DAY
                                                         222 East 41st Street
                                                         New York, New York  10017
                                                         Telephone:  (212) 326-3939
                                                         Facsimile:  (212) 755-7306
                                                         Corinne Ball (CB 8203)
                                                         Steven C. Bennett (SB 2746)
                                                         Heather Lennox (HL 3046)
                                                         Robert W. Hamilton (RH 3130)

                                                         ATTORNEYS FOR APPELLEES

APPENDIX A

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** <br> **SOUTHERN DISTRICT OF NEW YORK** | **FOR PUBLICATION** |
| In re: <br><br> CALPINE CORPORATION, et al. <br><br> Debtors. | Chapter:    11 <br><br> Case No.:  05-60200 (BRL) <br> Jointly Administered |

### MEMORANDUM DECISION AND ORDER DENYING MOTION OF COMPANIA INTERNACIONAL FINANCIERA, S.A., COUDREE GLOBAL EQUITIES FUND, STANDARD BANK OF LONDON AND LEONARDO CAPITAL FUND SPC FOR A LIMITED STAY PENDING APPEAL OF CONFIRMATION ORDER AND PLAN MODIFICATION ORDER

Before the Court is the motion (the "Stay Motion") of Compania Internacional Financiera, S.A., Coudree Global Equities Fund, and Standard Bank of London, whose investments are each managed by Yomi Rodrik (collectively, the "Rodrik Group"), and Leonardo Capital Fund SPC (the "Leo Group," and together with the Rodrik Group, the "Objecting Shareholders"), seeking what they characterize as a "limited or partial" stay pending appeal of this Court's Findings of Fact, Conclusions of Law, and Order Confirming Sixth Amended Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Confirmation Order") and Order Approving Motion Seeking Approval of Immaterial Modifications to the Debtors' Joint Plan of Reorganization Without the Need for Further Solicitation of Votes (the "Plan Modification Order") pursuant to Rule 8005 of the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules"). Calpine Corporation and its affiliated debtor entities (the "Debtors"), the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and the Unofficial Committee of Second Lien Debtholders object on the grounds that, *inter alia*, even a "limited stay" would threaten the Debtors' reorganization, jeopardize the Debtors' valuable exit financing commitment and potentially burden the estates

with almost a billion dollars in additional expense.  For the reasons set forth below, the Stay Motion is denied.

## BACKGROUND

On December 20, 2005 (the "Petition Date"), the Debtors commenced these Chapter 11 cases by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  On January 9, 2006, the United States Trustee for the Southern District of New York appointed the Creditors' Committee and subsequently, on May 9, 2006, appointed the Official Committee of Equity Security Holders (the "Equity Committee").

**The Disclosure Statement and Solicitation**

On June 20, 2007, the Debtors filed their Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") as well as their Disclosure Statement for Debtors' Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code (the "Disclosure Statement").  The Court approved the Disclosure Statement by order dated September 26, 2007.

 Following the Disclosure Statement hearing, this Court entered a plan solicitation procedures order which, among other things, established a discovery schedule for the Confirmation proceedings and the deadline to file objections to the Plan.  Pursuant to the scheduling order, on November 20, 2007, each of the Debtors, Creditors' Committee and Equity Committee submitted expert reports in support of its respective views on total enterprise value ("TEV") and publicly disclosed such views in filings with this Court. Inclusive of distributable cash, the Debtors' expert's mid-point total distributable value estimate was $20.883 billion, the Creditors' Committee's expert's mid-point distributable

value estimate was $17.783 billion, and the Equity Committee's expert's mid-point total distributable value estimate was $25.8 billion.  Based on these estimates and the Debtors' litigation adjusted claims estimate of $21.085 billion, both the Debtors and the Creditors' Committee asserted that unsecured creditors would not be paid in full, and equity security holders would not be entitled to any recovery under the Plan.  In addition, the Court-retained experts submitted an expert report that supported a finding of a New Calpine TEV of $18.95 billion.  No other party submitted an expert report.

Both prior to and subsequent to disclosure of the experts' valuations, the parties engaged in extensive discovery.  Thirteen different parties in interest promulgated 441 requests for production of documents, over 2 million pages of documents were produced by the Debtors, and nearly 157,000 pages were produced by other respondents; five different parties promulgated 105 interrogatories; three different parties promulgated 157 requests to admit; over 20 depositions were conducted; and eight expert reports were prepared by the Debtors, the Creditors' Committee and the Equity Committee, along with six rebuttal reports.  Fifty-two objections to confirmation of the Plan were filed.  Despite their ability to do so, the Objecting Shareholders did not participate in the discovery or confirmation process or file an objection to Confirmation.  They simply voted against the Plan.  The Plan was subsequently amended a number of times and all objections to confirmation were either withdrawn or resolved.

Under the provisions of the Plan, the Debtors will issue New Calpine Stock for distribution to creditors on account of allowed claims and as a part of a management and director equity incentive plan.  The Plan and the Debtors' operations will be funded

through a $7.6 billion secured exit-financing facility that the Debtors initially obtained last spring in a favorable debt market.

On December 18, 2007, the Debtors filed a Motion Seeking Approval of Immaterial Modifications to the Debtors' Joint Plan of Reorganization Without the Need for Further Solicitation of Votes (the "Plan Modification Motion"). As previously found by this Court, the Plan Modification Motion did not materially and adversely affect the treatment of equity security holders. Contrary to the assertions of the Objecting Shareholders, at no time was equity guaranteed to receive any distribution on account of their interests pursuant to the Plan. When the Debtors announced their updated TEV on November 20, 2007, the mid-point value provided no recovery of any kind to equity security holders. The Plan was simply a waterfall Plan with distributions to creditors and equity security holders based upon an enterprise value <u>to be determined by this Court</u>, based in large part on the reports of the industry experts, at the confirmation hearing. Based on those reports and the representations of all the parties, this Court found the TEV of $18.95 billion was justified and reasonable. Under the terms of the Plan, at that level, equity holders would receive no distribution on account of their interests. However, due to negotiations among the parties, equity holders were guaranteed the right to receive warrants ("New Calpine Warrants") rather than no distribution at all. As such, the Plan as confirmed, actually improved equity's position.

Although the Equity Committee initially objected to the Plan and Disclosure Statement, the Equity Committee eventually settled its confirmation objection and the need for a valuation trial was eliminated. Accordingly, the Plan Modification Order was

entered and the Debtors' Plan was confirmed at the confirmation hearing held on December 19, 2007.

**The Reconsideration Motion**

On December 31, 2007, the Objecting Shareholders, who had previously voted against the Plan, moved for reconsideration of the Plan Modification Order and the Confirmation Order (the "Reconsideration Motion") claiming both that the modifications to the Plan were material and that there was no notice of the plan modifications or meaningful opportunity for the Objecting Shareholders to be heard. *See* Reconsideration Motion, at pp. 8-15. More specifically, the Objecting Shareholders contend that they relied on the Equity Committee to pursue any objections to confirmation.

As noted by this Court in its bench ruling denying the Reconsideration Motion on January 14, 2008, the Objecting Shareholders are sophisticated investors who purchased post-petition over 5 percent of the Debtors' common stock between March and September 2007, when the Debtors were in the early stages of the Plan confirmation process. Despite the size of their investments, the risks involved, the existence of notice of the confirmation hearing and all other applicable deadlines, the Objecting Shareholders as a matter of volition did not participate in the confirmation process and despite their acquired stake, apparently did not monitor the Chapter 11 Cases, nor request electronic notice. The Objecting Shareholders, like any interested party, had substantial notice and opportunity to participate in the discovery and confirmation process. Other interested parties were hyperactive in this part of the proceedings. Having failed to participate in the process, the Court found the request for a "do over" inappropriate and, accordingly, for the reasons set forth in this Court's comprehensive bench ruling, denied the

Reconsideration Motion.[1]  *See* Transcript of Hearing on Reconsideration Motion; *see also* Minute Order Denying Motion for Reconsideration dated January 15, 2008 [docket no. 7404].

On January 18, 2007, the Objecting Shareholders filed their notice of appeal of the Confirmation Order, the Plan Modification Order and the order denying the Reconsideration Motion (the "Appeal").  Simultaneously therewith, the Objecting Shareholders filed the Stay Motion seeking what they describe as a "limited stay" of the Confirmation Order to obtain (a) a stay of the distribution of New Calpine Warrants to existing shareholders and (b) the issuance and reservation of (i) sufficient shares of New Calpine Stock to cover any shares that must be issued assuming all of the New Calpine Warrants are ultimately exercised, plus (ii) an additional 300,000,000 shares for the benefit of existing shareholders pending the outcome of the Appeal.  On January 22, 2008, both the Debtors and the Creditors' Committee filed objections asserting that the Objecting Shareholders (w) improperly seek to modify the Debtors' confirmed Plan; (x) fail to make the requisite showing to justify a stay pending appeal; (y) have requested a stay that is far from "limited" and would have far reaching consequences; and (z) are not entitled to a stay pending appeal unless they post a bond to cover the full amount of potential harm.

---

[1]    At the hearing, the Court granted the Debtors' oral motion to strike speculative industry hearsay commentaries prepared by Dahlman Rose & Co and Lehman Brothers, which were gratuitously attached as exhibits to the Objecting Shareholders reply memorandum of law.

## DISCUSSION

Bankruptcy Rule 8005 governs the procedures for seeking a stay pending appeal. *See* Fed. R. Bankr. P. 8005.  A party seeking a stay has the "heavy burden" to demonstrate (1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal, and (4) the public interests that may be affected.  *See ACC Bondholders v. Adelphia Commc'ns Corp.* (*In re Adelphia Commc'ns Corp.*), 361 B.R. 337, 346 (S.D.N.Y. 2007); *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002); *Silverman v. Nat'l Union Fire Ins.* (*In re Suprema Specialties, Inc.*), 330 B.R. 93, 95 (S.D.N.Y. 2005). Although there is authority within the Second Circuit to support both the propositions asserted by the Debtors' and the Creditors' Committee that all four criteria must be established before a stay is granted, as well as the balancing test approach emphasized by the Objecting Shareholders, the Court finds that the Objecting Shareholders have failed to meet their burden under either of these tests.  *See In re Tower Automotive, Inc.*, No. 05-10578, 2006 WL 2583624, at *1 (Bankr. S.D.N.Y. June 28, 2006) ("The moving party carries a 'heavy burden' in that 'all four criteria must be satisfied to some extent before a stay is granted.'"); *Fox v. Mandiri* (*In re Perry H. Koplik & Sons, Inc.*), No. 02-B-40648, 2007 WL 781905, at *2 (Bankr. S.D.N.Y. Mar. 13, 2007) ("The test for granting a stay under Bankruptcy Rule 8005 is conjunctive-as noted by the word "and" between the third and fourth factors.  Thus, each of the four requirements must be satisfied."); *In re Turner*, 207 B.R. 373, 375 (2d Cir. B.A.P. 1997) ("[f]ailure to satisfy one prong of this standard for granting a stay will doom the motion."); *compare with In re Adelphia Commc'ns*

*Corp.*, 361 B.R. at 346 ("the Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed."); *Mohammed*, 309 F.3d at 100 ("[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff [ ] will suffer absent the stay.  Simply stated, more of one excuses less of the other."); *In re Megan-Racine Associates, Inc.*, No. 96-CV-292, 1996 WL 167681, *5 (N.D.N.Y. Apr. 1, 1996) ("A court should balance four factors in determining whether to grant a stay pending appeal pursuant to Bankr. R. 8005...").

### **Irreparable Harm**

A showing of irreparable harm is the "principal prerequisite for the issuance" of a stay under Bankruptcy Rule 8005.  *Adelphia Commc'ns Corp.*, 361 B.R. at 347; *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66-67 (2d Cir. 2007) ("we have stated that '[i]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction,' and that, accordingly, 'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'") (citations omitted).  The moving party must prove that it faces irreparable harm that is "neither remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989).  The Objecting Shareholders allege that absent the relief requested in the Stay Motion, the distribution of New Calpine Warrants and New Calpine Stock, with no reservation for existing shareholders, would likely occur before the resolution of the Appeal, rendering it moot. However, merely invoking equitable mootness as the Objecting Shareholders have done

here – a risk that is present in any post-confirmation appeal of a chapter 11 plan – is not sufficient to demonstrate irreparable harm. *In re Bd. of Directors of Multicanal S.A.*, No. 04-10280, 2005 Bankr. LEXIS 1865, at *6 (Bankr. S.D.N.Y. Jan. 6, 2005) ("[t]here is substantial authority, however, that the risk of an appeal being rendered moot does not in and of itself constitute irreparable harm, even if it may be a relevant factor."); *In re Baker*, CV05-3487, 2005 WL 2105802, *9 (E.D.N.Y. Aug. 31, 2005 ("As other courts have noted, the possibility that an appeal will be rendered moot by a denial of stay does not, in and of itself, constitute irreparable harm.").

Other than mootness, the Objecting Shareholders contend that they will be irreparably harmed because the Debtors were grossly undervalued. However, the Objecting Shareholders have made no showing and have submitted no affidavits, declarations, or other appropriate evidence demonstrating that they are entitled to greater distributions. *See In re United Pan-Europe Commc'ns N.V.,* No. 02-16020, 2003 WL 221819, 10 at *4 (S.D.N.Y. Jan. 30, 2003) (holding that "[i]n light of [its] conclusory allegations, Movieco has failed to show irreparable harm"); *In re Penn-Dixie Indus.*, Inc., 6 B.R. 832, 837 (Bankr. S.D.N.Y. 1980) (denying emergency relief because "there has been no demonstration … of any real injury whatsoever that would result from a denial of the relief sought"); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998) (denying relief where "[t]he only evidence [of irreparable harm is] the conclusory and unsubstantiated assertions of irreparable injury").

Moreover, any harm the Objecting Shareholders may now face is a result of their own dilatory conduct. *See Mooreforce, Inc. v. U.S. Dept. of Transp.*, 243 F. Supp. 2d 425, 435 (M.D.N.C. 2003) (rejecting claim of irreparable harm where it resulted from

plaintiffs "own procrastination"); *In re Francis*, 15 B.R. 998, 1004 (Bankr. E.D.N.Y. 1981) (rejecting plaintiff's claims of irreparable harm because plaintiff found "itself in that position either by choice or neglect."). As set forth above, the Objecting Shareholders are sophisticated investors who could have (and should have) participated in the Confirmation process to diligently protect their interests – as they were entitled to do and as other equity holders opted do to – rather than relying solely on the efforts of the Equity Committee. Accordingly, the Objecting Shareholders have fallen well short of the requirement that harm be "actual and "imminent."

**<u>Substantial Harm to Others</u>**

In contrast, a stay would cause potentially substantial, irreversible injury to the Debtors, their creditors, and other stakeholders. As previously noted, the Debtors' operations will be funded through a $7.6 billion secured exit-financing facility. The Debtors' exit financing agreement, however, states that, as a condition of closing, the Court's confirmation order "shall not have been stayed ... or modified." A stay of the Confirmation Order would present a substantial risk that a condition precedent to financing will fail and the Debtors could lose their exit financing, forcing them back to restructuring, looking to obtain new exit financing in an unfavorable capital market environment.[2] The evidence shows that if the Debtors were required to negotiate a new exit financing commitment at this stage, the Debtors would incur an additional $900 million in aggregate interest expense alone.

---

[2]    It is without contradiction that the Debtors advantageous financing arrangement was obtained when economic conditions were quite different. Given current economic conditions, funders have been quick to exploit any opportunity to withdraw from commitments made in a more permissive debt market.

In addition to the tremendous loss of the Debtors' current exit facility, the cost of remaining in Chapter 11 would be significant. The professional fees alone could cost the Debtors up to $17 million per month, while claims accruing on account of post-petition interest could reach approximately $70 million per month. Assuming a stay would delay the Debtors' emergence from Chapter 11 for even as little as three months, the Debtors' fees and interest expense costs alone could amount to over $250 million, a significant portion of which would have to be paid in cash upon emergence. *See In re Adelphia Commc'ncs Corp.*, 361 B.R. at 353 ("the accrual of interest is a real and significant harm that must be considered").

Even if the Objecting Shareholders had some basis for their request to require the Debtors to issue 300 million shares of stock - which they do not - such issuance will inevitably drive down stock prices, harming not only creditors - now the new shareholders - but will also harm existing shareholders by placing the New Calpine Warrants further out of the money. Based upon the affidavit of the Debtors' financial advisor and investment banker, stock prices could, in fact, decline by as much as $6 per share. *See* Affidavit of Samuel M. Greene in Support of Debtors' Response to the Bankruptcy Court's Order to Show Cause Why the Objecting Shareholders' Motion for a Stay Spending Appeal Should Not Be Granted, at ¶ 11.

Accordingly, the granting of a stay would pose very real and significant harm to the Debtors and other stakeholders.

**<u>Substantial Likelihood of Success</u>**

In addition to the pitfalls in the Stay Motion set forth above, the Objecting Shareholders have made no showing of a substantial possibility of success on appeal as

required to grant a stay under Bankruptcy Rule 8005.   In moving for reconsideration, the

Objecting Shareholders failed to show that this Court made a manifest error of law or fact

or to provide any new evidence that would have changed the outcome of the Court's

decision to enter either the Plan Modification Order or the Confirmation Order.  *See* Fed

R. Civ. P. 59; Local Rule 9023-1(a).  The Objecting Shareholders now simply rehash the

same arguments regarding proper notice, due process, and their allegations that the Plan

Modification Motion allowed for material modifications to the Plan that this Court

previously rejected.  *See* Transcript of Hearing on Reconsideration Motion dated January

15, 2008; *see also* Minute Order Denying Reconsideration Motion.

   In addition to the reasons the Court gave denying the Reconsideration Motion, I

also not that section 1127(b) of the Bankruptcy Code provides, in pertinent part, that

"[t]he proponent of a plan or the reorganized debtor may modify such plan at any time

after confirmation of such plan and before substantial consummation of such plan, but

may not modify such plan so that such plan as modified fails to meet the requirements of

sections 1122 and 1123 of this title."  11 U.S.C. § 1129(b).  The Objecting Shareholders

do not qualify as 1127(b) plan proponents.

   While the Objecting Shareholders colloquially refer to the relief they seek in the

Stay Motion as "limited," in reality they seek to materially modify the agreed to and

confirmed Plan by requiring the Debtors issue and reserve (i) sufficient shares to cover

any shares that must be issued assuming all of the New Calpine Warrants are ultimately

exercised, and (ii) an additional 300,000,000 shares for the benefit of existing

shareholders pending the outcome of the Appeal.  As the Objecting Shareholders were

not the proponents of the confirmed Plan, they are not authorized under Section 1127(b)

to modify the confirmed Plan. *In re Planet Hollywood Intern.*, 274 B.R. 391, 400 (Bankr. D. Del. 2001) (holding that creditor did not have standing to modify confirmed plan under Section 1127(b)); *see also In re Burk Development Co., Inc.*, 205 B.R. 778, 799 (Bankr. M.D. La. 1997) ("[a]s some courts have mentioned, only the plan proponent or the reorganized debtor, not the U.S. Trustee, has standing to attempt to modify a plan prior to substantial consummation...."). Accordingly, the Objecting Shareholders have not demonstrated a substantial possibility of success on appeal on that issue.

## Public Interests

Lastly, there is a strong public "need for finality of decisions, especially in a bankruptcy proceeding." *In re Twenty-Six Realty Assocs., L.P.*, No. 95 CV 1262, 1995 WL 170124, at *16 (E.D.N.Y. apr. 4, 1995); *see also First Nat. Bank of Maryland v. Markoff*, 70 B.R. 264, 265 (S.D.N.Y. 1987) (recognizing the "public interest in timeliness and finality of bankruptcy proceedings."). "The public interest requires bankruptcy courts to consider the good of the case as a whole, and not individual [...] investment concerns .... the public interest cannot tolerate any scenario under which private agendas can thwart the maximization of value." *In re Adelphia Commc'ncs Corp.*, No. 02-41729, 2007 Bankr. LEXIS, at *414-415 (Bankr. S.D.N.Y. Jan. 3, 2007); *In re Baker*, 2005 WL at *10 ("[h]aving determined that the Debtor is unlikely to succeed on appeal, I find that the public interest is better served by allowing distributions under the Plan to proceed in an expeditious manner."); *In re Metiom, Inc.*, 318 B.R. 263, 272 (S.D.N.Y. 2004) ("[t]his Court finds that the public interest in the expeditious administration of bankruptcy cases as well as in the preservation of the bankrupt's assets for purposes of paying creditors,

rather than litigation of claims lacking a substantial possibility of success, outweighs the public interest in resolving the issues presented here on appeal.").

 As set forth above and in the Court's recent bench decision denying the Reconsideration Motion, the Objecting Shareholders had ample opportunity to participate in the discovery and Plan confirmation process and chose of their own volition not to participate, but rather to rely entirely on the efforts of the Equity Committee.  *See* Hearing on Reconsideration Motion; *see also* Minute Order Denying Reconsideration Motion.  Clearly, the public interest does not support favoring the interests of those who idly sit on their rights.

## Bond Issue

Even were this Court to find that the Objecting Shareholders had met the heavy burden necessary for the granting of a stay (a finding I do not make), no stay would be issued without the posting of a bond to cover the enormous risk of loss to the Debtors, their estates, creditors and interest holders in the range of $900 million to $1 billion.  *See Westpoint*, 2007 WL 1346616, at *7 (party seeking stay "has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of supersedeas bond in the full amount of the judgment."); *In re Adelphia Commc'ncs Corp.*, 361 B.R. at 350. A $900 million bond would cover only the aggregate additional interest expense the Debtors could suffer if they were unable to close on their existing exit financing, and does not include the additional expenses detailed above that the Debtors would accrue if their emergence from chapter 11 is delayed.  Accordingly, a $900 million bond would be a reasonable, justifiable measure of protection.

**<u>CONCLUSION</u>**

For the reasons set forth above and at oral argument, the Stay Motion is denied.

It is so ordered.

Dated:  New York, New York
        January 24, 2008

 _/s/ Burton R. Lifland_____
The Honorable Burton R. Lifland
United States Bankruptcy Judge

APPENDIX B



**February 7, 2008**

# Solutia's Suit: Banks Must Honor Bankruptcy Pact

**By JEFFREY MCCRACKEN and NATHAN KOPPEL**
*February 7, 2008; Page C3*

Solutia Inc. has sued three banks for backing out of a $2 billion financing commitment needed by the chemical company to exit from Chapter 11 bankruptcy protection.

**DOW JONES REPRINTS**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit:
www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

The lawsuit, filed yesterday, is believed to be one of the first of its kind and offers further evidence of how credit woes are making it harder and more expensive for companies to exit from bankruptcy.

The banks -- **Citigroup** Inc., **Goldman Sachs Group** Inc. and **Deutsche Bank** AG -- told Solutia last month that the tight credit market made them unable to find lenders to back the loan and qualified as a "materially adverse" condition that would allow the banks to terminate their agreement.

Solutia, of St. Louis, demands the banks complete the deal or pay $2.25 billion in damages, claiming fraud and breach of contract. Solutia, the former chemicals division of Monsanto Co., argues the banks knew the credit markets had been slowing for months when they agreed to the financing deal Oct. 25. It also charges that on several occasions Citi directors and managing directors admitted the loan-syndication market was "horrible" and said they already knew Citi would not be able to syndicate the exit financing.

The Solutia suit, and its underlying financing troubles, are "symptomatic of the general malaise in the credit markets," said James Millstein, co-head of restructuring at Lazard Ltd. "A number of other exit financings have run into trouble."

In an interview, Solutia Chairman and CEO Jeffry Quinn said the banks "recognized that there already was great uncertainty in the markets but made statements they'd step up and hold to their commitments. Now we feel like we had the rug pulled out from under us."

Citi spokeswoman Danielle Romero-Apsilos said: "We believe the suit is without merit and have complied with all of our contractual obligations." Representatives for Deutsche and Goldman declined to comment.

The banks have agreed with Solutia to file a response this week and begin trial Feb. 21.

Lenders often agree to provide financing with an option to renege if there is a "material adverse

change" in a company's business or in the capital or credit markets.

Mr. Quinn said Citi and the banks frequently "downplayed the significance of the [material adverse change] provision" over the course of the two months the parties negotiated the exit-financing package.

**Write to** Jeffrey McCracken at jeff.mccracken@wsj.com[1] and Nathan Koppel at nathan.koppel@wsj.com[2]

**URL for this article:**
http://online.wsj.com/article/SB120235007383649503.html

**Hyperlinks in this Article:**
**(1)** mailto:jeff.mccracken@wsj.com
**(2)** mailto:nathan.koppel@wsj.com

**Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

**RELATED ARTICLES FROM ACROSS THE WEB**

**Related Articles from WSJ.com**
• Deutsche Bank Says Market Woes Could Hit 2008 Profit Targets  Mar. 26, 2008
• Recession Is Inevitable  Mar. 14, 2008
• March May Be Quite Cruel  Mar. 08, 2008
• Lending Squeeze Hits Ailing Firms  Feb. 21, 2008

**Related Web News**
• Clear Channel Deal Collapses, Buyers Sue Banks Over Buyout Plan  Mar. 27, 2008  foxnews.com

**More related content**        *Powered by Sphere* 

APPENDIX C



HOME UK
**UK**

Close

# COMPANIES - INTERNATIONAL: Solutia sues over banks' loan U-turn



By Henny Sender in New York
Published: Feb 07, 2008

Solutia, a chemical company operating under Chapter 11 bankruptcy protection, has filed a lawsuit against banks that had agreed to provide $2bn in "exit" financing.

Such financing is generally used to repay debts and for working capital. The lawsuit underlines the turmoil in global credit markets.

Solutia said the banks, Citigroup, Deutsche Bank, and Goldman Sachs, informed the company that they would not provide the financing, citing changing market conditions. The banks dismissed the allegations as being without merit.

Jeffry N Quinn, Solutia's chief executive officer, said in a statement: "The willingness of those banks to offer committed financing that was not subject to a successful syndication was a major factor in deciding to award them this business."

Copyright The Financial Times Limited 2008

"FT" and "Financial Times" are trademarks of the Financial Times. Privacy policy | Terms
© Copyright The Financial Times Ltd 2008.